**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**(Alexandria Division)**

| | |
|---|---|
| KATHLEEN ABREY, | |
| Plaintiff, | |
| v. | Civil Action No.: 1:22-cv-00654-MSN-TCB |
| STEAMPUNK HOLDINGS, INC., *et al*. | |
| Defendants. | |

**DEFENDANT'S ANSWER AND AFFIRMATIVE**
**DEFENSES TO PLAINTIFF'S AMENDED COMPLAINT**

Defendant Steampunk Holdings, Inc. ("Defendant"),[1] by counsel, hereby submits its Answer and Affirmative Defenses to Plaintiff Kathleen Abrey's ("Plaintiff" or "Ms. Abrey") Amended Complaint. Each paragraph below responds to the numbered Paragraphs in Plaintiff's Amended Complaint. Defendant denies all liability on all claims and counts, and denies all allegations not explicitly admitted below.

**PRELIMINARY STATEMENT**

1.      Steampunk Holdings is a company that provides a range of information technology ("IT") services to various agencies of the U.S. government, including the Department of Commerce ("Commerce"), Department of Homeland Security ("DHS"), Department of Defense ("DOD"), Department of Justice ("DOJ"), Transportation Safety Administration ("TSA"), the U.S. Department of Agriculture ("USDA"), and Customs and Border Protection ("CBP"). As a government contractor tasked with helping to guard and handle the data and

---

[1] Per the Court's Order of November 10, 2022, (ECF No. 29), all claims against the individually named Defendants Matthew Warren and John Harllee have been dismissed from this case.

electronic systems of some of the federal government's most security-oriented agencies, Steampunk directly impacts the interests of the American public.

**ANSWER:** Defendant admits that Steampunk, Inc. provides the services referenced in the above paragraph, among other things, and denies the remaining allegations contained in Paragraph 1 of the Amended Complaint.

2.     Steampunk's executive leadership demoted Ms. Abrey on May 4, 2020, the day after she returned to work from leave in connection with the birth of her son. Defendants Matthew Warren (Steampunk's Chief Executive Officer ("CEO")) and John Harllee (Steampunk's Chief Operating Officer ("COO")), as well as Steampunk's chief angel investor Scott LaRose, told Ms. Abrey that they were moving her out of the Company's Civilian business to a part of the Company's business that was chronically underperforming. They also said that she nominally would keep her Executive Vice President title and her pay would remain unchanged, at least at that time. This was a clear concession that, although this was in reality a demotion and she was now in a lower-ranking role than she had before her leave, they were trying to avoid some of the most blatant, conspicuous indications of a demotion.

**ANSWER:** Defendant denies the allegations in Paragraph 2 of the Amended Complaint.

3.     Their plan, however, had forced Ms. Abrey in a much-reduced role at the Company, which significantly compromised her influence and seniority, and placed her employment on a precarious footing.  Ms. Abrey was now put in charge of the under-performing, historically lagging part of the business and faced demands by Mr. Warren and Mr. Harllee to somehow turn it around instantly, whereas before her leave she had been responsible for the most profitable, leading part of Steampunk's business.

**ANSWER:** Defendant denies the allegations in Paragraph 3 of the Amended Complaint.

4.      They also replaced Ms. Abrey in her prior role with a male employee whom she had hired and supervised prior to taking leave. This man was promoted to Executive Vice President and put in charge of the vast majority of Ms. Abrey's previous client portfolio. This was an open display of animus towards Ms. Abrey based on her gender, pregnancy, maternity leave, and status as a new mother.

**ANSWER:** Defendant denies the allegations in Paragraph 4 of the Amended Complaint.

5.      In addition, Mr. Warren apparently knew that he could not entirely hide or put a happy face on the nature of the shift and reduction in Ms. Abrey's role and position, writing to the other members of senior management on May 5, 2020 that he wanted to extend "a big thank you to Kate [Abrey] for being open and putting the business needs first," in a clear admission that she was being made to accept an adverse employment interest in the supposed interests of Steampunk.

**ANSWER:** Defendant admits that Mr. Warren sent an email on May 5, 2020, which contains the quoted language. Defendant denies the remaining allegations in Paragraph 5 of the Amended Complaint.

6.      Mr. Warren and other members of Steampunk's management regularly expressed their displeasure with, and distaste for, Ms. Abrey's leave and status as a new mother. Coupled with the pointed timing of Ms. Abrey's demotion, Steampunk management's conduct during and after her pregnancy provides direct evidence of discriminatory and retaliatory animus against Ms. Abrey in connection with her maternity leave, pregnancy, and motherhood.

**ANSWER:** Defendant denies the allegations in Paragraph 6 of the Amended Complaint.

7.      By way of example only, Mr. Warren spoke derisively about men who took anything more than token paternity leave, told Ms. Abrey that she could not return from leave part-time, even if she would be doing so early, and emphasized that she had to be "ready to work" when

she came back. In addition, Mr. Harllee personally confirmed Ms. Abrey's conviction that her pregnancy and leave had harmed her prospects at the Company and led to a downgrading of her position and role.

**ANSWER:**  Defendant denies the allegations in Paragraph 7 of the Amended Complaint.

8.      Over the next several months after her demotion, Defendants set in motion a new plan to gin up criticism of Ms. Abrey while continuing to display animus against her, a pattern that was noticed by various Steampunk employees. Ms. Abrey reported on multiple occasions to Defendants Warren and Harllee that the demotion was discriminatory, first on May 4, 2020 in the demotion meeting, and then later that week and at least twice over the following summer. Ms. Abrey also spoke with other high-ranking managers about the discriminatory nature of her obvious demotion in seniority and responsibility. In addition, Ms. Abrey objected to the Company's refusal to hire a highly qualified female job applicant on the basis that she was pregnant or seeking to become pregnant and was asking for certain assurances regarding maternity leave, while again objecting to the discrimination against herself since her return from maternity leave.

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny conversations that Ms. Abrey claims she had with unidentified high-ranking managers as alleged in Paragraph 8 of the Amended Complaint, and therefore denies them.  Defendant denies the remaining allegations in Paragraph 8 of the Amended Complaint.

9.      Steampunk terminated Ms. Abrey's employment on January 14, 2021, the day after she had complained regarding the Company's discrimination against the female job applicant and herself. She was replaced in her role and responsibilities by a white male colleague who had been promoted to her level by Defendants only one or two months before, in late 2020.

**ANSWER:**  Defendant admits that Steampunk, Inc. informed Ms. Abrey on January 14, 2021 that it was terminating her employment, and denies the remaining allegations in Paragraph 9 of the Amended Complaint.

10.    This termination came less than two months after a November 24, 2020 written performance assessment of Ms. Abrey by Mr. Warren in which Mr. Warren gave her ratings of "Exceeds Expectations" in two categories, "Exceptional Performance" in one category, and "Meets Expectations" in the remaining five categories. This categorically demonstrates that Ms. Abrey was doing her job in much more than a satisfactory fashion just several weeks before her unlawful termination in mid-January 2021.

**ANSWER:**  Defendant admits that the written performance evaluation of Ms. Abrey dated November 24, 2020 contained ratings of "Exceeds Expectations" in two categories, "Exceptional Performance" in one category, and "Meets Expectations" in five categories, and denies the remaining allegations in Paragraph 10 of the Amended Complaint.

11.    Defendants' termination of Ms. Abrey, among other adverse employment actions, was based upon unlawful bias and animus. These actions constituted discrimination and retaliation in violation of federal and Virginia law, including the Virginia Human Rights Act, Virginia Code §§ 2.2-3095(B)(1)(a), (B)(2), and (B)(6).

**ANSWER:**  Defendant denies the allegations in Paragraph 11 of the Amended Complaint.

12.    Therefore, Plaintiff brings this action seeking injunctive, declaratory and monetary relief against Defendants for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Pregnancy Discrimination Act ("PDA"), and the Virginia Human Rights Act ("VHRA"), Virginia Code §§ 2.2-3095(B)(1)(a), (B)(2), and (B)(6).

**ANSWER:**   Defendant admits that Ms. Abrey purports to bring this action against Defendant under Title VII and the VHRA. Defendant denies that Ms. Abrey is entitled to relief of any kind.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction pursuant to 28 U.S.C. § 1331 as this action involves federal questions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII").

**ANSWER:**  Defendant admits that federal question jurisdiction is appropriate in this Court under Title VII.

14.     The Court has supplemental jurisdiction over claims under the relevant state and local laws claims pursuant to 28 U.S.C. § 1367(a).

**ANSWER:**  Defendant denies the allegations in Paragraph 14 of the Amended Complaint.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**ANSWER:**  Defendant admits that venue is appropriate in this Court.

## ADMINISTRATIVE PROCEDURES

16.     On June 30, 2021, Plaintiff filed a complaint of discrimination and retaliation with Virginia's Office of the Attorney General's Office of Civil Rights ("VAOCR").  This complaint was referred by the VAOCR to the Equal Employment Opportunity Commission ("EEOC"), where Plaintiff had also filed a Charge of Discrimination on or around July 28, 2021. These administrative complaints alleged violations of the Virginia Human Rights Act and Title VII, as amended by the Pregnancy Discrimination Act.

**ANSWER:**  Defendant admits that Ms. Abrey filed a charge against it with the EEOC on July 2, 2021 alleging pregnancy discrimination and retaliation under Title VII. Defendant further admits that the Virginia Office of the Attorney General received Ms. Abrey's complaint against Defendant alleging violations of the VHRA on July 1, 2021.  Defendant denies the remaining allegations in Paragraph 16 of the Amended Complaint.

17.     On March 11, 2022, the EEOC issued Plaintiff a notice of right to sue ("Right to Sue"). Plaintiff filed this Complaint within 90 days of the EEOC's issuance of the Right to Sue under all relevant laws.

**ANSWER:** Defendant admits the allegations in Paragraph 17 of the Amended Complaint.

18.     Any and all other prerequisites to the filing of this suit have been met.

**ANSWER:**  Defendant denies the allegations in Paragraph 18 of the Amended Complaint.

**PARTIES**

19.     Plaintiff Kathleen Abrey is a former employee of Steampunk and a resident of the state of Virginia. At all relevant times, Ms. Abrey met the definition of an "employee" under all applicable statutes.

**ANSWER:**  Defendant admits that Ms. Abrey is a former employee of Steampunk, Inc. and that she was at relevant times a resident of the Commonwealth of Virginia, and denies the remaining allegations in Paragraph 19 of the Amended Complaint.

20.     Defendant Steampunk Holdings, Inc. is a Virginia based company. Its headquarters are located at 1753 Pinnacle Drive, Suite 900 McLean, VA 22012. At all relevant times, Defendant met the definition of an "employer" and/or a "covered employer" under all relevant statutes.

**ANSWER:**  Defendant denies the allegations in Paragraph 20 of the Amended Complaint.

21.     Defendant Matthew Warren is the CEO and Founder of Steampunk. Mr. Warren was, at all relevant times, an "employer" under the Virginia Human Rights Act. Mr. Warren undertook and participated in the unlawful conduct described herein. Upon information and belief, Mr. Warren is a resident of the State of Virginia.

**ANSWER:**  Defendant admits that Mr. Warren is the CEO of Steampunk, Inc., admits that he is a resident of the Commonwealth of Virginia, and denies the remaining allegations in Paragraph 21 of the Amended Complaint.

22.     Defendant John Harllee is the COO of Steampunk. Mr. Harllee was, at all relevant times, an "employer" under the Virginia Human Rights Act. Mr. Harllee undertook and participated in the unlawful conduct described herein. Upon information and belief, Mr. Harllee is a resident of the District of Columbia.

**ANSWER:**  Defendant admits that John Harllee is the COO of Steampunk, Inc., that he is a resident of the District of Columbia, and denies the remaining allegations in Paragraph 21 of the Amended Complaint.

## FACTUAL ALLEGATIONS

I.     **STEAMPUNK AGGRESSIVELY RECRUITS MS. ABREY BASED UPON HER SKILLS AND TRACK RECORD, PROMISING HER A PLACE IN THE C-SUITE**

23.     Beginning in 2015, Ms. Abrey and Steampunk CEO Mr. Warren worked together closely for several years at Accenture Federal Services, LLC ("Accenture"), where Mr. Warren observed her skill and experience in building and managing complex businesses.

**ANSWER:**  Defendant admits that Mr. Warren and Ms. Abrey worked together for several years at Accenture but denies the remaining allegations in Paragraph 23 of the Amended Complaint.

24.     Indeed, Ms. Abrey greatly expanded Accenture's business with the TSA over the course of three years while Mr. Warren supervised the DHS group in which Ms. Abrey was a Managing Director.

**ANSWER:**  Defendant denies the allegations in Paragraph 24 of the Amended Complaint.

25.     Later, when Mr. Warren was promoted at Accenture, Ms. Abrey was promoted into his old job heading the DHS group.

**ANSWER:**  Defendant admits the allegations in Paragraph 25 of the Amended Complaint.

26.     Mr. Warren was consistently impressed with Ms. Abrey and her work, and he often told her that he wanted to start a company with her.

**ANSWER:**  Defendant denies the allegations in Paragraph 26 of the Amended Complaint.

27.     Ms. Abrey and Mr. Warren were friends as well as colleagues, and they had many lengthy conversations about professional and personal subjects and their plans for the future.

**ANSWER:**  Defendant denies the allegations in Paragraph 27 of the Amended Complaint.

28.     For example, Mr. Warren knew that Ms. Abrey had undergone IVF procedures during their years working together at Accenture, all of which had failed, and that she later had been told by a fertility specialist that she was unlikely ever to carry a pregnancy to term.

**ANSWER:**  Defendant denies the allegations in Paragraph 28 of the Amended Complaint.

29.     It seems that Mr. Warren found Ms. Abrey a more appealing prospective business partner as a woman due to her apparent inability to give birth herself and lack of plans to have children in the future.

**ANSWER:**  Defendant denies the allegations in Paragraph 29 of the Amended Complaint.

30.    In 2018, when Mr. Warren started making more detailed plans about forming the company that eventually became Steampunk, he told Ms. Abrey that he wanted her to be his second-in-command at the new company, and that he planned for her to eventually assume his role as CEO.

**ANSWER:**  Defendant denies the allegations in Paragraph 30 of the Amended Complaint.

31.    In fact, Mr. Warren saw Ms. Abrey as so important to his plans for the new enterprise, and held her in such high regard professionally, that he said if she did not agree to join him, he likely would not start the company.

**ANSWER:**  Defendant denies the allegations in Paragraph 31 of the Amended Complaint.

32.    Mr. Warren's persistent pursuit of Ms. Abrey to join him in his new venture worked, and she eventually agreed to leave behind a secure and lucrative career at Accenture.

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 32 of the Amended Complaint, and therefore denies them.

33.    In leaving Accenture for the new company, Strategic Enterprise Solutions, Inc. (a/k/a SE Solutions, which later became Steampunk), Ms. Abrey sacrificed a substantial annual cash salary, as well as unvested stock that she had earned at Accenture worth several hundred thousand dollars.

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 33 of the Amended Complaint, and therefore denies them.

34.    Ms. Abrey made this leap based upon Mr. Warren's promises that she would be his "number two" at the Company until she became CEO, and that she would have a significant equity stake in Steampunk.

**ANSWER:** Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 34 of the Amended Complaint, and therefore denies them.

35.     Mr. Warren further represented that the goal was to sell the Company within five to seven years, likely after Ms. Abrey had become CEO, at a minimum price of four dollars ($4.00) per share.  The timing and pricing seemed consistent with Mr. Warren's experience with another company, Agilex Technologies, Inc., that Mr. Warren had helped sell to Accenture.

**ANSWER:** Defendant denies the allegations in Paragraph 35 of the Amended Complaint.

36.     Once Ms. Abrey agreed to join him and leave Accenture, Mr. Warren orchestrated their respective resignations to avoid the appearance and suspicion that he had violated his restrictive covenants with Accenture.

**ANSWER:** Defendant denies the allegations in Paragraph 36 of the Amended Complaint.

37.     When Accenture received Ms. Abrey's notice of resignation in January 2019, they offered her a major promotion to a position running the West Coast Region of their Health and Public Service business. This promotion would have resulted in a salary increase of approximately 60 percent.

**ANSWER:** Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 37 of the Amended Complaint, and therefore denies them.

38.     However, Ms. Abrey ultimately decided to leave Accenture for Steampunk, relying on Mr. Warren's promises to treat her as a true partner in the business and to compensate her for the risk she was taking with a sizeable slice of equity that would be worth millions of dollars in an eventual sale of the Company.

**ANSWER:** Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 38 of the Amended Complaint, and therefore denies them.

39.     Mr. Warren's plan to recruit Ms. Abrey succeeded in large part because he made his promises of equity and fairness publicly and repeatedly. For instance, he made statements regarding Ms. Abrey succeeding him as CEO and the Company's minimum eventual sale price of $4 per share at meetings with others in attendance, including at least one meeting of ten other people involved in the launch of the Company, and did so with regard to presenting Ms. Abrey as one of the co-leaders of the Company as well.

**ANSWER**:  Defendant denies the allegations in Paragraph 39 of the Amended Complaint.

## II.     MS. ABREY IS PART OF STEAMPUNK'S TOP LEADERSHIP TRIO UNTIL <u>SHE ANNOUNCES HER PREGNANCY</u>

40.     On or around May 15, 2019, Ms. Abrey started at Steampunk (called SE Solutions at the time) as Executive Vice President and General Manager.

**ANSWER**:  Defendant admits that Ms. Abrey started at SE Solutions, Inc., on or around May 15, 2019, and denies the remaining allegations in Paragraph 40 of the Amended Complaint.

41.     She was the most senior woman in the company, which had (and still has) few women in leadership roles.

**ANSWER**:  Defendant denies the allegations in Paragraph 41 of the Amended Complaint.

42.     On May 29, 2019, the Company issued a press release announcing that Mr. Warren and Mr. Harllee had been appointed to lead the company as "Co-Chief Operating Officers," and Ms. Abrey had "been named as Executive Vice President and General Manager for the Emerging Markets Sector."

**ANSWER**:  Defendant admits that SE Solutions, Inc. issued a press release on May 20, 2019 announcing that Messrs. Warren and Harllee had been appointed as co-chief operating officers and that Ms. Abrey had been named executive vice president and general manager for

emerging markets, and denies the remaining allegations in Paragraph 42 of the Amended Complaint.

43.     Mr. Warren, Ms. Abrey, and Mr. Harllee were featured together in a photograph accompanying the announcement. Mr. Warren said that he wanted the announcement to signal to the Company that Ms. Abrey was part of a senior leadership team of three people.

**ANSWER:**  Defendant admits that Mr. Warren, Ms. Abrey and Mr. Harllee were featured together in a photograph accompanying the press release and denies the remaining allegations in Paragraph 43 of the Amended Complaint.

44.     Mr. Warren also arranged for him and the other two members of top leadership to share an office in Tysons Corner, Virginia.

**ANSWER:**  Defendant denies the allegations in Paragraph 44 of the Amended Complaint.

45.     Ms. Abrey had signed a one-year non-competition agreement while at Accenture, and therefore her job and responsibilities at Steampunk had to be structured to take those restrictions into account. It was understood that this meant that Ms. Abrey could not be directly involved in much of the Company's sales activity towards some prime government client agencies.

**ANSWER:**  Defendant admits that Ms. Abrey's job responsibilities at SE Solutions, Inc. and later Steampunk, Inc. were structured to consider and ensure compliance with her noncompete obligations to Accenture, and denies the remaining allegations in Paragraph 45 of the Amended Complaint.

46.     Initially, Ms. Abrey was responsible for the profit and loss of the Civilian business segment, consisting of the Company's business with various government agencies with the exception of the DHS. The plan was for Ms. Abrey to become responsible for DHS business after

her first year with the Company.  The Senior Vice Presidents running the Company's individual businesses and segments would report to Ms. Abrey.

**ANSWER:**  Defendant denies the allegations in Paragraph 46 of the Amended Complaint.

47.     When Ms. Abrey arrived at Steampunk, Mr. Warren told her that her first priority was to find the right Senior Vice President to run the Civilian business, and that the new hire would then report to her.

**ANSWER:**  Defendant denies the allegations in Paragraph 47 of the Amended Complaint.

48.     Ms. Abrey hit the ground running. Within three months, she recruited Max Licht from Salesforce and hired him to be Senior Vice President for the Civilian business.

**ANSWER:**  Defendant denies the allegations in Paragraph 48 of the Amended Complaint.

49.     Ms. Abrey also negotiated the hires of other key personnel for the Civilian business, which laid the foundation for the growth in the Civilian business that occurred over the following years.

**ANSWER:**  Defendant denies the allegations in Paragraph 49 of the Amended Complaint.

50.     Ms. Abrey also helped set the stage for a successful DHS business by recruiting former DHS Secretary Kevin McAleenan for Steampunk's Board of Directors.

**ANSWER:**  Defendant denies the allegations in Paragraph 50 of the Amended Complaint.

51.     Mr. Warren recruited Diane Ashley to run the DHS business as a Senior Vice President, but asked Ms. Abrey to work with Ms. Ashley behind the scenes due to his dissatisfaction with her results, even while Ms. Abrey had to remain mindful of her non-compete obligations.

**ANSWER:**  Defendant denies the allegations in Paragraph 51 of the Amended Complaint.

52.     With Ms. Abrey's guidance, Ms. Ashley secured the first new piece of business for Steampunk at the Transportation Safety Administration (TSA), consisting of several million dollars. Ms. Ashley later left her employment with Steampunk.

**ANSWER:**  Defendant admits that Ms. Ashley later separated from Steampunk, Inc.'s employ, and denies the remaining allegations in Paragraph 52 of the Amended Complaint.

53.     In October 2019, in advance of an off-site senior leadership team meeting in Savannah, Georgia, Ms. Abrey was responsible for helping the Civilian, DHS and Commerce teams to prepare their business strategies and financial objectives for presentation at the meeting.  She was uniformly praised for her work in that area.  At that off-site meeting, the senior leadership team set the Company's financial targets for 2020.

**ANSWER:**  Defendant admits that Ms. Abrey was responsible for helping the DHS and Commerce teams to prepare for presentation at an off-site leadership team meeting in Savannah, Georgia and that the senior leadership set Steampunk, Inc.'s financial targets for 2020. Defendant denies the remaining allegations in Paragraph 53 of the Amended Complaint.

54.     Ms. Abrey also worked with David Wolf, who headed Steampunk's business at the Department of Commerce. Mr. Warren told Ms. Abrey that he was concerned about Mr. Wolf's performance and asked her to help. Ms. Abrey worked to reshape Mr. Wolf's role and focus at the Company. Together, they positioned Steampunk to be awarded a multi-billion-dollar development contract.

**ANSWER:**  Defendant admits Ms. Abrey supervised David Wolf who led the Commerce business.  Defendant denies the remaining allegations in Paragraph 54 of the Amended Complaint.

III.   **MS. ABREY UNEXPECTEDLY BECOMES PREGNANT AND TAKES LEAVE**

55.    Early during her tenure at Steampunk, Ms. Abrey learned that she was pregnant, which came as a surprise in light of the medical advice she had received and the fact that she and her husband were not trying to become pregnant at that point. Ms. Abrey informed people at Steampunk about her pregnancy in or around August 2019, having waited a typical amount of time to announce her pregnancy.

**ANSWER:**   Defendant admits that Ms. Abrey informed her colleagues about her pregnancy in or around August 2019. Defendant is without sufficient knowledge to admit or deny the remaining allegations in Paragraph 55 of the Amended Complaint, and therefore denies them.

56.    Ms. Abrey's team reacted with shock, as they did not think she could get pregnant (a belief shared by Ms. Abrey herself).

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 56 of the Amended Complaint, and therefore denies them.

57.    During the months leading up to the delivery of her child, Ms. Abrey met and exceeded the demands of her job while managing a difficult pregnancy.

**ANSWER:**  Defendant denies the allegations in Paragraph 57 of the Amended Complaint.

58.    However, she felt that she had to assure Steampunk's management, particularly Mr. Warren and Mr. Harllee, that she was committed to the Company and would do her best to minimize the impact of her unexpected pregnancy on her work.  This was due to the apparent attitudes by management towards leave, and the intolerance of any even perceived priority other than the Company.

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny the allegations concerning Ms. Abrey's belief or intent and therefore denies them. Defendant denies the remaining allegations in Paragraph 58 of the Amended Complaint.

59.     Ms. Abrey did not take any formal paid time off during her pregnancy—even amid some medical emergencies—and worked from a hospital emergency room on two occasions. During her pregnancy, Ms. Abrey suffered from medical conditions and complications that caused her to lose around thirty pounds.

**ANSWER:**  Defendant denies that Ms. Abrey did not take any formal paid time off during her pregnancy. Defendant is without sufficient knowledge to admit or deny the remaining allegations in Paragraph 59 of the Amended Complaint and therefore denies them.

60.     Towards the end of this difficult and health-endangering pregnancy, Mr. Warren, who had been superficially supportive, finally told Ms. Abrey that she did not have to keep coming into the office to work.

**ANSWER:**  Defendant denies the allegations in Paragraph 60 of the Amended Complaint.

61.     Even before Ms. Abrey gave birth or took leave, conduct by Ms. Abrey's male colleagues filled her with dread that she was now viewed differently, and that the Company's male management would diminish her role and sideline her as a result. For example, Mr. Warren openly shared his disdain for the concept of paternity leave, stating that all he had to do after the birth of his child was watch his wife breastfeed, so "what was [he] supposed to do, stare at her or go back to work."

**ANSWER:**  Defendant denies the allegations in Paragraph 61 of the Amended Complaint.

62.     Furthermore, Max Licht, who Ms. Abrey had hired to lead the Civilian business while under her supervision, asked Ms. Abrey detailed questions during a work trip to Savannah, Georgia about her commitment to working after giving birth. It was apparent that Mr. Licht was currying favor with Mr. Warren during the months leading up to her leave, and even before she took leave, he increasingly was communicating directly with Mr. Warren on the pretext that he "didn't want to bother" Ms. Abrey because she was pregnant.

**ANSWER:** Defendant denies the allegations in Paragraph 62 of the Amended Complaint.

63.     In addition, during the off-site work event in Savannah, at one point Mr. Licht told Ms. Abrey, "I don't think you'll want to come back after you have the baby.  Some women want to come back. I don't know [about you]."  Mr. Licht had been hired by Ms. Abrey and Steampunk in order to work for and under Ms. Abrey, who had significantly more and broader work experience than him.

**ANSWER:** Defendant denies the allegations in Paragraph 63 of the Amended Complaint.

64.     This shift in treatment and the growing trend of being cut out of communications about Company business led Ms. Abrey to meet with Mr. Harllee in December 2019 or early January 2020.  At this meeting, she told Mr. Harllee that she was nervous about having her baby and going on leave, and whether she would be returned to the same position when she came back.  She specifically told him that she was concerned that she would return to a diminished role and responsibilities. Mr. Harllee assured Ms. Abrey that he would protect her position and do everything in his power to make sure that did not happen.  Yet, continued conduct by Mr. Warren and Mr. Licht caused her to have doubts about how Steampunk management would ultimately react to her pregnancy and motherhood.

**ANSWER:** Defendant denies the allegations in Paragraph 64 of the Amended Complaint.

65.     Ms. Abrey worked up until the day she gave birth to her son on January 23, 2020.

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny the remaining allegations in Paragraph 65 of the Amended Complaint and therefore denies them.

66.     Steampunk offered only short-term disability leave at the time and did not have a separate maternity/paternity leave policy.

**ANSWER:**  Defendant admits that Steampunk, Inc. at the time offered short term disability leave and did not have a separate maternity/paternity leave policy in place and denies the remaining allegations in Paragraph 66 of the Amended Complaint.

67.     Therefore, after giving birth Ms. Abrey took six weeks of short-term disability at partial pay.

**ANSWER:**  Defendant admits the allegations in Paragraph 67 of the Amended Complaint.

68.     After those weeks of short-term disability leave, Ms. Abrey took leave without pay until May 1, 2020.

**ANSWER:**  Defendant admits the allegations in Paragraph 68 of the Amended Complaint.

69.     Ms. Abrey expressed her willingness to return earlier, but Mr. Warren encouraged her not to return until after her non-compete period with Accenture had expired.

**ANSWER:**  Defendant denies the allegations in Paragraph 69 of the Amended Complaint.

70.     Mr. Warren also rejected Ms. Abrey's offer to come back sooner than May 1, 2020 on a part-time basis.  Mr. Warren told Ms. Abrey several times that she could take off as much time as she wanted, but that she had to really be "ready to work" upon her return.  "Come in when you're really ready to work," Mr. Warren said, conveying that he did not believe Ms. Abrey was yet prepared—and would not be prepared—to do so given her new childcare responsibilities.  It was

clear to Ms. Abrey that Mr. Warren now viewed her as less dedicated to the Company and no longer suitable to serve as a member of Steampunk's top leadership.

**ANSWER:** Defendant denies the allegations in Paragraph 70 of the Amended Complaint.

71. Mr. Warren inappropriately directed employees not to speak to Ms. Abrey while she was on leave, despite the fact that she had expressed the desire and need to stay in touch with the office on a weekly basis, and that she was available to consult on issues as they came up. He also told Ms. Abrey not to talk with anyone about Company business during her leave. This was undermining conduct, particularly as applied to someone who ostensibly was a member of senior management. Mr. Warren either unknowingly or intentionally mischaracterized and misapplied the conventions and rules surrounding leave in connection with the birth of a child, doing so in a manner that sidelined Ms. Abrey and harmed her position and authority at the Company.

**ANSWER:** Defendant denies the allegations in Paragraph 71 of the Amended Complaint.

72. Indeed, multiple Steampunk employees wished to—and at times still did—call Ms. Abrey regularly during her leave in order to check in and to obtain advice and guidance, which unsurprisingly was necessary on occasion. Yet, it was clear that Mr. Warren's directives had a chilling effect and greatly reduced the contact that Ms. Abrey otherwise would have had with her colleagues and subordinates.

**ANSWER:** Defendant denies the allegations in Paragraph 72 of the Amended Complaint.

73. When he learned about such communications, Mr. Warren instructed these employees not to contact her further, falsely claiming that it somehow would jeopardize her leave, which particularly made no sense as Ms. Abrey was on leave without pay, per Company policy.

**ANSWER:** Defendant denies the allegations in Paragraph 73 of the Amended Complaint.

IV.   **STEAMPUNK DEMOTES MS. ABREY ON THE VERY DAY SHE RETURNS FROM MATERNITY LEAVE**

74.    When Ms. Abrey was set to return from her maternity leave in early May 2020, Mr. Warren directed her to speak with no one that day until she first met with him, Mr. Harllee and Scott LaRose (Steampunk's chief angel investor).

**ANSWER:**  Defendant admits that Messrs. Warren, Harllee, and LaRose met with Ms. Abrey when she returned to work on May 4, 2020 and denies the remaining allegations in Paragraph 74 of the Amended Complaint.

75.    At that meeting, the three men told Ms. Abrey that she would no longer be responsible for the profit and loss of the Civilian business and that Mr. Licht (who she had recruited and hired, and who had been reporting to her) would now be running that growing, profitable part of the Company.

**ANSWER:**  Defendant denies the allegations in Paragraph 75 of the Amended Complaint.

76.    Mr. Licht had only joined Steampunk in October 2019, and his prior work experience was exclusively or nearly exclusively in sales, without experience in delivery of products/projects to clients.  Ms. Abrey, by contrast, had 13 years of such sales and delivery experience.  In addition, Ms. Abrey had five more years of job experience than Mr. Licht overall, and he had been hired as a junior employee reporting to Ms. Abrey.

**ANSWER:**  Defendant admits that Steampunk, Inc. hired Mr. Licht in October 2019 and denies the remaining allegations in Paragraph 76 of the Amended Complaint.

77.    It was obvious that Mr. Warren, Mr. Harllee, and Mr. LaRose had started to consider and then decided to replace Ms. Abrey with Mr. Licht after she announced her pregnancy and/or during her maternity leave.  This flew in the face of their false assurances to Ms. Abrey that she would return to the same position she held before her leave.

**ANSWER:** Defendant denies the allegations in Paragraph 77 of the Amended Complaint.

78.     When Ms. Abrey immediately pointed out that this was a demotion, Mr. Warren insisted that it could not be a demotion because she would have the same title and salary as before.

**ANSWER:** Defendant denies the allegations in Paragraph 78 of the Amended Complaint.

79.     Of course, this is false. Ms. Abrey's authority and responsibilities were tremendously reduced when the Civilian business was taken away from her. In addition, the portion of the Company's business over which Ms. Abrey presided had also been changed completely. Ms. Abrey told the three male leaders of Steampunk that she believed this was being done to her because of her pregnancy, leave, and new status as a mother, and reiterated this to Mr. Warren and Mr. Harllee again later that same week.

**ANSWER:** Defendant denies the allegations in Paragraph 79 of the Amended Complaint.

80.     Even without a reduction in compensation or change in formal job title, this was a demotion. Other executives and employees at the Company immediately saw this "restructuring" for what it was and understood the implications for Ms. Abrey.  One senior project manager expressed confusion about the revised organization structure, correctly noting that Ms. Abrey had once been overseeing everything except DoD work, and now she suddenly was not.

**ANSWER:** Defendant denies the allegations in Paragraph 80 of the Amended Complaint.

81.     Not only did the demotion reduce the scope of her portfolio and remit in terms of the business segments she supervised and managed, it also effectively ended her place in and ousted her from the Company's senior leadership. She obviously was no longer one of the top three co-leaders of Steampunk, and this was imposed on her immediately upon her return from maternity leave.

**ANSWER:** Defendant denies the allegations in Paragraph 81 of the Amended Complaint.

22

82.     In addition, along with this demotion, Defendants told Ms. Abrey that she would still assume responsibility for the Department of Homeland Security (DHS) part of the business as of May 2020, which had been planned before she went on leave, although now she would do so without being in charge of the profitable, growing Civilian business (which, before her leave, she was still supposed to be heading after her return).

**ANSWER:**  Defendant denies the allegations in Paragraph 82 of the Amended Complaint.

83.     There was nothing gradual or subtle about this shift and jettisoning of Ms. Abrey. She was cut out of conversations and decision-making to which she been central before her maternity leave.  Mr. Warren no longer even informally consulted with Ms. Abrey on Company matters, which he routinely did in the years before Ms. Abrey's pregnancy.

**ANSWER:**  Defendant denies the allegations in Paragraph 83 of the Amended Complaint.

84.     By way of possible explanation for his conduct, Mr. Warren condescendingly told Ms. Abrey in a phone conversation shortly after her return, "Really glad you had a baby and all, but we couldn't wait for you to get back, we have a business to run."

**ANSWER:**  Defendant denies the allegations in Paragraph 84 of the Amended Complaint.

85.     Just a day after Ms. Abrey's return, on or around May 5, 2020, Mr. Warren sent an email to the senior management team, which now included Max Licht, extending "a big thank you to Kate for being open and putting the business needs first."  The email also exulted in Ms. Abrey's return because with her return "we will have no more restrictions" and "we get to actually organize the business based on the needs versus around our restrictions" (i.e., Ms. Abrey's leave).

**ANSWER:**  Defendant admits that Mr. Warren sent an email to the senior management team on May 5, 2020 that contained the quoted language and denies the remainder of the allegations in Paragraph 85.

86.     In addition, Mr. Warren's email stated that, "Yesterday morning, we spent a lot of time with Kate discussing the business and the organizational changes we wanted to take as we enter into the next phase of our Steampunk journey," before thanking Ms. Abrey for "putting the business needs first."  Notably, Ms. Abrey was not copied on and was left off the list of recipients of the original email that went to senior management announcing the changes that constituted her demotion.  This email's content was an open admission by Mr. Warren that Ms. Abrey had, colloquially, "taken one for the team," and that her position at the Company had been downgraded, changed for the worse, and was no longer as desirable.

**ANSWER:**  Defendant admits that Mr. Warren sent an email to the senior management team on May 5, 2020 that contains the quoted language attributed to that email, and denies the remaining allegations in Paragraph 86 of the Amended Complaint.

87.     Mr. Warren displayed his discomfort and distaste for Ms. Abrey's new status as a mother by repeatedly reacting in an immature manner to any reminder that Ms. Abrey was breastfeeding her child while working from home due to the COVID-19 pandemic.  If Mr. Warren heard any background noise over a Zoom call, he would stop the meeting to call attention to the sound of a breast pump device (or what he suspected was one): "What's that noise? Oh! That is very loud. Can you mute?"

**ANSWER:**  Defendant denies the allegations in Paragraph 87 of the Amended Complaint.

88.     If Mr. Warren heard Ms. Abrey's newborn baby son cry in the background on a Zoom, even softly, he would abruptly tell Ms. Abrey to go on mute and remove the baby from the room, even when Ms. Abrey was mid-sentence, and even if the baby was already in another room with a nanny.  This undermining, belittling conduct, in front of other colleagues, only further

cemented the connection between Ms. Abrey's motherhood and Defendants' new negative attitude and campaign against her.

**ANSWER:**  Defendant denies the allegations in Paragraph 88 of the Amended Complaint.

89.  In or around May or June 2020, Ms. Abrey spoke with Mr. Harllee on the phone and in person to express her fears regarding the ultimate result of the demotion, and to point out that her prediction that her job would suffer for having taken maternity leave had come true. Ms. Abrey expressed to Mr. Harllee in no uncertain terms that her newly downgraded position and role at the Company was due to her being a woman and having been pregnant and taken leave.

**ANSWER:**  Defendant denies the allegations in Paragraph 89 of the Amended Complaint.

90.  Indeed, Mr. Harllee responded to Ms. Abrey's objections to this discriminatory treatment by admitting that she was right.  Among other things, Mr. Harllee said that he understood why she was upset, that her "intuition" was correct, and that what she said would happen in fact happened.

**ANSWER:**  Defendant denies the allegations in Paragraph 90 of the Amended Complaint.

91.  Over the course of the remainder of 2020, Ms. Abrey confided in and discussed her ordeal with at least six other colleagues, with the revelation that several of them had independently made the connection between her reduced role and her pregnancy and leave.  Some of these colleagues also informed Ms. Abrey that other Steampunk employees felt the same way.  Certain of these conversations, which were conducted by telephone, included direct discussion by Ms. Abrey and her coworker that she was being discriminated against due to sexism.  At least two of these colleagues had in fact told Ms. Abrey during her leave that it seemed there would be changes when she returned, and that Defendants were taking advantage of her being out in setting up their maneuvers.

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 91 of the Amended Complaint, and therefore denies them.

92.     In or around early summer 2020, soon after Ms. Abrey received her performance review, a male colleague went to Defendants Warren and Harllee about a conversation he had with Ms. Abrey.  This male coworker told Mr. Warren and Mr. Harllee about a telephone call in which Ms. Abrey had directly shared her concerns and belief that she had been demoted and discriminated against because she is a woman, a mother, and took maternity leave.

**ANSWER:**  Defendant denies the allegations in Paragraph 92 of the Amended Complaint.

93.     Defendants Warren and Harllee confronted Ms. Abrey about this, telling her that this male coworker had disclosed the phone conversation, and that such statements by Ms. Abrey were "fighting words."  They prohibited Ms. Abrey from saying again to coworkers that she had been subjected to discrimination, with the implicit threat that she would be out of the Company if she did.  This was as blatant an expression of retaliatory animus and intent as one sees in the workplace, and in a little more than a month Defendants would act upon it by firing Ms. Abrey.

**ANSWER:**  Defendant denies the allegations in Paragraph 93 of the Amended Complaint.

94.     Unfortunately, Defendants' unlawful conduct and displays of animus towards Ms. Abrey were not limited to—and did not end with—her demotion but continued with further reductions to her role and other actions coordinated to manufacture a pretext for her eventual termination.

**ANSWER:**  Defendant denies the allegations in Paragraph 94 of the Amended Complaint.

95.     As part of her demotion and the restructuring of her role, Ms. Abrey became solely responsible for the part of the Company that senior leadership frequently referred to as the "Island of Misfit Toys." This nickname conveyed the problematic, unproductive nature of the hodgepodge

unit that had been foisted upon her, and which she now was supposed to make immediately successful.

**ANSWER:**  Defendant denies the allegations in Paragraph 95 of the Amended Complaint.

96.     Defendants also, in taking the Civilian business away from Ms. Abrey, ensured that she would not get credit or be recognized for her contributions to the profitable part of the Company (which she was running before her maternity leave), even though she had set it up to thrive and begun the process of obtaining many contracts that later came to fruition.  For example, Ms. Abrey had made several key hiring moves that brought high-performing employees into the Company before her maternity leave that had helped drive greatly increased deal activity and revenue for Steampunk.

**ANSWER:**  Defendant denies the allegations in Paragraph 96 of the Amended Complaint.

97.     Now, Mr. Licht, a man she had hired and who had reported to her, was given credit for reaping new business that he had not truly originated.

**ANSWER:**  Defendant denies the allegations in Paragraph 97 of the Amended Complaint.

98.     In or around July 2020, two months after the demotion, Mr. Warren, Mr. Harllee, and Mr. LaRose again met with Ms. Abrey.  During this meeting, they reiterated that her new role was to run only DHS and Commerce.

**ANSWER:**  Defendant denies the allegations in Paragraph 98 of the Amended Complaint.

99.     They asked her to describe her plan for achieving the DHS and Commerce numbers for the year.  Ms. Abrey pointed out that she had only recently returned from leave and had only just been made solely responsible for those businesses, one of which (DHS) she had not worked on directly at all prior to her return from leave, in accordance with her Accenture non-compete restriction.

**ANSWER:**  Defendant denies the allegations in Paragraph 99 of the Amended Complaint.

100.    The three men refused to acknowledge the fact that new business in government contracts could not be produced overnight or week-to-week, as new work takes months to close due to the need for multiple levels of approval.  She pointed out that this was the case with her work in her old role as well, and that it would take several months for deals she was working on at that time to bear fruit.  During this conversation, Ms. Abrey again pointed out that her demotion came immediately upon her return from maternity, which she pointed out appeared to be patently discriminatory.

**ANSWER:**  Defendant denies the allegations in Paragraph 100 of the Amended Complaint.

101.    This dynamic continued to be illustrated even after Ms. Abrey's eventual unlawful termination, as the Company closed on four prime contract deals that she had worked on, totaling more than $1.1 billion just weeks after she was ousted.

**ANSWER:**  Defendant denies the allegations in Paragraph 101 of the Amended Complaint.

102.    Shortly after that success, the Company won another $2 billion contract for which Ms. Abrey personally had laid the groundwork through direct client interactions with contacts at the U.S. Patent & Trademark Office.  Ms. Abrey and her team were instrumental in getting the agency to give Steampunk a look despite its marginal corporate track record and qualifications.

**ANSWER:**  Defendant denies the allegations in Paragraph 102 of the Amended Complaint.

103.    Ms. Abrey made vital contributions to these deals, which became the biggest awards the Company had ever obtained. Because of the Company's plan to diminish Ms. Abrey's role and then oust her before those deals were realized, however, others got the credit for those deals, and reaped substantial rewards.

**ANSWER:**  Defendant denies the allegations in Paragraph 103 of the Amended Complaint.

104.    Even as this plan was unfolding, in July 2020, Messrs. Warren, Harllee and LaRose rejected Ms. Abrey's concerns about being sidelined, and Mr. Warren even ticked off a list of reasons (a list that he had apparently prepared in advance) why Ms. Abrey should be thankful that she had a job after returning from maternity leave. Among the reasons Mr. Warren gave was that she should be grateful for being invited to be part of the "elite" Steampunk club, for getting experience at a start-up company, and for her salary and "generous" equity. Of course, in the culmination of Steampunk's plans for Ms. Abrey following the birth of her child, all of this would soon be abruptly taken away.  Mr. Warren declared that he was so proud of this list of things to be grateful for that he had shown it to his wife.

**ANSWER:** Defendant denies the allegations in Paragraph 104 of the Amended Complaint.

105.    Defendants continued to degrade Ms. Abrey's role and peel off responsibilities, taking away her last area of responsibility that went across the entire organization—"Operational Excellence"—in or around mid-July 2020. At that time, Ms. Abrey had a call with Mr. Warren about this significant change to her role.  She expressed to him then that she was saddened and disturbed by this development, which demonstrated once and for all that she was out of top management and was on a continuous slide, being pushed out of Steampunk by Mr. Warren and Mr. Harllee.  Ms. Abrey again raised that she believed the action against her was improper and linked to her status as a woman who had become pregnant, taken leave, and was now a mother.

**ANSWER:** Defendant denies the allegations in Paragraph 105 of the Amended Complaint.

106.    Despite the demotion and impossible demands being placed on her to immediately turn around a floundering part of the business, Ms. Abrey pressed ahead and worked hard in short time to improve the performance of the DHS and Commerce areas for the second half of 2020.

**ANSWER:** Defendant denies the allegations in Paragraph 106 of the Amended Complaint.

107.    As part of this work, Ms. Abrey put together a strategy and presented it to the leadership team in August 2020.  Ms. Abrey largely succeeded in executing the strategy and fell just short of meeting the net new sales target (set by Mr. Warren and Mr. Harllee) as well, which would have been a challenge for anyone, starting only mid-year after her return to work from leave. Although Ms. Abrey had been involved in setting sales targets before her maternity leave, and also presented commitments and stretch goals in annual strategy sessions, she lost those responsibilities and authority after going on leave.\

**ANSWER:** Defendant denies the allegations in Paragraph 107 of the Amended Complaint.

108.    Mr. Warren refused to recognize the manifest improvements and business successes being led by Ms. Abrey, even though Mr. Licht had presided over similar results the prior year in the same area and had been praised (and promoted) for them.

**ANSWER:** Defendant denies the allegations in Paragraph 108 of the Amended Complaint.

109.    Defendants were so reluctant to credit Ms. Abrey for any achievements that when she successfully worked with Diane Ashley, the Senior Vice President who worked on DHS, to add new work to an existing contract, Defendants hastened to tell Ms. Abrey that the work "did not count" as net new business.

**ANSWER:** Defendant denies the allegations in Paragraph 109 of the Amended Complaint.

110.    Likewise, when Ms. Abrey and Ms. Ashley captured a new contract at TSA and thereby doubled the pipeline of new work by the end of September 2020, Defendants again contended that such success somehow "did not count."

**ANSWER:** Defendant denies the allegations in Paragraph 110 of the Amended Complaint.

111.    In or around late November 2020, Ms. Abrey received a 2020 Performance Evaluation with an overall rating of "Meets Expectations." Although this review was not as strong

as her previous reviews, her work clearly was too strong to be rated as unsatisfactory, even amid a transparent effort to build a pretext to push her out of the Company. On its face, the review made it clear that Ms. Abrey was in fact a solid and productive member of Steampunk's management and needed time to grow plentiful new business in her new role, which she was dropped into only six months before.

**ANSWER:**  Defendant admits that Ms. Abrey's review from Steampunk, Inc. received in November 2020 had a rating of "Meets Expectation" in the category of Overall Performance, and denies the remaining allegations in Paragraph 111 of the Amended Complaint.

112.    Specifically, Mr. Warren rated Ms. Abrey as having "Exceptional Performance" in one category (Work Habits), "Exceeds Expectations" in two categories ("Job Skills and Knowledge" and "Attitude"), and "Meets Expectations" in the remaining five categories (including "Potential for Future Development," showing that her future at the Company was seen as solid).

**ANSWER:**  Defendant admits the that the review rated Ms. Abrey as having "Exceptional Performance" in one category (Work Habits), "Exceeds Expectations" in two categories ("Job Skills and Knowledge" and "Attitude"), and "Meets Expectations" in the remaining five categories (including "Potential for Future Development)," and denies the remaining allegations in Paragraph 112 of the Amended Complaint.

113.    In addition, statements by Ms. Abrey in the evaluation regarding driving her team to double their pipeline of business and her focus on setting an example for her team on "grinding out new pipeline generation and client engagement" show that Ms. Abrey was increasing business in her areas (which were greatly underperforming before they were foisted on her) and making

that a singular focus.  Mr. Warren did not contradict or challenge these statements by Ms. Abrey, either in writing or verbally.

**ANSWER:**  Defendant denies the allegations in Paragraph 113 of the Amended Complaint.

114.    Mr. Warren, in his "Manager's Comments" to Ms. Abrey's November 2020 Performance Assessment (less than two months before her abrupt termination), stated that Ms. Abrey "is a very strong leader" who "has demonstrated her ability to continue to build a team and work on existing contracts."  He also wrote that the Company would "build out her portfolio," acknowledging that this was a work in progress (she had barely been in the position for six months) and not her sole responsibility.

**ANSWER:**  Defendant admits that the November 2020 review Manager's Comments stated in part "Kate is a very strong leader.  She has demonstrated her ability to continue to build a team and work on existing contracts.  She will need to improve on winning new work, with new capabilities as we build out her Portfolio."  Defendant denies the remaining allegations in Paragraph 114 of the Amended Complaint.

115.    Further written praise from Mr. Warren included that "Kate is a very positive person which is incredible 85% of [the] time," while saying that she "sometimes [should] have tougher internal talks with under[-]performers as she continues to grow."  The review also stated that "2021 will be the year of net new sales, clients, and capabilities hence building a diversified portfolio.  I'm very excited on what we have done but even more excited about 2021."

**ANSWER:**  Defendant admits that the November 2020 review Manager's Comments also stated in part "Kate is a very positive person which is incredible 85% of the time.  However, as an Executive, it will require her to sometimes have tougher internal talks with under performers as she continues to grow. 2021 will be the year of net new sales, clients, and capabilities hence

32

building a diversified portfolio. I'm very excited on what we have done but even more excited about 2021." Defendant denies the remaining allegations in Paragraph 115.

116. All of this written feedback from Mr. Warren in November 2020 indicated that Ms. Abrey was performing her job not just satisfactorily, but very well. In addition, Defendants clearly at that point fully anticipated that Ms. Abrey would be working at Steampunk into 2021 as the business, and her new business area in particular, continued to grow. Indeed, Mr. Warren praised Ms. Abrey and her work with her team in writing at least as late as December 29, 2020. Unfortunately, Defendants would not give Ms. Abrey more than a couple of weeks of 2021 to realize and demonstrate the fruits of her labor at Steampunk, as their discriminatory and retaliatory impulses would soon overtake their regard for her business value to them.

**ANSWER:** Defendant denies the allegations in Paragraph 116 of the Amended Complaint.

117. Many other communications between Mr. Warren and Ms. Abrey in the weeks and months leading up to her eventual termination in January 2021 were positive in nature, and included praise for her work, including with regard to her business development and management of her team. Defendants consistently told Ms. Abrey that she was doing a good job. Generally, the only negative aspect of these discussions was that some of Ms. Abrey's team members were not performing well, and that she would work on fixing this by replacing certain team members over the coming months.

**ANSWER:** Defendant denies the allegations in Paragraph 117 of the Amended Complaint.

118. In addition, over the fall of 2020, Ms. Abrey continued to close significant new government contracts for Steampunk, including a deal with the Transportation Security Administration (TSA), as well as net new work on the Company's contract with U.S. Immigration and Customs Enforcement (ICE).

**ANSWER:** Defendant denies the allegations in Paragraph 118 of the Amended Complaint.

119.   At one point during this period, Ms. Abrey again went to Mr. Harllee for advice on how she might restore a good working relationship with Mr. Warren.  Mr. Harllee assured her that there was no issue with her performance.  This, at least, was true.

**ANSWER:** Defendant denies the allegations in Paragraph 119 of the Amended Complaint.

120.   Yet, Steampunk again moved the goalposts on Ms. Abrey and redefined what she had to achieve in order even to maintain her position at the Company.  In December 2020, Steampunk adopted a new standard for quarterly forecasts and new definitions for sales.

**ANSWER:** Defendant denies the allegations in Paragraph 120 of the Amended Complaint.

121.   Before they imposed this new standard, Steampunk leadership encouraged teams to develop quarterly "forecasts" for weekly discussions.  Mr. Warren had directed Ms. Abrey and other leadership to use the forecast sessions to push their teams to overachieve—i.e., to set goals that they would struggle to achieve.

**ANSWER:** Defendant denies the allegations in Paragraph 121 of the Amended Complaint.

122.   In December, however, Mr. Warren advised Ms. Abrey that forecasts were now to be treated as "commitments" to the Company.  Naturally, this dovetailed well with the Defendants' by then well-established pattern of seeking to find fault with Ms. Abrey.

**ANSWER:** Defendant denies the allegations in Paragraph 122 of the Amended Complaint.

123.   Indeed, Mr. Warren applied these new standards for sales retroactively (to already-set goals and forecasts, without allowing them to be revised in light of the new "commitment" definition and treatment), so that the new work Ms. Abrey had brought to the business would not count towards the net new sales forecast, and her ambitious team goals would now appear unsound and unmet.

**ANSWER:**  Defendant denies the allegations in Paragraph 123 of the Amended Complaint.

124.     Around this time, Steampunk leadership also heavily scrutinized Ms. Abrey's recommendation to hire a Black female candidate into a Vice President role.  Ms. Abrey was never again given another slot or headcount to hire into for her team.

**ANSWER:**  Defendant denies the allegations in Paragraph 124 of the Amended Complaint.

125.     Anticipating a return to the office once the pandemic eased or (optimistically) subsided, Steampunk announced in December 2020 that Ms. Abrey would no longer be sharing an office with Mr. Warren and Mr. Harllee.  This only deepened and confirmed that Ms. Abrey was no longer a member of senior leadership, no matter what her title supposedly still was.

**ANSWER:**  Defendant denies the allegations in Paragraph 125 of the Amended Complaint.

126.     As a separate and distinct discriminatory and retaliatory adverse employment action against Ms. Abrey, she was denied any bonus whatsoever for 2020 in the weeks after her performance review.

**ANSWER:**  Defendant denies the allegations in Paragraph 126 of the Amended Complaint.

127.     During the holidays in December 2020, Ms. Abrey interviewed another woman for a position on Steampunk's Design team.

**ANSWER:**   Defendant admits the allegations in Paragraph 127 of the Amended Complaint.

128.     Ms. Abrey thought the candidate would be a great fit for Steampunk, and she advocated hiring her. Others also believed that she was a high-potential candidate, and wanted to make it work and finally make a move to evolve the Company's maternity benefits.  The group recommended that the candidate be hired, and Steampunk extended an offer of employment.

**ANSWER:**  Defendant admits the several individuals at Steampunk, Inc., including Ms. Abrey, advocated hiring the candidate and that Steampunk, Inc. extended an offer of employment. Defendant denies the remaining allegations in Paragraph 128 of the Amended Complaint.

129.    Ms. Abrey had learned from the candidate in the course of the interviews that the candidate was trying to get pregnant through IVF treatments.

**ANSWER:**  Upon information and belief, Defendant admits the allegations in Paragraph 129 of the Amended Complaint.

130.    The candidate shared this information with Ms. Abrey because she wanted written assurance that, if she joined Steampunk, she could take leave without pay when her child was born, as Ms. Abrey had.

**ANSWER:**  Defendant is without sufficient knowledge to admit or deny the allegations in Paragraph 130 of the Amended Complaint, and therefore denies them.

131.    Ms. Abrey tried to secure this written assurance for the candidate and was immediately met with resistance. Dan Parker (Steampunk's Head of Human Resources ("HR")) and Mr. Harllee said that Carolyn Muir (Steampunk's General Counsel) did not want to set such a precedent.

**ANSWER:**  Defendant admits that Dan Parker and John Harllee consulted with Carolyn Muir about the candidate's request for written assurance, and denies the remaining allegations in Paragraph 131 of the Amended Complaint.

132.    Ms. Abrey pressed for creative solutions to address the job candidate's concerns.

**ANSWER:**  Defendant admits the allegations in Paragraph 132 of the Amended Complaint.

133.    Ms. Abrey was asked to talk to the candidate about her own experience at the Company as a new mother, and she dutifully explained the Company's policies to the candidate. The candidate told Ms. Abrey that she was not comfortable relying upon such a short disability period for leave, and likely would have to turn down the job for that reason.  Ms. Abrey then reached out to Mr. Parker to express her concern about the Company's need to be flexible on her leave request and offer adequate maternity leave.

**ANSWER:**  Defendant admits that it asked Ms. Abrey to talk to the candidate during the interview process and that Ms. Abrey contacted Mr. Parker concerning maternity leave options for the candidate.  Defendant denies the remaining allegations in Paragraph 133 of the Amended Complaint.

134.    In early January 2021, Ms. Abrey also scheduled a broader meeting with Mr. Parker and two other managers to come up with a plan that would work for the candidate.  They all agreed that it would make sense to offer the candidate unpaid leave similar to what Ms. Abrey had taken, which Ms. Abrey then proposed to Mr. Harllee.  Mr. Harllee asked that the matter be added to the agenda of her weekly meeting with him and Mr. Warren.

**ANSWER:** Defendant is without sufficient knowledge to admit or deny the allegation that it was Ms. Abrey that scheduled a broader meeting with Mr. Parker and two other managers to come up with a plan that would work for the candidate, as alleged in Paragraph 134 of the Amended Complaint, and therefore denies them. Defendant admits the remaining allegations in Paragraph 134 of the Amended Complaint.

135.    On the evening of January 12, a group of colleagues including Ms. Abrey convened to address the job candidate's concerns about maternity benefits and arrived at a creative solution that involved having the candidate initially join Steampunk as an independent contractor, with the

potential to become an employee down the line.  Ms. Abrey added this proposal to the agenda for her weekly meeting with Mr. Warren and Mr. Harllee the next day as well.  Also on the agenda for discussion was Ms. Abrey's bonus for 2020, as well as the bonuses of other employees, and business goals for the first quarter of 2021, indicating that (at least to all appearances) to this point Ms. Abrey's continued employment at Steampunk was contemplated by Defendants.

**ANSWER:**  Defendant admits that on January 12, Ms. Abrey and a group of colleagues met to discuss the candidate's joining Steampunk, Inc..  Defendant denies the remaining allegations in Paragraph 135 of the Amended Complaint.

136.    On the afternoon of January 13, 2021, Ms. Abrey met with Mr. Warren and Mr. Harllee for their regular weekly meeting.  They talked about an e-mail Mr. Warren had sent earlier that morning regarding Ms. Abrey's purported performance going into the first quarter of 2021.

**ANSWER:**    Defendant admits the allegations in Paragraph 136 of the Amended Complaint.

137.    Mr. Warren claimed that Ms. Abrey's portfolio had underperformed for six quarters.  In response, Ms. Abrey pointed out the obvious—that she had only been in charge of that portfolio (DHS and Commerce) for the past two quarters (i.e., six months), rather than the years of underperformance in that part of the business that they now seemed to be attempting to attribute falsely to her, and that new business takes time to develop, particularly with government contracts.

**ANSWER:**  Defendant denies the allegations in Paragraph 137 of the Amended Complaint.

138.    Mr. Warren also asked what she had done before maternity leave (which he well knew), and Ms. Abrey described her achievements.

**ANSWER:**  Defendant denies the allegations in Paragraph 138 of the Amended Complaint.

139.    He said that he disagreed, but notably did not say why, or offer any substantive response.  Instead, he announced that 2021 Q1 (the first three months of 2021) would be Ms. Abrey's last chance to keep her position at Steampunk. Ms. Abrey later wrote an email objecting to this and raising the fact that she had been on maternity leave for the first half of 2020.

**ANSWER:** Defendant denies the allegations in Paragraph 139 of the Amended Complaint.

140.    They then talked about the job candidate and the proposed independent contractor solution for hiring the candidate, and allowing her to take unpaid leave should she have a baby.

**ANSWER:**   Defendant admits the allegations in Paragraph 140 of the Amended Complaint.

141.    Mr. Harllee expressed misgivings about hiring the job candidate as proposed, stating that he did not want to set a precedent for extending unpaid maternity leave.  He also worried that it would not "look good" in terms of client perception if the candidate were to go on maternity leave after starting work on the client's project.

**ANSWER:** Defendant denies the allegations in Paragraph 141 of the Amended Complaint.

142.    They pointedly asked Ms. Abrey if she thought it was a "good look" to have a project manager go on maternity leave during a project. Ms. Abrey explained that the candidate would have time to establish herself for several months and that it was a very good thing to show clients that the Company, like federal agencies, follows similar policies that treat employees who need maternity leave well.

**ANSWER:** Defendant denies the allegations in Paragraph 142 of the Amended Complaint.

143.    The two men told Ms. Abrey that she had to "do the right thing for the client and the business" regarding the Company's response to the candidate.

**ANSWER:** Defendant denies the allegations in Paragraph 143 of the Amended Complaint.

144.     Ms. Abrey expressed strong concern about this approach and reaction by Mr. Warren and Mr. Harllee.  She said that she believed such a decision or approach could be seen as discriminatory, saying among other things, "Is it because she is a woman considering having a baby, like I was?  Isn't that discriminatory?  I've just been through this."

**ANSWER:**  Defendant denies the allegations in Paragraph 144 of the Amended Complaint.

145.     Ms. Abrey invoked her own personal experience with discrimination of this type to Defendants.  Ms. Abrey pointed out to her two managers the undeniable fact that she herself had paid the price and was discriminated against as a woman in the terms and conditions of her employment, including being demoted promptly upon her return from maternity leave.  She also stated that failing to hire the female candidate because of the possibility that she would be pregnant or take leave would be discriminatory and unlawful, and would open the Company up to legal trouble and a possible lawsuit.  Ms. Abrey's objections to Defendants Warren and Harllee did not consist merely of the amount of leave they were willing to allow, but obviously that they blatantly did not want to hire the female candidate because of the possibility that she could become pregnant soon and need to take a leave at all.

**ANSWER:**  Defendant denies the allegations in Paragraph 145 of the Amended Complaint.

146.     Ms. Abrey wanted the best outcome for the Company, and in her view (and that of her colleagues) the Company would miss out on a good employee for no good reason, indeed due to discrimination.  She offered to work with Mr. Parker to extend the maternity benefits available to employees, as such policies and programs are critical for attracting the best female talent.  Indeed, the upper ranks of Steampunk have only two women among its eleven members, with neither woman in a business-side, client-facing role.

**ANSWER:**  Defendant denies the allegations in Paragraph 146 of the Amended Complaint.

147.     Ms. Abrey asked whether Mr. Harllee was concerned about extending or allowing maternity leave in particular, and Mr. Harllee rolled his eyes and said "No."  This displayed open irritation at Ms. Abrey raising serious questions regarding the Company's decisions and treatment of not only the female candidate in question, but Steampunk's female employees as well, including Ms. Abrey.

**ANSWER:**  Defendant denies the allegations in Paragraph 147 of the Amended Complaint.

148.     During or right after this exchange, it seemed that the two men were communicating with each other through text messages or other means during the discussion to coordinate their responses to Ms. Abrey.  As they were known to do during other Company meetings (which has been observed by other employees as well), the two men at one point on the video call/conference simultaneously started looking down, seemingly at their smartphones, and were clearly typing in rapid succession.

**ANSWER:**  Defendant denies the allegations in Paragraph 148 of the Amended Complaint.

149.     Ms. Abrey reached out to Mr. Warren to schedule a call early the next morning, on January 14, 2021.  He called her at or around 9:00 a.m.

**ANSWER:**     Defendant admits the allegations in Paragraph 149 of the Amended Complaint.

150.     She said that she understood from him that first quarter performance was important. Mr. Warren cut her off and sharply said it was time to end things.

**ANSWER:**  Defendant denies the allegations in Paragraph 150 of the Amended Complaint.

151.     He told Ms. Abrey that she was not "a good cultural fit," and that she was "cold and transactional." These vague, stereotypical characterizations of Ms. Abrey tellingly contradicted a different stereotypical adjective used to pigeonhole women professionally that had

been leveled at her just the day before in her meeting with Mr. Warren and Mr. Harllee, when she had been accused of being "too nurturing." The use of this female-stereotyping language by Defendant Warren, in her termination meeting no less, confirms and provides direct evidence of the discriminatory motivation behind the negative treatment of Ms. Abrey in her employment (particularly after her maternity leave), including her termination.

**ANSWER:** Defendant denies the allegations in Paragraph 151 of the Amended Complaint.

152.    Mr. Warren's new, discriminatorily charged excuse for firing Ms. Abrey ("cold and transactional") also flew in the face of Mr. Warren's own characterization of Ms. Abrey as a "very positive person" in her November 2020 performance assessment, which contradicts the idea that she somehow was not "a good cultural fit." What apparently did not "fit" for Defendants was Ms. Abrey's continued willingness to call out the discriminatory treatment of herself as a woman and mother, as well as the job candidate under discussion at the time.

**ANSWER:** Defendant denies the allegations in Paragraph 152 of the Amended Complaint.

153.    This was a descriptor that had been leveled at her by her male managers many times in the past as well, saying things such as, "Now that you're a mom, it makes sense— you're too nurturing." Not only was Ms. Abrey supposedly "too nurturing," but her former co-leaders at Steampunk, Defendants Warren and Harllee, previously had more than once lamented that Ms. Abrey had supposedly lost her "sharp elbows" after having a baby. This conduct provides further direct evidence of discriminatory animus, given the Company's two top managers stereotyping Ms. Abrey in direct relation to supposed changes in her personality and approach to her subordinates after having given birth.

**ANSWER:** Defendant denies the allegations in Paragraph 153 of the Amended Complaint.

154.   Ms. Abrey was being terminated without notice, the day after raising concerns about the Company's treatment of female employees, including herself, particularly with regard to maternity leave.

**ANSWER:** Defendant denies the allegations in Paragraph 154 of the Amended Complaint.

155.   Ms. Abrey had been given barely two quarters to work after her maternity leave, after being put in charge of a chronically and known under-performing unit.   In addition, government contracts typically take at least six months and often more than nine months to close. Yet, Ms. Abrey had in fact still come close to hitting the annual, twelve-month targets in her new area, even after having the deck intentionally stacked against her.

**ANSWER:** Defendant denies the allegations in Paragraph 155 of the Amended Complaint.

156.   Indeed, two very large government application development contracts that Ms. Abrey and her team had been focused on since her demotion and return from maternity leave closed successfully shortly after her termination.   One was worth $63 million and the other potentially up to $2 billion (over five to ten years) for Steampunk, which were to date the biggest wins in the Company's history. Ms. Abrey had positioned the Company to win this enormous business, and she and her team had already submitted the documents and paperwork and had client meetings for these bids well before her termination.   The clients on these contracts thought highly enough of Ms. Abrey that they reached out to her following her termination, distraught, puzzled, and angry at her sudden, unaccountable ouster.

**ANSWER:** Defendant denies the allegations in Paragraph 156 of the Amended Complaint.

157.   Steampunk sent Ms. Abrey a separation agreement containing a severance offer a few days later.

**ANSWER:** Defendant admits that Steampunk, Inc. provide Ms. Abrey with a separation agreement and denies the remaining allegations in Paragraph 157 of the Amended Complaint.

158.    At least one female employee resigned her employment at Steampunk very soon after the Company terminated Ms. Abrey, reportedly in reaction to how Ms. Abrey had been treated.

**ANSWER:** Defendant denies the allegations in Paragraph 158 of the Amended Complaint.

159.    Upon information and belief, the female job candidate who was under consideration never joined Steampunk.

**ANSWER:** Defendant admits that the female candidate who Steampunk, Inc. extended an offer of employment never joined Steampunk, Inc., and denies the remaining allegations in Paragraph 159 of the Amended Complaint.

160.    In late 2020, Max Licht, the white male colleague of Ms. Abrey who was put in charge of her previous areas of responsibility after being hired by Ms. Abrey to report to her, was promoted to the same level as Ms. Abrey after being with Steampunk for barely one year.  After Ms. Abrey's termination, Mr. Licht and another white male colleague, Matt Reeves, were given authority over Ms. Abrey's former areas of responsibility and duties by the Defendants. Mr. Licht had been hired by Ms. Abrey in October 2019, and his prior work experience was much less than hers.

**ANSWER:** Defendant denies the allegations in Paragraph 160 of the Amended Complaint.

161.    In addition, Mr. Licht had not demonstrated any large-scale results on deliverables (either in previous jobs or at Steampunk). Indeed, following Ms. Abrey's ouster from Steampunk, clients reported significant delivery challenges to her under Mr. Licht's management.

**ANSWER:** Defendant denies the allegations in Paragraph 161 of the Amended Complaint.

## FIRST CAUSE OF ACTION
### (Discrimination in Violation of Title VII and the Pregnancy Discrimination Act)
### *Against Steampunk*

162.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

**ANSWER:**  Defendant repeats and re-alleges each and every response in the preceding paragraphs, as though fully set forth herein.

163.     By the actions described above, among others, Defendant Steampunk discriminated against Plaintiff on the basis of her gender, pregnancy, and motherhood status in violation of Title VII and the Pregnancy Discrimination Act (PDA) by denying Plaintiff the same terms and conditions of employment available to males and/or non-pregnant employees, including, but not limited to, denying her the opportunity to work in an employment setting free of unlawful discrimination, reducing and restricting her job role, and terminating her employment.

**ANSWER:** Defendant denies the allegations in Paragraph 163 of the Amended Complaint.

164.     As a direct and proximate result of the unlawful discriminatory conduct committed by Defendant Steampunk in violation of Title VII and the PDA, Plaintiff has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of monetary damages and other relief.

**ANSWER:** Defendant denies the allegations in Paragraph 164 of the Amended Complaint.

165.     As a direct and proximate result of the unlawful conduct committed by Defendant Steampunk in violation of Title VII and the PDA, Plaintiff has suffered, and continues to suffer, physical illness and ailments, as well as severe mental anguish and emotional distress, including, but not limited to, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which she is entitled to an award of monetary damages and other relief.

**ANSWER:**  Defendant denies the allegations in Paragraph 165 of the Amended Complaint.

166.    Defendant Steampunk's unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under Title VII and the PDA, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:**  Defendant denies the allegations in Paragraph 166 of the Amended Complaint.

### SECOND CAUSE OF ACTION
**(Retaliation in Violation of Title VII and the Pregnancy Discrimination Act)**
***Against Steampunk Only***

167.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

**ANSWER:**  Defendant repeats and re-alleges each and every response in the preceding paragraphs, as though fully set forth herein.

168.    By the actions described above, among others, Defendant Steampunk retaliated against Plaintiff on the basis of her complaints of discrimination by, among other things, reducing and restricting her job role and terminating her employment, which would not have occurred but for Plaintiff's legally protected activity.

**ANSWER:**  Defendant denies the allegations in Paragraph 168 of the Amended Complaint.

169.    As a direct and proximate result of Defendant's unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

**ANSWER:**  Defendant denies the allegations in Paragraph 169 of the Amended Complaint.

170.    As a direct and proximate result, Plaintiff has suffered, and continues to suffer, physical illness, ailments and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of

self-esteem and self-confidence and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

**ANSWER:** Defendant denies the allegations in Paragraph 170 of the Amended Complaint.

171.    Defendant Steampunk's unlawful discriminatory actions constitute malicious, willful and wanton violations of Title VII and the PDA for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Defendant denies the allegations in Paragraph 171 of the Amended Complaint.

**THIRD CAUSE OF ACTION**
**(Discrimination in Violation of VHRA)**
***Against All Defendants***

172.    Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

**ANSWER:**  Defendant repeats and re-alleges each and every response in the preceding paragraphs, as though fully set forth herein.

173.    Defendants have discriminated against Plaintiff on the basis of her gender and pregnancy in violation of the VHRA by subjecting Plaintiff to disparate treatment based upon her gender and pregnancy, including, *inter alia*, reducing and restricting her job role and terminating her employment.

**ANSWER:** Defendant denies the allegations in Paragraph 173 of the Amended Complaint.

174.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the VHRA, Plaintiff has suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income, compensation and benefits, for which she is entitled to an award of monetary damages and other relief.

**ANSWER:** Defendant denies the allegations in Paragraph 174 of the Amended Complaint.

175.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the VHRA, Plaintiff has suffered, and continues to suffer, physical illness and ailments, as well as mental anguish and emotional distress for which she is entitled to an award of monetary damages and other relief.

**ANSWER:**  Defendant denies the allegations in Paragraph 175 of the Amended Complaint.

176.     Defendants' unlawful discriminatory conduct was intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's rights under the VHRA, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:**  Defendant denies the allegations in Paragraph 176 of the Amended Complaint.

177.     Defendants' unlawful discriminatory and retaliatory actions constitute malicious, willful and wanton violations of the VHRA, for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:**  Defendant denies the allegations in Paragraph 177 of the Amended Complaint.

<u>**FOURTH CAUSE OF ACTION**</u>
**(Retaliation in Violation of VHRA)**
*Against All Defendants*

178.     Plaintiff repeats and re-alleges each and every allegation in the preceding paragraphs, as though fully set forth herein.

**ANSWER:**  Defendant repeats and re-alleges each and every response in the preceding paragraphs, as though fully set forth herein.

179.     By the actions described above, among others, Defendants retaliated against Plaintiff on the basis of her complaints of discrimination by, among other things, reducing and restricting her job role and terminating her employment, which would not have occurred but for Plaintiff's legally protected activity.

**ANSWER:**  Defendant denies the allegations in Paragraph 179 of the Amended Complaint.

180.     As a direct and proximate result of Defendants' unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

**ANSWER:** Defendant denies the allegations in Paragraph 180 of the Amended Complaint.

181.     As a direct and proximate result, Plaintiff has suffered, and continues to suffer, physical illness, ailments, and conditions, as well as mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence and other emotional pain and suffering, for which she is entitled to an award of compensatory damages and other relief.

**ANSWER:** Defendant denies the allegations in Paragraph 181 of the Amended Complaint.

182.     Defendants' unlawful discriminatory actions constitute malicious, willful and wanton violations of VHRA for which Plaintiff is entitled to an award of punitive damages.

**ANSWER:** Defendant denies the allegations in Paragraph 182 of the Amended Complaint.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, through the following relief:

A.     A declaratory judgment that the actions of Defendants complained of herein violate the laws of the United States and the State of Virginia;

B.     An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages, including but not limited to past and future lost earnings;

D.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to her professional and personal reputations and loss of career fulfillment;

E.     An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, emotional pain and suffering and emotional distress;

F.     An award of punitive damages in an amount to be determined at trial;

G.     An award of liquidated damages in an amount to be determined at trial;

H.     An award of attorneys' fees and costs that Plaintiff has incurred in this action to the fullest extent permitted by law; and

I.     Such other and further relief as the Court may deem just and proper.

**ANSWER:** Defendant denies that Ms. Abrey is entitled to relief sought in the Amended Complaint or any relief or damages by virtue of the allegations in the Amended Complaint. Defendant respectfully requests that Ms. Abrey take nothing by reasons of said Amended Complaint.

## GENERAL DENIAL

Defendant denies all allegations not expressly admitted herein.

## AFFIRMATIVE DEFENSES

Defendant asserts the following affirmative and other defenses, without prejudice to its right to argue that Plaintiff bears the burden of proof regarding some or all of these defenses.

1.     Plaintiff's Amended Complaint, in whole or in part, fails to state a cause of action upon which relief can be granted as a matter of fact and/or law.

2.     Plaintiff's claims are barred, in whole or in part, by the applicable statutes of

limitations and/or jurisdictional prerequisites to suit.

3.      Plaintiff's claims are barred, in whole or in part, for failure to properly exhaust her administrative remedies.

4.      Plaintiff's claims for relief are barred to the extent that Plaintiff seeks damages in excess of the limits imposed by applicable law.

5.      Plaintiff was not an employee of Defendant and to the extent that any claim asserted by Plaintiff is predicated upon the existence of an employer-employee relationship between Plaintiff and Defendant, the same should be dismissed.

6.      At all material times, Plaintiff was an at-will employee subject to discharge at any time, with or without cause so long as said discharge was not for an unlawful reason.

7.      At all times relevant hereto, Defendant has acted in good faith and has not violated any rights which may be secured to Plaintiff under any federal, state, or local laws, rules, regulations or guidelines.

8.      Plaintiff's claims are barred to the extent they rely on claims or conduct not included in her administrative charges.

9.      Plaintiff has not suffered any legally cognizable damages.

10.     Plaintiff's claims for damages may be barred, in whole or in part, because any acts or omissions giving rise to her claims were undertaken or made in good faith, and Plaintiff's employer had reasonable grounds for believing that its actions or omissions did not violate the law.

11.     Any and all actions taken with respect to Plaintiff's employment or the terms and conditions thereof were based upon legitimate business reasons and were taken without regard to Plaintiff's rights, entitlements, actions or inactions under law.

12.     Plaintiff has failed to state a claim for the recovery of punitive damages upon which

relief may be granted.

13.     Plaintiff's claims for damages are barred or reduced by her failure to mitigate her alleged damages, by her failure to suffer actual damages, and/or by her inability to prove actual damages.

14.     All decisions made as to Plaintiff's employment were without consideration as to any protected category, but if it is determined that any protected category was a motivating factor in any decision, then Defendant asserts that the same result would have been reached, regardless of any protected category in which the Plaintiff may lie, based upon the facts and circumstances of the case.

15.     Plaintiff's claims are barred to the extent they seek injunctive, declaratory, or other equitable relief in light of the fact that Plaintiff has an adequate remedy at law and has suffered no irreparable harm due to any alleged conduct of Defendant.

16.     Defendant reserves the right to rely on each and every additional defense that may become known to it through the course of this litigation, including discovery, trial, or otherwise. Defendant expressly reserves the right to amend this Answer, to assert different or additional defenses, or to otherwise amend any of its denials or averments.

WHEREFORE, Defendant Steampunk Holdings, Inc. respectfully requests that the Court dismiss Plaintiff's Amended Complaint with prejudice and award Defendant its costs, attorneys' fees and all other relief to which it may be entitled.


November 23, 2022                              Respectfully submitted,

                                              **JACKSON LEWIS P.C.**


                                              _____/s/_____

Nigel L. Wilkinson (Va. Bar No. 46500)
Janea J. Hawkins (Va. Bar No. 95202)
10701 Parkridge Blvd., Ste 300
Reston, Virginia 20191
(703) 483-8300 - Telephone
(703) 483-8301 Fax
nigel.wilkinson@jacksonlewis.com
janea.hawkins@jacksonlewis.com

*Counsel for Defendant Steampunk Holdings, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 23, 2022, I electronically filed the foregoing *Answer and Affirmative Defenses* with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

>    Seth James B. Obed, Esq.
>    Obed Law Group, PLC
>    111 Oronoco Street
>    Alexandria, Virginia 22314
>    Tel.: (732) 567-4052
>    Fax: (703) 894-4940
>    Email: sobed@obedlaw.com
>
>    Lawrence M. Pearson, Esq., admitted *pro hac vice*
>    Alfredo J. Pelicci, Esq., admitted *pro hac vice*
>    Wigdor LLP
>    85 Fifth Avenue
>    New York, NY 10003
>    Tel. (212) 257-6800
>    Fax: (212)-257-6845
>    Email: lpearson@wigdorlaw.com
>    Email: apelicci@wigdorlaw.com
>
>    ***Counsel for Plaintiff Kathleen Abrey***

By:         /s/
        Nigel L. Wilkinson (VA Bar No. 46500)
        **JACKSON LEWIS P.C.**
        10701 Parkridge Boulevard, Suite 300
        Reston, VA 20191
        (703) 483-8300-Telephone
        (703) 483-8301-Fax
        Nigel.Wilkinson@jacksonlewis.com

        ***Counsel for Defendant Steampunk Holdings, Inc.***

4895-4652-4736, v. 1