EXHIBIT 1

Page 1

1

2       UNITED STATES DISTRICT COURT

        EASTERN DISTRICT  OF VIRGINIA

3       -------------------------------------------X

        KATHLEEN ABREY,

4

                                        PLAINTIFF,

5

                -against-              Index No.:

6                                      1:22-cv-654

7

        STEAMPUNK HOLDINGS, INC., MATTHEW WARREN and

8       JOHN HARLLEE, in their individual and

        professional capacities,

9

                                        DEFENDANTS.

10      -------------------------------------------X

11

12                              DATE: April 25, 2023

13                              TIME: 10:00 A.M.

14

15            EXAMINATION BEFORE TRIAL of the

16      Defendant, JOHN HARLLEE, taken by the

17      Plaintiff, pursuant to a Court Order, held

18      via videoconference, before Rivka Trop, a

19      Notary Public of the State of New York.

20

21

22

23

24

25

J. HARLLEE

1
2     A.  No.
3     Q.  Were you concerned about the
4  optics of Ms. Brioux going out on leave
5  while she was assigned to a contract?
6     A.  I was concerned about the
7  substance.
8     Q.  My question is, were you concerned
9  about the optics of Ms. Brioux going out on
10  leave while she was assigned to a project?
11     A.  I was concerned about the optics
12  in the context of the customer's reaction
13  and expectations.
14     Q.  Did you previously work with CIS
15  before?
16     A.  I have been involved with
17  companies, been working with CIS for the
18  better part of 20 years.
19     Q.  Did you have any reason to believe
20  that CIS viewed leave unfavorably?
21        MR. WILKINSON:  Objection.
22     A.  I don't -- I don't have any
23  preconceived notion as to that person's
24  perspective on things.
25     Q.  Did you contact any of your

J. HARLLEE

1
2  contacts at CIS to run this scenario by
3  them?
4     A.  This was an open procurement, as I
5  recall.  And as that is the case, you are
6  prohibited from talking to anybody inside
7  the government except for the contracting
8  officer.
9     Q.  Were you prohibited in talking
10  with anyone from CIS at all, that you can't
11  talk to anyone at CIS?
12     A.  Anything related to the
13  procurement, which this would have been.
14     Q.  But could you have generally
15  consulted with somebody at CIS regarding
16  CIS's position on leave?
17     A.  My position on that would have
18  been any question like that would have been
19  germane to the solicitation and therefore
20  not permissible.
21     Q.  And did you inquire about whether
22  or not that would have been permissible?
23        MR. WILKINSON:  Objection.
24     A.  It might have been illegal, so I
25  would not make that inquiry to start.

J. HARLLEE

1
2        MR. PELICCI:  I am going to ask
3  you to refresh your folder on Exhibit
4  share.  The way it's going to work
5  today, I will introduce an exhibit, you
6  will refresh your Exhibit Share and it
7  will appear there.
8     Q.  Before we turn to the exhibit, do
9  you recall communicating with Ms. Abrey
10  about Ms. Brioux?
11     A.  Briefly.
12     Q.  Did you communicate with Ms. Abrey
13  substantially about Ms. Brioux?
14        MR. WILKINSON:  Objection.
15     A.  What do you mean by substantially?
16     Q.  Well, you said briefly, maybe you
17  could define the nature of how you
18  communicated with Ms. Abrey about
19  Ms. Brioux?
20     A.  I think I had a couple of e-mails
21  that other folks may have been on.  And I
22  chatted with her for probably a total of
23  five to ten minutes about it.
24     Q.  Do you recall when you chatted
25  with Ms. Abrey about it?

J. HARLLEE

1
2     A.  Yes, shortly after she got back
3  from vacation, in the second week of
4  February, we had, Matt Warren and myself had
5  a challenging conversation with her about
6  concerns that we had with her forecasting
7  and ability to understand some of the basics
8  of the business.
9        And at the end of that
10  conversation she brought up the Jacquelyn
11  Brioux situation.  And I told her, more or
12  less, what I just told you were my concerns.
13  I said we have a couple of different ways to
14  potentially navigate this.  And she
15  expressed that she wanted to get it done, as
16  did Matt Reeves and Kristin Recco and
17  Jennifer Sessums.
18        Then subsequent to that
19  conversation, Ms. Abrey called me, because
20  she was very upset about the preceding part
21  of that conversation which is what the
22  substance of the conversation was in terms
23  of her performance.
24        And in that conversation, I
25  circled back with her on Brioux and simply

8 (Pages 26 - 29)

Page 58

J. HARLLEE

1
2  while you were at Accenture, and they don't
3  want you leveraging those for a certain
4  period of time after you leave.
5      Q.  But were you able to call on those
6  customer relationships by proxy through
7  other employees?
8      A.  I didn't have any restrictions.  I
9  hadn't been calling on any customers in the
10 timeline that it was operative.
11     Q.  But now, would Mr. Warren have
12 been able to call on the relationships with
13 other clients by proxy through other
14 employees?
15         MR. WILKINSON:  Objection.
16     A.  I would have to look at the
17 language.
18         Well, what do you mean by proxy?
19     Q.  Well, there are certain
20 restrictions in place that limited client
21 interactions; is that correct?
22     A.  Correct.
23     Q.  And so could you essentially skirt
24 those restrictions by communicating to other
25 employees what you wanted them to do and

Page 59

J. HARLLEE

1
2  have them do it?
3         MR. WILKINSON:  Objection.
4      A.  I would have to look at the
5  language.  I don't want to opine on it
6  without seeing it.
7      Q.  But isn't that what was going on
8  at Steampunk?
9         MR. WILKINSON:  Objection.
10     A.  What do you mean by "skirt"?
11     Q.  Well, there were certain
12 restrictions for Mr. Warren and Ms. Abrey.
13 And wasn't Mr. Warren directing client
14 interactions that he was prohibited from
15 interacting with directly, but wasn't he
16 using other employees to engage with those
17 clients?
18     A.  If other employees are engaging
19 with the client, then Mr. Warren isn't.
20     Q.  So it is your position that as
21 long as the other employee is being the one
22 communicating with the client, then that
23 wouldn't have been a violation of the
24 restrictions?
25         MR. WILKINSON:  Objection.

Page 60

J. HARLLEE

1
2      A.  I previously stated, if you want
3  to have this conversation, I am happy to
4  look at the language, but I don't have it in
5  front of me.  So I really can't --
6      Q.  I am not really as concerned as I
7  am with what the terms of the restrictions
8  were, as much as I am concerned about what
9  your practices were at Steampunk regarding
10 those restrictions.
11         Was it your position at Steampunk
12 with respect to the restrictions, putting
13 aside what the restrictions themselves say,
14 what were you doing at Steampunk around
15 these restrictions?
16         MR. WILKINSON:  Objection.
17     A.  I don't know how to answer that
18 question.  What we were doing, we were
19 trying to abide them and trying to build a
20 successful company notwithstanding the
21 restrictions.  And we were all very
22 delighted when May rolled around of 2020.
23     Q.  So what was not allowed, what
24 wasn't allowed?
25         MR. WILKINSON:  Objection.

Page 61

J. HARLLEE

1
2      A.  I would have to refer back to
3  outside counsel's interpretation of the
4  language.  I don't have it in front of me.
5      Q.  But isn't it your position that a
6  lot of the structural or organizational
7  changes at Steampunk centered around these
8  restrictions?
9      A.  Yes.
10     Q.  So what was allowed and what
11 wasn't allowed regarding the restrictions?
12         MR. WILKINSON:  Objection.
13     A.  What wasn't allowed, that people
14 who were calling, people who were calling on
15 restricted clients weren't allowed to report
16 to people who had restrictions, and people
17 who had restrictions were not allowed to
18 call clients themselves.
19     Q.  Is that your understanding of the
20 only requirements?
21         MR. WILKINSON:  Objection.
22     A.  To the best of my recollection,
23 you asked how we operated, I said a number
24 of times, I would need to look at the
25 specific restrictions to opine on what they

16 (Pages 58 - 61)

J. HARLLEE

1
2  mean.
3     Q.  Did Mr. Warren's restrictions end
4  in February of 2020?
5     A.  I believe so.
6     Q.  Were the organizational changes
7  connected to Mr. Warren's restrictions made
8  in February of 2020?
9     A.  Were they what?
10    Q.  Made, were the organizational
11 changes in association with Mr. Warren's
12 restrictions made in 2020, in February of
13 2020?
14    A.  Mr. Warren, I believe, in February
15 took his anticipated position of CEO of the
16 company and I became sole chief operating
17 officer.
18    Q.  And that occurred in February of
19 2020?
20    A.  As I recall, I don't recall the
21 date.
22    Q.  And did reporting structure change
23 in February of 2020 based off Mr. Warren's
24 restrictions being lifted?
25    A.  Some of them may have.  Formally

J. HARLLEE

1
2  we made a conscious decision to do the reorg
3  once Ms. Abrey's restrictions were up as
4  well, so that we could do it in one full
5  swoop.
6     Q.  Who made that decision?
7     A.  Mr. Warren and myself in
8  conjunction with counsel.
9     Q.  Was Scott LaRose involved?
10    A.  He would have been aware of it.
11 He was not really engaged in the day-to-day
12 operations of the company.
13    Q.  Mr. LaRose was not engaged in the
14 day-to-day operations of Steampunk?
15    A.  Correct.
16    Q.  Was Mr. LaRose engaged in any of
17 Steampunk's operations?
18    A.  I don't know what operation means
19 in this context.  He had no authority,
20 formal authority inside the organization.
21 And he was sporadically kept apprised of how
22 the business was going.  We certainly
23 strategized with him at the office of the
24 CEO level from time to time.  But he was not
25 providing any direction to the company.

J. HARLLEE

1
2     Q.  Did he have any informal
3  authority?
4     A.  No.
5     Q.  Mr. LaRose had no informal
6  authority?
7     A.  Mr. LaRose had relationships with
8  Matt and I.  And we took his suggestions
9  seriously, since he is a smart guy with a
10 lot of experience.  But he had no formal or
11 informal authority over the company.
12    Q.  So was he investing in Steampunk?
13       MR. WILKINSON:  Objection.
14    A.  No, actually, I would not call it
15 an investment.
16    Q.  Did he give Steampunk money?
17    A.  He didn't give us any money.
18    Q.  Did he loan Steampunk money?
19    A.  He did loan Steampunk Holdings
20 money.
21    Q.  Did Steampunk Holdings given that
22 money to Steampunk, Inc.?
23    A.  That money was used in an
24 acquisition to buy SE Solutions which was
25 subsequently re-branded as Steampunk.

J. HARLLEE

1
2     Q.  Does Steampunk Holdings own
3  anything else in terms of organizations or
4  business entities besides Steampunk, Inc.?
5     A.  No.
6     Q.  Is there a board of directors at
7  Steampunk Holdings?
8     A.  I believe there is.
9     Q.  Is there a board of directors at
10 Steampunk, Inc.?
11    A.  Yes, there is.
12    Q.  Are they different boards of
13 directors?
14    A.  I would have to look, I don't
15 know.  It is a holding company.  It is not
16 particularly active.
17    Q.  When you say it is not
18 particularly active, what does that mean?
19    A.  It has no employees, no revenue,
20 it is a holding company.
21    Q.  Does it own anything?
22    A.  I guess it owns Steampunk, yes.
23    Q.  Does it own anything else besides
24 Steampunk?
25    A.  Not to my knowledge.

17 (Pages 62 - 65)

J. HARLLEE

1
2 working business opportunities, including
3 Ms. Abrey.
4     Q. So earlier we discussed SE
5 Solutions versus Steampunk, and you
6 described SE Solutions as a platform?
7     A. Is that a question?
8     Q. Yes.
9     A. Yes.
10     Q. So was building out the leadership
11 team part of creating what would eventually
12 be Steampunk?
13     A. Yes.
14     Q. And so would you call Ms. Abrey a
15 critical building block of Steampunk?
16     MR. WILKINSON: Objection.
17     A. She was clearly a part of our
18 leadership team. In hindsight, I don't
19 think she was a critical building block.
20     Q. At the time Ms. Abrey joined, did
21 you view her as a critical building block?
22     MR. WILKINSON: Objection.
23     A. I had high hopes for her
24 performance, yes.
25     Q. That's not my question. I am not

J. HARLLEE

1
2 asking about your hopes for her performance.
3 My question is did you view her as a
4 critical part of the leadership team?
5     MR. WILKINSON: Objection.
6     A. In the sense that I viewed all the
7 leadership team as critical, yes.
8     Q. Ms. Abrey in particular?
9     A. I just answered that question.
10     Q. I don't believe so.
11     A. Can we read back the answer then,
12 because I did answer.
13     Q. I will decide when we read back
14 answers.
15     A. Okay.
16     Q. My question to you, you said I
17 viewed everybody in the leadership team that
18 way. And I am focusing on Ms. Abrey, not
19 everyone on the leadership team. My
20 question to you is, did you view Ms. Abrey
21 herself as a critical member of the
22 leadership team when she joined SE
23 Solutions?
24     MR. WILKINSON: Objection.
25     A. Yes, in the same way I viewed

J. HARLLEE

1
2 everybody on the leadership team as
3 critical.
4     Q. So when Kate joined SE Solutions,
5 did she report to you or Mr. Harllee?
6     A. I am Mr. Harllee.
7     Q. You or Mr. Warren, I am sorry?
8     A. She reported to Matt.
9     Q. And was she assigned to oversee
10 any specific sectors?
11     A. She had general, a general remit
12 to make things happen in the areas where she
13 did not have the restriction from her
14 Accenture employment.
15     Q. Was that Emerging Markets?
16     A. That was called Emerging Markets,
17 yes.
18     Q. And did Mr. Warren also oversee
19 Emerging Markets?
20     A. He did, except for a couple of
21 accounts inside of there that he was
22 prohibited from calling into.
23     Q. So was Ms. Abrey's title executive
24 vice president and general manager for the
25 emerging markets sector?

J. HARLLEE

1
2     A. That sounds right.
3     (Whereupon, a photo was marked
4 Harllee Exhibit 9 for identification as
5 of this date by the reporter.)
6     Q. Before you is Exhibit 9, there is
7 no Bates stamps. Have you seen this lovely
8 picture of yourself, Mr. Warren and
9 Ms. Abrey before?
10     A. I think some of us are more lovely
11 in the picture, I have, but not recently.
12     Q. Who is more lovely?
13     A. I would say I am the least lovely.
14     Q. That's not very nice to yourself,
15 Mr. Harllee?
16     A. I stick to the facts, Alfredo.
17     Q. I like your shirt, it matches mine
18 today?
19     A. Pink always looks good.
20     Q. So do you recall this photograph
21 being taken?
22     A. Not particularly.
23     Q. Do you know if any other
24 leadership members were there during this
25 photo shoot?

52 (Pages 202 - 205)

Page 206

J. HARLLEE

1
2    A.  I believe Robbe was there, because
3    he probably took the picture.
4    Q.  Was there a reason no one else on
5    the leadership team was invited to be on
6    this photograph?
7    A.  This was an announcement about the
8    three of us joining the company on the same
9    day.  So I don't think there would be any
10   reason for anybody else to be there.
11   Q.  Then turning down to the last
12   sentence in the first paragraph, it says,
13   "In addition Kate Abrey has been named the
14   executive vice president and general manager
15   for the emerging markets sector."  Do you
16   see that?
17   A.  I do.
18   Q.  Is that what we just discussed, is
19   that what you understood Ms. Abrey's title
20   to be?
21   A.  That jives with what we just
22   discussed, yes.
23   MR. PELICCI:  I am introducing
24   another exhibit.
25   (Whereupon, a 16-page letter Bates

Page 207

J. HARLLEE

1
2    No. 106205 was marked Harllee Exhibit
3    10 for identification as of this date
4    by the reporter.)
5    MR. PELICCI:  Plaintiff's
6    Exhibit 10 is being introduced.  You
7    will see a Bates stamp on there,
8    106205.  It is a letter from
9    JacksonLewis to the Equal Employment
10   Opportunity Commission.  It is a
11   16-page exhibit.
12   Q.  I am going to ask you to, please,
13   turn to the third page of the exhibit.
14   The first sentence of the third
15   paragraph on the first page says, "Ms. Abrey
16   began working for Steampunk on May 15, 2019
17   as an EVP and general manager leading the
18   commerce and DHS portfolio."
19   Is that correct?
20   A.  Emerging Markets would have
21   encompassed commerce.  The DHS portfolio
22   would have been outside of that.  So there
23   is an error there.
24   Q.  So this is not correct?
25   A.  No, because of her restrictions,

Page 208

J. HARLLEE

1
2    she could not have had DHS reporting to her.
3    Q.  Are you aware that there is a
4    letter submitted on behalf of Steampunk to
5    the United States Equal Employment
6    Opportunity Commission?
7    A.  I am.
8    Q.  Were you aware of this letter when
9    it was sent out?
10   A.  I was.
11   Q.  Did you review this letter?
12   A.  I did.
13   Q.  Is there a reason you didn't
14   correct that inaccuracy?
15   A.  I must not have noticed it.
16   Q.  I mean, it is a pretty substantial
17   inaccuracy.  I mean, this case is about
18   Ms. Abrey's role being changed because of
19   her pregnancy, and in this letter here you
20   are representing that Ms. Abrey's role is
21   something else.  Do you not find that to be
22   an important inaccuracy that is worth
23   correction?
24   MR. WILKINSON:  Objection.
25   A.  She was running DHS later in the

Page 209

J. HARLLEE

1
2    life of the organization.  I believe people
3    probably got it conflated.
4    Q.  But this says this is actually
5    what she was hired to run?
6    A.  Yes, it does.
7    Q.  So once again, that's not correct?
8    A.  At the time that she was hired,
9    she did not have responsibility for the DHS
10   portfolio.
11   Q.  And then the second sentence of
12   the second paragraph reads, "The primary
13   function of the EVP role is to grow
14   Steampunk's business.  This requires that
15   the EVP win net new business to continue to
16   expand the company's base of revenue while
17   also expanding the size and scope of
18   existing delivery projects and programs."
19   Do you see that?
20   A.  I do.
21   Q.  At the time of Ms. Abrey's hiring
22   she was not permitted to attempt to win net
23   new business in DHS; is that correct?
24   A.  She was not permitted to directly
25   engage with DHS.  She certainly provided, in

53 (Pages 206 - 209)

J. HARLLEE

1          J. HARLLEE
2 my opinion, the majority of the direction to
3 Diane Ashley, who worked for me at the time,
4 but she was providing the front-end advice
5 to her.  And it was understood that
6 Ms. Ashley would work for Ms. Abrey when the
7 restrictions were up.
8     Q.  It was your understanding that
9 Ms. Abrey was the one was primarily
10 responsible for providing Ms. Ashley
11 supervision?
12     A.  That's not what I said.
13     Q.  You said she was the one primarily
14 providing guidance?
15     A.  No, as I explained earlier, at the
16 time that we were starting the company there
17 was a bit of an all-hands-on-deck dynamic,
18 which similarly to the description I gave
19 you on seniority, different people provided
20 different input to the employee base based
21 on their expertise in a particular area.
22 Ms. Ashley reported to me, I help her in a
23 number of different ways.  But Ms. Abrey
24 primarily, along with Mr. Warren and
25 Mr. Cole, Mr. Dillon, also provided advice

1          J. HARLLEE
2 to Ms. Ashley, on the front end of the
3 business, which is not my area of expertise.
4     Q.  Did you conduct any performance
5 assessments of Ms. Ashley, by that I mean
6 formal performance reviews?
7     A.  Not to my recollection.
8     Q.  And so who was responsible at the
9 time of Ms. Abrey's hire in that pre-leave
10 period, who was responsible, who was
11 Ms. Ashley's formal supervisor?
12     A.  I was her formal supervisor.
13     Q.  Until when?
14     A.  Until Ms. Abrey came back from her
15 maternity leave and her restrictions were
16 up.
17     Q.  And was there a plan put in place
18 regarding those organizational changes, when
19 Ms. Abrey would then assume a supervisory
20 control of Ms. Ashley?
21     A.  Can you restate the question,
22 please.
23     Q.  Was there a plan in place or a
24 plan ever developed whereby Ms. Abrey would
25 assume supervisory control of Ms. Ashley?

1          J. HARLLEE
2     A.  I don't think there was any formal
3 plan, but it was certainly discussed and
4 understood.
5     The primary reason that Kate came
6 to Steampunk was to be able to drive our
7 business inside of DHS.  And it was
8 understood by everyone, including Ms. Abrey,
9 that DHS would formally report to her as
10 soon as her restrictions were up.  And
11 therefore Ms. Ashley would report to her,
12 because Ms. Ashley had responsibility for
13 DHS.
14     Q.  So Ms. Ashley didn't report to
15 Ms. Abrey until May of 2020?
16     A.  She didn't report to her formally.
17 She was responsible for the overall
18 forecasting of the Emerging Markets business
19 as well as Diana Ashley's forecast.
20     Q.  I see the word "wedges" and "net
21 new" a lot in documents.  And it seems to be
22 something that Mr. Warren loves to talk
23 about.  Sounds like it is a wide
24 conversation at Steampunk.
25     Are you familiar with wedges and

1          J. HARLLEE
2 net new?
3     A.  Yes.
4     Q.  So in terms of providing specific
5 guidance, prior to May 2020, was Ms. Abrey
6 permitted to engage in the DHS sector
7 regarding net new or wedges?
8     A.  Absolutely.
9     Q.  Was she able to contact those
10 clients to discuss it with them?
11     A.  She was not supposed to.
12     Q.  Did she?
13     A.  I don't know.
14     Q.  Did you?
15     A.  I could have, I didn't.
16     Q.  But did Diane Ashley?
17     A.  Yes, Diane certainly talked to the
18 customers.
19     Q.  And did Diane Ashley update you on
20 her net news and wedges in DHS prior to May
21 2020?
22     A.  Yes, she did.  But that tended to
23 be the forecast sessions instead of the
24 day-to-day grind that she was involved in.
25     Q.  Were you typically involved in the

54 (Pages 210 - 213)

J. HARLLEE

1   a bid, in terms of staffing, there are some
2   people on there that you classify as key
3   personnel?
4      A. I didn't say that. There are
5   people on there that the government
6   classifies as having to be filled as key
7   personnel. And we then assign them to that,
8   but it is not our choice.
9      Q. Is that part of the staffing
10  considerations?
11     A. Yes.
12     Q. And then you said contracts, what
13  do you mean by contracts?
14     A. Nondisclosure agreements,
15  government terms and conditions,
16  subcontracts with prime contractors, CTAs,
17  JVs, anything across the board.
18     Q. It may be self-explanatory, but I
19  have to hear it from you. What is the deal
20  with strategy in terms of how you assisted
21  Ms. Ashley on strategy?
22     A. Typically that would have happened
23  in the context of a forecast session, where
24  if she was asking for help and I saw an

J. HARLLEE

1   opportunity to give her an idea that might
2   work, then I would do that. But I would say
3   I was fourth or fifth or sixth on the list
4   in terms of the feedback I gave her from
5   that perspective.
6      Q. Was there a time when Ms. Abrey
7   was not part of the forecasting sessions for
8   Ms. Ashley?
9      MR. WILKINSON: Objection.
10     A. I don't know if there was a
11  forecast session that Ms. Abrey couldn't
12  attend for some reason. I do know that
13  Ms. Abrey vetted and signed off and
14  presumably adjusted, if she felt
15  appropriate, the forecasts coming from
16  Diane, David Wolf and others.
17     Q. And did you participate in that
18  process?
19     A. In what way?
20     Q. Did you ever shape the forecasts?
21     A. No.
22     Q. But you said you participated in
23  the forecasting sessions. You said you may
24  have been, I think you said, one of the six

J. HARLLEE

1   in terms of feedback, which is a bit
2   surprisingly low, given your place on the
3   chain of command?
4      A. It is not my area of expertise. I
5   defer to my vetters (phonetic) there.
6      Q. But you were Diane's formal
7   supervisor?
8      A. I was.
9      Q. What type of strategy advice did
10  you give Diane about net news and wedges?
11     A. I took, along with a lot of other
12  people on multiple occasions, I worked
13  through, I tried to explain to her why the
14  wedge approach was so important to the
15  company and tried to get her focused on
16  that.
17     Q. So who ran the forecasting
18  sessions for Ms. Ashley while Ms. Abrey was
19  out on leave?
20     A. I believe Ms. Ashley at that point
21  was handling the forecast for herself.
22     Q. But did anyone oversee that with
23  her?
24     A. We handled it in the forecast

J. HARLLEE

1   sessions.
2      Q. Who else would be present for the
3   DHS forecasting sessions while Ms. Abrey was
4   out on leave?
5      A. It would not have been a DHS
6   forecasting session. It would have been a
7   company forecast session. There were any
8   number of people there, mostly the
9   leadership team. Probably the most
10  important people to be there would have been
11  Matt, Brad, Sean, Matt Reeves.
12     Q. Why were they the most important
13  people?
14     A. Because those were the folks who
15  had the skills on the front end of the
16  business, with the exception of Mr. Reeves,
17  who was responsible for delivery and was a
18  key component in the decision making.
19     Q. But Mr. Reeves actually later
20  assumed Ms. Abrey's front end
21  responsibilities when you fired her?
22     A. Succession planning.
23     Q. What went into that decision?
24     A. Into which decision?

56 (Pages 218 - 221)

J. HARLLEE

1
2   Q.   To make Mr. Reeves Ms. Abrey's
3   replacement?
4   A.   You can't have a vacuum at the top
5   of an organization.  We put Mr. Reeves into
6   that position as the accelerating portfolio
7   lead to find out whether or not he was
8   suited for the position.  He was certainly
9   capable of carrying the position for a
10  while.  And he had the relationships with
11  the vast majority of the folks who worked
12  for Kate, which comprised over half of the
13  employees of the company at the time that
14  she left.
15  Q.   And when Ms. Abrey was terminated,
16  you were very unhappy with Ms. Ashley's
17  performance; correct?
18  A.   I had been unhappy with
19  Ms. Ashley's and Ms. Abrey's performance for
20  some time, and more important their
21  credibility and grasp of the business.
22  Q.   What was your view on Ms. Ashley's
23  performance when you terminated Ms. Abrey?
24  A.   Ms. Ashley responded better, I
25  would not say well, but better from a

J. HARLLEE

1
2   productivity perspective when Ms. Ashley was
3   out and Matt took a more direct approach
4   with Diane.  And so we were hopeful that
5   with a change of management Ms. Ashley would
6   be made into a productive player of the
7   company.
8   Q.   When you were her formal
9   supervisor, you didn't make her into a
10  productive player?
11  A.   That was not my role.
12  Q.   You didn't have any responsibility
13  for her productivity as her formal
14  supervisor?
15  A.   Not on the front end of the
16  business.
17  Q.   You just listed four things that
18  you assisted with her, while they are back
19  end functions, don't they affect her front
20  end capabilities?
21  A.   Typically the back end functions
22  don't come meaningfully into play until you
23  got a customer who is eager to buy something
24  and a customer that you built a relationship
25  with and had trusted you.  We rarely got to

J. HARLLEE

1
2   that point with Ms. Ashley's opportunities.
3   Q.   But you couldn't make a
4   competitive bid if you don't have good
5   pricing, could you?
6   A.   You certainly could put a
7   competitive bid in if you don't have good
8   pricing.
9   Q.   And it would be competitive if
10  your pricing is not good?
11  A.   If there are other people bidding
12  on it, it is competitive.
13  Q.   Is that your idea of competitive,
14  as long as you are in the pool, it is
15  competitive?
16  A.   I don't know how you are using the
17  term.  Competitive to me is compete, you are
18  going against other people.
19  You are asking me putting in
20  pricing that really, really high, does that
21  have a negative impact on competition?
22  Sure.
23  Q.   Generally grading Diane Ashley's
24  performance and your understanding of her
25  performance at the time when you terminated

J. HARLLEE

1
2   Ms. Abrey, what would you say your general
3   assessment of her overall performance was?
4   A.   That the results weren't there.
5   Q.   Would you say she was a good
6   performer, bad performer, mediocre,
7   terrible?
8   A.   She was an enthusiastic performer
9   and a hard worker.  But she was not able, in
10  most cases, to get over the hump to put us
11  in a position to make a competitive bid.
12  Q.   Do you believe that DHS was
13  underperforming?
14  A.   You would have to break it into
15  components.  The front end of the DHS
16  business has not come anywhere close to
17  meeting my expectations.  During the time
18  while Kate was here and on leave, the
19  delivery side of the business in DHS
20  actually did very well.
21  Q.   So the DHS front end was not
22  performing well when Ms. Abrey was on leave?
23  A.   It performed better than when she
24  was around.  But it was not where we needed
25  it to be.

57 (Pages 222 - 225)

J. HARLLEE

1                     
2   it is wrong to say that it is not an
3   adverse action, rather the court ruled
4   that it could not serve as the basis
5   for a claim.
6       MR. WILKINSON:  You are exactly
7   right, that's exactly what I said.
8       MR. PELICCI:  So it is relevant.
9   And to the extent that defendants want
10   to make the argument that the
11   restrictions influenced the way they
12   structured the business, and that's
13   part of their argument, if they want
14   that to be part of their argument, then
15   we need to see what the restrictions
16   are that so-called shaped how you all
17   pushed Ms. Abrey out.
18       MR. WILKINSON:  Okay, again, you
19   provide to me the document request that
20   is out there, that to which this will
21   be responsive, and I will take a look
22   at it.  If it is responsive and
23   non-objectionable, then we will
24   consider it.
25       MR. PELICCI:  We have no problem

J. HARLLEE

1                     
2   with you forfeiting that defense, if
3   you also decide to do that in the
4   alternative.
5       MR. WILKINSON:  You are wasting
6   your own time here.  If you want to
7   continue with this, that's fine.  We
8   are not forfeiting anything.
9       (Whereupon, a short recess was
10   taken.)
11   Q.   When was the plan put in place for
12   Ms. Abrey to eventually assume formal
13   supervision of Ms. Ashley?
14   A.   I don't recall specifically.
15   Q.   When was the plan formalized?
16   A.   They announced it in May when her
17   restrictions were up.
18   Q.   Do you know when the decision was
19   made?
20   A.   I don't recall.  It was a known
21   thing that was going to happen since the
22   inception of the company.
23   Q.   Was it formalized at that point?
24   A.   No.  We had not done it.  It was
25   not formalized in my mind until we do it.

J. HARLLEE

1                     
2   Q.   But was the plan formalized?
3   A.   I don't know what that means.
4   Q.   Well, was it pull put in writing
5   anywhere?
6   A.   Right, when we announced.
7   Q.   I am saying prior to announcing
8   it, prior to Ms. Abrey going on leave -- I
9   want to remind you, I don't want to
10   interrupt you, but I want to finish my
11   question.
12       My question is prior to Ms. Abrey
13   going on leave, was it put in writing that
14   she would eventually assume formal
15   supervision of Ms. Ashley?
16   A.   I don't recall.
17   Q.   Are you aware if that was put in
18   writing prior to leave?
19   A.   I don't recall.
20   Q.   When is the earliest you recall
21   seeing in writing a plan for Ms. Abrey to
22   assuming supervision of Ms. Ashley?
23   A.   I don't recall.
24   Q.   And then had you seen in writing
25   prior to Ms. Abrey going out on leave that

J. HARLLEE

1   Ms. Abrey would oversee DHS?
2   A.   Repeat the question, please.
3   Q.   So prior to Ms. Abrey going out on
4   leave, did you ever see in writing, in any
5   form, that Ms. Abrey would assume control of
6   DHS?
7   A.   In writing or in any form?
8   Q.   In writing.
9   A.   No, I don't recall.
10   Q.   You reviewed several documents for
11   today's deposition; did you not?
12   A.   I did.
13   Q.   And in the documents reviewed, did
14   you see anything about Ms. Abrey assuming
15   control of DHS prior to her going out on
16   leave?
17   A.   I don't recall seeing anything
18   like that.
19   Q.   Was there any formal policies for
20   record keeping in place at Steampunk
21   regarding Ms. Abrey's employment?
22       MR. WILKINSON:  Objection.
23   A.   Yes.
24   Q.   Who oversaw those policies?

**59 (Pages 230 - 233)**

Page 242

J. HARLLEE

1
2  case was it needed, because her having
3  relationship with those folks was not going
4  to add to our relationship as a company with
5  those customers. That box was checked.
6      Q. But that's not in fact the case of
7  how things were operating prior to
8  Ms. Abrey's leave; is that correct?
9      A. That's a huge generalization. Can
10  you be more specific, please.
11     Q. So Ms. Abrey did engage with
12  Mr. Licht regarding client relationships
13  prior to going out on leave; correct?
14     A. Yes, I just explained, she was
15  trying to.
16     Q. But she did assist him with client
17  relationships prior to going out on leave;
18  correct?
19     A. Not my impression.
20     Q. And she did provide Mr. Licht
21  guidance on the nitty-gritty of deals prior
22  to going out on leave; correct?
23     A. I have no idea.
24     Q. You have no idea about how
25  Ms. Abrey or if Ms. Abrey assisted Mr. Licht

Page 243

J. HARLLEE

1
2  prior to going out on leave?
3      A. I don't know what she did or how
4  she did it. I do know that she was pressing
5  him to get her engaged to meet his clients.
6  And that was sort of the extent of my
7  awareness.
8      MR. PELICCI: I am going to ask
9  you to refresh.
10     (Whereupon, a three-page e-mail
11  Bates No. 25741 through 25743 was
12  marked Harllee Exhibit 11 for
13  identification as of this date by the
14  reporter.)
15     MR. PELICCI: This is Exhibit 11.
16     Q. Plaintiff's Exhibit 11, Bates
17  stamped 25741, it is a three-pager. It is
18  an e-mail from, the very first e-mail is
19  Brad Cole to Kate Abrey, Joe Nizhnikov, Max
20  Licht, Ben Lienard, Carolyn Muir, Nick
21  Trzcinski, Brandon Feather, Sean Dillon, do
22  you see that?
23     A. I do. It is a long e-mail, I need
24  to read, if you want me to comment on it.
25     Q. We are not going to read that

Page 244

J. HARLLEE

1
2  e-mail. In fact, I am not really even
3  concerned with the substance of the first
4  e-mail.
5      What I am curious about is, of the
6  people listed in the to line of this e-mail,
7  what portfolios or -- what was the other
8  term you used portfolio and sectors, what
9  portfolios or sectors did the people belong
10  to starting with Ms. Abrey in the to line at
11  the time of this e-mail?
12     A. Ms. Abrey had Emerging Markets,
13  Mr. Nizhnikov worked inside of Civilian,
14  Mr. Licht had Civilian, Ben Lienard works
15  for the capture team, Carolyn is the general
16  counsel, Nick Trzcinski was Kate's peer
17  running DOD, Brandon Feather is a technical
18  SME and Sean Dillon is our CTO.
19     Q. Just so I understand your position
20  is that these sectors that are represented
21  here are Civilian, and what was the one you
22  said Kate was?
23     A. Emerging Markets.
24     And then DOD.
25     Q. And was DOD a separate sector or

Page 245

J. HARLLEE

1
2  portfolio?
3      A. It was.
4      Q. And had it stayed that way for the
5  course of Ms. Abrey's employment?
6      A. Once Nick came on, yes.
7      Q. I am sorry, once Nick came on, DOD
8  remained outside of Civilian and Emerging
9  Markets?
10     A. Right.
11     Q. Who oversaw DOD after Nick was
12  fired?
13     A. It was transitioned into
14  Mr. Licht's portfolio.
15     Q. So that was my question, if it was
16  consolidated under any other portfolio.
17     So Mr. Trzcinski was consolidated
18  under Licht, his portfolio was?
19     A. He wasn't, his portfolio was. He
20  had similar performance problems to Kate,
21  and was terminated.
22     Q. But there is no DHS represented
23  here, why is that?
24     A. Because it looks like -- you see,
25  I need to read the e-mail now if you want me

62 (Pages 242 - 245)

J. HARLLEE

1
2  remember her embracing it as I would have
3  expected her to do.
4      Q.  Why?
5      A.  Because she was now going to be
6  able to call on the customers with whom she
7  had a relationship directly.
8      Q.  But it had never been communicated
9  to her in writing prior to her leave that
10  that would be the organizational structure;
11  is that correct?
12      A.  I don't recall it being in writing
13  to her.  We certainly talked about it.
14      Q.  When did you talk about it with
15  baby Bree?
16      A.  It was part of the overall
17  process, thoughts, plans.  We had to deal
18  with restrictions.  And then once we dealt
19  with the restrictions, or rather they
20  expired, then she would be leading the
21  charge inside of DHS.  That's where it would
22  not make sense to not take advantage of
23  that, given the depth of the experience at
24  DHS.
25      Q.  Was there anything that prevented

J. HARLLEE

1
2  Ms. Abrey from continuing to oversee any of
3  the clients that fell under Emerging
4  Markets?
5      A.  Say that the question again.
6      Q.  Was there anything that prevented
7  Ms. Abrey overseeing DHS while she continued
8  to oversee Emerging Markets?
9      MR. WILKINSON:  Objection.
10      A.  Well, she did continue to oversee
11  Commerce and Department of Justice, which
12  were part of Emerging Markets.  In terms of
13  preventing her from being able to cover
14  everything else, which I think is what your
15  question is, we would never put a single
16  person in charge of the entire business.  We
17  diversified our risk by having at least two
18  or ideally three or four different
19  portfolios.
20      Q.  But is Mr. Warren considered in
21  charge of the entire business?
22      A.  He is.  But that's not the same
23  thing.
24      Q.  Does he oversee all the
25  portfolios?

J. HARLLEE

1
2      A.  He does.
3      Q.  And you yourself said for
4  succession planning it is good to have a
5  backup in mind?  Was Kate, in fact, that
6  back up?
7      A.  No, that's never been my opinion.
8  She had an opportunity to become the CEO
9  down the road if she performed.  Frankly,
10  she was not ready to be the CEO when she was
11  here.
12      Q.  Did you ever hear Mr. Warren say
13  Ms. Abrey has sharp elbows?
14      A.  I don't believe so.
15      Q.  Did you ever hear Mr. Warren say
16  Ms. Abrey was nurturing?
17      A.  I don't believe so.
18      Q.  Did you hear Mr. Warren call David
19  Wolf an idiot?
20      A.  I have already answered that
21  question, no.
22      Q.  So did you hear Mr. Warren
23  reprimand Ms. Abrey for her baby making
24  noises during video meetings?
25      MR. WILKINSON:  Objection.

J. HARLLEE

1
2      A.  No.  I may have heard him, she had
3  a habit of calling in to calls on the
4  treadmill or on her bike.  And the ambient
5  background noise was a problem.  I believe I
6  recall that Mr. Warren commented on it once.
7  I know I heard a number of different people
8  complaining about the background noise from
9  the bike and the treadmill.
10      Q.  Do you recall a point in time
11  where you had a conversation with Ms. Abrey,
12  and you admitted to her that her concerns
13  prior to her going out on leave about her
14  role changing had come true?
15      A.  No.
16      Q.  No?
17      A.  No.
18      Q.  Do you remember any conversations
19  along those lines?
20      A.  No.
21      Q.  Nothing?
22      A.  Nothing.
23      Q.  Who is Bruce Klein?
24      A.  He was a quite expensive
25  professional coach that we brought onto help

66 (Pages 258 - 261)

Page 262

J. HARLLEE

1  a number of folks level up from a
2  productivity perspective.
3
4      Q.  Who were those folks?
5      A.  He was working with Diane, I think
6  he was working with Matt Reeves.  I am not
7  sure who else.  Oh, and Diane -- no, I said
8  Diane, didn't I?  And we gave Kate an
9  opportunity to do it, but she didn't feel
10 like she needed it.
11     Q.  Are you aware or were you ever
12 made aware that Ms. Ashley told Mr. Dillon
13 about Ms. Abrey's complaints of pregnancy
14 discrimination?
15         MR. WILKINSON:  Objection.
16     A.  I never had a conversation with
17 Sean Dillon about anything like that.
18     Q.  Did Sean Dillon ever discuss
19 Ms. Abrey with you?
20     A.  I am sure he did, yes.
21     Q.  Do you recall if he ever discussed
22 any changes to Ms. Abrey's role with you?
23     A.  No.
24     Q.  What is operational excellence?
25     A.  Operational excellence was an

Page 263

J. HARLLEE

1  initiative that sputted out where we were
2  trying to take advantage of Kate's expertise
3  in delivery, similar from the e-mail that we
4  just had the talk about, about focusing on
5  making sure that our delivery was working
6  the way it should be.  We had a number of
7  people who came from software companies, who
8  didn't have long-term experience in the
9  services world.  And as with any good
10 company, we wanted to put the best practices
11 out there and make sure we put our best into
12 the company from a delivery perspective.
13     Q.  When is the first time you can
14 recall hearing Ms. Abrey mention that she
15 feels like her pregnancy leave resulted in
16 changes to her role at Steampunk?
17         MR. WILKINSON:  Objection.
18     A.  I never heard her say that.
19     Q.  Did Mr. Warren tell you she said
20 something similar to that during his call
21 with her on the 14th of January?
22         MR. WILKINSON:  Objection.
23     A.  No.
24     Q.  Did you know that Mr. Warren

Page 264

J. HARLLEE

1  recorded that call?
2
3      A.  I did.
4      Q.  Did he communicate to you prior to
5  recording that call about doing that?
6      A.  He did.
7      Q.  Was it your recommendation to
8  record the call?
9      A.  We talked about whether or not it
10 is best practice in my experience and at
11 Steampunk in personnel matters, particularly
12 ones that are negative, to have two people
13 involved from a company perspective.  And
14 Mr. Warren felt very strongly that with his
15 relationship with Kate, it would be
16 unpleasant and embarrassing for her to have
17 somebody on the phone, given the depth of
18 his relationship with her.
19         And we talked about that.  And in
20 lieu of having me join the call, we used the
21 phone call as a proxy for basically myself
22 in that context.
23     Q.  So prior to that call, the first
24 call regarding Kate on January 13, 2021, so
25 we said there were two key calls during that

Page 265

J. HARLLEE

1  period, there was one you call the
2  challenging call on January 13, and then
3  there was the termination call on the 14th.
4
5         Prior to that, did you have any
6  reason to believe that Kate was not happy at
7  Steampunk?
8      A.  She was not performing.  She knew
9  she was not performing.  And she obviously
10 was not happy with her performance.  I
11 believe she stated that a number of times,
12 including in written documents.
13         But outside of that lack of
14 performance, I don't have any reason to
15 believe that she was unhappy.
16     Q.  Do you remember any conversations
17 where you discussed Ms. Abrey's health or
18 happiness at Steampunk prior to January 13,
19 2021, since she returned from leave?
20     A.  I don't recall any conversations
21 like that, no.
22     Q.  So did you think Ms. Abrey was
23 unhappy at Steampunk prior to January 13?
24         MR. WILKINSON:  Objection.
25     A.  I don't know how to answer that

67 (Pages 262 - 265)

J. HARLLEE

1
2  question.  That's not how I looked -- that's
3  not the lens I look through when I look at
4  the company.
5      Q.  Okay, so you don't look at
6  employee happiness?
7      A.  I look at it in the aggregate, and
8  I look at it with regard to my direct
9  reports.  But I was not managing her, that
10  was outside of my purview.
11     Q.  But did you have any assessment of
12  whether or not you thought she was happy at
13  Steampunk?
14     A.  I would have been very
15  disappointed if she was happy at Steampunk
16  with the performance that she was putting
17  out for the previous nine months.
18     Q.  So you wanted Ms. Abrey to be
19  unhappy?
20     A.  No, I would be surprised if she
21  was happy given her lack of performance.
22  She was a very professional, hard working
23  person.  And she could not get it going.
24     Q.  When could she not get it going?
25     A.  Well, in Q3, and Q4 in 2019 she

J. HARLLEE

1
2  badly missed her forecasts.
3      Q.  For which portfolio?
4      A.  For the folks that she was
5  responsible for holding the forecast for.
6      Q.  You said she badly missed her
7  forecast in Q3 and 4 of 2019.  And I am
8  asking for which portfolios is that your
9  position?
10     A.  I guess Emerging Markets and DHS.
11  She had responsibility basically for the
12  front end of the business with regard to
13  David Wolf and Diane Ashley.  And they set
14  forecasts up and she signed off on them, and
15  the business didn't materialize in either
16  case.
17         And then that trend continued
18  after she got back, at which point I became
19  very worried about it, and then certain
20  things came up that made me question whether
21  or not she actually understood some of the
22  basic tenets of our business.  So she had a
23  credibility issue with me.  And it caused a
24  lot of challenges financially for the
25  company.

J. HARLLEE

1
2      Q.  Did you communicate that
3  credibility issue to her in writing prior to
4  January 13?
5      A.  Did I?
6      Q.  Correct.
7      A.  I don't think I did.  Matt Warren
8  did on, I believe, several occasions.  And
9  in one case, because she was arguing the
10  semantics of what a forecast meant, we
11  changed the terminology inside the company
12  as a whole from forecast to commit, so that
13  we didn't have to argue as to what a
14  particular term meant.
15         She also didn't have a handle of
16  the inner relationships between bookings and
17  FTEs, which is a very, very fundamental
18  problem.  And that came to the floor on the
19  January 4 forecast, which she then dropped
20  after having been pointed out a very basic
21  issue, frankly, around the inconsistency of
22  the two forecasts.  At which point she
23  continued to lose credibility with me, at
24  which point I was not sure we could have her
25  in the position that she was in.

J. HARLLEE

1
2      Q.  On January 13, 2021, did
3  Ms. Ashley have credibility with you?
4      A.  She did.
5      Q.  You didn't fire Ms. Ashley, did
6  you?
7      A.  We did not.
8      Q.  Ms. Ashley resigned; right?
9      A.  Correct.
10     Q.  Why did Ms. Ashley resign?
11     A.  Ms. Ashley -- you know what, I
12  have no idea.  She didn't talk to me.
13     Q.  Did you later learn that
14  Ms. Ashley resigned because of how she felt
15  you treated Ms. Abrey?
16     A.  I don't track the gossip, I have
17  no idea.
18     Q.  You didn't learn that?
19     A.  Learn what?
20     Q.  That Ms. Ashley says she resigned
21  because of the way you treated Ms. Abrey?
22     A.  I never heard that from her.
23     Q.  Did you ever hear it from anybody?
24     A.  It was a reasonable inference to
25  me.  I can't remember if I heard anybody

J. HARLLEE

1  tell me that.
2  Q.   Why was that a reasonable
3  inference?
4  A.   She and Kate were very close.
5  Kate had spent the late nine months frankly
6  protecting her from folks putting pressure
7  on her to perform.
8  Q.   But Ms. Abrey was not back at the
9  company for nine months at that point?
10  A.   Okay, eight months, seven and a
11  half, if you wish.
12  Q.   Are you aware that Ms. Abrey
13  received a performance review in November or
14  December of 2020?
15  A.   Yes.
16  Q.   Did you provide any feedback for
17  that performance review?
18  A.   I don't think I did.
19  Q.   And did you raise any or did you
20  suggest that you confront Kate in connection
21  with that performance review regarding some
22  of the performance concerns that you
23  mentioned today?
24  A.   We had had a number of

J. HARLLEE

1  conversations with Kate about her routine
2  and her performance going back to --
3  Q.   My question, and I am going to
4  respectfully redirect you to my question, my
5  question is, did you make a recommendation
6  or even discuss mentioning any of the
7  performance concerns that you discussed
8  today in connection with Ms. Abrey's
9  performance review?
10  A.   I don't recall specifically.
11  Q.   Did Mr. Warren tell you or discuss
12  Ms. Abrey's performance review with you?
13  A.   I don't recall that happening
14  specifically, no.
15  Q.   Did you view Ms. Abrey's
16  performance review prior to it being
17  provided to her?
18  A.   I don't believe so.
19  I might have, but I don't think
20  so.
21  Q.   Is it your opinion that Ms. Abrey
22  was cold?
23  MR. WILKINSON:  Objection.
24  A.   No.

J. HARLLEE

1  Q.   What about transactional?
2  MR. WILKINSON:  Objection.
3  A.   I don't know what that means.
4  Q.   Prior to January 13, or
5  January 14, I should say, prior to
6  January 14, 2021, did you ever notify Kate
7  Abrey that you had plans to terminate her
8  employment?  And that is a specific
9  question.  I am not talking about
10  performance deficiencies.  I am asking you
11  if prior to January 14, 2021, did you ever
12  indicate to Ms. Abrey that you or Mr. Warren
13  intended to terminate her employment?
14  A.   We communicated to her in the
15  December time frame that she needed to hit
16  her forecast and land her deals by the end
17  of Q1 or we were going to have some hard
18  conversations.
19  Q.   But you didn't wait until Q1, did
20  you?
21  A.   We did not, because of what
22  transpired early in the quarter.
23  Q.   So when was the decision made to
24  terminate Ms. Abrey's employment?

J. HARLLEE

1  A.   It was a bit of an evolution.  We
2  hadn't made any decision for the latter part
3  of 2020.
4  There was a forecast session at
5  the beginning of the year.  I think it was
6  on the 4th.  And Ms. Abrey forecast I
7  believe a $2 million opportunity, but she
8  only had a forecast of two FTEs associated
9  with that opportunity.  And that is a null
10  set in terms of both of them being true, you
11  get about $250,000 a year per person.  So
12  there is no way there could have been a
13  $2 million booking, because there was only
14  two people on the job, which would imply a
15  $500,000 booking.  We pointed this out to
16  her.  And she the next day dropped her
17  forecast after we had had conversation after
18  conversation after conversation about her
19  getting her forecasts right in Q1 2021.
20  Q.   And was the forecast formalized?
21  A.   Yes.
22  Q.   When was that formalized?
23  A.   It was put forth on January 4.
24  Q.   And when was the changes made?

69 (Pages 270 - 273)

1                J. HARLLEE
2        A.   Subsequent to a conversation that
3   we had that day, probably the next couple of
4   days, maybe the next day.  I don't remember
5   exactly.  It was soon after that.
6        Q.   Is it your position that that's
7   what made you decide to terminate
8   Ms. Abrey's employment?
9        A.   That in conjunction with the body
10  of work that had happened over the preceding
11  months.
12       Q.   And so that change with the
13  forecast happened on January 4 or 5, 2021?
14       A.   It was that week.
15       Q.   And you didn't communicate the
16  termination to Mr. Abrey on the January 13,
17  2021 call, did you?
18       A.   Which call?  We had not made a
19  final decision on it until we had the hard
20  conversation on the 13th about performance
21  and forecast, and Ms. Abrey deflected and
22  did not take accountability for the problem
23  nor was she willing to hold her employees
24  accountable.  And that in combination with
25  the lack of understanding of the basics of

1                J. HARLLEE
2   the business coupled with continual missing
3   of forecasts, the final straw for lack of a
4   better word was her unwillingness to accept
5   responsibility and acknowledge the lack of
6   performance.
7        Q.   By the time of January 13, 2021,
8   how many forecasts, in your view, did
9   Ms. Ashley miss?
10       A.   I couldn't tell you, most of them.
11       Q.   You didn't terminate Ms. Ashley,
12  did you?
13       A.   We talked long hard about
14  terminating Ms. Ashley.  And Ms. Abrey
15  wouldn't hear of it.
16       Q.   But who was the final decision
17  maker on if Ms. Ashley was to be terminated?
18       A.   Technically Matt or myself.
19  However, reaching down through an executive
20  and firing one of their people when they
21  object to it, is not workable, generally.
22       Q.   Why is that not workable?  You
23  guys were the bosses, weren't you?
24       A.   Sure, it is just not appropriate.
25  We were trying to work through Ms. Abrey to

1                J. HARLLEE
2   either get her to perform better or to fire
3   her.  And Kate was unable to do one and
4   unwilling to do the other.
5        Q.   Was there a point in time when you
6   removed delivery excellence from Ms. Abrey?
7        A.   Not to my recollection.  I believe
8   it sputted out, Ms. Abrey showed limited
9   interest in it.
10       Q.   Did you assign delivery excellence
11  to anybody else?
12       A.   Not with that nomenclature.  But
13  it moved over into the CIO shop,
14  essentially.
15       Q.   Who oversees that now?
16       A.   Emily Connolly.
17       Q.   What is Emily Connolly's title?
18       A.   I am not sure.  I have to look at
19  it.
20       Q.   Who oversaw delivery excellence or
21  whatever you call it after that, immediately
22  after Ms. Abrey?
23       A.   I don't recall.
24       Q.   Did Mr. Warren tell you anything
25  about his termination call with Ms. Abrey?

1                J. HARLLEE
2        A.   He said it was a difficult
3   conversation.  And he was not sure how she
4   would want to handle it.
5        Q.   Did he debrief you on the call?
6        A.   I don't know if I would say it was
7   a debrief, but yes, we talked about it.
8        Q.   There is mention that Ms. Abrey on
9   that call said to him that Mr. Licht
10  reported to her prior to leave, and then
11  after leave he no longer reported to her?
12       A.   No.
13       Q.   Did Mr. Warren ever bring that up
14  to you, that Ms. Abrey said that to him
15  during the termination call?
16       A.   No.
17       Q.   Are you aware that Ms. Abrey was
18  told that she was not a good cultural fit?
19            MR. WILKINSON:  Objection.
20       A.   That never came out of my mouth, I
21  don't know.
22       Q.   Do you think Ms. Abrey was a good
23  cultural fit for Steampunk?
24            MR. WILKINSON:  Objection.
25       A.   If she was performing, she would

70 (Pages 274 - 277)

J. HARLLEE

1
2  have been.
3      Q.  So in your eyes culture is about
4  performance?
5      A.  Not entirely.  But it is difficult
6  to build a good culture if you are not
7  winning.
8      Q.  So what is culture about?
9      A.  Culture is about folks being
10  excited to be part of the organization that
11  is doing good things for the right people
12  and taking the time to celebrate that.
13      Q.  Anything else you want to add to
14  that?
15      MR. WILKINSON:  Objection.
16      A.  No.
17      Q.  Was Ms. Abrey directed upon her
18  return from maternity leave not to
19  communicate with anyone until she met with
20  you and Mr. Warren?
21      A.  I believe Mr. Warren talked to her
22  and asked her to chat with us prior to her
23  coming back, because we wanted to get her up
24  to speed on where we were going, what had
25  happened while she was gone, potential

J. HARLLEE

1
2  personnel issues and context around the
3  like.  And we thought it was important that
4  she got up to speed before she started to
5  engage with folks without necessarily having
6  the context having been gone for three
7  months.
8      Q.  Why would Ms. Abrey not be able to
9  communicate with anyone?  If that's the
10  case, why couldn't Ms. Abrey communicate
11  with employees that she was previously
12  familiar with?
13      MR. WILKINSON:  Objection.
14      A.  My recollection is that we had a
15  conversation with her either the day of,
16  probably the day of, the day she came back.
17  So we are not talking about any extended
18  period of time.
19      Q.  But why at all was the instruction
20  given to Ms. Abrey?  I hear your reasoning
21  regarding employees that she may not have
22  been familiar with.  But why couldn't
23  Ms. Abrey communicate with employees that
24  she was familiar with you before she met
25  with you and Mr. Warren?

J. HARLLEE

1
2      MR. WILKINSON:  Objection.
3      A.  Because the ground truth of the
4  business, and we wanted to get her up to
5  speed before she started to engage with
6  anybody.
7      Q.  In association with Ms. Abrey's
8  termination, her equity was clawed back; is
9  that correct?
10      A.  Correct.
11      Q.  And you testified earlier that
12  that's an automatic process, whereby an
13  employee is terminated, their equity is
14  automatically clawed back unless you
15  specifically make an exception; is that
16  correct?
17      A.  That is correct.
18      Q.  Did you make an exception with
19  respect to Ms. Abrey?
20      A.  I did not.
21      Q.  Was there any communications made
22  to anybody by yourself or that you were
23  aware of, to put the ball in motion for the
24  actual process of clawing back Ms. Abrey's
25  equity?

J. HARLLEE

1
2      A.  I am sure we talked about it.  But
3  it is basically an automatic process that
4  happens if you don't, if there is not a
5  request for an exception, which as I said
6  before, there has only been one while I have
7  been here.
8          The way it works, when somebody
9  gets terminated, general counsel gets
10  notified, coordinates with the financial
11  team.  And on their last paycheck, they are
12  effectively reimbursed for what they paid
13  for the stock.  And that's shows up on their
14  final paycheck.
15      Q.  Did you need to e-mail anybody to
16  tell them to start that process?
17      A.  Given her prominence, it is
18  possible that I did.  But it works, it is a
19  default setting.
20      Q.  Who would you have had to e-mail?
21      A.  I would have e-mailed my general
22  counsel.
23      Q.  Is that Ms. Muir?
24      A.  Yes.  But I don't believe I did.
25      Q.  Do you recall telling Ms. Abrey,

71 (Pages 278 - 281)

Page 294

J. HARLLEE

1
2     A.  Ms. Abrey didn't work for me.
3     Q.  But did you have the authority to
4  fire Ms. Abrey?
5     A.  No, I don't think so.
6     Q.  Did you make recommendations to
7  Mr. Warren regularly about who or who he
8  shouldn't fire?
9     A.  I would not say regularly.
10 Because we are not in the business of firing
11 people on a regular basis.  Well, as
12 example, Kate's peer Nick Trzcinski, Matt
13 and I talked a lot about.  He was
14 responsible for bringing in a board member.
15 And he had frankly, he was very similar to
16 Kate, he had an inability to forecast
17 accurately and close business.  So we
18 terminated him towards the end of 2020.  We
19 certainly talked about that.
20     MR. PELICCI:  We could go ahead
21     and take the break now.  Let's take a
22     15-minute break.
23     (Whereupon, a short recess was
24     taken.)
25     MR. PELICCI:  Earlier it came up

Page 295

J. HARLLEE

1
2  regarding Mr. Warren's restrictions and
3  what responsive document requests,
4  which documents requests they would be
5  responsive, I am identifying document
6  request 28, 29, 30, 31, 32.
7     MR. WILKINSON:  Hold on a second.
8  You are saying that the restrictions
9  that Mr. Warren was under, and I am
10 presuming this comes from -- well, I
11 guess I don't know where it comes from.
12 It is probably part of his non-compete
13 agreement that he would have signed or
14 whatever agreement he signed with
15 Accenture.  You are saying that that
16 document would be responsive to request
17 28, 29, 30, 31 and what else?
18     MR. PELICCI:  32, 31 and 32,
19 produce all documents communications
20 and/or ESI concerning the assignment of
21 business or work related to the
22 Department of Homeland Security to
23 Ms. Abrey, similarly 32 asks for that
24 regarding Commerce and 30 talks about
25 reorganization and restructuring that

Page 296

J. HARLLEE

1
2  impacted her roles.  So if it is
3  defendant's position that those
4  restrictions were the factor that was
5  considered for the restructuring and/or
6  what portfolios Ms. Abrey was assigned
7  to or where Warren's place was in the
8  organization, who reported to who, we
9  need to see those restrictions.
10 Because it has been defendant's
11 position throughout these depositions
12 and the litigation that defendants
13 considered Mr. Warren's and Ms. Abrey's
14 restrictions how they structured the
15 business.  And defendants did not
16 object to these document requests in
17 their supplemental responses.
18     So I have identified it now.  I
19 have limited time.  So I am not going
20 to engage in a ton of back and forth on
21 that.  So I will need to know that by
22 tomorrow morning.
23     MR. WILKINSON:  Let me put it this
24 way, I will take a look at this, and I
25 will consider it and I will let you

Page 297

J. HARLLEE

1
2  know.
3     MR. PELICCI:  Okay.  Just let us
4  know by tomorrow morning.
5     Just to be clear on the record,
6  you did agree to provide the updated
7  audit report?
8     MR. WILKINSON:  Yes, that's one of
9  the things that I need to flesh out a
10 little bit.  Let me put it this way, I
11 don't believe the final audit is
12 actually done.  But I have not talked
13 to Mr. Harllee about what he was
14 talking about, because I didn't think
15 that would be appropriate at this
16 point.  But I will find out what it is
17 that the company has and if there is
18 something that we should provide.
19     So my understanding is that
20 whatever the audit, it would have been
21 for the second half of 2022, right, so
22 that would have been -- was there other
23 information that you don't think that
24 you have with respect to the financial
25 picture for the second half of 2022.

75 (Pages 294 - 297)

Page 322

```
1              J. HARLLEE
2               I N D E X
3
4    EXAMINATION BY              PAGE
5      MR. PELICCI        4
6
7      INFORMATION AND/OR DOCUMENTS REQUESTED
8    INFORMATION AND/OR DOCUMENTS      PAGE
9    Board meeting records for showing    69
     attendance for both Steampunk Holdings
10   and Steampunk, Inc?
11   E-mails relevant to maternity leave  147
12   Report                187
13   Completed audit report and Mr.   228
     Warren's restriction agreement
14       QUESTIONS MARKED FOR RULING
15          PAGE LINE
16
             7   14
17
            310  20
18
19
20
21
22
23
24
25
```

Page 324

```
1              J. HARLLEE
2    HARLLEE EXHIBITS
3
4    EXHIBIT      EXHIBIT
5    LETTER     DESCRIPTION      PAGE
6
     Exhibit 11    Three-page e-mail Bates 43
7      No. 25741 through 25743
8    Exhibit 12    Two-page e-mail     255
       Bates No. 76561
9
     Exhibit 13    Tale of Two Portfolio  285
10     slides
11   Exhibit 14    Two-page e-mail     320
       Bates No. 508895
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 323

```
1              J. HARLLEE
2             E X H I B I T S
3
4    HARLLEE EXHIBITS
5
6    EXHIBIT      EXHIBIT
7    LETTER     DESCRIPTION      PAGE
8
9    Exhibit 1    Bates No. 457254 to    33
       457255, a two-page
10     document
11   Exhibit 2    E-mail Bates stamped   49
       SHI 00168602
12
13   Exhibit 3    E-mail Bates No. 166597 70
13
     Exhibit 4    E-mail Bates No. 75623 114
14
     Exhibit 5    Two-page e-mail Bates  120
15     No. 296071 to 296072
16
     Exhibit 6    E-mail Bates No.     124
17     169969
18
     Exhibit 7    E-mail with Bates No.  138
19     168671
20   Exhibit 8    Email with Bates No.   161
       61145
21
     Exhibit 9    Photo          205
22
     Exhibit 10   16-page letter     207
23     Bates No. 106205
24
25
```

Page 325

```
1              J. HARLLEE
2             C E R T I F I C A T E
3
4    STATE OF NEW YORK      )
                         : SS.:
5    COUNTY OF QUEENS       )
6
7      I, RIVKA TROP, a Notary Public for and
8    within the State of New York, do hereby
9    certify:
10     That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14     I further certify that I am not related
15   to any of the parties to this action by
16   blood or by marriage and that I am in no way
17   interested in the outcome of this matter.
18     IN WITNESS WHEREOF, I have hereunto set
19   my hand this 25th day of April, 2023.
20
21
22         Rivka Trop
23          RIVKA TROP
24
25
```

82 (Pages 322 - 325)

Page 326

1 NIGEL WILKINSON, ESQ.
2 Nigel.Wilkinson@jacksonlewis.com
3                    May 5, 2023
4 RE:   Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.
5    4/25/2023, John Harllee (#5885139)
6     The above-referenced transcript is available for
7 review.
8     Within the applicable timeframe, the witness should
9 read the testimony to verify its accuracy. If there are
10 any changes, the witness should note those with the
11 reason, on the attached Errata Sheet.
12     The witness should sign the Acknowledgment of
13 Deponent and Errata and return to the deposing attorney.
14 Copies should be sent to all counsel, and to Veritext at
15 cs-ny@veritext.com
16
17   Return completed errata within 30 days from
18 receipt of testimony.
19    If the witness fails to do so within the time
20 allotted, the transcript may be used as if signed.
21
22          Yours,
23          Veritext Legal Solutions
24
25

Page 328

1 Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.
2 John Harllee (#5885139)
3          ACKNOWLEDGEMENT OF DEPONENT
4    I, John Harllee, do hereby declare that I
5 have read the foregoing transcript, I have made any
6 corrections, additions, or changes I deemed necessary as
7 noted above to be appended hereto, and that the same is
8 a true, correct and complete transcript of the testimony
9 given by me.
10
11 _____   _____
12 John Harllee          Date
13 *If notary is required
14          SUBSCRIBED AND SWORN TO BEFORE ME THIS
15    _____ DAY OF _____, 20___.
16
17
18    _____
19    NOTARY PUBLIC
20
21
22
23
24
25

Page 327

1 Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.
2 John Harllee (#5885139)
3      E R R A T A   S H E E T
4 PAGE_____ LINE_____ CHANGE_____
5 _____
6 REASON_____
7 PAGE_____ LINE_____ CHANGE_____
8 _____
9 REASON_____
10 PAGE_____ LINE_____ CHANGE_____
11 _____
12 REASON_____
13 PAGE_____ LINE_____ CHANGE_____
14 _____
15 REASON_____
16 PAGE_____ LINE_____ CHANGE_____
17 _____
18 REASON_____
19 PAGE_____ LINE_____ CHANGE_____
20 _____
21 REASON_____
22
23 _____ _____
24 John Harllee          Date
25

83 (Pages 326 - 328)

Page 327

1   Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.

2   John Harllee (#5885139)

3                E R R A T A   S H E E T

4   PAGE _ALL_ LINE _ALL_ CHANGE _SALIDER SHOULD_

5   _____ BE "SALITER"_____

6   REASON_____

7   PAGE _220_ LINE _6_ CHANGE _SHOULD BE_

8   _'BETTERS' NOT VETTERS_____

9   REASON_____

10  PAGE _222_ LINE _6_ CHANGE _ACTING NOT_

11  _ACCELERATING_____

12  REASON_____

13  PAGE _238_ LINE _15_ CHANGE _MEDDLING NOT_

14  _METALING_____

15  REASON_____

16  PAGE _258_ LINE _15_ CHANGE_____

17  _____

18  REASON _NO IDEA WHAT 'BABY BREE' IS_

19  PAGE _263_ LINE _2_ CHANGE _SHOULD BE_

20  _'SPUTTERED'_____

21  REASON_____

22

23  _____   _5/23/23_

24  John Harllee                    Date

25

Page 327

1   Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.

2   John Harllee (#5885139)

3                  E R R A T A   S H E E T

4   PAGE _268_ LINE _18_ CHANGE _FLOOR SHOULD BE_

5   _____ 'FORE'

6   REASON _____

7   PAGE _276_ LINE _8_ CHANGE _SHOULD BE_

8   _____ 'SPUTTERED'

9   REASON _____

10  PAGE _318_ LINE _14_ CHANGE _SMART SHOULD_

11  _BE HARD_

12  REASON _____

13  PAGE _57_ LINE _12_ CHANGE _~~BEEN~~ BEFORE_

14  _'LEFT IN MAY' KATE SHOULD BE ADDED_

15  REASON _I MAY HAVE MISSPOKEN_

16  PAGE _329_ LINE _4_ CHANGE _FEB SHOULD BE_

17  _JAN_

18  REASON _MAY HAVE MISSPOKEN_

19  PAGE _____ LINE _____ CHANGE _____

20  _____

21  REASON _____

22

23  _____        5/23/23

24  John Harllee                      Date

25

Page 328

1    Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.

2    John Harllee (#5885139)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, John Harllee, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____        5/23/23
                                             _____

12   John Harllee                           Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    23RD DAY OF MAY_____, 2023.

16

17

18   _____

19                    NOTARY PUBLIC

20

21                    ┌─────────────────────────────┐
22                    │   DAVID TEICHIRO IZAWA       │
                      │       NOTARY PUBLIC          │
                      │   REGISTRATION # 7802714     │
                      │  COMMONWEALTH OF VIRGINIA    │
23                    │   MY COMMISSION EXPIRES      │
                      │      AUGUST 31, 2026         │
                      └─────────────────────────────┘

24

25

                        Veritext Legal Solutions
212-279-9424               www.veritext.com              212-490-3430