KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
EXHIBIT 7

**Page 1**

```
1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF VIRGINIA

3                (Alexandria Division)

4

5    KATHLEEN ABREY,            )

6          Plaintiff,          )

7          vs.                 ) 1:22-cv-00654-MSN-LRV

8    STEAMPUNK HOLDINGS, INC.,  )

9          Defendant.          )

10         *     *     *     *     *     *

11

12

13

14

15

16         The videotaped deposition of KATHLEEN ABREY

17   was taken on Wednesday, April 5, 2023, commencing at

18   9:59 a.m., at the offices of Jackson Lewis P.C.,

19   10701 Parkridge Boulevard, Suite 300, Reston,

20   Virginia, before Audra A. Gilbert, Court Reporter,

21   Notary Public.

22         *     *     *     *     *     *
```

**Page 2**

```
1              A P P E A R A N C E S

2

3    ON BEHALF OF THE PLAINTIFF:

4         ALFREDO J. PELICCI, ESQUIRE

5         Wigdor LLP

6         85 Fifth Avenue

7         New York, New York 10003

8         (212) 257-6800

9         apelicci@wigdorlaw.com

10

11   ON BEHALF OF THE DEFENDANT:

12        NIGEL L. WILKINSON , ESQUIRE

13        Jackson Lewis P.C.

14        10701 Parkridge Boulevard

15        Reston, Virginia 20191

16        (703) 483-8300

17        nigel.wilkinson@jacksonlewis.com

18

19   ALSO PRESENT:

20        GLEN FORTNER, VIDEOGRAPHER

21        JOHN HARLLEE

22
```

**Page 3**

```
1                  I N D E X

2    VIDEOTAPED DEPOSITION OF KATHLEEN ABREY

3              April 5, 2023

4

5    EXAMINATION BY:                     PAGE

6    Mr. Wilkinson                        6

7

8

9

10   ABREY DEPOSITION EXHIBITS:      PAGE MARKED

11   Exhibit Nos. 1 through 3            11

12   Exhibit No. 4                       13

13   Exhibit No. 5                       15

14   Exhibit No. 6                       36

15   Exhibit No. 7                       62

16   Exhibit No. 8                       72

17   Exhibit No. 9                       78

18   Exhibit No. 10                      79

19   Exhibit No. 11                      98

20   Exhibit No. 12                     168

21   Exhibit No. 13                     210

22   (Exhibits continued on the following page.)
```

**Page 4**

```
1    ABREY DEPOSITION EXHIBITS (continued):  PAGE MARKED

2    Exhibit No. 14  (Retained by counsel)    211

3    Exhibit No. 15                           238

4    Exhibit No. 16                           244

5    Exhibit No. 17                           279

6    Exhibit No. 18                           280

7    Exhibit No. 19                           287

8    Exhibit No. 20                           296

9    Exhibit No. 21                           298

10   Exhibit No. 22                           301

11   Exhibit No. 23                           303

12   Exhibit No. 24                           318

13   Exhibit No. 25                           323

14   Exhibit No. 26                           330

15   Exhibit No. 27                           361

16   Exhibit No. 28                           368

17   Exhibit No. 29                           386

18   Exhibit No. 30                           389

19   Exhibit No. 31                           389

20   Exhibit No. 32                           391

21   Exhibit No. 33                           396

22   Exhibit No. 34                           400
```



Page 21

KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

1    Q.   Okay.  What is your understanding of what
2  the agreement obligated you to do or not to do?
3    A.   So it outlined a number of elements that I
4  supported directly for a period of time, at least
5  one year past my -- the last date of my employment,
6  which I believe was May 4th of 2019, approximately,
7  looking back for clients that I had supported
8  previously, the past previous 18 months, nor could I
9  share IP or directly manage or oversee that part of
10  the business.
11    Q.   Did -- did Accenture give you a list of the
12  clients that they didn't want you to solicit?
13    A.   I don't recall.
14    Q.   Did you have an understanding of which
15  clients, though, you were supposed to stay away
16  from?
17    A.   Yes.
18    Q.   What were those -- who were those clients?
19    A.   The -- well, the primary clients that we
20  supported within Department of Homeland Security:
21  TSA, USCIS, ICE, CBP.
22        There were probably others, but those are

Page 22

1  the primary that I can recall at this time.
2    Q.   Okay.
3    A.   And I don't recall at this time if they
4  sent me a letter that enumerated the exact clients.
5        (Interruption at the door.)
6    BY MR. WILKINSON:
7    Q.   What -- did you have an understanding of
8  why Accenture wanted you to sign a noncompete
9  agreement?
10    A.   Yes.
11    Q.   What was that understanding?
12    A.   They were concerned about protecting their
13  business interests, as they were with every
14  executive in that position.
15    Q.   So the idea is that you established
16  relationships with DHS and various other agencies
17  within that department that you could potentially
18  exploit if you went and contacted them as soon as
19  you left Accenture?
20    MR. PELICCI:  Objection.
21    BY MR. WILKINSON:
22    Q.   Is that a fair understanding of it?

Page 23

1    A.   In part, in part.
2    Q.   Okay.  What -- what about -- what is
3  your understanding as to the sort of why they wanted
4  you to stay away from these particular clients?
5    MR. PELICCI:  Objection.
6    THE WITNESS:  My understanding is that all
7  executives at the level that I was operating at at
8  Accenture were under the same agreement; that
9  Accenture was concerned that if executives left,
10  that it would damage their business --
11    BY MR. WILKINSON:
12    Q.   How?
13    A.   -- because they were successful, and they
14  were the leaders of this business area and,
15  therefore, had deep understanding of the business,
16  understood -- had client relationships, had people
17  as well that they -- that worked for them that we
18  could not solicit to come and work.  And, therefore,
19  a departure of a senior leader could jeopardize that
20  area of the business because they were so effective.
21    Q.   Okay.  So you left Accenture, and then you
22  went directly to SE Solutions, right, which later

Page 24

1  became Steampunk?
2    A.   I did.
3    Q.   And that was May of 2019?
4    A.   Correct.
5    Q.   All right.  And when you were at
6  Steampunk -- well, let me put it this way:  SE
7  Solutions, then Steampunk, also did business with
8  DHS; is that right?
9    A.   Correct.
10    Q.   And so, for a year, you were prohibited
11  from your -- by your noncompete from soliciting DHS;
12  is that right?
13    A.   All of the elements that I described in
14  kind of what I said that was -- encompassed my
15  noncompete, I was prohibited from directly doing any
16  of those things.
17    Q.   Okay.  And then, after your year or your
18  time is up, then it was a free for all, right?  You
19  can go and do whatever you wanted with DHS?
20    MR. PELICCI:  Objection.
21    THE WITNESS:  Yeah.  I would say that
22  certain restrictions were lifted.  I wouldn't



KATHLEEN ABREY                                    April 05, 2023
ABREY V STEAMPUNK HOLDINGS                            25–28

Page 25

1 characterize it as a free for all.

KATHLEEN ABREY

ABREY V STEAMPUNK HOLDINGS

4    A.  I was then allowed to be more directly
5 involved in managing and driving that part of the
6 business, including some client contacts that I may
7 have been prohibited from having directly.
8    Q.  Okay.  What did SE Solutions do when you --
9 or, you know, right around the time that you started
10 there?
11       MR. PELICCI:  Objection.
12       THE WITNESS:  Provided consulting
13 technology services to the government.
14       BY MR. WILKINSON:
15    Q.  Was it similar what Accenture did?
16    A.  Yes.
17    Q.  Was it on the same scale as Accenture?
18    A.  No.
19    Q.  What was the difference?
20    A.  600,000 employees compared to under a
21 hundred employees, I believe, at the time.
22    Q.  Okay.  And you went to Accenture, for lack

Page 26

1 of better word, to follow Matt Warren there; is that
2 right?
3       MR. PELICCI:  Objection.
4       BY MR. WILKINSON:
5    Q.  Or to join him?  Maybe that's a better --
6    A.  I did not go to Accenture to follow --
7    Q.  No, no, no, no.  I'm sorry.  If I said
8 Accenture, then that's my --
9    A.  Oh.
10    Q.  -- mistake.
11       To SE Solutions?
12       MR. PELICCI:  Objection.
13       THE WITNESS:  I would not characterize it
14 that way.
15       BY MR. WILKINSON:
16    Q.  How would you characterize it?
17    A.  I went to SE Solutions, having been very
18 much encouraged by Matt Warren to join, with the
19 intention of building and growing and selling a
20 company based upon, you know, the -- the potential
21 for me to both ascend to be the CEO, which was a
22 direct discussion, as well as the potential stock

Page 27

1 and the financial -- the financial benefits.
2       I joined, though, not solely because of
3 Mr. Warren, but because of the -- the team that we
4 were putting together, which, you know, included
5 John Harllee.  It included Diane Ashley.  It
6 included many people other people that I had a great
7 deal of respect for, and I felt that, collectively,
8 we would be an unstoppable team.
9       Matt Warren was certainly the person that I
10 had the closest relationship with when I was at
11 Accenture and who was the one who was the -- I would
12 say the pointy edge of the sphere who discussed the
13 concept with me.
14       BY MR. WILKINSON:
15    Q.  So when all of you sort of came together to
16 sort of -- is it fair to say that you came and took
17 over SE Solutions to create another company?
18       MR. PELICCI:  Objection.
19       THE WITNESS:  We were -- I think it was
20 characterized as we had -- a platform was purchased
21 by Scott LaRose that we were going to use as an
22 accelerator to be able to develop a company that

Page 28

1 would be very appealing for a potential acquisition.
2       BY MR. WILKINSON:
3    Q.  So were you-all trying to build something
4 from the ground up or just take -- take that
5 platform that was under a hundred employees, and
6 then the goal was to try to grow that to a much
7 larger company?
8       MR. PELICCI:  Objection.
9       THE WITNESS:  I -- it's sort of
10 splitting -- we were definitely using the platform
11 as an accelerator.
12       BY MR. WILKINSON:
13    Q.  Well, what do you mean by "as an
14 accelerator"?
15    A.  There were existing capabilities and
16 functions that existed within the company, such as,
17 you know, with the infrastructure around some of the
18 finances and HR and some contracts.  There were some
19 contract vehicles.  There were also some actual, I
20 think, you know, 20 or $30 million a year of annual
21 revenue that we could use for past experience, past
22 performance.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
49–52

Page 49

1 ground truth.  That's why I'm -- that's why I'm --
2 I'm trying to pick my words carefully.
3     BY MR. WILKINSON:
4     Q.  Okay.
5     A.  Does that make sense?
6     Q.  Maybe.  But I think you're kind of jumping
7 the gun a little bit, right?
8     A.  Okay.
9     Q.  So -- well, what did -- so tell me, what
10 did this represent in terms of temporal context?
11     A.  Sure.  The day after I returned from
12 maternity leave, I met with Matt, John, and Scott.
13     During the course of that conversation, I
14 was told that I was no longer going to be
15 responsible for the civilian portion of the
16 business.  I said, in the course of that discussion,
17 That is a demotion.
18     This chart doesn't even represent all of
19 the organization.  For example, DOD is not on this
20 chart and there was another individual running DOD.
21     This represents what changed for me.  I
22 went from having civilian, which had been my primary

Page 50

1 focus, to inheriting DHS, which was always part of
2 the plan.  That's not new.  It was because of what
3 we talked about previously that we had orchestrated
4 I could not run DHS.  And then I had commerce, which
5 was David Wolf, and then, again, a blank box in DOJ.
6 No one existed in DOJ at that point in time.
7     Q.  Okay.  How many employees did Steampunk
8 have before you go out -- went out on maternity
9 leave?
10     A.  About a hundred.  I don't remember,
11 exactly.
12     Q.  Do you -- do you know how many employees
13 the company had when you came back from maternity
14 leave?
15     A.  I really -- I don't know.  No, I don't --
16     Q.  Was it more than a hundred?
17     A.  Probably -- I think there was some growth,
18 yes.  But I also think there was some contraction,
19 so I don't know that -- it wasn't a substantive
20 change.  We didn't go from a hundred to a thousand.
21     Q.  Okay.  Do you know how the company operated
22 structurally, if you would, while you were out on

Page 51

1 maternity leave?
2     MR. PELICCI:  Objection.
3     THE WITNESS:  Not officially, no.
4     BY MR. WILKINSON:
5     Q.  Well, how about unofficially?
6     A.  I was told not to -- I was not to speak to
7 anyone about the business, so I would be
8 speculating.
9     Q.  Well, okay.  So I'm not asking whether you
10 talked to anybody.
11     I'm asking if you know how the organization
12 was structured while you were out on maternity
13 leave?
14     A.  I don't know.
15     Q.  Did you -- did you participate in any kind
16 of meetings or anything work related while you were
17 out on maternity leave?
18     A.  Officially, no.
19     Q.  Okay.  Unofficially, did you?
20     A.  Yes.  People called me.
21     Q.  Did you -- okay.  But did you participate
22 in any kind of team meetings --

Page 52

1     A.  No.
2     Q.  -- or group meetings?
3     A.  No -- or not that I recall at this time.
4 I -- I'm fairly certain me.
5     Q.  After the organization changed, do you
6 remember having to be responsible for affirming
7 anybody's time sheets under this new structure for,
8 like, DHS and commerce?
9     A.  I do not recall, for the length of my
10 employment at Steampunk, the time sheet approval
11 process.  It was not a feature of my role.
12     Q.  So -- so, as I understand, your -- part of
13 your claim is that this change, which you
14 characterize as a demotion, right, was a
15 discriminatory act against you.
16     Am I understanding that right?
17     A.  Yes.
18     MR. PELICCI:  Objection.
19     BY MR. WILKINSON:
20     Q.  Okay.  Why do you believe that that was a
21 discriminatory act?
22     MR. PELICCI:  Objection.



Page 57

1    That -- and -- and the only reason I was
2  out is because I had a baby.  If I hadn't left, it
3  wouldn't have changed.  If I hadn't had left, it
4  wouldn't have changed.
5    Q.  What wouldn't have changed?
6    A.  The organizational structure.
7    Q.  So you -- so your belief is that, had you
8  not gone out on maternity leave, this organizational
9  structure would never have changed?
10    MR. PELICCI:  Objection.
11    THE WITNESS:  That was my understanding.
12    BY MR. WILKINSON:
13    Q.  Well, what are you basing that
14  understanding on?
15    A.  The fact that that was the area that I
16  was run -- the business that I was running
17  previously, the conversations that I had had with
18  Matt and John and Scott about my role within the
19  company and my trajectory within the company to be
20  the next CEO of the company, which was a fairly
21  widely known, if at times contentious, topic.
22    Q.  Why was it contentious?

Page 58

1    A.  I think there was concern -- I don't know.
2  I don't know.  It was contentious.
3    Q.  So is it your contention, then, that the
4  only reason that this organization changed was
5  because you went out on maternity leave?
6    MR. PELICCI:  Objection.
7    THE WITNESS:  Yes.  That's all I know.
8  That's my only understanding.  I don't have any
9  other sense as to why.
10    BY MR. WILKINSON:
11    Q.  Do you know what the difference between
12  causation and correlation is?
13    MR. PELICCI:  Objection.
14    THE WITNESS:  I -- I believe so, but
15  please -- please explain.
16    BY MR. WILKINSON:
17    Q.  Well, I want to know what your
18  understanding of the difference between causation
19  and correlation is?
20    MR. PELICCI:  Objection.
21    THE WITNESS:  It's either -- is it can you
22  prove it -- causation is:  Can you factually prove

Page 59

1  one plus one equals two?  Or causation is -- or
2  correlation is it may seem that one plus one equals
3  two, but you can't prove it.
4    BY MR. WILKINSON:
5    Q.  So I guess -- I guess I was thinking of
6  something a little bit different, right?
7    The way I understand it is that causation
8  is something flows from something else, meaning an
9  act occurs and you get an effect, right?  Cause and
10  effect?  Does that make sense?
11    A.  Sure.
12    Q.  Okay.  And correlation is something happens
13  one place and something happens in another place,
14  but there's no actual causal connection between the
15  two.  They just happen to be one thing happens and
16  something else happens.
17    Does that make any sense to you?
18    A.  Yes.
19    Q.  Okay.  So what I want to understand from
20  you is -- it seems to me that what you're saying is
21  we're talking about a cause -- like, a causal
22  connection, right, between your going out on

Page 60

1  maternity leave and the organization structure
2  changing, right?
3    A.  Yes.
4    Q.  And I want to know from you why you think
5  it is a causal connection as opposed to a
6  correlational connection?
7    MR. PELICCI:  Objection.
8    THE WITNESS:  I believe, because of some of
9  the things that I've already elucidated, I was
10  responsible for hiring Max.  I was responsible for
11  that part of the business.  I -- the only thing that
12  changed was that I had a baby and that I was gone
13  from the business.  And the only reason I was gone
14  from the business is because I had a baby.
15    MR. WILKINSON:  Okay.  Do you mind if we
16  take a quick break?
17    THE WITNESS:  Sure.
18    MR. PELICCI:  Sounds good.
19    MR. WILKINSON:  Is that okay, guys?
20    MR. PELICCI:  No problem.
21    MR. WILKINSON:  Okay.
22    THE VIDEOGRAPHER:  Going off the record.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
69–72

Page 69

1   A.  No.

2   Q.  Is it fair to sort of describe Steampunk,

3   when you started, as a start-up company?

4       MR. PELICCI:  Objection.

5       THE WITNESS:  Yes.

6       BY MR. WILKINSON:

7   Q.  Had you ever worked at a start-up company

8   before?

9   A.  No.

10  Q.  All right.  Did you -- did you review the

11  complaint that was filed in this case before it got

12  filed?

13  A.  Yes.

14  Q.  Did you understand what was in the

15  complaint and what it was saying?

16  A.  Yes.

17  Q.  Did you review the defendant's motion to

18  dismiss that complaint when it got filed?

19  A.  I believe I did, yes.

20  Q.  Did you understand what that motion was

21  trying to do?

22      MR. PELICCI:  Objection.

Page 70

1       THE WITNESS:  I believe -- I mean, at a

2   high level, yes.

3       BY MR. WILKINSON:

4   Q.  What was your understanding?

5   A.  That didn't feel that I was discriminated

6   against.  There was no basis for that.

7   Q.  That's the -- that's the complete --

8   A.  I believe there was something also that

9   Steampunk Holdings and Steampunk, Inc., there was

10  confusion around that, when, for me, they were

11  synonymous, but...

12  Q.  Did you review the exhibits that were

13  attached to the motion to dismiss?

14  A.  I am sure that I did, but I don't recall

15  them all offhand.

16  Q.  Right now, you don't have any recollection

17  of what -- what they were?

18  A.  No, I do not.

19      MR. WILKINSON:  This is not stapled.  We

20  can staple these later.

21      I'm going to -- the court reporter is going

22  to hand you what will be marked as Exhibit 8.

Page 71

1       (Abrey Exhibit Number 8 was marked for

2   identification.)

3       BY MR. WILKINSON:

4   Q.  This is a copy of the amended complaint

5   that was filed in this case.

6       Did you review this document before your

7   lawyers filed it?

8   A.  Yes.

9       How does it differ from the other exhibits

10  that I already have, though -- oh, these are the

11  interrogatories.  I'm just trying to understand

12  the -- I've gotten a lot of documents sitting

13  here --

14  Q.  Oh, just wait.

15  A.  -- so I'm just trying to make sure -- what

16  did you say?

17  Q.  I said, Just wait.

18      Well, you understand what the complaint is,

19  right?

20  A.  Yes, I do.

21  Q.  All right.  That contains the allegations

22  that form the basis for your lawsuit?

Page 72

1   A.  Yes.

2   Q.  Okay.  So I just wanted to know whether you

3   were able to understand what that document was

4   before your lawyers filed it?

5   A.  Yes.

6   Q.  Okay.  Did you approve the content of that

7   amended complaint before it got filed?

8       MR. PELICCI:  Objection.

9       BY MR. WILKINSON:

10  Q.  And that's kind of a yes-or-no question,

11  because I don't want to know what you and your

12  lawyers discussed.

13  A.  Yes.

14  Q.  Are all of the facts that are identified in

15  that amended complaint true?

16      MR. PELICCI:  Objection.

17      THE WITNESS:  To the best of my knowledge,

18  at the time that it was submitted, yes.

19      BY MR. WILKINSON:

20  Q.  Well, are there any facts asserted in that

21  complaint that you now realize may not be true?

22  A.  No.  But I see that it was filed in -- in



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
77–80

Page 77

1    Q.  So did you ever take a look at your
2  paycheck?
3       MR. PELICCI:  Objection.
4       THE WITNESS:  My paycheck was direct
5  deposited so, no.
6       BY MR. WILKINSON:
7    Q.  Did you ever look at your W-2s?
8    A.  I sent them to my tax attorney.
9    Q.  Okay.  That --
10   A.  Not closely, no.
11      MR. WILKINSON:  Okay.  I'm going to --
12  let's mark this as Exhibit 9.
13      (Abrey Exhibit Number 9 was marked for
14  identification.)
15      BY MR. WILKINSON:
16   Q.  So these appear to be copies of your W-2s
17  from 2019, 2020, and 2021; is that right?
18   A.  2019, 2020 -- yes.
19   Q.  And you can see that your employer is
20  identified as Steampunk, Inc., right?
21   A.  I can, yes.
22      And I will apologize and say that I

Page 78

1  wouldn't even know the difference between Steampunk
2  Holdings, Inc., and Steampunk, Inc.
3      Again, that may be because I am too much of
4  a layperson in this, but that would not be something
5  that I would discern the difference.
6      MR. WILKINSON:  Okay.  I'm going to hand --
7  the court reporter is going to mark what is -- we
8  marked as Exhibit 10.
9      (Abrey Exhibit Number 10 was marked for
10  identification.)
11      BY MR. WILKINSON:
12   Q.  So this looks like -- this came from your
13  lawyers, and I presume that you gave this to them,
14  right?
15      So this identifies, what, a direct deposit
16  to your account, right?
17   A.  Yep.
18   Q.  And it identifies payment from Steampunk,
19  Inc., doesn't it?
20   A.  It does.
21   Q.  So do you have any basis to conclude that
22  Steampunk Holdings, Inc., was actually your

Page 79

1  employer, as opposed to Steampunk, Inc.?
2      MR. PELICCI:  Objection.  Asked and
3  answered.
4      THE WITNESS:  I -- yeah, I don't have a
5  different answer for what I said before.  I
6  literally did not know that there was a difference,
7  and I wouldn't have even -- for me, looking at
8  Steampunk, Inc., and then Steampunk Holdings, Inc.,
9  that there was -- I wouldn't, as a layperson, have
10  ever flagged that.
11      BY MR. WILKINSON:
12   Q.  Okay.  But I'm asking you now whether you
13  have any basis to believe that Steampunk, Inc. --
14  I'm sorry -- Steampunk Holdings, Inc., as opposed to
15  Steampunk, Inc., was your employer?
16      MR. PELICCI:  Objection.
17      THE WITNESS:  Sitting here today, I -- I
18  don't.
19      BY MR. WILKINSON:
20   Q.  Well, I mean, it -- it -- it seems a little
21  intuitive, doesn't it, that if your paycheck is
22  coming from a company called Steampunk, Inc., that

Page 80

1  that's probably who employed you?
2      MR. PELICCI:  Objection.  That's not a
3  question.
4      MR. WILKINSON:  It is a question.
5      BY MR. WILKINSON:
6    Q.  Does that not seem reasonable, that if
7  you're looking at a paycheck or your W-2s and it
8  says this is Steampunk, Inc., that means that that's
9  the entity that employed you?
10      MR. PELICCI:  Objection.
11      THE WITNESS:  Again, Steampunk was who
12  employed me.  I did not look at the words after
13  Steampunk.  If it had said a different word, not
14  Steampunk, then I would have made a differentiation.
15  Steampunk was the company --
16      BY MR. WILKINSON:
17   Q.  Okay.  But you're --
18   A.  -- I worked for.
19   Q.  But that's not my question to you, right?
20      My question to you is:  Does it not seem
21  reasonable that, after looking at your W-2s that
22  reference your employer as Steampunk, Inc., and



Page 89

1  responses.

KATHLEEN ABREY those in front of you?
ABREY V STEAMPUNK HOLDINGS

4    Q.  All right.  Were you -- were involved --
5        (Interruption.)
6        BY MR. WILKINSON:
7    Q.  Were you involved in preparing the answers
8  to these interrogatories?
9    A.  Yes.
10    Q.  So you're familiar with what the answers
11  are?
12    A.  I mean, I would need to refresh my memory
13  but, yes.
14    Q.  Did you not look at them when you were
15  preparing for today's deposition?
16    A.  I certainly did review portions of them in
17  more detail than others, yes.
18    Q.  Well, looking at those two documents,
19  Exhibits 2 and 3, did you review all of those
20  documents or portions of those documents?
21    A.  Portions.
22    Q.  Okay.  Were you involved in preparing the

Page 90

1  amended responses to the defendant's document
2  requests?
3    A.  Can you clarify what that means?
4    Q.  Sure.  There's another set of discovery
5  requests that asked for you to produce documents.
6        Are you familiar with that?
7    A.  Yes.
8    Q.  Okay.  So did -- were you involved in
9  preparing the answers to those --
10        MR. PELICCI:  Objection.
11        MR. WILKINSON: -- requests?
12        THE WITNESS:  I don't think so.
13        BY MR. WILKINSON:
14    Q.  Did you get a chance to read them?
15    A.  I don't think so.
16    Q.  So how did you know what documents to pull
17  together to produce in this litigation?
18        MR. PELICCI:  Objection.  Now we're talking
19  about attorney-client communications again.
20        MR. WILKINSON:  Well, I'm not asking for
21  the substance.
22        MR. PELICCI:  Well, of course you are.

Page 91

1  You're asking how she knew.  And there's
2  attorney-client communication in response to that
3  question, and we're not talking about that today.
4        BY MR. WILKINSON:
5    Q.  So you gathered documents to produce in
6  this litigation, right?
7    A.  Yes.
8    Q.  And you did not look at the documents --
9  the written requests that we submitted that said we
10  want you to produce these documents?
11    A.  I do not believe so, no.
12    Q.  Okay.  So the only inference I can draw
13  from that is that your lawyers told you what to get,
14  right, and you gathered it --
15        MR. PELICCI:  Objection.
16        MR. WILKINSON: -- is that right?
17        MR. PELICCI:  No, that can't be answered.
18        Once again, that's an attorney-client
19  communication.
20        BY MR. WILKINSON:
21    Q.  Okay.  Well, let me ask you this, then:
22  Did you produce all the documents that you either

Page 92

1  sent to or received from the EEOC?
2    A.  I don't know that I was asked -- I produced
3  everything that I was asked to produce.
4    Q.  And you have no specific recollection
5  whether you produced documents that you sent to the
6  EEOC, like your charge or -- I believe -- I believe
7  we received a picture of a -- no, I take that back.
8        All right.  So you have no recollection
9  whether you produced everything from the EEOC
10  related to your charge?
11    A.  I produced everything that I was asked to
12  produce.  I don't know what was produced to you.  I
13  provided all of my e-mail.
14    Q.  Okay.  Did you --
15    A.  Since the beginning of time.
16    Q.  Did you provide to your lawyers everything
17  that you had either received from or sent to the
18  EEOC?
19    A.  To the best of my knowledge, yes.
20    Q.  Okay.  Did you provide to your lawyers
21  everything that you sent to or received from the
22  Virginia Attorney General's Office - Office of Civil



Page 93

1  Rights?
2      A.  It's all electronic.
3      Q.  Were there any other documents that you
4  did not provide to your lawyers related to your
5  charge or the complaint filed with the Virginia
6  Attorney General's Office?
7      A.  I don't know.  This is the first time I'm
8  being asked.  I don't know.  I don't think so, but I
9  don't know.
10     Q.  Well, you -- you produced a picture of a
11  letter that you got from the attorney general's
12  office.
13         Do you remember that?
14     A.  Okay.  No.  I don't know what's been
15  produced to you.
16     Q.  Okay.  Okay.  I presume -- and you can tell
17  me if I'm wrong -- that when your lawyers produced
18  to us a photograph of a letter that you received
19  from the Virginia Attorney General's Office, that
20  you must have taken that photograph and given it to
21  your lawyers?
22     A.  Yes.

Page 94

1      Q.  Okay.  Do you believe that you have sent to
2  your lawyers everything that you would have received
3  or sent to the Virginia Attorney General's Office
4  regarding this -- regarding your complaint filed
5  with them?
6      A.  I would assume so, but I don't know
7  definitively.
8      Q.  Did you ever reach out to Ellen Marcus and
9  ask for documents --
10         MR. PELICCI:  Objection.
11         MR. WILKINSON:  -- related to your charge
12  filed with the Virginia Attorney General's Office or
13  the EEOC?
14         MR. PELICCI:  We're not answering that.
15  That's an attorney-client communication.
16         MR. WILKINSON:  No.  I'm asking whether she
17  reached out to ask for documents that are responsive
18  in this litigation.
19         MR. PELICCI:  And that's a question, so did
20  she reach out to her attorney to ask the attorney
21  something, which is a communication.
22         And I don't even know where you're going

Page 95

1  with this line of questions.  She said she gave
2  everything to us.  We made documents available to
3  you.  So I -- I don't think this is appropriate to
4  continually ask her about attorney-client
5  communications in a hundred different ways.
6         MR. WILKINSON:  Okay.  So attorney-client
7  communications are privileged when they are seeking
8  or for the purpose of seeking legal advice.  Seeking
9  documents from an agent that are responsive in
10  discovery is not seeking legal advice.
11         BY MR. WILKINSON:
12     Q.  So it's a yes-or-no question.  I don't know
13  what to know the substance of any communications you
14  may have had with Ms. Marcus or anybody at her firm.
15         I just want to know whether you reached out
16  to ask for documents that would be responsive in
17  this litigation.
18     A.  No.
19     Q.  Okay.  Why not?
20     A.  I worked --
21         MR. PELICCI:  Objection.
22         THE WITNESS:  -- with my attorney -- I'm

Page 96

1  working with my current attorney on all document
2  production requests.
3         BY MR. WILKINSON:
4      Q.  Okay.  Did you obtain a copy of your file
5  from Ms. Marcus when your relationship with her
6  ended?
7         MR. PELICCI:  Objection.
8         THE WITNESS:  I -- no.  Not a file -- not a
9  copy of a file, no.
10         BY MR. WILKINSON:
11     Q.  Well, did you get -- did you -- did she
12  provide you with all of the documents that she had
13  collected that were part of your client file when
14  you ended the relationship with her?
15     A.  I don't recall.  I don't recall.
16     Q.  Okay.  Did you review any of the deposition
17  transcripts -- or the transcripts from any
18  depositions taken in this case to prepare for your
19  deposition today?
20     A.  No.
21     Q.  So I'm going to hand you what will be
22  marked as Exhibit 11.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
101–104

Page 101

1  Accenture to run half of -- a quarter of the
2  country, for a company that basically tossed me
3  aside when I had a baby.  Yes, yes, I was still very
4  emotional.
5      Q.  Why didn't you go back to Accenture after
6  Steampunk fired you?
7      A.  I considered it.
8      Q.  But why didn't you?
9          MR. PELICCI:  Objection.
10         THE WITNESS:  I had a better offer.
11         BY MR. WILKINSON:
12     Q.  At Deloitte?
13     A.  Yeah.
14     Q.  How much are you making at Deloitte?
15     A.  About a million dollars a year.
16     Q.  Well, that's significantly better than at
17 Steampunk, too, isn't it?
18         MR. PELICCI:  Objection.
19         THE WITNESS:  Steampunk was not about my
20 annual salary.  Steampunk was really -- I was there
21 for the stock.
22         BY MR. WILKINSON:

Page 102

1      Q.  So -- so let me kind of go back, because I
2  want to -- I want to go through, and I want to find
3  out exactly what you're claiming in this case.  And
4  we can start generally, and then we can start
5  drilling down.
6          But what specifically are the claims that
7  you're raising in this case?
8          MR. PELICCI:  Objection.
9          THE WITNESS:  That I was demoted, having
10 been -- based upon discrimination, pregnancy
11 discrimination.  I was then set up to not perform
12 and then fired under a pretense of performance, but
13 that was a direct result of my having a baby; and
14 that, as a result of my being fired, I -- all of my
15 stock in the company was clawed back, which was a
16 direct result of me having had a baby, be demoted,
17 and set up to be fired.
18         BY MR. WILKINSON:
19     Q.  So --
20     A.  And retaliated against --
21     Q.  Okay.
22     A.  -- for protecting other women.

Page 103

1      Q.  Okay.  So remember we talked earlier about
2  the -- the difference between causation and
3  correlation?
4      A.  Yes.
5      Q.  Okay.  So I want you to tell me all of the
6  things that happened causally as a result of your
7  having a baby and taking maternity leave.
8          MR. PELICCI:  Objection.
9          BY MR. WILKINSON:
10     Q.  I want to know what -- I want to know what
11 the causal effects were, and I want you to tell me
12 what they are.
13         MR. PELICCI:  Objection.  I'm going to ask
14 you to actually clarify, because that doesn't even
15 make sense to me.
16         MR. WILKINSON:  Okay.  Well, I prefer you
17 don't coach your witness.  I've already instructed
18 the witness, if she doesn't understand something,
19 she can ask me.  She doesn't need you to do that --
20         MR. PELICCI:  Coming from you?
21         MR. WILKINSON:  -- okay?
22         BY MR. WILKINSON:

Page 104

1      Q.  So I want you to tell me -- so do you
2  understand what I'm asking?
3      A.  It would be great -- the causal and
4  correlation are a confusing concept --
5      Q.  Okay.  Well, then, let's forget --
6      A.  -- I think for a lot of people --
7      Q.  Okay.
8      A.  -- so that's --
9      Q.  Forget the correlation bit, right?
10     A.  Okay.
11     Q.  You understand a causal connection, right?
12 Cause and effect --
13     A.  Yes.
14     Q.  -- you know what that means, right?
15     A.  Yes, yes.
16     Q.  Okay.  So I want you to tell me what all of
17 the effects were as a result of your having a
18 baby -- and is there a difference -- are you
19 differentiating between the having a baby part and
20 going on maternity leave, or are you just kind of
21 lumping that together?
22         MR. PELICCI:  Objection.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
113–116

Page 113

1  Q.  Correct.
2  A.  Yeah.
3  Q.  I want some context.
4  A.  Absolutely.
5  Q.  Okay.
6  A.  Would you like me to repeat things that I
7  said earlier?
8  Q.  Well, I want you to put them in -- in the
9  proper temporal context because now we're talking
10  about what -- right?
11      As I understand this, you're saying that
12  bad things happened to you as a result of your, I
13  guess, announcing that you were pregnant, right?
14  Because if nobody knew, they couldn't do anything
15  because of it, right?
16      MR. PELICCI:  Objection.
17      THE WITNESS:  I think my -- yeah.  Bad
18  things happened to me because I was a woman that was
19  having a baby.  I just want to be clear that I'm not
20  agreeing that I was -- bad things happened to me
21  because I announced that I was having a baby.
22      BY MR. WILKINSON:

Page 114

1  Q.  Well, you wouldn't have --
2  A.  It was a constellation of occurs.
3  Q.  Well, you wouldn't be a man having a baby,
4  right?
5      MR. PELICCI:  Objection.
6      THE WITNESS:  Yeah.
7      BY MR. WILKINSON:
8  Q.  Well, let me ask it -- let me ask you sort
9  of a preceding question:  Are you claiming that bad
10  things happened to you solely because you're a
11  woman, having nothing to do with the pregnancy?
12      MR. PELICCI:  Objection.
13      THE WITNESS:  No.
14      BY MR. WILKINSON:
15  Q.  Okay.  So we will assume, then, that the
16  bad things you are describing to me is because you
17  were having a baby, right?
18      And you can say --
19  A.  Yeah.
20  Q.  -- a woman having a baby.
21  A.  I'm just trying to be --
22  Q.  As far as I --

Page 115

1  A.  Precise.
2  Q.  -- understand, men can't have babies,
3  right?
4  A.  I'm just trying to be precise.
5      Part of the reason I'm being precise is
6  Matt Warren, as I have mentioned, knew that I could
7  not have a baby, was under the impression I could
8  not have a baby when I took on the role as EVP and
9  number three in the company as his successor.  That
10  acknowledgement changed when I announced that I was
11  having a baby.
12      BY MR. WILKINSON:
13  Q.  But that's just -- but that's based on your
14  reading of the situation, right?  Matt didn't come
15  out and tell you, Oh, well, I don't -- you know, my
16  whole vision of you, Kate Abrey, is that -- or I'm
17  hiring you only because I know you can't have a
18  baby.
19      MR. PELICCI:  Objection.
20      BY MR. WILKINSON:
21  Q.  He never said that to you, did he?
22      MR. PELICCI:  Objection.

Page 116

1      THE WITNESS:  No.
2      BY MR. WILKINSON:
3  Q.  Okay.  So let's go on, then, and you can
4  tell me about the bad things that happened to you
5  because you were pregnant.
6  A.  Sure.  So, as I mentioned previously, Max
7  Licht asked me in Savannah whether I would be
8  returning to work --
9  Q.  Okay.
10  A.  -- and suggested that I may not want to
11  return to work.
12      I was not involved in certain conversations
13  that I was then made aware of between Matt, Max, and
14  John Harllee that I was -- said that they did not
15  want to bother me because I was pregnant.
16  Q.  And when -- when did that happen?
17  A.  That happened a series -- like, multiple
18  times over the course of the late fall and early
19  winter, prior to me having the baby.
20  Q.  But you had a -- you -- you had a rather
21  difficult pregnancy, though, right?
22  A.  I did.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
121–124

Page 121

1 were being considered.
2     And I -- I don't know exactly what else
3 because I wasn't in the conversation.
4    Q. You don't know what you don't know?
5    A. I don't know what I don't know, but I knew
6 that they were happening.
7    Q. Well, how did you know that?
8    A. Because Matt and Max were talking on the
9 phone all the time and telling me not -- that I did
10 not need to be bothered about it.
11    Q. Okay. What else?
12    A. Prior to me going on leave?
13    Q. Mm-hmm.
14    A. I don't know that there was much else.
15    Q. Okay. How about, then, after you -- so
16 after you came back from leave, right?
17     Now we're talking about the bad things that
18 happened because you had a baby and took leave,
19 okay?
20    A. I think it's important to note a few things
21 that happened while I was on leave.
22    Q. Okay.

Page 122

1    A. I was on short-term disability leave and
2 then an unpaid leave of absence. I had asked Matt
3 Warren to have weekly meetings with me to be able to
4 stay up to speed with the key decisions in the
5 business.
6    Q. Okay.
7    A. The dynamic between the two of us changed
8 radically. He did not do that. He not only did not
9 do that, he did not really have the same level of
10 engagement with me, in terms of how he was treating
11 me as a partner in the business.
12     He instructed everyone in the business,
13 either from a misunderstanding or a
14 mischaracterization, that they could not speak to
15 me, and I was cut out of the business.
16     Before I -- I asked to return to leave --
17 from leave early and part-time, and he told me, You
18 may only return to work when you are ready to
19 actually work.
20     And if I didn't say that totally correctly,
21 that's the essence of it.
22    Q. Okay.

Page 123

1    A. I'm not quoting him.
2    Q. Okay. What else?
3    A. I was -- so then, when I returned from
4 work, I was told that I was not to speak to anyone
5 about this --
6    Q. Who told you that?
7    A. Matt.
8    Q. He told you not to speak to anyone when you
9 came back to work?
10    A. Yep.
11    Q. Was there a --
12    A. You may not speak to anyone --
13    Q. -- reason for that?
14    A. -- which was -- which was unusual, because
15 I was top three in the company, and a lot of people
16 were very excited for me, because most people are
17 happy for people that have had a child and they
18 hadn't talked to me in a long time.
19    Q. Okay. What else?
20    A. The day after, I was demoted. I had the
21 meeting with Matt, John, and Scott, in which a
22 significant portion of the performing part of the

Page 124

1 organization that was under my purview prior to
2 going out to have a baby -- and the only reason I
3 was out was to have a baby -- was no longer
4 reporting to me. I made this noted during the
5 discussion.
6    Q. During the discussion with whom?
7    A. With Matt, John, and Scott.
8    Q. Okay. What did you tell them?
9    A. This is a demotion.
10    Q. Okay.
11    A. They told me, Don't be selfish.
12    Q. Okay. What else happened?
13    A. The next day, they sent a communication to
14 the organization -- or to the leadership -- I wasn't
15 copied on it, so I don't recall who -- communicating
16 that I had been demoted and, in essence, ask --
17 congratulating me for being a team player.
18    Q. Did they use that -- is that your sort
19 of --
20    A. No, that was my read.
21    Q. -- characterization --
22    A. Yes.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
125–128

Page 125

1   Q.   -- of it?
2   A.   Yes.
3   Q.   They didn't say, Hey, we've --
4   congratulations.  We've demoted Kate Abrey?
5   A.   No.
6   Q.   Okay.
7   A.   People within the organization noted that.
8   Q.   Okay.
9   A.   I had a conversation specifically with Sean
10  Dillon, the CTO, later that week, in which I told
11  him that, upon return from maternity leave, having a
12  baby, I was now demoted.
13  Q.   Okay.
14  A.   He empathized with me, and I believe -- I
15  wasn't -- I don't know -- he called Matt and John or
16  Matt.  I don't know who.  That evening, I was called
17  by Matt and John and told, You are a leader in this
18  company.  Those are fighting words.  You do not say
19  that.
20  Q.   What were the fighting words?
21  A.   That I was demoted for being on a leave of
22  absence for having a baby.

Page 126

1   Q.   Okay.
2   A.   I wept and wept and wept, embarrassingly
3   so, and said that's how I feel.
4   Q.   So who -- who specifically told you that?
5   A.   Matt Warren and John Harllee.  I don't know
6   who's -- my guess is it was Matt, but I'm not going
7   to put words in either of their mouths.  I don't
8   remember.
9   Q.   Well, what I'm trying to -- what I'm trying
10  to figure out is whether the fighting words were
11  that you were saying you were demoted, or was it you
12  were demoted because you took leave?
13  A.   Oh, it was -- it was absolutely, in my
14  mind, because of the baby, because of the baby.
15  Q.   Well, what I'm trying to figure out is
16  what -- what specifically did they tell you?
17  A.   Don't tell anyone else that -- don't go
18  around -- what I took away was, Kate, don't go
19  around complaining to people that you had a baby and
20  then you were demoted.
21  Q.   Okay.
22  A.   Don't say it again.  Because you're a

Page 127

1   leader.  That's what they said.
2   Q.   Okay.
3   A.   And it was a very horrible experience for
4   me because they were people that I respected quite a
5   lot.
6   Q.   And when did that happen?
7   A.   That happened with -- within a week or so
8   of me returning from maternity leave.
9   Q.   Okay.  What else?
10  A.   The fall -- I was given responsibility
11  for -- for what was called operational excellence, I
12  believe --
13  Q.   Okay.
14  A.   -- which was a crosscutting component of
15  the business.  I was told, without reason and for no
16  lack of performance on my part, that I would no
17  longer be doing that, about a month after I returned
18  from maternity leave.
19  Q.   Well -- okay.  So what -- what is operation
20  excellence?
21  A.   It was kind of, like, making sure that
22  people were delivering effectively.

Page 128

1        Max Licht did not have the same experience
2   that I did, from a growing up in consulting and
3   knowing how to deliver and manage.  He was really a
4   salesperson.
5   Q.   And when -- all right.  When did you start
6   being responsible for operation excellence?
7   A.   I would have always been responsible for it
8   in my areas of -- prior to departing.  Like, it was
9   just part and parcel of what you do.
10       Kind of, you asked me in the beginning of
11  this, What do you do? and I described that.  This
12  was a part of that.
13  Q.   And that was -- that was across all --
14  across the entire company, right?
15  A.   Across the parts of the company that I was
16  allowed to oversee.  Meaning, prior to my maternity
17  leave, DHS could not report to me.
18  Q.   Well, did operation excellence -- I mean,
19  were you not able to perform --
20  A.   No, not in DHS.  No, I couldn't do that for
21  DHS.
22  Q.   All right.  So maybe I don't quite



KATHLEEN ABREY                                        April 05, 2023
ABREY V STEAMPUNK HOLDINGS                            137–140

Page 137

1   Q.  So -- okay.  So what -- what else happened
2   as a result of you being pregnant and taking leave?
3      A.  The other thing that happened was that I
4   was very sensitive to other people in a similar
5   predicament.
6      Q.  What -- what do you mean "a similar
7   predicament"?
8      A.  Someone else who was trying to have a baby
9   or was pregnant and their plans of how we, as
10  Steampunk, were going to be treating them.
11     Q.  So are you talking just about Jacquelyn
12  Brioux or someone else, or both?
13     A.  Yeah.  No, Jacquelyn.
14     Q.  Okay.  So -- all right.  So what -- what
15  bad happened to you concerning Jacquelyn Brioux as a
16  result of your being pregnant and taking leave?
17     A.  I advocated for her to have leave and be
18  treated better than I was treated.  I made that
19  point the day before I was fired and was -- in my
20  opinion, there is a direct relationship to the fact
21  that I made that complaint based -- and related it
22  to myself and the fact that I had a baby, and then I

Page 138

1   was terminated.
2      Q.  Are you aware of anybody else advocating
3   for -- and we'll talk about Jacquelyn, but are you
4   aware of anybody else that also advocated on her
5   behalf at Steampunk?
6      A.  Yeah.  Absolutely.
7      Q.  Who?
8      A.  Jen Sessums.
9      Q.  Who else?
10     A.  She's the person that I know advocated
11  strongly.  A group of us got together, at my
12  request, to talk about how to improve the situation,
13  but I was the one that was put on the spot about it
14  and didn't back down --
15     Q.  What do you --
16     A.  -- and was --
17     Q.  -- what do you mean you were the one who
18  was put on the spot and didn't back down?
19     A.  There was an e-mail exchange that occurred
20  about her leave and her situation and her employment
21  agreement.  I believe John Harllee forwarded me that
22  and said, I'd like to discuss this with you.

Page 139

1      And, in a conversation with Matt and John,
2   the day before I was fired, they discussed it with
3   me and told me that they disagreed with my opinion,
4   which is when I specifically said, I believe this is
5   a pattern around maternity leave, similar to the way
6   that I was treated.  There's a discrimination that's
7   occurring here.
8      I then followed up with John afterward --
9   because the conversation was awful, in my opinion,
10  with Matt and John -- to understand and was told
11  that I was not a gas station attendant.
12     Q.  What does that mean?
13     A.  I don't know.  But it felt like what it
14  meant was that we were not in -- in positions that
15  could just be swapped in and out of; meaning going
16  out on leave, as a woman, was problematic.
17     Q.  Okay.  What else happened to you as a
18  result of your being pregnant and taking leave?
19     A.  I think those are the high points -- or the
20  low points.
21     Q.  Okay.  So -- all right.  So, then, tell me
22  about your retaliation claim, because that's a

Page 140

1   different type of claim.
2      You're aware of that?
3      A.  Yeah.
4      Q.  Okay.  So what are you basing your
5   retaliation -- why don't you tell me what think
6   a retaliation claim is?
7      MR. PELICCI:  Objection.
8      THE WITNESS:  I think a retaliation claim
9   is that if I -- you know, similar to, like, if you
10  point something out that's going wrong with the
11  company that could be a discriminatory act, that you
12  can't be -- adverse action can't be taken against
13  you as a result of that.
14     BY MR. WILKINSON:
15     Q.  Okay.  So let's go through the list of
16  things that you complained about -- about regarding
17  discrimination.
18     Why don't you start from the beginning.
19  What was the first time that you complained about
20  discrimination?
21     MR. PELICCI:  Objection.
22     THE WITNESS:  My first concern about



ESQUIRE
DEPOSITION SOLUTIONS

Page 141

1 discrimination was the first meeting I had with John
2 prior to going on leave.
3     BY MR. WILKINSON:
4     Q.  All right.  Well, tell me -- tell me
5 what -- what part of that conversation did you raise
6 the issue of discrimination?
7     A.  I'm having a baby, and I'm very concerned
8 about how that's going to impact my role in the
9 company.  And, when I return, I'm afraid I'm going
10 to return, because I'm having a baby, to a different
11 position.
12     Q.  And what bad thing had happened to you
13 as a result of that specific conversation?
14         MR. PELICCI:  Objection.
15         THE WITNESS:  I don't know.  I don't know
16 how they made the decisions that they made.
17         BY MR. WILKINSON:
18     Q.  Well, I'm asking you:  Do you believe that
19 something bad happened to you as a result of having
20 that conversation with Mr. Harllee?
21     A.  I don't know.
22     Q.  Okay.  What was the next time that you

Page 142

1 complained of discrimination?
2     A.  The discussion with Matt, John, and Scott.
3 I said that I felt that I was being -- that I was
4 discriminated against.
5     Q.  This is when you came back from leave?
6     A.  Yes.
7     Q.  Okay.  So tell me specifically what you
8 told them?
9     A.  I don't remember verbatim, but I said,
10 during the course -- in realtime, This is a
11 demotion, and this doesn't feel right to me.
12     Q.  What else did you tell them?
13     A.  I think that's probably -- that's -- that's
14 the essence of what I told them, as it related to
15 the demotion.
16     Q.  And what do you think are the bad things
17 that happened as a result of that conversation?
18         MR. PELICCI:  Objection.
19         THE WITNESS:  I was further set up for --
20 for not being successful.  I think it laid the
21 foundation for how they treated me.  I was in -- in
22 the top three of the company, and it further

Page 143

1 solidified it that I was not.
2     BY MR. WILKINSON:
3     Q.  And that's sort of all of the things that
4 you've already told me about?
5         I don't need you to repeat all of them --
6     A.  Yes.
7     Q.  -- unless you want to --
8     A.  No, it's okay.
9     Q.  -- but -- but I'm taking from your answer
10 that you're talking about the series of events that
11 we talked about with respect to the discrimination;
12 you believe that those are also the events that were
13 caused by the conversation you had with Mr. Harllee,
14 Mr. Warren, and Mr. LaRose?
15         MR. PELICCI:  Objection.
16         THE WITNESS:  Yeah.  I mean, not -- again,
17 these two things are kind of tied together, so I
18 can't really -- I don't think I can effectively,
19 like, divorce them.
20         BY MR. WILKINSON:
21     Q.  Okay.
22     A.  It's hard -- I don't -- I couldn't read

Page 144

1 their minds.  All I can tell you is what happened.
2 Why it happened exactly is because I had a baby.
3     Q.  Okay.
4     A.  That's all I can say.  I was out of the
5 office.  I had a baby.  I came back, and all of
6 these things happened.  I don't know why they
7 happened.
8     Q.  Okay.  All right.  So when was the next
9 time that you -- that you complained of
10 discrimination?
11     A.  Can you clarify, just for my edification --
12 and it will help me answer the question, I think,
13 better -- what you mean by "complain"?  Do you mean
14 talk to anyone?
15     Q.  Well, so I think you described what you
16 understood a retaliation claim to be, right?  You
17 said -- and I think -- I think what you said was
18 that you complained of discrimination, right, and
19 then something happened as a result of that, right?
20     A.  Uh-huh.
21     Q.  And so what I want to know -- and sort of
22 in the legal parlance, that complaining part is



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
145–148

Page 145

1  called protected activity, right --

2    A.  Uh-huh.

3    Q.  -- so what I'm trying to figure out is I

4  want to try to figure out what -- what protected

5  activity did you engage in, right, that then would

6  be linked to -- and you -- you -- you said that you

7  understood it to be an adverse employment action,

8  right?

9    A.  Mm-hmm.

10    Q.  So I'm trying to -- I'm trying to -- I want

11  to know, from you, where's -- you know, what's the

12  protected activity, and what the adverse action is,

13  right?

14    A.  Mm-hmm.  Yep.  I think the next instance,

15  based upon that, is the discussion that I had with

16  Sean Dillon that we've discussed about me saying I

17  was demoted upon return from maternity leave and

18  that I was upset about that, and his subsequent

19  conversations with Matt and John -- I can only

20  presume -- and, very directly, that call that

21  occurred in the evening with Matt and John about the

22  fact that I was not to say that again.

Page 146

1    Q.  You're not to go around telling people that

2  you were demoted?

3    A.  No.  That I was -- further, that I was

4  demoted because of my maternity leave.

5    Q.  Okay.

6    A.  They said it was a very serious allegation,

7  and I --

8    Q.  Who said it was a serious allegation?

9    A.  Matt and John.  I don't remember which.

10    Q.  So how did -- how did they convey this to

11  you?

12    A.  Over the phone.

13    Q.  So they both called you?

14    A.  Yeah.  I knew there was something wrong.

15  And, actually, Sean called me in advance and warned

16  me, I hope I didn't open Pandora's box for you,

17  Kate.  I told them what you said because I take it

18  very seriously.

19          So they called me, and it was in the

20  evening.  I can't remember -- one called me and then

21  the other one was conferenced in.  And it was

22  extremely painful.

Page 147

1    Q.  And I think you said that happened when?

2    A.  The evening after I believe Sean talked to

3  them, which was, like, within a week or so of me

4  returning from leave.

5    Q.  Okay.  That's what -- that's what I was

6  trying to get at, okay?

7    A.  Okay.

8    Q.  So sometime in May?

9    A.  Yeah, yeah.  Yep, yep.

10    Q.  Okay.

11    A.  I had also had conversations with other

12  people about feeling this way, and they had

13  suggested that they would go forward with the --

14  with the -- with a problem with the same

15  discrimination.  I asked them not to, as a result --

16  as a direct result of that conversation, because I

17  was afraid of what they would do.

18    Q.  All right.  You're going to have to be a

19  little bit more specific as --

20    A.  Sure.  Diane Ashley -- I spoke to Diane

21  Ashley.  She was very aware of the fact that I was

22  being discriminated against, in my opinion, for

Page 148

1  having the baby and coming back from leave.

2    Q.  Okay.

3    A.  She had spoken to her coach, Bruce, about

4  that, and that Bruce was going to go forward to Matt

5  and John and talk to them about the fact that he

6  also was concerned that I had been discriminated

7  against.

8    Q.  Okay.

9    A.  I asked Diane to please not do that because

10  I had just been told, Don't do it again.  Don't keep

11  causing trouble.

12    Q.  So what's -- who is Bruce?

13    A.  Bruce was an external coach.

14    Q.  Do you know a last name?

15    A.  I don't.  I can find out.  I don't know.

16    Q.  Did you review the documents that Diane

17  Ashley produced in preparation for your deposition?

18    A.  No.

19    Q.  Did she send you a copy of what she gave to

20  us?

21    A.  No.  I don't believe so, no.

22    Q.  Okay.  What else?



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
149–152

Page 149

1    MR. PELICCI:  Objection.
2    THE WITNESS:  Okay.  We're going back to
3  what are the adverse actions that were taken --
4    BY MR. WILKINSON:
5    Q.  Well, let's see.  Okay.  So -- so you're
6  saying that you had the conversation with Sean
7  Dillon, right?
8    A.  Yes.
9    Q.  And Matt and John told you to stop it --
10   A.  Yes.
11   Q.  -- right?
12   Q.  Were there other adverse actions that came
13  as a result of your discussion with Sean Dillon?
14   MR. PELICCI:  Objection.
15   THE WITNESS:  No.  I don't believe so.
16   BY MR. WILKINSON:
17   Q.  Okay.  So, then, what was the next
18  complaint?
19   A.  I tried to be a good employee and not
20  complain.  I was trying to be part -- I was trying
21  to reestablish myself as the top three.
22   Q.  Okay.

Page 150

1    A.  So I -- I basically tried to shut up and
2  color.  I -- the action was I wasn't allowed to say
3  it.
4    Q.  Okay.  Well, when was the next time that
5  you did complain?
6    A.  I think the next time I said it was when I
7  had the one-on-one with John as a follow-up and
8  said, I'm -- this -- What I was concerned about
9  prior to leave happened.
10   Q.  When did that happen, the conversation with
11  John?
12   A.  In the summer.  I don't remember when.
13   Q.  What did you tell him?
14   A.  I said, I think my premonitions have come
15  true, and I -- and he acknowledged them -- that.
16   Q.  And what happened as a result of that
17  conversation with John?
18   A.  Nothing.
19   Q.  When was the -- well, let me ask you this:
20  Is it your contention that -- well, who -- who are
21  the people that you -- that you contend
22  discriminated against you?

Page 151

1    A.  Matt and John.
2    Q.  Anybody else?
3    MR. PELICCI:  Objection.
4    THE WITNESS:  I mean, primarily Matt and
5  John.  I mean --
6    BY MR. WILKINSON:
7    Q.  Well, "primarily" suggests that there are
8  others, so who else do you believe discriminated
9  against you?
10   MR. PELICCI:  Objection.
11   THE WITNESS:  There were certainly some
12  discriminatory comments made by Max Licht.
13   BY MR. WILKINSON:
14   Q.  When?  And what did he say?
15   A.  Well, I've told you some of them, about
16  how --
17   Q.  You told me the one before you went out on
18  leave --
19   A.  Right --
20   Q.  -- okay?
21   A.  Yeah.  So right when I returned from leave,
22  if I recall correctly, he was communicating to me

Page 152

1  about, like, Are you really ready to, like, keep up
2  or get back to work?  And -- and then the way he --
3  I think that's the clearest, like, specific example
4  that comes to mind at this time.
5    Q.  Okay.  All right.  So, then, after the
6  conversation with John, what was the next time that
7  you complained?
8    A.  Probably shortly before I was terminated.
9    Q.  And tell me about that.
10   A.  There are two elements of that:  One was
11  Matt sent me an e-mail about my performance, and I
12  responded that I disagreed with his characterization
13  of my performance, specifically that I was not
14  responsible for the areas that he outlined in the
15  e-mail, in part, because I was on leave during some
16  of that time period.
17   That translated into the discussion -- part
18  of the discussion the day before I was terminated,
19  during which we discussed that specifically, and I
20  made the point that I was on -- I was out on
21  maternity leave for part of that period of time; and
22  that, when I returned, as we colloquial -- we coined



Page 153

1 the term "misfit toys," I was given --

2    BY MR. WILKINSON:

3    Q.  "We" or "you" coined that term?

4    A.  I think I did.

5    Q.  Okay.

6    A.  Yeah.  I did but then we used it

7 together --

8    Q.  Got it.

9    A.  -- and the purpose of using it, the purpose

10 for coining it that I was given the low part of

11 the -- low-performing part of the organization and

12 were not given the appropriate resources to be able to

13 turn it around, and I was not given that.

14    So the adverse action that occurred was I

15 was set up to fail.  Told it was performance, but it

16 was really because I had a baby.

17    And those -- that was part of the

18 conversation, not in those exact words, but very

19 close to that, the day before I left -- before I was

20 fired.

21    Q.  Well, so -- all right.  Well, tell me, as

22 best as you can recall, how that conversation went.

Page 154

1    A.  So it was a standing meeting we had.  We

2 met every Wednesday at, like, 1:00 or 2:00, and Matt

3 had sent the e-mail that week-ish.  And so he said

4 to me in that call, What have you achieved, Kate?

5 What have you achieved here?

6    And I listed my achievements, such as

7 hiring Max, getting Kevin McAleenan on the board,

8 helping to establish kind of the foundation of the

9 company, and then what I was working to achieve in

10 the areas where I was currently responsible.  And he

11 said, That's not how I remember it.  And I said,

12 Well, I disagree.  And it has to do with the fact

13 that, you know, I -- I was -- I was out, Matt.  I

14 was out for having a baby for part of this time.

15    And then we transitioned the conversation

16 to talk about the woman who was trying to have the

17 baby and wanted to be the PM.

18    Q.  Jacquelyn Brioux?

19    A.  Jacquelyn, yes.  I don't remember her name.

20    Q.  Okay.  I'll remind you, because I -- often,

21 you know, we've been just talking about the

22 "candidate" or the "lady" and just, like, it's so

Page 155

1 confusing.

2    A.  Oh, yeah.  Her name is Jacquelyn.

3    Q.  Okay.

4    A.  I'm -- again, she wasn't someone that I

5 knew well, so -- and I don't have any

6 communications, so I don't -- I don't recall her

7 name.

8    We then transitioned the conversation to

9 talk about Jacquelyn.  And, during the course of

10 that discussion, I advocated -- so what had happened

11 with Jacquelyn -- I think it's relevant, if you'll

12 permit me the ability to explain?

13    Q.  Sure.

14    A.  I was asked to speak to Jacquelyn over the

15 holidays -- by Jen Sessums, who was advocating for

16 her to join the company -- to talk about my

17 experience with the company, as a woman who had just

18 had a baby.  I did that.

19    At that point in time, I told her it had

20 been really hard, but that I, -- as the most senior

21 woman in the company, top three, I would not stand

22 for how I was treated, and I would help to protect

Page 156

1 her and made sure she had a successful experience

2 here.  I was -- again, I was trying to sell her on

3 the company.

4    I then went to Dan Parker and talked to Dan

5 about the fact that we needed to be able to attract

6 the best talent, and the best talent -- 50 percent

7 of them have babies, and we needed to have benefits

8 and policies in place that supported women more so

9 than what I had been supported.  Because I said, I'm

10 the most -- the most senior woman in the company.

11 I'll take one for the team, but I don't want the

12 next person to have to go through what I went

13 through.

14    And he said --

15    Q.  So what was it -- so what was it you were

16 trying to protect them -- you know, the next woman

17 from?

18    MR. PELICCI:  Objection.

19    BY MR. WILKINSON:

20    Q.  What -- when you say, I don't -- I didn't

21 want -- you were meeting with Dan parker, right?

22    A.  Mm-hmm.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
157–160

Page 157

1    Q.  And you just said, I believe, that you --
2  you were -- you didn't want the next woman to go
3  through what you went through, and so what I'm --
4  what is it you're talking about there?
5       MR. PELICCI:  Objection.
6       BY MR. WILKINSON:
7    Q.  What were you trying to get Dan parker to
8  do?
9    A.  Two different questions.
10      What was I trying to get Dan parker to do?
11   Q.  Mm-hmm.
12   A.  Help me to advocate, to support the request
13  that she had for a leave of absence going into the
14  company.  Be assured that she would be able to have
15  the role that she was hired for and then return to
16  the role that she was hired for after she had the
17  baby.
18      That is not what happened to me.  That is
19  what I was trying to protect her from.
20   Q.  Because of the demotion, is what you're
21  saying?
22      MR. PELICCI:  Objection.

Page 158

1       BY MR. WILKINSON:
2    Q.  Right?
3    A.  Because I left the company having -- being
4  in the top three.  I had a baby and I came back and
5  I was no longer.
6    Q.  Okay.
7    A.  She was not looking at the exact same
8  position, but the same analogy -- I think in this
9  case, again, my memory may be flawed.  I believe she
10  was going to be the PM of a program.  Would she be
11  able to go on leave and return as the PM?  Would we
12  allow her the time to have meaningful time with her
13  newborn child?
14      That's what I was trying to protect her
15  from, and that's what I was trying to get Dan to
16  advocate for.
17   Q.  Do you know whether Dan did advocate for
18  her?
19   A.  Well, I know -- let me tell you what I do
20  know -- I don't know that, a hundred percent, how it
21  went down with him.  Probably, but I don't know.  I
22  wasn't in the conversation.

Page 159

1       I convened a group -- or a group was
2  convened of myself, Jen, Dan, and Jen -- I believe
3  that's all -- to talk about what we thought would be
4  a reasonable approach to bringing her on and what
5  kind of package we could give her and what position
6  to put her in; namely, I think the PM position.
7       Someone -- I don't remember if it was me --
8  I don't think it was me.  But someone wrote --
9  summarized this approach and sent it on to Matt and
10  John.  John forwarded it me and said, I'd like to
11  discuss this with you, which laid the foundation for
12  the discussion that happened the day before I was
13  fired, whereby we discussed what I was advocating to
14  Dan, the same thing I advocated to -- to Matt and to
15  John.
16      I was told that they didn't believe that
17  was a good business decision, nor would it be a good
18  look for the company to have a woman in a new
19  program go out shortly after on maternity leave, and
20  what would we tell the client.  And I said, I don't
21  think we should be proud of that fact.  It's not a
22  problem.  That's something to celebrate, and I think

Page 160

1  our clients would be very understanding of that.
2       Because, in my experience, the clients that
3  I told were thrilled that I was having a baby.  It's
4  a happy thing for most people.  Not something -- and
5  so the end of the conversation was basically, Noted.
6  There was nothing else for me to have said.
7    Q.  Okay.  And you believe you got fired for
8  that?
9       MR. PELICCI:  Objection.
10      THE WITNESS:  I called John to talk about
11  both things after, and I got fired the next day.
12      BY MR. WILKINSON:
13   Q.  Okay.  All right.  Is there -- what else is
14  there in terms of your complaining about something
15  and then suffering an adverse action because of it?
16      MR. PELICCI:  Objection.
17      THE WITNESS:  I think it's pretty
18  comprehensive at this time, as -- in terms of what I
19  recall.
20      MR. WILKINSON:  Okay.  Do you guys want to
21  break for lunch?
22      THE WITNESS:  Sure.



Page 161

1     MR. WILKINSON: Okay.

2     THE VIDEOGRAPHER: Going off the record.

3  The time is 12:39.

4     (A luncheon recess was taken.)

5     THE VIDEOGRAPHER: Going back on the

6  record. The time is 1318.

7  BY MR. WILKINSON:

8  Q. Okay. Welcome back, Ms. Abrey.

9     Even though we took a break, the resumption

10  of this deposition means you're still under oath.

11     Do you understand that?

12  A. I do. I do.

13     And there were two things I was hoping I

14  could just provide a little bit of clarification on

15  from this morning, if that's okay?

16  Q. Sure.

17  A. I made a comment as it related to my --

18  kind of my discussions -- my complaints about being

19  discriminated against. And, specifically, I think I

20  said something along the lines of, you know, I

21  talked to -- to John Harllee and -- the second time

22  and you asked what happened and I said, Nothing

Page 162

1  happened.

2     And what I meant by "nothing happened" is

3  that there was no resolution of kind of the -- the

4  issue, right? It was a -- it was a good

5  conversation, but there were no actions that

6  occurred as a result.

7  Q. So -- okay. Well, then, refresh my

8  recollection as to when that conversation took place

9  and what the conversation was?

10  A. Sure. It was in the summer of -- after I

11  returned. Sometime in the summer. I don't remember

12  when. And it was in relationship to the

13  conversation that I had had with him prior to going

14  on leave --

15  Q. Okay.

16  A. -- around my -- my maternity leave and what

17  would happen, that my role would be reduced in the

18  company.

19  Q. So you raise that -- you raised that issue

20  with Mr. Harllee before you went on leave and then,

21  after you came back, sometime in the summer, you had

22  sort of a follow-up conversation about that topic?

Page 163

1  A. Yes, yes.

2  Q. Okay.

3  A. And that, basically, kind of the

4  premonition that I had had, had come to pass.

5  Q. So, I mean, do you remember in a little bit

6  more specific terms as to what you -- what you

7  actually said to him?

8  A. I mean, I don't remember my exact words,

9  but it was something along the lines of, you know,

10  We are where we are now, and it is as predicted, in

11  many ways, what we had discussed, you know, before I

12  went on leave, and that was a result of me going on

13  leave to have a baby, which he acknowledged.

14  Q. Well, how did he acknowledge that?

15  A. I don't remember. I just know he

16  acknowledged it. I don't remember if he said, "Yes,

17  and"; or, "No, but." But he acknowledged it.

18  Q. So is it -- is it your contention

19  that that -- when -- well, I guess it must have

20  happened before you actually came back, right, the

21  plan was put into place to restructure some of the

22  company, right? Is that a fair assumption?

Page 164

1  A. I don't know when the plan was put into --

2  into action.

3  Q. Right. But, I mean, it would seem

4  logically it must have happened before you actually

5  came back, right?

6     MR. PELICCI: Objection.

7     THE WITNESS: I don't think it happened the

8  day that I came back. I'm sure -- yes, sometime in

9  advance.

10  BY MR. WILKINSON:

11  Q. Do you think that -- well, is it your

12  contention that -- that Mr. Warren and Mr. Harllee

13  were trying to set up so they would fire you?

14     MR. PELICCI: Objection.

15     THE WITNESS: I don't know what their

16  intention was. All I know is what happened.

17     And what happened was that I returned

18  and -- from maternity leave. I was demoted. I was

19  given the low-performing part of the organization.

20  I complained about that. It escalated over time.

21  And I was fired.

22  BY MR. WILKINSON:



Page 169

1  of a man who we partnered with -- I can't remember
2  where he worked.  It might have been ServiceNow.
3  I'm not sure.  And we considered at one point in
4  time potentially hiring him, but that did not come
5  to pass, I don't believe.
6        And then the final one, Number 5, is
7  talking about the fact that Matt is -- was
8  encouraging me, in advance of a meeting, I think, to
9  talk -- think about how -- like, what would we be
10  focused on for the sector that I was responsible
11  for, and he's relating that to something that he had
12  already done or had kind of come up with Max
13  and that I'm trying to kind of, like, be effective
14  in -- in that.
15        Is that what you were looking for?
16    Q.  Yeah.  So, in terms of your sector, is
17  that -- is that sort of the collection of DHS and
18  commerce and whatever it is that was sort of falling
19  under your responsibility --
20    A.  Yes.
21    Q.  -- under the new structure?
22        Can you think of a reason why Mr. Warren or

Page 170

1  Mr. Harllee would want you to fail?
2        MR. PELICCI:  Objection.
3        BY MR. WILKINSON:
4    Q.  I mean, I got the -- I got the impression
5  that you were -- that you said this was a setup,
6  right, to try to get you to fail --
7        MR. PELICCI:  Objection.
8        BY MR. WILKINSON:
9    Q.  -- and I'm wondering if -- if you have any
10  idea or thoughts about what the motivation to set
11  you up to fail would be?
12        MR. PELICCI:  Objection.
13        THE WITNESS:  I don't know.
14        It seemed to me that I wasn't the person --
15  the person that couldn't have the baby that joined
16  the company, but then I had the baby and it was a
17  different -- I had a different perspective.
18        For example, they -- they would reference,
19  you know, previously I was too sharp and
20  transactional.  I had sharp elbows.  And then I was
21  too nurturing.
22        But, again, I don't know why they would

Page 171

1  want that to be the case.
2        BY MR. WILKINSON:
3    Q.  Why they would want what to be the case?
4    A.  That I would fail.  I just wasn't the fit
5  anymore.
6    Q.  Okay.  I'd like you to -- if you go back to
7  Exhibit 1 --
8    A.  Okay.
9    Q.  -- which are the responses to the requests
10  for admission, and take a look at the response to
11  RFA 9, which is on page 3.
12        So you see Number 9 asks you -- it says,
13  "Please admit that you did not want to add any
14  additional facts to your counsel's letter attached
15  as part of your complaint questionnaire filed with
16  the Virginia Attorney General's Office."
17        And you know what that's referring to?
18    A.  Yes.
19    Q.  Okay.  And the response is:  "Deny."
20        So I want to know why you denied this
21  request, and I -- and I think -- let me back that up
22  again.

Page 172

1        I want to know what other fact did you want
2  to add to your counsel's letter before it got filed
3  with the Virginia Attorney General's Office?
4        MR. PELICCI:  Objection.
5        THE WITNESS:  The facts have always been
6  the facts, since the beginning.  I provided all of
7  the facts, as I knew them, from the beginning to my
8  attorney and to my attorneys.  And over time it -- I
9  think it became clear that we needed to provide
10  additional relevant detail and information.
11        I don't recall offhand the -- and I'm
12  sorry.  There are lots of different iterations, and
13  I'm happy to look at the specifics.
14        But I don't recall offhand what the
15  additional facts were.
16        BY MR. WILKINSON:
17    Q.  Well, then, why -- so why did you deny
18  this?
19        MR. PELICCI:  Objection.
20        THE WITNESS:  As I said --
21        BY MR. WILKINSON:
22    Q.  I mean, you had to have had some



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
181–184

Page 181

1    A.  Across the course of the fall when I was
2  managing Diane Ashley and that I was not being
3  difficult enough in her -- on her.
4         And that is not reflected in the words
5  "nurturing," but you can see the theme and pull
6  through of that in my performance review, which was
7  very positive, in December, where they refer to my
8  area of growth, which is around having challenging
9  conversations with additional -- with employees.
10    Q.  So -- so you -- so you believe that -- I
11  guess I'm still confused as to how that raises an
12  issue of discrimination.
13         I mean, you're talking about your
14  performance and that your performance is due to
15  having to deal with an underperforming sector of the
16  business.
17         How is that raising an issue of
18  discrimination?
19         MR. PELICCI:  Objection.
20         THE WITNESS:  Because we talked about the
21  only reason I was managing the low performing part
22  of the organization is because I was demoted the day

Page 182

1  that I returned from maternity leave, which I was
2  demoted because I had a baby and was out of the
3  office for that reason.
4         BY MR. WILKINSON:
5    Q.  And that's what you were -- that's what you
6  were discussing with him?
7    A.  We discussed the outcome of that, which is
8  the fact that I was managing the low-performing part
9  of the organization, and I pushed back directly on
10  the e-mail that he had sent about the low
11  performance and why I did not agree with the low
12  performance.
13    Q.  What do you think -- what do you think
14  should have happened when you came back from
15  maternity leave?
16         MR. PELICCI:  Objection.
17         THE WITNESS:  I resumed my
18  responsibilities, the same role that I had had
19  previously, including the responsibilities for --
20  that I remained in the top three of the organization
21  is probably the easiest way to put it.
22         BY MR. WILKINSON:

Page 183

1    Q.  Do you think that your taking
2  responsibility for DHS when you came back, was that
3  a discriminatory act?
4         MR. PELICCI:  Objection.
5         THE WITNESS:  The discriminatory act, in my
6  opinion, was the removal of me from being in the top
7  three of the organization and no longer having
8  responsibility for the civilian portion of the
9  business.
10         BY MR. WILKINSON:
11    Q.  So -- so your having -- your having to take
12  on the responsibility for DHS was not a
13  discriminatory act?
14         MR. PELICCI:  Objection.
15         THE WITNESS:  Independent of the other
16  actions?  No.  It was always planned.
17         BY MR. WILKINSON:
18    Q.  Right.  And it would make sense, right,
19  given your background at Accenture, with your
20  relationships with DHS, right?
21         MR. PELICCI:  Objection.
22         THE WITNESS:  It was always planned.

Page 184

1  It's -- was not a change of plan.
2         BY MR. WILKINSON:
3    Q.  So do -- is it your contention that,
4  because DHS was not doing as well as it should have,
5  was that in and of itself a discriminatory act --
6         MR. PELICCI:  Objection.
7         MR. WILKINSON:  -- for challenging your
8  running DHS?
9         THE WITNESS:  The -- the discriminatory act
10  was that civilian, the high-performing -- or the
11  more high-performing part of the organization that I
12  was responsible for laying the foundation for was
13  removed from me, and my performance was based -- my
14  performance review was based upon only the
15  underperforming components of the organization, not
16  balanced with what I had responsibility for before I
17  had my son.
18         BY MR. WILKINSON:
19    Q.  Were you being sort of judged solely on,
20  say, the money?
21         I mean, what I hear you -- what I hear you
22  saying is that civilian was successful, right?  It



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
193–196

Page 193

1    We, as a team, were putting in place and
2  making the right pivots to grow the business, which
3  ultimately was very successful.  Large contracts
4  were closed shortly after I departed.
5    Over the course of that six to
6  seven months, the goalposts kept changing.  What was
7  once an, Kate, encourage your team to be
8  aspirational, turned into firm commitments to the --
9  to the organization.
10    Q.  Were that -- were those -- those changes or
11  did those -- were those just for you, or was it for
12  everybody?
13    A.  No.  It was for the entire organization;
14  however, the difference -- and an important
15  difference -- is that my time at the helm in that
16  area began when I returned from maternity leave.  So
17  my personal ability to effect that change was not
18  the same as other people who had been working those
19  territories and businesses for much longer.
20    So their ability to return and capitalize
21  on those results -- they were working deals for
22  those six to nine months.  I might have been working

Page 194

1  on a deal for -- as Matt referenced in the e-mail he
2  sent to John, at TSA for just a few months.  So
3  while the commitment didn't change, the time to
4  achieve the commitment was not the same.
5    I am a pleaser, by nature.  I work my rump
6  off to try to be successful, and I never wanted to
7  let them down.  So I pushed hard, and I push hard to
8  try to achieve and stretch ourselves to achieve.
9    Even when we did achieve, people that
10  achieved similar things -- men that achieved similar
11  things a year prior received accolades.  We were
12  told they didn't count.  This included upsell on the
13  ICE program, which was an existing contract.
14    Mike Fischer, the year before, had closed
15  something else on contract.  He, you know, walked on
16  water.  We had to fight -- I had to fight to get
17  that recognized.
18    So the relevance of that, you know, to how
19  I was performing, is that it was constantly evolving
20  and changing my performance.  So when I got that
21  e-mail, I responded in kind and -- and put in
22  writing my perspective about that was not a

Page 195

1  realistic expectation, nor had I been responsible
2  for that business long enough to effect the change.
3    Q.  So if you were -- so you were -- you were
4  on maternity leave for four months?  February,
5  March, April --
6    A.  January 23rd to May --
7    Q.  Oh, I guess --
8    A.  -- May 1st, 2nd, something like that.
9    Q.  Okay.  So like three and a half months,
10  right?
11    A.  Yeah, yeah.
12    Q.  Do you think that made the difference?
13    Like, had -- if you had -- if you had been
14  working, say, with DHS since -- you know, if you had
15  been able, right, to work with DHS since January, do
16  you think that would have made a difference?
17    MR. PELICCI:  Objection.
18    BY MR. WILKINSON:
19    Q.  From January of 2020 to January of 2021?
20    A.  I -- I could only speculate.  I don't know.
21    I couldn't do that.  What I could do is
22  continue to build on the momentum that I had with

Page 196

1  the civilian business, and that's what I had been
2  focused on prior to leaving.  So if I had had those
3  four months in the civilian space, I think our
4  success in the civilian space would have been even
5  greater.
6    Q.  But that wouldn't have affected, though,
7  the piece that you had -- DHS and commerce -- or
8  would it have?
9    A.  If I had returned --
10    MR. PELICCI:  Objection.
11    THE WITNESS:  If I had returned to the
12  top-three position and civilian had remained under
13  me and I had not been discriminated against and
14  demoted for having a baby, I would have had that
15  performance, and I would have had that time over
16  target.
17    BY MR. WILKINSON:
18    Q.  So is that really just -- is that -- so
19  that, to me, sounds like it's all financial, right?
20  There were numbers to look at, and Matt was saying,
21  your numbers are not --
22    A.  Mm-hmm.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
233–236

Page 233

1 out by the success of the programs that were closed
2 shortly after that I left, that we were doing the
3 right things to build deep, durable work.
4     BY MR. WILKINSON:
5     Q.  So the -- what Matt was expecting -- what
6 Mr. Warren was expecting of you and your team, did
7 that affect anybody other than just you, or did it
8 also affect your team members?
9     MR. PELICCI:  Objection.
10     THE WITNESS:  What do you mean by that?
11     BY MR. WILKINSON:
12     Q.  Well, you -- you were saying that, you
13 know, Mr. Warren was sort of -- to sort of put words
14 in your mouth -- and you can correct me if I'm,
15 like, being wrong here, but it sounds like he was
16 sort of misjudging your performance, right, and --
17 and sort of penalizing you for that?
18     MR. PELICCI:  Objection.
19     BY MR. WILKINSON:
20     Q.  Is that a fair assessment?
21     A.  When I returned from maternity leave, I was
22 given the unsuccessful portion of the business and

Page 234

1 was not given the time over target to effect the
2 change that would have realized benefits, nor was I
3 given the ability to have my performance of the
4 nonperforming part of the business balanced with the
5 civilian business that was removed from my
6 responsibility upon return.
7     So it's a long -- it's -- the answer is not
8 black and white.
9     Q.  Okay.  So -- well, you -- you had talked
10 about how Mr. Warren had changed the goalposts --
11     A.  Mm-hmm.
12     Q.  -- so to speak, right?  And that affect --
13 that affected your whole team, right, not just you?
14     A.  Correct.  Yeah.
15     Q.  Is that -- is that right?
16     A.  Mm-hmm.
17     Q.  Okay.  So is it your contention, then, that
18 Matt -- that Mr. Warren's sort of using your
19 pregnancy and going out on maternity leave to also
20 adversely effect the members of your team?
21     MR. PELICCI:  Objection.
22     BY MR. WILKINSON:

Page 235

1     Q.  Or was that just an effect of what
2 happened?
3     MR. PELICCI:  Objection.
4     THE WITNESS:  I can only be focused, I
5 think, on what happened to me.  What happened to me
6 was that I was fired for nonperformance.  No one
7 else was fired in -- on my team for nonperformance.
8     BY MR. WILKINSON:
9     Q.  Well, they both quit, right?
10     A.  (No response.)
11     Q.  Didn't both of your team members quit?
12     A.  They weren't fired for nonperformance.
13     Q.  Okay.  But my question to you was:  Didn't
14 both your team members quit?
15     MR. PELICCI:  Objection.
16     THE WITNESS:  Yes.
17     When it's appropriate, can I use -- take a
18 bathroom break?
19     MR. WILKINSON:  Oh, my goodness.
20 Absolutely.  Yes.
21     (Off the stenographic record.)
22     THE VIDEOGRAPHER:  Going off the record.

Page 236

1 The time is 1441.
2     (A recess was taken.)
3     THE VIDEOGRAPHER:  Going back on the
4 record.  The time is 1455.
5     BY MR. WILKINSON:
6     Q.  All right.  So, Ms. Abrey, I'm still on
7 page 2 of the telephone call transcript.
8     A.  Sure.
9     Q.  So I wanted to ask you:  So -- so did
10 you -- did you believe that you had disappointed
11 Mr. Warren?
12     A.  Yeah.
13     Q.  And at that point had your team sort of
14 sufficiently delivered what they had committed to
15 deliver by that point?
16     A.  This goes back to the goalpost continuing
17 to change over time and evolving.  Based upon the
18 way that the goalposts were set, no, they did not
19 perform.
20     Q.  Okay.
21     A.  But, again, I think it's important to note
22 that the goalposts were changing.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

Page 241

1 at what Mr. Warren is saying to you during the
2 telephone call, it -- it kind of appears that he is
3 sort of rattling off some figures that sort of match
4 up with what's in this PowerPoint, right?
5    A.  I can take your word -- like, I don't see,
6 for example, like, there's this, like -- it's 16
7 wedge deals versus 1.  I don't -- I see 1 to 15.
8    Q.  Right.  Right.  So --
9    A.  It's -- yeah.
10    Q.  Okay.  So --
11    A.  I certainly had not seen this -- this is
12 new to me.  First of all, I didn't have a memory --
13 a concrete memory of everything that was said in the
14 discussion.  This is not something that I had ever
15 seen while at Steampunk.
16    Q.  All right.  Do you have any reason to
17 believe that any of the figures in this PowerPoint
18 presentation are just wrong?
19        MR. PELICCI:  Objection.
20        THE WITNESS:  I have no way of being able
21 to -- to say neither here, nor there.  I don't have
22 the company pipeline.  I don't have the sales

Page 242

1 records.
2        BY MR. WILKINSON:
3    Q.  Yeah.  You know, I'm not -- I'm not sort of
4 the asking you to -- to sort of weigh on the
5 accuracy of that.  I know there's no way you
6 could --
7    A.  Okay.
8    Q.  -- ever know that.  But I guess what I'm
9 getting at is -- is:  Do you think -- I'm not --
10 I've got to figure out how to ask this question that
11 it's not so terrible.
12        You don't believe that Mr. Warren made all
13 of this stuff up just to set you up and fire you, do
14 you?
15        MR. PELICCI:  Objection.
16        THE WITNESS:  I have no idea.
17        I think, as is described in the transcript,
18 later on, I questioned the standards by which I was
19 measured and the fact that I didn't see this, ever.
20 I don't know what conclusion to draw from that, but
21 I -- this is not something I was held to, by my
22 knowledge, while I was there.

Page 243

1        BY MR. WILKINSON:
2    Q.  Okay.  Well, so if you're looking at --
3 let's see.  So -- let's see.  Hold on.
4        Well, is it -- is it fair to say that
5 Mr. Warren was sort of -- was focused on generating
6 net new business and wedge deals?
7    A.  Yes.
8    Q.  And he was putting a lot of pressure on you
9 to do that, wasn't he?
10    A.  He was putting pressure on the entire
11 business to do that, yes.
12        MR. WILKINSON:  Let's mark this as
13 Exhibit 16.
14        (Abrey Exhibit Number 16 was marked for
15 identification.)
16        THE WITNESS:  Which ones are we looking at?
17 Can I put these in my stack, or are we going to keep
18 looking at this one, 15?
19        MR. WILKINSON:  I think you can put that
20 back in your stack.
21        THE WITNESS:  Okay.  I just didn't want to
22 mess up the alignment.

Page 244

1        Okeydoke.
2        BY MR. WILKINSON:
3    Q.  Okay.  So you've been handed what's been
4 marked as Exhibit 16.
5        This is the performance evaluation, I
6 believe, that you've walked about earlier --
7    A.  Yes.
8    Q.  -- and I think you actually referenced it
9 in the -- in the telephone call.
10        Do you see under the "Manager's
11 Comments" -- and you'd referenced there -- there are
12 various -- you know, various parts of this
13 evaluation that's meets, exceeds.  You've got "Work
14 Habits":  "Exceptional Performance"; "Exceeds
15 Expectations" for attitude and for job skills and
16 knowledge.
17        We go down to the manager's comments, and
18 we see the -- sort of in the third line there,
19 referring to you, Mr. Warren says, "She will need to
20 improve on winning new work, with new capabilities
21 as we build out her portfolio.  In terms of
22 communication, I would like to see Kate have harder



Page 253

1  "...and so if that's this quarter with me, Matt,
2  that's fine."
3  You did not understand that to mean --
4  well, did you not have an understanding that -- that
5  it was you, Kate Abrey, your job was on the line?
6  That if you didn't deliver, then you wouldn't be
7  there? And you seemed to acknowledge that.
8  A. I was doubling down on the fact that we
9  were going to achieve the objectives and that we
10  needed the time to do that effectively. I was
11  consistent about that, and that would have been, in
12  my opinion, the requisite amount of time to have
13  produced results, and we did. If you look at the
14  results after I departed, we did.
15  Q. Okay. So is it your contention that you
16  were not -- or that your job was not in jeopardy if
17  you didn't hit your -- or meet your goals for Q1?
18  A. I think, based upon the way that they were
19  constructing my performance targets and the meeting
20  I had had the day before, yes.
21  Q. "Yes" what?
22  A. Yes --

Page 254

1  Q. You understood that your job was in
2  jeopardy?
3  A. I did understand that my job was in
4  jeopardy, but they were measuring me, at this point
5  in time, against an unfair set of performance
6  targets that I was given the day I returned from
7  maternity leave, not independent of that, and I
8  needed the right amount of time and resources to
9  turn that book of business -- albeit an even
10  lessened book of business -- around.
11  I was trying to make hay out of something
12  that was not in a good place, and I needed the time
13  to do that, which I could -- that's a very
14  consistent commentary that I had.
15  Q. Did -- did -- when you met with Mr. Warren
16  and Mr. Harllee the previous day, did either one of
17  them say that if you don't -- it's -- in so many
18  words, if you don't turn this around by Q1, you need
19  to go?
20  A. I don't remember. I -- the tone changed so
21  much in the course of that conversation between the
22  two topics we talked about -- the Jacquelyn and me

Page 255

1  pushing back on the performance topics -- I walked
2  away from that conversation feeling terrible, so
3  terrible that I called John and said, Matt was the
4  best boss I ever had, and now he's the worst. What
5  happened?
6  Q. What did Mr. Harllee say?
7  A. He said, You're not a gas station
8  attendant. You're accountable for your results.
9  Q. What does a gas station attendant have to
10  do with anything?
11  A. I don't know. I'm just telling you that's
12  what I remember of the conversation.
13  Q. All right. So, in a sense, he said, You
14  are accountable for your results?
15  A. I literally just told you what I know. I
16  don't know what he meant by that. You'll have to
17  ask him.
18  Q. No, I -- no, no. I seem to understand that
19  you didn't know what he meant by the gas station
20  attendant, which is why I asked, What does that
21  mean? and you don't know.
22  A. Yeah.

Page 256

1  Q. But -- but I think you also said he said,
2  You are accountable for your results. Is -- right?
3  A. I'm sure he did say I was accountable for
4  my results, and I think I asked him, in the context
5  of that, how to work better with Matt.
6  Q. All right. Take a look at the -- take a
7  look at page 5. I'm talking about line 9, that
8  paragraph there.
9  It looks like you were -- you were sort of
10  arguing with Mr. Warren about how he has defined net
11  new. I think that's -- you're referencing the goals
12  changing --
13  A. Correct.
14  Q. -- right?
15  And you say, "At the end of the day, it's
16  your perspective"; essentially saying, You're the
17  CEO. What you sort of expect is what goes, right?
18  MR. PELICCI: Objection.
19  BY MR. WILKINSON:
20  Q. Is that what you meant by that, or did you
21  mean something different than that?
22  A. I was -- I had been consistently talking to



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
265–268

Page 265

1  been escalating.

2  Then we met again in July about

3  something, something, and had the same conversation

4  with him.  I had the same conversation with him

5  about the fact that my trajectory at the company had

6  been significantly changed upon my return, and I

7  wept about it, wept.  And that's what he's talking

8  about.

9      As a matter of fact, he, during one of the

10  conversations, stayed up all night -- he told me --

11  and wrote a list of the reasons why I should be

12  grateful that I still had a job, and why I should be

13  grateful that I had a job, not just a job, but a job

14  at Steampunk when I returned from maternity leave,

15  and that he had showned it -- shown it to his wife,

16  Linda.

17      And -- and that devastated me because,

18  again, I can't say it enough:  Matt was like a

19  brother to me.

20      Q.  Did he show you the list?

21      A.  No.  He read it to me.

22      Q.  What was on it?

Page 266

1      A.  It -- we were one of the fastest growing

2  companies, small business companies.  I had this

3  great stock that was going to vest with the company

4  and I was going to have this great payout.  We were,

5  like, a very collaborative team.  We had some of the

6  best people in the business.  Those sorts of things

7  were the reasons I should be grateful.

8      I don't recall the whole list, so please

9  forgive my memory --

10      Q.  Okay.

11      A.  -- if it's not perfect, but that -- those

12  were some of the things.

13      Q.  Flipping over to page 12 of this, you

14  essentially asked Mr. Warren what you could have

15  done better, and then, on page 12, he's sort of

16  telling you that.

17      Not that you want -- not -- I'm not asking

18  you to agree with Mr. Warren, but do you believe

19  that this is what he believed were the issues?

20      MR. PELICCI:  Objection.

21      THE WITNESS:  I -- I don't know.  Much of

22  this was news to me when he said it to me that day.

Page 267

1      BY MR. WILKINSON:

2      Q.  Well, do you have any reason to believe

3  that he was just lying to you about all of this?

4      MR. PELICCI:  Objection.

5      THE WITNESS:  No.  I think -- as I -- I

6  think what I said in the actual discussion, in the

7  actual transcript, his perspective is his

8  perspective.  I don't know what his perspective is,

9  but it's his perspective.

10      BY MR. WILKINSON:

11      Q.  What -- so he starts -- he also -- at line

12  18 and 19, right, he's talking about "when our

13  restrictions were done."

14      He was under some restrictions from

15  Accenture as well?

16      A.  Mm-hmm.  Yes.

17      Q.  And that's -- you guys are talking about

18  the noncompete restrictions?

19      A.  Yes.

20      Q.  What were -- he's talking about sort of

21  ongoing issues with Diane Ashley.

22      What was going on -- what was going on with

Page 268

1  her and what Mr. Warren was expecting of her?

2      A.  He didn't have much faith in Diane's

3  ability to be successful.

4      Q.  And what was he basing that on, or what did

5  he -- I mean, I presume he told you what he was

6  basing that on, right?

7      A.  Yeah.  I think there was a mismatch of

8  expectations.  Diane was brought in -- Diane

9  believed and was brought in to be the SVP of DHS,

10  which constituted, I think in her mind -- and I

11  don't want to speak for her, but managing and

12  growing the business.

13      And in his -- in my -- again, I don't want

14  to put words in his mouth, but his expectation was

15  solely on growth and not really on managing.  So she

16  had a team below her that she was meant to be

17  focused -- laser focused on growing.

18      Q.  Is that an issue that he -- that Mr. Warren

19  would talk to you about?

20      A.  Yes.

21      Q.  Wasn't he also wanting you to sort of be

22  the heavy there and get Diane laser focused?



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
269–272

Page 269

1    A. The responsibility for Diane transferred
2  to me -- and, you know, technically, she reported
3  to John and Matt and John Loughlinfer. While
4  I was out, I believe she reported to John and Matt.
5  I don't know, exactly.
6       Matt, I remember saying one time he was
7  going to kind of have his approach with her, and
8  then, when my restrictions were lifted, it was then
9  my responsibility.
10      So between the three of the top three --
11 the three people that were supposed to be the top
12 three people in the company, we all worked with
13 Diane.
14   Q. But, starting in May of 2020, she became --
15 she primarily became your responsibility, didn't
16 she?
17      MR. PELICCI: Objection.
18      THE WITNESS: She certainly worked for me,
19 yes, absolutely.
20      BY MR. WILKINSON:
21   Q. Well, were -- were you not primarily
22 responsible for her --

Page 270

1      MR. PELICCI: Objection.
2      MR. WILKINSON: -- after she came under
3  your -- under your sort of -- into your portfolio?
4      THE WITNESS: She did report to me under my
5  portfolio, yes, yes, for sure.
6       The reason I'm -- I'm being careful about
7  my word choice is because, you know, we looked at
8  the org chart earlier and we talked a lot -- we've
9  talked a lot about cascading responsibilities --
10      BY MR. WILKINSON:
11   Q. Sure.
12   A. -- and how responsibilities are managed,
13 and so it was all of our responsibility, as a
14 leadership team, to make Diane successful. I was
15 the person next above her, absolutely, once I
16 returned from maternity leave.
17   Q. Okay. You can set that one aside, if you
18 like.
19      I want to go back to the request for
20 admissions, which is Exhibit 1.
21      So, looking at Request 33, this is, again,
22 one of those double negatives.

Page 271

1      All right. You -- essentially, you're
2  saying you did report to HR if you experienced
3  discrimination or retaliatory conduct prior to
4  January 14th, and so I want to know who did you
5  report what to and when?
6    A. Okay. So John is responsible for -- the
7  COO is responsible for human resources, legal,
8  finance, et cetera.
9       I operated, you know, above the -- my level
10 within the company was officially above -- more
11 senior to -- not responsible for but more senior to
12 HR and legal. I spoke to John twice about my
13 concerns. Once I --
14   Q. And that's what we've talked about --
15   A. Yes.
16   Q. -- earlier, right?
17   A. Yeah.
18   Q. Well, but John was the COO, and Dan Parker
19 was the HR head, right?
20   A. Yes. I was told not to speak to anyone
21 about how I felt after I discussed it with John,
22 who, in my opinion, had responsibility for Dan.

Page 272

1    Q. So you're -- so -- okay. So your response
2  to this, you're saying, Well, it was HR because I
3  talked to John and John was responsible for HR?
4    A. Correct.
5    Q. So you didn't go and talk to Dan Parker at
6  all about claims that you were being discriminated
7  against or retaliated against?
8    A. No, I did not talk to Dan directly.
9    Q. But indirectly through John?
10   A. Correct.
11   Q. Got it.
12      And I believe that you said that nothing
13 got resolved from your conversations with John,
14 right?
15   A. Correct. He gave me advice, but nothing
16 changed.
17   Q. And why didn't you, then, go to Dan?
18   A. I was told not to speak to anyone else in
19 the organization about this. I was not sure what
20 that -- I mean, that was, in essence, Or else, you
21 know? Like, that's what was --
22   Q. Or else --



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
273–276

Page 273

1    A. -- I was told.

KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS          April 05, 2023

3    on camp. And I already had been

4    demoted. I was being marginalized from being an

5    executive within this company that I gave up a lot

6    to, and I was told not to speak about what I felt

7    was an injustice that occurred to me to anyone else

8    in the company. That included Dan.

9        And I was trying to make it work because I

10   had committed so much to being there. I wanted the

11   company to be successful.

12   Q. Request for Admission 34 is the same type

13   of question but regarding the general counsel's

14   office.

15       So who in the general counsel's office did

16   you report that you had experienced discrimination

17   or retaliation?

18   A. The answer is the same as above.

19   Q. So John?

20   A. The general counsel's office reported to

21   John.

22   Q. Okay.

Page 274

1    A. Yes.

2    Q. How about Request 36?

3        So the same question: Who did you report

4    to? when what did you say?

5    A. Sure. So, again, in the discussion on

6    January 13th, I had a very overt conversation about

7    this. I think I said -- I even called out maternity

8    leave in that discussion.

9        And, prior to that, I had talked to Dan

10   Parker about the candidate and my concern about our

11   perception within the industry of being -- I don't

12   believe I used the word discriminatory, but not

13   favorable to top female talent. And that occurred

14   one-on-one and then in a group setting.

15   Q. And your issue there was that Steampunk

16   didn't offer benefits that would be attractive

17   enough to attract top talent for top women, top

18   female talent?

19       MR. PELICCI: Objection.

20       THE WITNESS: The discussion that I had

21   with Dan -- the first discussion that I had with Dan

22   was after I spoke to Jacquelyn and I understood what

Page 275

1    she was hoping to do, which was to take a leave of

2    absence if she was successful in getting a baby.

3        My conversation with him as to that was:

4    Dan, you -- we talked about from the beginning of

5    Steampunk that we were going to improve the

6    maternity benefits. They did not improve for me,

7    and, actually, it was very hard for me. I want to

8    see us do better for the future, because I think it

9    will benefit and position the business to be more

10   successful in the future with women. That is what

11   the -- the essence of the conversation was with Dan.

12       And, by the way, he agreed, which led to

13   the group meeting where we tried to come up with a

14   solution that worked. That's what was flagged for

15   discussion with Matt and John.

16       And, in that conversation, I remember

17   feeling so uncomfortable about this because I was --

18   again, I don't know, because I can't read their

19   minds, but I felt like I brought this up again; I

20   related it to myself; I related it to maternity

21   leave; and eyes were rolled. And I said, Is this it

22   again? And I felt like they were texting about me,

Page 276

1    like -- because we were on camera.

2        I don't know if that happened. That's pure

3    speculation. But I did bring it up directly to

4    them.

5        BY MR. WILKINSON:

6    Q. So I think you had mentioned that

7    Ms. Brioux was being considered for a project

8    manager position?

9        Do -- do you remember specifically what she

10   was being considered for?

11   A. I don't. I -- I recall it was a

12   client-facing position, a very -- an

13   important client -- I believe it was a PM, but I

14   don't remember, exactly.

15   Q. Well, what were the -- I mean, what would

16   the project manager be responsible for doing?

17   A. Project manager is usually responsible for

18   doing -- managing the team, making sure that the

19   client is happy, communicating to the client,

20   managing risks and issues, and ensuring deliverables

21   are achieved and submitted in a timely fashion, in

22   accordance with the contract.



Page 277

1    Q.   Is that position what you were calling a
2  KATHLEEN ABREY sion?
3    A.   ABREY V STEAMPUNK HOLDINGS es it is;

4  sometimes it isn't.
5    Q.   Do you know what it was on this
6  particular --
7    A.   No.
8    Q.   -- thing?
9    A.   I don't -- yeah, I don't know.
10    Q.   Do you remember what project it was
11  supposed to be for?
12    A.   No.
13    Q.   And you don't know when it was supposed to
14  be bid or awarded or anything like that?
15    A.   I -- the only temporal reference that I
16  have to it is that, over the course of the
17  discussion with her, she -- she represented to me
18  that she had IVF, and then I think I heard
19  secondhand that she was actually pregnant.  And this
20  would have impacted, somewhat, the early stages of
21  the project, if she were to go on leave.  So
22  that's -- we can do the math there, right?  Like ten

Page 278

1  months-ish.  That's my only reference point that I
2  recall.
3        MR. WILKINSON:  All right.  Here we have
4  what's marked as Exhibit 17.
5        (Abrey Exhibit Number 17 was marked for
6  identification.)
7        BY MR. WILKINSON:
8    Q.   So this appears -- I don't know that you're
9  on this one.
10        So this is -- appears to be an e-mail from
11  Mr. Reeves, and he -- he worked in your portfolio,
12  didn't he?
13    A.   He did, yep.  Yep, he did.
14        And he also supported a few other areas,
15  yeah.
16    Q.   Okay.  So he -- so you weren't his only
17  sort of supervisor?
18    A.   It -- I was his primary supervisor.  Over
19  time -- well, first of all, he reported --
20  initially, he reported to Diane Ashley.  Then he
21  reported to me.  And, at times, he supported across
22  civilian as well.

Page 279

1    Q.   Oh, okay.
2    A.   That may not be neApril 05, 2023 here,
3  but...
4    Q.   Okay.  So it looks like -- so this is
5  talking about Ms. Brioux, and it looks like she was
6  looking to get some assurances in a written offer
7  letter that she was -- that she wanted to take a
8  request for leave without pay and then return
9  afterwards, once she decided to return to work full
10  time.
11        Is that refreshing your recollection of
12  what she was looking to do?
13    A.   It sounds -- is sounds about right, yeah.
14    Q.   So it looks like -- let's see here.
15        (Abrey Exhibit Number 18 was marked for
16  identification.)
17        BY MR. WILKINSON:
18    Q.   I'm giving you what we've marked
19  Exhibit 18.
20        Have you seen this document before?
21    A.   Yes.  I think I have.
22    Q.   All right.  So this is -- this looks like

Page 280

1  it's the list -- or sort of like, if you would,
2  Ms. Brioux's wish list, right, or her demand.  This
3  is what -- this is what she was looking to do,
4  right?  Take --
5    A.   I don't know that.  I don't -- I've
6  never -- I had never seen this, like, in realtime.
7  I saw this as a -- as a -- as an attachment to one
8  of the letters.
9    Q.   Oh.  So Jen Sessums didn't or Kristin Recco
10  didn't --
11    A.   No.
12    Q.   -- show you this?
13    A.   I never saw this -- I never saw this in
14  realtime.
15    Q.   Okay.  Well, do you have a -- well, I
16  suppose I can represent to you this is what she was
17  looking for.
18        She was seeking a week of paid leave -- and
19  I guess at that point Steampunk had a paid parental
20  leave policy, right, that gave parents a week of
21  paid leave at a hundred percent?
22        MR. PELICCI:  Objection.



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
281–284

Page 281

1    THE WITNESS:  I do believe they implemented
2  something like that for both men and women, yeah.
3    BY MR. WILKINSON:
4    Q.  Okay.
5    A.  I don't remember the details, but, yeah,
6  that sounds right.
7    Q.  Do you have a -- I mean, do you have a
8  recollection of it being implemented, like, in July
9  of 2020?
10    A.  Again, I don't know when.  I recall that
11  there was something that was done -- and I actually
12  even recall so much so -- that it was directed to
13  both men and women -- that I took some offense to
14  it, personally.  I don't think I expressed that
15  offense, but it was something like -- like, Come on.
16  We're not even doing it for the women?  Like, this
17  is for men and -- like, the women are already not
18  being treated properly, but --
19    Q.  Well, wasn't there --
20    A.  -- that's just my emotional response.  I
21  don't know that that's --
22    Q.  Well, wasn't there a policy that was just

Page 282

1  for women first, and then the women in the HR
2  department, like Michelle Brickwedde, right?  Didn't
3  she sort of raise a stink and saying this ought to
4  be for men as well and not just women?
5      Does that ring a bell with you at all?
6      MR. PELICCI:  Objection.
7      THE WITNESS:  No, that doesn't ring a bell
8  with me at all.
9      BY MR. WILKINSON:
10    Q.  Okay.  Well, in any event, I'm going back
11  to what Ms. Brioux was asking for.
12      It looks like one week paid leave, five
13  weeks of short-term disability, and then 14 weeks of
14  unpaid leave and then 8 weeks of work from home,
15  flexible return to work.
16      Does that sound about right what she was
17  looking for?
18      MR. PELICCI:  Objection.
19      THE WITNESS:  I -- yeah, I don't remember.
20      BY MR. WILKINSON:
21    Q.  Well, you said that you were advocating to
22  give her what she was asking for, in writing.

Page 283

1    You don't remember what it was that she was
2  asking for?
3    A.  I recall it being very similar to what I
4  had wanted to do.  That's -- that was my
5  recollection and always my parallel, was to myself,
6  and not -- I don't remember her unique
7  circumstances, nor do I -- I actually don't believe
8  I -- I knew this.
9    Q.  Well, you took off -- let's see.  So you
10  took off, roughly, 13 weeks, right?
11    A.  I took --
12    Q.  Last week in January and then February,
13  March, and April?
14    A.  And I do think I took PTO and then I took
15  the -- there was a -- as far as I recall, the only
16  maternity benefit that I was allowed to -- that I
17  was eligible for was short-term disability leave --
18    Q.  Well, I was actually --
19    A.  -- and then unpaid leave.
20    Q.  I was actually talking about the time --
21    A.  I know.
22    Q.  -- the amount of time, right?

Page 284

1    A.  I'm just having to do the math in my
2  head --
3    Q.  Okay.
4    A.  -- because I feel like it was one week of
5  paid PTO, five weeks, if I remember correctly, of
6  short-term disability at a certain percentage of my
7  pay, and then beyond that was my unpaid leave of
8  absence.
9      I took off from the day I gave birth to
10  May -- the very beginning of May.  Whatever those
11  number of days are, I don't know.
12    Q.  Well, I guess what I'm trying to understand
13  is:  I think what you had said earlier you were
14  advocating to give Ms. Brioux the same thing that
15  you took, and you took approximately 13 weeks of
16  leave.  She's asking for 20 weeks of leave, plus an
17  additional 8 weeks of working from home and have a
18  flexible return date.
19      So that's -- that's really quite a lot --
20  quite different than what you took, isn't it?
21      MR. PELICCI:  Objection.
22      THE WITNESS:  I didn't know this.  I was



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
297–300

Page 297

1    BY MR. WILKINSON:
2    Q.  Well, when you were working there, were you
3  aware of anybody else taking leave without pay?
4    A.  Yeah.  There was somebody that had cancer,
5  I think, or their mother had cancer.  I know there
6  were a few other women that -- there was, like, one
7  or two other women who had babies, I think, but I
8  don't know -- I have no -- I had no insight into
9  what their situation was --
10    Q.  Okay.
11    A.  -- or I don't recall any insight into their
12  situation.
13        MR. WILKINSON:  All right.  You will be
14  handed what will be marked as Exhibit 21.
15        (Abrey Exhibit Number 21 was marked for
16  identification.)
17        BY MR. WILKINSON:
18    Q.  So this is an e-mail from Dan Parker to
19  Matt Reeves, and he is saying that Kate -- and I
20  presume that he is referring to you -- called him
21  directly on Friday and asked the status about
22  Ms. Brioux.  It looks like Brittany and Kate have

Page 298

1  talked to Ms. Brioux about support from the company,
2  and JH -- and I'm assuming that means Mr. Harllee,
3  right?
4    A.  Mm-hmm.
5    Q.  -- has notionally approved additional leave
6  without pay in August for maternity leave, if she
7  wants/needs it, but we couldn't include it --
8  anything in written -- written in an offer letter
9  about a commitment for future leave without pay.
10        Were you aware that Mr. Harllee had
11  notionally approved her taking 14 weeks of leave
12  without pay for maternity leave in August?
13    A.  I am sure that -- I knew we were trying to
14  get to a yes for her, yes.
15        I don't know that I knew the -- where we
16  were and exactly what had been approved or not
17  approved, but I think everyone was trying to figure
18  out how to hire her.
19    Q.  So at this point you didn't know that
20  Mr. Harllee had already approved --
21    A.  No.
22    Q.  -- her taking 14 weeks of leave without

Page 299

1  pay?
2        MR. PELICCI:  Objection.
3        THE WITNESS:  Not that I recall, no.
4        As I mentioned, I'm fairly certain that, on
5  the 11th or shortly thereafter, we had a group
6  meeting about this, to get to a yes that we
7  presented to Matt and John.
8        BY MR. WILKINSON:
9    Q.  Well, do you have any reason to believe
10  that Mr. Parker would have been misstating the fact
11  that Mr. Harllee had already notionally approved
12  additional 14 weeks of unpaid leave for Ms. Brioux?
13        MR. PELICCI:  Objection.
14        THE WITNESS:  I don't.  And I don't see
15  where it says 14 weeks or how I would know that it
16  would be 14 weeks.
17        BY MR. WILKINSON:
18    Q.  Well, it says, Has -- has natural --
19  notionally approved of additional leave without pay
20  in August for maternity leave if she wants.  We
21  can't -- she was asking for 14 weeks of leave
22  without pay?

Page 300

1    A.  I didn't know that until -- again, I had
2  never seen that documentation before.
3    Q.  Okay.  Do you think that Mr. Harllee's
4  actions in agreeing that Ms. Brioux could take
5  additional leave without pay was discriminatory?
6        MR. PELICCI:  Objection.
7        THE WITNESS:  I don't think -- this does
8  not indicate anything that would be discriminatory.
9  However, it's a point in time, and it does not, I
10  don't think, illustrate the breadth of what happened
11  with Jacquelyn.
12        MR. WILKINSON:  22?
13        THE REPORTER:  Mm-hmm.
14        MR. WILKINSON:  You'll be handed what's
15  been marked Exhibit 22.
16        (Abrey Exhibit Number 22 was marked for
17  identification.)
18        BY MR. WILKINSON:
19    Q.  You had mentioned earlier that a meeting
20  was convened to discuss Ms. Brioux.
21        Is this what you're talking about here?
22  Does this reflect that meeting?



Page 305

1   A.  -- in a creative fashion, so I think that's
2   what I referred to here as well.
3   Q.  So, I mean, Mr. Harllee says he doesn't love
4   the idea of a non-Steampunk resource leading our
5   first or any new win prime in S&P.
6       Do you know what -- what that's about?  Was
7   this -- was this, like, the first time S&P would,
8   like, win a new prime contract?
9   A.  So -- I don't remember the contract that we
10  were -- I don't recall the specific contract we were
11  trying to hire her for.
12  Q.  Okay.
13  A.  If that was the case, it certainly could
14  have been.  Our first goal wasn't to have her,
15  though -- as you can see from the preceding things,
16  she wanted to be an employee of Steampunk.  She
17  wasn't -- it sounds like we weren't able to -- the
18  solution we were at this point in time that this
19  e-mail was sent was that we were considering having
20  her -- a workaround, which would be to have her be a
21  subcontractor.
22  Q.  Mm-hmm.

Page 306

1   A.  So that wasn't our primary objective was to
2   have her be a non-Steampunk resource.  We wanted her
3   to be Steampunk.  She wanted to be Steampunk.  She
4   applied to be Steampunk.  We were negotiating with
5   her as Steampunk.  And then that changed in -- to
6   try to get to yes.
7   Q.  All right.  So -- so do you -- so -- all
8   right.  So number -- right.  Number three,
9   Mr. Harllee says, "...I don't get the logic of
10  hiring a PM, getting the project kicked off and then
11  a month or two after it gets going, the leader is
12  out for 14 weeks.  I am all open for being flexible
13  (particularly given the facts) on something like
14  this, but I am concerned about customer impact,
15  project impact, and the gymnastics on this."
16      Do you think that Mr. Harllee was being
17  unreasonable for having these concerns?
18      MR. PELICCI:  Objection.
19      THE WITNESS:  It was his perspective.  I
20  don't -- I can't speak to reason or nonreason.  I
21  didn't have the same concerns.
22      BY MR. WILKINSON:

Page 307

1   Q.  Okay.  But, I mean, do you think that
2   Mr. Harllee was unreasonable in raising these
3   concerns?
4   A.  Again, his perspective is his perspective.
5   I didn't agree with them.
6   Q.  Do you believe that these are unreasonable
7   concerns?
8   A.  Personally?
9   Q.  Yeah.
10  A.  Yes.
11  Q.  Okay.  Do you think it makes a
12  difference -- so what Mr. Harllee is talking about
13  is -- for number three, anyway -- new contract
14  project manager, which is client facing, right?
15  That project manager is supposed to be establishing
16  a relationship with the client, right?
17  A.  Mm-hmm.
18  Q.  And then comes on to the project and then
19  is gone for, you know, three months, three and a
20  half months, right?
21  A.  Mm-hmm.
22  Q.  Do you think it makes a difference whether

Page 308

1   that person is out because they wanted to take that
2   unpaid leave as a maternity leave or, let's say,
3   they had an opportunity to take a sabbatical and
4   hang out in the Himalayas?  Would that -- do you
5   think it makes a difference the reason for the time
6   being out?
7       MR. PELICCI:  Objection.
8       THE WITNESS:  I would be speculating.  In
9   this case, I knew the reason, and I didn't think the
10  reason was unreason -- I didn't think it was
11  unreasonable.
12      BY MR. WILKINSON:
13  Q.  Well, do you -- do you think it was
14  discriminatory to -- to raise these concerns, the
15  fact that -- that Mr. Harllee didn't think somebody
16  should be out for 14 weeks --
17  A.  I think --
18  Q.  -- even if they were going on maternity
19  leave?
20      MR. PELICCI:  Objection.
21      THE WITNESS:  I think the only reason we
22  were considering whether this highly qualified woman



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
309–312

Page 309

1 could fill this position was because she was having
2 a baby, not because she was having a baby, and
3 she was so important to my company's success or in
4 Mr. Harllee's estimation, able to fill a role such
5 as this with a client.
6     And I had been through something where I
7 had felt like I had been in a position where I could
8 deliver something very effectively. I had a baby,
9 and I was told I couldn't anymore. It was very
10 similar, and I raised that concern directly and
11 loudly with them in the -- or not loudly, but
12 directly and effectively with them on the meeting
13 that I had on the 13th.
14   Q.  So you think the issue was the fact that it
15 was a woman having a baby, not the fact that she
16 wanted to take 14 weeks of leave that was the issue?
17   A.  The reason she was taking -- the only
18 reason she was taking it --
19   Q.  No, no, no. I understand --
20   A.  Yeah.
21   Q.  -- I understand that the reason she was
22 taking leave, right, but what I'm trying -- what I'm

Page 310

1 trying to get at is --
2   A.  Yeah.
3   Q.  -- is your position is that -- if she
4 wasn't going to take leave, right? Let's go back to
5 my hypothetical. She has a baby over the weekend,
6 on Saturday, and comes back to work on Monday.
7     Do you still think that the company would
8 have had an issue with her in that role?
9     MR. PELICCI: Objection.
10     THE WITNESS: I don't know. My guess is
11 no.
12     BY MR. WILKINSON:
13   Q.  So, then, doesn't it follow from that,
14 then, the issue is she'd be out on leave for
15 14 weeks, not the fact that she had a baby and was
16 out on leave for 14 weeks?
17     MR. PELICCI: Objection.
18     THE WITNESS: No -- no, I don't think it
19 does. Is the expectation that women have a baby and
20 then come back to work the next day?
21     BY MR. WILKINSON:
22   Q.  No. What I'm trying to understand is that

Page 311

1 you seem to be -- you seem to be focusing on this
2 notion of she's having a baby and going on leave,
3 right?
4     And I'm asking you whether it's really the
5 baby part or is it the leave part that's the issue?
6   A.  And I think, as we discussed earlier, in my
7 opinion, the two are intrinsically linked.
8   Q.  Okay.
9   A.  You don't go on -- she's not going on leave
10 to go to the Himalayas. She's going on leave to, as
11 you read in her e-mail, spend time with her infant.
12 And she saw how -- the detrimental impact that that
13 had on her upbringing and how she was able to
14 contribute and grow and thrive as a human. And
15 she's asking us to trust her enough to come in, fill
16 a role as a PM, as a very qualified female, go off,
17 have a baby, and come back and be able to fill that
18 same position.
19   Q.  So --
20   A.  That is the issue that I have -- that I
21 believe is discriminatory.
22   Q.  Okay. So if -- if she were a man whose

Page 312

1 wife was about -- or partner was about to have a
2 baby and the man said, I want to take 14 weeks off
3 to spend time with my new child, do you think --
4 going through this same rationale here, do you think
5 that would also be discriminatory?
6     MR. PELICCI: Objection.
7     THE WITNESS: If equal standards were
8 applied, yes, I do. I mean, I think that you
9 can't -- I would draw a reference to the fact that
10 my current employer provides the same maternity and
11 paternity benefits.
12     BY MR. WILKINSON:
13   Q.  Right. But that wasn't my question, right?
14     So I think your answer was: If it was a
15 man who wanted to take 14 weeks of leave to spend
16 time with a baby, then this -- then the logic that
17 Mr. Harllee is talking about here would still be
18 considered discriminatory, in your mind?
19     MR. PELICCI: Objection.
20     THE WITNESS: Yeah. I don't know that I --
21 the thing that I see as discriminatory is that she
22 was a woman having a baby. She was highly



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
377–380

Page 377

1    A.  Yeah.
2    Q.  -- because I don't know how you could
3  possibly know that --
4    A.  Mm-hmm.
5    Q.  -- right?
6       But if you were employed today, could you
7  just cash in your stock?
8       MR. PELICCI:  Objection.
9       THE WITNESS:  I don't -- yeah, I don't
10  know.  And that certainly wouldn't be my intention.
11      BY MR. WILKINSON:
12    Q.  Well, whether it was your intention or not,
13  do you know whether you would have the ability to
14  cash in your stock if you wanted to?
15      MR. PELICCI:  Objection.
16      THE WITNESS:  I don't know.
17      BY MR. WILKINSON:
18    Q.  Do you know whether you would have the
19  ability to sell it?
20      MR. PELICCI:  Objection.
21      THE WITNESS:  I don't know.
22      BY MR. WILKINSON:

Page 378

1    Q.  But what you're asking -- but what you're
2  asking for is the cash value of the stock now?
3       MR. PELICCI:  Objection.
4       THE WITNESS:  I've been -- I've asked to
5  retain the same stock that I had, that I was
6  granted.
7       BY MR. WILKINSON:
8    Q.  Meaning you want the company to give you 4
9  million in shares of stock?
10      MR. PELICCI:  Objection.
11      THE WITNESS:  I've asked to retain the
12  amount of stock that I was granted, because the
13  purpose of me joining the company was not to buy or
14  sell the stock, and the short-term basis was to be
15  part of the foundational leadership team that saw
16  the company from inception through to acquisition.
17  And then, as a team, based upon how successful we
18  were at the time of acquisition, we would all
19  benefit based upon our relative portfolio of stock.
20      BY MR. WILKINSON:
21    Q.  So what would happen, then -- remember,
22  your -- the allegations in your complaint were that

Page 379

1  at the -- at the January 13th meeting was that
2  Mr. Warren said you have Q1 to turn it around;
3  otherwise, you were going to be gone, right?
4    A.  He certainly insinuated that, yes.
5    Q.  Well, that was -- that's a direct
6  allegation in your complaint --
7    A.  Yeah.
8    Q.  -- that that was the understanding, right?
9    A.  We talked about performance and the need to
10  perform in a timely fashion.  There were e-mail
11  exchanges going back and forth about how that
12  performance was being dictated and --
13    Q.  Well, regardless of how it was being
14  dictated, you understood, from the meeting on
15  January 13th, that if your Q1 performance didn't --
16  wasn't up to par, you were going to be gone, right?
17      MR. PELICCI:  Objection.
18      THE WITNESS:  The -- again, this is --
19  we've talked about this a little bit.  You have to
20  agree with Matt to move Matt.  You have to use
21  rationale to move Matt.  It was certainly an
22  expectation that I was under scrutiny -- my

Page 380

1  performance was under scrutiny, absolutely.  And was
2  there a potential impact to that?  Absolutely.
3       BY MR. WILKINSON:
4    Q.  Do you think that if you had not been fired
5  on January 14th and you did not meet your
6  commitments for Q1, do you think Matt would have
7  fired you then?
8       MR. PELICCI:  Objection.
9       THE WITNESS:  I think there's a lot of
10  speculation in that.
11      BY MR. WILKINSON:
12    Q.  Okay.
13    A.  The targets moved all the time on people
14  staying, going, coming, leaving based upon Matt's
15  mood of the day, so I do not know.
16      And what happened was that I was fired, and
17  the other thing that happened was that I did
18  perform.
19    Q.  Okay.  Well --
20    A.  So there's a lot of conjecture in that.
21    Q.  There is a lot of conjecture in that, and
22  that's -- and that's what I'm asking you about.



Page 397

1  to be recommunicated and communicated because people
2  noticed that there was a shift, and it wasn't
3  totally intuitive. Not everyone understood why and
4  what the shift meant, really.
5     Q.  Mm-hmm. Did Mr. Warren ever express to you
6  his frustration that he didn't think that you were
7  sort of pushing Diane and/or David as much as you
8  should?
9     A.  Yes.
10    Q.  And when did he start doing that, if you
11 remember?
12       MR. PELICCI: Objection.
13       THE WITNESS: Always, to some extent. It
14 depended on the day. He was in -- a mercurial -- it
15 wasn't -- it wasn't consistent. He was never happy
16 with either of them, which is why, again, it's
17 important to note, I immediately recognized I was
18 given the part of the business, when I came back,
19 that was viewed as underperforming. The view of
20 whether Diane and David were good were questioned
21 from very early on.
22       BY MR. WILKINSON:

Page 398

1     Q.  Do you have any understanding of why they
2  didn't get fired much earlier on?
3     A.  There was a lot of discussion about it. I
4  protected them, in many ways, and was working to try
5  to improve their performance.
6     Q.  And -- and when do you remember the
7  discussion starting about firing them?
8     A.  Oh, I mean, probably, you know, on and
9  off -- I mean, we -- we questioned whether to keep
10 David when we first joined the company.
11    Q.  Mm-hmm. And what about Diane?
12    A.  When did he stop thinking it might work
13 with Diane? I can't remember if it was right --
14 right around the time that she -- that I was
15 leaving. I got her a coach, Bruce, the guy that we
16 talked about earlier.
17    Q.  Mm-hmm.
18    A.  He was pretty down on her. And then he
19 would go high on her the next day. So it would --
20 it would vacillate, but he was not a Diane fan.
21       THE VIDEOGRAPHER: Five minutes remaining.
22       MR. WILKINSON: Okay.

Page 399

1     You may just run out the clock here,
2  Alfredo.
3        MR. PELICCI: It might have been the
4  30-minute recording we listened to.
5        MR. WILKINSON: Okay. 34.
6        (Abrey Exhibit Number 34 was marked for
7  identification.)
8        BY MR. WILKINSON:
9     Q.  So this is an e-mail exchange between you
10 and Mr. Warren again, and it looks like Mr. Warren
11 is sort of talking to you, I think, about trying to
12 continue to push both David and Diane --
13    A.  Mm-hmm.
14    Q.  -- is that right?
15    A.  Yep.
16    Q.  And he says that we -- "...we missed bad in
17 2020 so that won't be acceptable in 2021 and it
18 starts now."
19       What -- so what -- were you trying to do
20 anything to try to -- well, what were you trying to
21 do to get David and Diane moving in the direction
22 that Matt wanted them to move in?

Page 400

1     A.  What was I doing?
2     Q.  Mm-hmm.
3     A.  I was applying every tool that I could come
4  up with in my toolkit from every single day, seven
5  days a week, coaching them.
6     Q.  Mm-hmm.
7     A.  Trying to be good cop/bad cop with them,
8  getting involved, hands on, with clients and the
9  teams to support them; doing everything I could, in
10 the short period of time that I had been back, to
11 try to set them up to be successful and also give
12 them real feedback.
13    Q.  Well, were you doing that from, like, when
14 you started working, right when you came back in May
15 of 2020, or was it not until later?
16       This e-mail is --
17    A.  Oh, no. I --
18    Q.  -- exchange is dated December, but --
19    A.  Yeah, yeah, yeah, absolutely. I was
20 doing -- I was working with both of them,
21 constantly.
22    Q.  From the get-go?



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS

April 05, 2023
401–404

Page 401

1    A.  Yes.  From the return from maternity leave.

2    Q.  Right.  Right, right.  So -- so where do

3  you think the issues lay?  I mean, was it -- were --

4  were Diane and David just not able to do what you

5  needed them to do or not do what Matt was -- needed

6  them to do?  I mean, where -- because things didn't

7  progress the way Matt wanted them to, right?

8    A.  Mm-hmm.

9    Q.  And I'm -- I want to know from you:  Where

10  do you think things kind of sort of fell apart?

11    A.  I think there were different expectations

12  from the beginning.  I think David and Diane were

13  much more of the traditional services company people

14  and that they were looking to capture and knew how

15  to capture, maybe even more looking to capture, big

16  prime contracts.  They didn't know how and they

17  weren't -- didn't realize that the expectation

18  wouldn't be, from the very get-go, to close small

19  incremental pieces of business.

20    Q.  And that was the goal, right?  Those were

21  the wedge deals?

22    A.  That became clear that that was what was

Page 402

1  viewed as successful.

2        Now, I would argue that was that the

3  overall long-term goal of the company?  No.  I think

4  that the deep, durable work was the long-term goal

5  of the company with prime contracts.  Because that

6  positions us to be more attractive for sale, et

7  cetera.

8    Q.  Mm-hmm.  And so -- but Matt wasn't

9  necessarily focused on that?  He was focusing more

10  on the wedge deals --

11    A.  Mm-hmm.

12    Q.  -- net new?

13    A.  Yeah.  Correct.

14        MR. WILKINSON:  Okay.  I'll give you a

15  couple minutes to spare.

16        MR. PELICCI:  We're good.

17        MR. WILKINSON:  Okay.

18        MR. PELICCI:  Yes.  Thank you.

19        THE VIDEOGRAPHER:  Anything else for the

20  record?

21        MR. WILKINSON:  We're done.

22        THE VIDEOGRAPHER:  All right.  This marks

Page 403

1  the end of the deposition of Kathleen Abrey.  We're

2  off the record at 1805.

3        (Reading and signature not waived.)

4        (Off the record at 6:05 p.m.)

5        April 05, 2023

Page 404

1  COMMONWEALTH OF VIRGINIA, to wit:

2        I, Audra A. Gilbert, before whom the

3  foregoing deposition was taken, do hereby certify

4  that the within-named witness personally appeared

5  before me at the time and place here set out, and

6  after having been duly sworn by me, according to

7  law, was examined by counsel.

8        I further certify that the examination was

9  recorded stenographically by me, and this transcript

10  is a true record of the proceedings.

11        I further certify that I am not of counsel

12  to any party, nor an employee of counsel, nor

13  related to any party, nor in any way interested in

14  the outcome of this action.

15        As witness my hand and notarial seal this

16        day of _____, 2022.

17

18

19        AUDRA A. GILBERT, Notary Public

20        Notary Registration No-7328582

21

22  MY COMMISSION EXPIRES:  JUNE 30, 2026



KATHLEEN ABREY
ABREY V STEAMPUNK HOLDINGS
April 05, 2023
405–407

**Page 405**

```
1              DEPOSITION ERRATA SHEET

2    Case Caption:  Kathleen Abrey v. Steampunk Holdings

3    Deposition Date:  April 5, 2023

4    Witness:  Kathleen Abrey

5          DECLARATION UNDER PENALTY OF PERJURY

6    I declare under penalty of perjury that I have read

7    the entire transcript of my Deposition taken in the

8    captioned matter or the same has been read to me,

9    and the same is true and accurate, save and except

10   for changes and/or corrections, if any, as indicated

11   by me on the DEPOSITION ERRATA SHEET hereof, with

12   the understanding that I offer these changes as if

13   still under oath.

14   Signed on the _____ day of_____, 20____.

15   _____

16   (Witness)

17   Subscribed to and sworn before me this _____

18   day of_____, 2023, in _____

19   _____

20   Notary Public

21   My commission expires _____,

22   Notary No. _____
```

**Page 407**

```
1    Page No._____Line No._____Change to:

2

3    Reason for change:

4    Page No._____Line No._____Change to:

5

6    Reason for change:

7    Page No._____Line No._____Change to:

8

9    Reason for change:

10   Page No._____Line No._____Change to:

11

12   Reason for change:

13   Page No._____Line No._____Change to:

14

15   Reason for change:

16   Page No._____Line No._____Change to:

17

18   Reason for change:

19   Page No._____Line No._____Change to:

20

21   Reason for change:

22
```

**Page 406**

```
1              DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:

3

4    Reason for change:

5    Page No._____Line No._____Change to:

6

7    Reason for change:

8    Page No._____Line No._____Change to:

9

10   Reason for change:

11   Page No._____Line No._____Change to:

12

13   Reason for change:

14   Page No._____Line No._____Change to:

15

16   Reason for change:

17   Page No._____Line No._____Change to:

18

19   Reason for change:

20   Page No._____Line No._____Change to:

21

22   Reason for change:
```

