EXHIBIT 8

Page 1

1

2      UNITED STATES DISTRICT COURT

       EASTERN DISTRICT  OF VIRGINIA

3      -------------------------------------------X

       KATHLEEN ABREY,

4

                                       PLAINTIFF,

5

                    -against-          Index No.:

6                                      1:22-cv-654

7

       STEAMPUNK HOLDINGS, INC., MATTHEW WARREN and

8      JOHN HARLLEE, in their individual and

       professional capacities,

9

                                       DEFENDANTS.

10     -------------------------------------------X

11

12                          DATE: April 24, 2023

13                          TIME: 10:18 A.M.

14

15          EXAMINATION BEFORE TRIAL of the

16     Defendant, MATTHEW WARREN, taken by the

17     Plaintiff, pursuant to a Court Order, held

18     via videoconference, before Rivka Trop, a

19     Notary Public of the State of New York.

20

21

22

23

24

25

M. WARREN

1
2     Q.  And did you start on the same date
3  with anybody else?
4     A.  John Harllee.
5     Q.  What was your role at SE
6  Solutions?
7     A.  Chief operating officer of
8  emerging markets.
9     Q.  And what's under emerging markets?
10  Do you cover specific clients?
11     MR. WILKINSON:  Objection.
12     A.  When we started at SE Solutions,
13  many of us had restrictions from our
14  previous employer.  And those restrictions
15  prevented us from focusing on certain
16  clients and/or solicitation of individuals
17  of our previous employer.
18     So SE Solutions, when we arrived,
19  emerging markets was sort of a catch-all
20  that was designed to make sure that we were
21  compliant to our restrictions while being
22  opportunistic in areas that we could
23  actually go out and try to do our job.
24     Q.  Thank you.  But my question is:
25  Was there any specific clients that you

M. WARREN

1
2  oversaw as head of emerging markets at SE
3  Solutions?
4     MR. WILKINSON:  Objection.
5     A.  When we came in, I don't think
6  there was an account inside of -- that I
7  recall.
8     There might have been one small,
9  little USDA project, but I'm not even sure
10  that fell under me at that point in time.  I
11  don't recall.  But I remember, no, I think
12  it was a catch-all for new stuff.
13     Q.  Can we agree to use the term
14  "portfolio"?  Are you familiar with the term
15  "portfolio"?
16     A.  Sure.
17     Q.  Would you have described emerging
18  markets as a portfolio?
19     MR. WILKINSON:  Objection.
20     A.  Sure.  It was a portfolio that was
21  fairly empty in terms of clients and
22  business that were underneath it.  But we
23  were hopeful to build it up.
24     Q.  Remind me, what was your title
25  over at emerging markets?

M. WARREN

1
2     A.  Chief operating officer.
3     Q.  Was there any other portfolios in
4  SE Solutions at the time?
5     A.  I don't recall.  We certainly had
6  accounts, but I'm not sure what the
7  structure was there under, like Homeland
8  Security.
9     Q.  Do you remember any of the other
10  accounts you had at SE Solutions?
11     A.  Well, I was not overseeing
12  Homeland Security due to my restrictions,
13  but --
14     Q.  I'm sorry, when I say you had, do
15  you recall any of the other accounts that
16  were part of SE Solutions at the time?
17     A.  I do not.
18     Q.  Was there a time that SE Solutions
19  became what is now Steampunk?
20     A.  Yes.
21     Q.  When did that happen?
22     A.  As I'm sitting here now, I
23  believe, to the best of my recollection, was
24  July-ish time frame.  Summertime, but I
25  believe it was July.

M. WARREN

1
2     Q.  Was there a time where you became
3  CEO?
4     A.  I became CEO after the
5  restrictions were done.
6     Q.  When did that happen?
7     A.  That happened -- I don't recall
8  specifically, but it would have happened
9  after a year of me leaving Accenture.  My
10  last day of Accenture was February of '19.
11  I don't recall the exact date when I was
12  announced CEO, but it had to happen some
13  time after February of 2020.
14     Q.  Have you ever had experience as a
15  CEO before?
16     A.  With that title?
17     Q.  Sure.
18     A.  I have never been a CEO prior.
19     Q.  In general, given some of the
20  responsibilities as a CEO, because you
21  paused, understandably, did you do things
22  that were very similar to the
23  responsibilities that you had a CEO?
24     A.  Yes.  I did a start-up before
25  where I was the president of that portfolio,

4 (Pages 10 - 13)

Page 26

M. WARREN

1
2   periods of time?
3       A.   Yes.
4       Q.   So we're going call it the
5   pre-leave period of time, which is that
6   first period, we're going to call it the
7   leave period of time, which is the second
8   period, and we're going to call the third
9   period of time the post-leave period.
10          So when I say those terms, will
11  you know what they mean?
12      A.   I want to give a little context on
13  this.  That's not how we ran the company.
14  It was --
15      Q.   That's fine, Mr. Warren.  That's
16  how I'm running this deposition.
17          So those are the time periods that
18  I'm asking you to think about today.  When I
19  ask questions and I will direct you to a
20  time period, I just need you to have the
21  context of time period.  Thank you.
22      A.   Understood.
23      Q.   So during the first time period,
24  which is the pre-leave time period, May 15,
25  2019, to January 23, 2020, was Steampunk

Page 27

M. WARREN

1
2   divided into portfolios?
3       A.   I believe so.  I know emerging
4   markets.  I think Homeland Security was the
5   other one.  But I don't recall specifically
6   how it was organized.
7       Q.   So you have no idea what
8   portfolios besides those two existed at
9   Steampunk during the pre-leave period?
10      A.   Sitting here today, I don't
11  recall.
12      Q.   And then during the leave period,
13  which was January 23, 2020, to May 4, 2020,
14  was Steampunk divided into portfolios?
15      A.   The same answer as before.  Yes,
16  we were definitely divided into portfolios
17  around our restrictions.  And I know I was
18  responsible for emerging markets with Kate.
19      Q.   And what were the other portfolios
20  during that time that you can recall?
21      A.   That's what I can't recall.  I
22  know we had Homeland Security.  That was the
23  big part of it.
24      Q.   Did you have work with the
25  Department of Defense?

Page 28

M. WARREN

1
2       A.   We did.  We hired a gentleman.  I
3   hired a gentleman, because that's outside of
4   my restrictions.  We looked at the business
5   before our restrictions were done, after our
6   restrictions were done.  Kate just happened
7   to get pregnant and have maternity leave in
8   between there and then.
9       Q.   I appreciate that, but my question
10  is what portfolio was DOD under?
11      A.   It was under the DOD portfolio.
12      Q.   It had its only separate
13  portfolio?
14      A.   Yes, it did.
15      Q.   What about USDA?  Did it have its
16  own separate portfolio or was it under one
17  of the umbrella portfolios?
18      A.   We hired a gentleman by the name
19  of Max Licht, who was responsible for USDA.
20  I think at one point we had some EPA stuff
21  going.  But yes, Max Licht, was
22  responsibility, like Nick, for USDA.
23      Q.   What about the USPTO?  Was that a
24  part of the work that Steampunk was doing
25  during the pre-leave period?

Page 29

M. WARREN

1
2       A.   I believe that fell under emerging
3   markets, yes.
4       Q.   What about DOJ?  Was that part of
5   the work?
6       A.   No.  We eventually got into DOJ or
7   hired somebody to help us get into DOJ in
8   2020.  But before our restrictions let up, I
9   don't think we had any DOJ, from what I can
10  recall.
11      Q.   And then prior to May 4, 2020, did
12  you have any portfolios or work with ICE?
13      A.   That's part of Department of
14  Homeland Security.
15      Q.   Did that fall under emerging
16  markets or was that separate?
17      A.   That was separate, because I was
18  restricted from touching Homeland Security.
19      Q.   What about Kate?  Was she able to
20  oversee ICE prior to her return from leave?
21      A.   Kate was able -- no.  She had the
22  same restrictions on Homeland.  But both of
23  us were allowed to put together strategy,
24  coaching, messaging.  So when our
25  restrictions were gone, we could hit the

8 (Pages 26 - 29)

M. WARREN

1
2 ground running in terms of the strategy of
3 Homeland Security.  But we were not allowed
4 to go talk to clients directly.
5     Q.  So did your restrictions prevent
6 you from formally overseeing ICE?
7     A.  Yes.
8     Q.  Did Kate's restrictions prevent
9 her from formally overseeing ICE?
10    A.  Yes.
11    Q.  What about DHS?  Did Kate's
12 restrictions prevent her from formally
13 overseeing DHS prior to her return from
14 leave?
15    A.  Yes.  The keyword there is
16 "formally," Alfredo.  Formally, she was not
17 allowed to oversee anything from Homeland
18 Security.  However, she was able to give
19 coaching, strategy, instruction.
20    Q.  Perfect.
21       And then what about the USPTO?
22 Were you able to formally oversee the USPTO?
23    A.  Me, no.
24    Q.  Was Kate able to formally oversee
25 the USPTO prior to her return from leave?

M. WARREN

1
2     A.  Yes.
3     Q.  What about the DOJ?  Were you able
4 to oversee the DOJ prior to May of 2020?
5     A.  No.
6     Q.  Was Kate able to oversee the
7 DOJ --
8     A.  I'm sorry, can I stand corrected?
9 You said until May 8.  I was allowed to
10 oversee all of it on February 15, 2020.  My
11 restrictions were done.
12    Q.  So you do remember when your
13 restrictions came up?
14    A.  I do, yes.
15    Q.  That was February of 2020?
16    A.  That's correct.
17    Q.  So prior to Kate's return from
18 maternity leave, was she able to formally
19 oversee the DOJ?
20    A.  Yes.
21    Q.  And what about the USDA?  Were you
22 able to oversee the USDA prior to February
23 of 2020?
24    A.  Yes.
25    Q.  Did you oversee the USDA prior to

M. WARREN

1
2 February of 2020?
3     A.  I helped work with Max and coached
4 and gave strategy and we discussed sort of
5 the long-term of how we were going to build
6 the business at USDA.  He formerly reported
7 to John Harllee, but for me, I was more of
8 the coaching and advising as we were setting
9 out to build the business.
10    Q.  And were you formally able to
11 oversee DOD prior to February of 2020?
12    A.  Yes.
13    Q.  Did you oversee DOD prior to
14 February of 2020?
15    A.  Yes.
16    Q.  Was Kate able to oversee DOD prior
17 to May of 2020?
18    A.  Was she able to?  Based on the
19 restrictions, yes, but she did not.
20    Q.  Was Kate able to oversee USDA
21 prior to May of 2020?
22    A.  She was able to, yes, but she did
23 not.
24    Q.  If I use the term "Civilian," will
25 you know what that means?

M. WARREN

1
2       MR. WILKINSON:  Objection.
3     A.  In what context?
4     Q.  Did you have a portfolio at
5 Steampunk named Civilian?
6     A.  In what timeline?
7     Q.  Let's take it each timeline.  So
8 pre-leave, was there a portfolio called
9 Civilian?
10    A.  No.  There was talks about
11 potentially doing Civilian, but never a
12 Civilian.
13    Q.  Was there any overlap with the
14 portfolio called emerging markets and
15 Civilian?
16       MR. WILKINSON:  Objection.
17    A.  Was there any overlap?
18    Q.  Yes.
19    A.  Civilian didn't exist.
20    Q.  Sure.  But at what time did
21 Civilian come into existence?
22    A.  I'm not sure Civilian, to this
23 day, has ever been a term to name one of
24 portfolios, as best as I can recall.
25    Q.  You didn't use the term Civilian

9 (Pages 30 - 33)

M. WARREN

1
2    A.  She was responsible for coaching,
3  teaching, mentoring, setting up the strategy
4  with Diane.  But it formally did not roll up
5  to her, no.
6    Q.  Was Diane -- when we say Diane, I
7  don't think there are any other Dianes that
8  will come up today.
9    A.  Yes, I think you're right.  Diane
10  Ashley, I'm sorry.
11    Q.  Okay.  No problem.  You could just
12  say "Diane."  You don't need to say the last
13  name, as long as we have an agreement that
14  you're talking about Diane Ashley.
15    A.  Okay.
16    Q.  As the leader of the emerging
17  markets portfolio when she was first hired,
18  was DHS under the emerging markets
19  portfolio?
20    A.  No, because she was restricted
21  from that.  However, she did have a
22  secondary responsibility, as we all did.
23  The intent was always for Kate, after
24  restrictions, to run Homeland Security.
25  It's a big part of why we hired her,

M. WARREN

1
2  specifically her relationships at TSA.
3    So her secondary responsibility
4  was to help put the strategy in place with
5  Diane, so that when her restrictions were
6  done and we could reorganize the company,
7  that we are off to the races building an
8  amazing Homeland Security portfolio.
9    Q.  So when Ms. Abrey was hired in May
10  of 2019, was she leading the DHS portfolio?
11    A.  No.
12    Q.  During Ms. Abrey's hiring process,
13  was Ms. Abrey informed that she would be
14  receiving equity if she joined the company?
15    A.  I'm sorry, say that one more time.
16    Q.  During Ms. Abrey's hiring process,
17  was she informed that she would be receiving
18  equity to join the company?
19    A.  I would assume but I was not part
20  of those conversations.  But, yes, I believe
21  the answer is yes.
22    Q.  So you have no recollection of
23  early conversations during Ms. Abrey's
24  hiring about her being awarded equity?
25    A.  So we run an employee-owned

M. WARREN

1
2  company, Alfredo.  And there is equity that
3  is given to all employees.  And it is
4  something that I believe separates Steampunk
5  from other companies in the D.C. area.
6    And I absolutely talked to Kate
7  that she would be one of those employees
8  that should and will get equity, if she
9  decided to join what was SE Solutions.  In
10  terms of the amount and the negotiation and
11  all that, that was not me.  That was Dan
12  Parker in SE Solutions.
13    Q.  But you do have a recollection of
14  conversations, generally, about Ms. Abrey
15  receiving equity when she joined SE
16  Solutions?
17    A.  Yes.
18    Q.  What do you recall about those
19  conversations, besides the fact of what you
20  just testified, that she would receive
21  equity?  Do you recall anything else?
22    A.  I do not.
23    Q.  Do you recall making comments
24  about the value of the equity?
25    A.  I do not recall.

M. WARREN

1
2    Q.  Do you recall that you said that a
3  target sell price for the company would be
4  when shares hit $4?
5    A.  I do not recall saying $4.  What I
6  do recall is that we consistently talked
7  about what makes the value of a company and
8  its stock value increase.  A lot of folks
9  that joined, this was their first rodeo, and
10  we used our case example, our experience at
11  Agilex, which sold for a little less than
12  $3 a share.
13    But what Steampunk or what SE
14  Solutions was going to be one day, at that
15  point we were dreaming and talking initially
16  that if it could be $10 a share, we wanted
17  that.
18    Q.  In your view, as CEO of the
19  company, was $4 a realistic share price?
20    MR. WILKINSON:  Objection.
21    A.  I think anything was realistic at
22  that point, because our value was less than
23  a penny.  If we performed and we did our
24  job, and by performance, meaning winning new
25  work and growing the business and finding

14 (Pages 50 - 53)

Page 82

1           M. WARREN
2    technology officer, chief growth officer,
3    chief people officer, et cetera, et cetera.
4        Q.  Kate was the only EVP, though,
5    when she joined?
6        A.  Yes, that's right.
7        Q.  Were there -- during Kate's
8    employment at Steampunk, were there any
9    other EVPs?
10       A.  I don't think so.  The best I can
11   recall right now, the answer would be no.
12       Q.  Did Mr. Max Licht become an EVP at
13   any point?
14       A.  Yes.  Max is an EVP today, yes.
15       Q.  And do you know if that happened
16   during Ms. Abrey's employment?
17       A.  The best I can recall, I think it
18   happened at some point in 2020, yes.
19       Q.  And currently today, are there any
20   other EVPs, besides Mr. Licht?
21       A.  To the best of my knowledge, no,
22   there are none.
23       Q.  And since you've joined SE
24   Solutions, which then became Steampunk, do
25   you have knowledge of anybody else ever

Page 83

1           M. WARREN
2    having the title of EVP, besides Ms. Abrey
3    or Mr. Licht?
4        A.  To the best of my knowledge, no, I
5    don't recall any other people.
6        Q.  Was Ms. Abrey, when she first
7    joined SE Solutions, tasked with building
8    out the organization in terms of new hires?
9           MR. WILKINSON:  Objection.
10       A.  Can you frame that a little bit,
11   Alfredo?  That's sort of a broad one.
12       Q.  Sure.  We could forget the
13   building out term.  I could see why that is
14   broad.
15          But when Ms. Abrey first joined SE
16   Solutions, was it one of her
17   responsibilities to help fill key leadership
18   roles?
19       A.  Yes.  Let's just talk about 2019
20   for a second, but yes, that was part of it.
21   We had -- our motto that year was "invest in
22   the best."  And that was a responsibility of
23   the entire leadership team at the time,
24   which we've discussed earlier.
25          But the main focus was really

Page 84

1           M. WARREN
2    about putting us in a position to put the
3    best team forward to go ahead and grow the
4    company, and grow the company was primarily
5    around winning net new work with new
6    clients, and that absolutely was her primary
7    focus.
8           Secondary, like all of us, was to
9    figure out if there were people that we
10   could bring into the company to make us even
11   better than what we were and building a
12   culture that was awesome.
13       Q.  So in terms of winning new
14   clients, in 2019, when Ms. Abrey joined
15   Steampunk, then SE Solutions, was she able
16   to win new clients in DHS?
17       A.  Well, so, let's talk about that.
18          We did win one new wedge deal in
19   DHS at TSA, under Diane Ashley in 2019.  It
20   was a small wedge, two to three people.  And
21   Kate was absolutely a part of working with
22   Diane to help put the strategy and coaching
23   together for that.
24          One is not sufficient to grow the
25   company as we wished, but she absolutely was

Page 85

1           M. WARREN
2    a part of that, even though Diane
3    technically reported up to John Harllee and
4    did not formally fall under Kate Abrey.
5        Q.  But was Ms. Abrey permitted to do
6    client-facing work under DHS in May of 2019?
7        A.  No, absolutely not.
8        Q.  That's because of her
9    restrictions; correct?
10       A.  Yes, sir, because of her former
11   employment restrictions.
12       Q.  Where was Ms. Abrey permitted to
13   do client-facing work in 2019?
14       A.  Per her restrictions or her
15   responsibilities at Steampunk?
16       Q.  Well, I would imagine Steampunk
17   operated within the law in terms of
18   restrictions; is that correct?
19       A.  Yes, but what I'm saying is Kate
20   could have called it into DOD, but we hired
21   somebody to do that.  So that was not a
22   focus area.
23          So my question about restrictions,
24   she could call into the entire federal
25   government, state and local, anywhere else.

22 (Pages 82 - 85)

M. WARREN

1
2  Other than Homeland Security, she had no
3  restrictions.
4          Her responsibility, really, was to
5  focus on working with David, helping on
6  commerce, we eventually added justice, and
7  then she even asked if she could try to
8  figure out how to get into postal.
9          Those were her major
10  responsibilities, knowing that her big, big
11  knowledge was Homeland Security, and the
12  idea was to roll that underneath her when
13  her restrictions were done.
14      Q.  Was Kate able to do client-facing
15  working in May of 2019 in the portfolio that
16  you described as emerging markets?
17      A.  As long as it was not Homeland
18  Security, the answer would be yes.
19      Q.  And did Ms. Abrey, in fact, do
20  client-facing work in emerging markets in
21  2019?
22      A.  I do remember the CIO of PTO
23  coming out to Steampunk that she
24  participated in.
25          I don't know if I recall any other

M. WARREN

1
2  client meetings, Alfredo.  I don't.
3      Q.  Was the sector we described as
4  Civilian underneath emerging markets?
5          MR. WILKINSON:  Objection.
6      A.  Yes.  I mean, is the question did
7  Max report to Kate?  Is that what you're
8  asking?
9      Q.  No.  My question is, under the
10  portfolio umbrella -- less so about
11  reporting structure.  We'll get to that.
12          But in terms of portfolios, just
13  understanding the structure of the company,
14  was the Civilian portfolio considered a part
15  of emerging markets?
16      A.  Yes, I don't recall, Alfredo,
17  based on our last conversation.
18          But I do know that Max was focused
19  on USDA and a couple of others.
20          That was Civilian.  I don't
21  believe Civilian was part of emerging
22  markets.  And I'll tell you why; because I
23  was restricted out of commerce.
24          I was also restricted -- yes, I
25  was.  So USDA, no, I don't believe -- USDA

M. WARREN

1
2  reported to Civilian and Civilian, I guess,
3  reported to John, based on what we were
4  talking about earlier.
5      Q.  What about CBP?  Was that part of
6  Civilian?
7      A.  Yes.  And I am answering this,
8  because the Civilian thing I forgot, we
9  talked about that earlier.
10          CBP, Diane had the opportunity to
11  take on CBP when she joined.  That wasn't
12  really her hot spot.  She was focusing
13  primarily on other components.
14          Max, who is somebody I knew prior
15  to SE Solutions, we had dinner while I was
16  at Accenture and he was at Sales Force.  But
17  the CBP community is a pretty tight-knit
18  community, very difficult to count.
19          And we pulled out CBP from
20  Homeland Security to put that under Max, so
21  he could utilize all the relationships and
22  the knowledge and experience that he did at
23  Sales Force and Oracle before that.  Which,
24  by the way, we both started at Oracle.
25  That's where our careers both started.

M. WARREN

1
2      Q.  Earlier you testified that you
3  didn't consider Kate a friend because you
4  didn't take trips with her, you didn't spend
5  non-work hours with her and you didn't do
6  non-professionally related things with her.
7  Do you recall that?
8      A.  I do, yes.
9      Q.  Do you consider Mr. Licht a
10  friend?
11      A.  Yes, I do.  We actually go and do
12  stuff socially.
13      Q.  And in May of 2019, was Mr. Licht
14  a friend?
15      A.  No, not at that point.  We became
16  friends as time went on.
17      Q.  When did you become friends with
18  Mr. Licht?
19      A.  I mean, I don't know what day.
20  But we've gone to dinner with our wives and
21  whatnot.  So I don't recall that.
22      Q.  Have you taken trips with
23  Mr. Licht?
24      A.  Have I taken trips with Mr. Licht?
25  I don't recall, Alfredo.

23 (Pages 86 - 89)

M. WARREN

1
2  Mr. Licht that the plan was for Kate to fill
3  your role and then him slide up into Kate's
4  role?
5      A.   All the conversations with our
6  leadership team, in terms of succession
7  plan, which we do to this day, is that if
8  and when you performed, and Kate could do
9  her job, that she was going to be the first
10  person in line to take over the CEO job.
11  But she had to earn it.  This company is
12  built on merit.  Nothing is given.  There's
13  no entitlements.
14      And Kate had all the opportunity
15  there.  She was just unable to perform to
16  see it through.  But she had all the chances
17  in the world to get there.
18      Q.   Was the intent for Max to be
19  Kate's successor?
20      A.   No, because I viewed them as
21  peers.
22      Q.   I'm going to ask you to refresh.
23      (Whereupon, a two-page e-mail
24      Bates No. 76561 to 76562 was marked
25      Warren Exhibit 9 for identification as

M. WARREN

1
2  of this date by the reporter.)
3      MR. PELICCI:  This is Plaintiff's
4  Exhibit 9.  There will be those Bates
5  stamps again at the bottom.  You should
6  see 76561.
7      A.   I got it.
8      Q.   There are numerous bullet points
9  on this.  First off, just making sure we're
10  on the same page, not literally, but
11  metaphorically on the same page with what
12  exhibit we are looking at.
13      I am looking at an exhibit here,
14  which is an e-mail from you to Scott LaRose,
15  Kate, John Harllee, Dan Parker, calling
16  meeting notes with Max.  Is that what you're
17  seeing?
18      A.   Yes, I am seeing it.
19      Q.   Do you see numerous bullet points?
20      A.   I do.
21      Q.   I want to ask you to please read
22  the last sentence of the second bullet
23  point.
24      A.   Can I just read the whole thing?
25  We talked about succession planning --

M. WARREN

1
2      Q.   I can read it out loud, actually.
3  The second bullet reads:  We talked about
4  succession planning.  My ultimate move will
5  to slide over to be chairman of the board
6  about one year into sale.  I will still be
7  active and I will work with Harllee and
8  others on the sale of the company.
9      I explained to him the process of
10  the sale and explained to him the buyer will
11  offer a retention package for folks like him
12  and Kate, plus others to help with the
13  transition.  I told him that I wasn't
14  interested in being part of that process
15  again, and that they will be buying the
16  leadership team operating versus myself and
17  Harllee.
18      And when Kate slides up, that Max
19  could be her successor, and he could choose
20  if he wants to backfill his spot.
21      So my primary concern is with that
22  last sentence.  So you're saying when Kate
23  slides up, Max could be Kate's successor and
24  he could choose if he wants to backfill his
25  spot.

M. WARREN

1
2      Does this remind you of your
3  intent of having Mr. Licht be Kate's
4  successor?
5      MR. WILKINSON:  Objection.
6      A.   That's not what it says, Alfredo.
7  This was more about me taking the chairman
8  of the board and Kate sliding up.  What
9  happens to the rest of the organization,
10  there are a ton of different options.
11      But one thing is for sure is that
12  Kate had the first shot at being the CEO.
13  But in moving her out of her spot, there
14  would be all sorts of chairs that would have
15  to move around; right?
16      So where Max goes from there or
17  after, is basically saying, okay, if we get
18  to that point or here, Max is going to be
19  opportunities.  Because when people move up,
20  new opportunities move up.  That's what I'm
21  trying to say there.
22      Q.   So what would that new opportunity
23  be if Kate moved up for Max?
24      A.   I don't know.  That's the whole
25  thing.  It's a hypothetical.

36 (Pages 138 - 141)

M. WARREN

1
2      Did Kate run weekly meetings with
3  Mr. Licht?
4      A.  To the best of my knowledge, no.
5      Q.  Then it says, "Harllee and I will
6  not have any restrictions starting Monday,
7  February 17," do you see that?
8      A.  I do.
9      Q.  To the best of your knowledge, is
10  that when you and Mr. Harllee's restrictions
11  were lifted?
12      A.  To the best of my knowledge.  But
13  the 15th probably was a Saturday.  So
14  February 15 I believe was the actual date,
15  if my memory served me right.
16      Q.  Do you recall setting up
17  one-on-one meetings with the employees that
18  Kate had standing weekly meetings with?
19      A.  I recall two, and that's David
20  Wolf and Diane Ashley.  And Matt Reeves.
21      Q.  Can you turn to the top of the
22  e-mail in the subject and let me know what
23  it says?
24      A.  Kate maternity leave.
25      Q.  And then turning to bullet point

M. WARREN

1
2  3, it says I will set up one on ones each
3  week with Max, Diane and Davis?
4      A.  I don't see bullets.
5      Q.  You have numbers, 1, 2, 3, 4,
6  turning to the third number, you said I will
7  set up one on ones each week with Max, Diane
8  and David, do you see that?
9      A.  Yes.
10      Q.  So this is an e-mail about Kate's
11  maternity leave where you said you are
12  filling in on the one on ones that she used
13  to have, and you are listing Mr. Licht
14  there.  Does that refresh your recollection
15  as to whether or not Kate had weekly
16  meetings with Mr. Licht?
17      A.  To my recollection Kate was not
18  meeting with Max one on one.  They certainly
19  talked, but there is not a formal meeting
20  between the two as far as I remember.
21      Q.  Then why are you listing Mr. Licht
22  in this e-mail about Kate's maternity leave?
23      A.  Well, we talked a little bit,
24  Alfredo, what the culture and definition is
25  of CEO.  And I used the words lead from the

M. WARREN

1
2  front, and it was probably a little bit in
3  the context of demonstrating that this is
4  how you do it.
5      Q.  But my question is, this is an
6  e-mail about Kate's maternity leave where
7  you said you are going to start covering her
8  one-on-ones that she had with employees.
9  And in this e-mail you are talking about
10  Mr. Licht and scheduling meetings with him.
11      So I understand that you said
12  leading from the front is one of your
13  attributes that you strive for.  But my
14  question is why in this e-mail about Kate's
15  maternity leave are you discussing one on
16  one meetings with Mr. Licht, if Kate did not
17  supervise Mr. Licht?
18      MR. WILKINSON:  Objection.
19      A.  I don't recall.
20      Q.  Who is Nick?
21      A.  Nick Trzcinski is a peer of Kate's
22  at the time that we hired to build a DOD
23  business very similar to Max.
24      Q.  Was he under Kate's supervision?
25      A.  No.

M. WARREN

1
2      Q.  So turning to the second e-mail
3  from Mr. Dillon to Kate, he says, "Is there
4  anything I could do to help with David or
5  Diane while you are away?"  He says, "I am
6  already pretty tightly integrated with Nick
7  and Max knows how to get me."
8      Any idea why Mr. Dillon would be
9  talking about his integration with Nick and
10  Max in the subject of Kate's maternity leave
11  and ask her about it?
12      A.  I don't know.
13      Q.  No idea at all?
14      A.  I don't know.
15      Q.  Then you were actually forwarded
16  this e-mail by Kate, if you look at Kate's
17  response, Kate says to you, "I am going to
18  say thanks, but we are good."
19      And you say, "yes, and thanks, it
20  is amazing how they seem to get distracted
21  by the dynamic things in business versus
22  staying in lane."
23      What does that means, "dynamic
24  things in business versus staying in lane"?
25      A.  I don't recall.

49 (Pages 190 - 193)

Page 206

M. WARREN

1
2      A.  We are friendly, we are not
3  friends, no.
4      Q.  So I think earlier, under your
5  definition of "friend," you listed three
6  things, trips, spending time out of work
7  hours and non-professional related events,
8  do you do any of those things with Joe?
9      A.  No.
10      Q.  So what organization did Joe
11  belong to?
12      A.  He reported to Max.
13      Q.  And so did Ms. Abrey supervise
14  Joe?
15      A.  No.
16      MR. PELICCI:  If you could please
17  refresh.
18      (Whereupon, a three-page e-mail
19      48335 to 48337 was marked Warren
20      Exhibit 19 for identification as of
21      this date by the reporter.)
22      THE WITNESS:  I am going to have
23  to use the restroom here at some point.
24      MR. PELICCI:  We can after this
25  exhibit, no problem.

Page 207

M. WARREN

1
2      Q.  What should be before you is
3  Plaintiff's Exhibit 19?
4      A.  Okay, I have it up.
5      Q.  And so, the second e-mail is an
6  e-mail from Ms. Abrey to you, Mr. Harllee,
7  Sean Dillon and Brad Cole, do you see that?
8      A.  I do.
9      Q.  And Ms. Abrey is updating you
10  about a meeting she had with Joe regarding
11  his client relationships, do you see that?
12      A.  Okay.
13      Q.  Why was Ms. Abrey meeting with Joe
14  regarding his client relationships?
15      A.  I don't recall.
16      Q.  Was that part of Ms. Abrey's
17  responsibilities?
18      A.  No, it was not.
19      Q.  Did you tell Ms. Abrey that this
20  was not part of her responsibilities?
21      A.  I don't recall.
22      Q.  If you look to the top, you did
23  respond to this e-mail, do you see that?
24      A.  I do.
25      Q.  In that response, did you say to

Page 208

M. WARREN

1
2  Ms. Abrey or ask Ms. Abrey why she was
3  meeting with Joe about his client
4  relationships?
5      A.  Can you say that again off the
6  record.
7      Q.  In your response, did you ask
8  Ms. Abrey why she was meeting with Joe
9  regarding his client relationships?
10      A.  I did not.
11      Q.  And in your second sentence of
12  that reply, you said, "Linda and I had Devyn
13  in January of 2009, which is a bit less than
14  one year after I started Agilex"?
15      A.  Yes.
16      Q.  Did you take paternity leave at
17  Agilex?
18      A.  I do not recall.
19      Q.  Did Agilex have a paternity leave
20  policy?
21      A.  I do not recall.
22      Q.  Do you remember if you took any
23  time off around the birth of your child in
24  2009?
25      A.  I do not recall.

Page 209

M. WARREN

1
2      Q.  Was your wife employed at the
3  time?
4      A.  Was my wife employed at the time
5  of what?
6      Q.  2009?
7      A.  She was not.
8      She was for my son.  I also have
9  an older son.  She was employed during that
10  time.
11      MR. PELICCI:  We can go ahead and
12  take a break now.
13      (Whereupon, a short recess was
14      taken.)
15      Q.  Was Ms. Abrey involved in any of
16  the staffing discussion for the Federal
17  Civilian Sector prior to her going out on
18  maternity leave?
19      A.  Yes, I mean, Alfredo, the way we
20  were structured before the restrictions, our
21  Accenture restrictions, was it was very
22  fluid, everybody was sort of helping with
23  everything a little bit, which I know is not
24  ideal on how to run a company.  But we were
25  tied to the restrictions from Accenture.  So

53 (Pages 206 - 209)

M. WARREN

1
2 the answer, is yes, she was involved in some
3 of the discussions about figuring out who
4 was going to run Civilian, absolutely.
5      Q.   Was anyone else that was not a
6 portfolio lead for Civilian involved in
7 staffing discussions for Civilian?
8          MR. WILKINSON:  Objection.
9      A.   Staffing discussions, so my guess
10 is, yes, I don't recall fully.  But I know
11 Brad Cole and Sean Dillon and other folks
12 also chimed in verbally.  I don't know if we
13 asked Matt Reeves to help, even though he
14 was running Homeland delivery at that time.
15 But my guess is that there were other people
16 involved, not just Kate Abrey.
17      Q.   So Kate did participate in
18 staffing, the staffing discussions for
19 Civilian?
20      A.   My guess is she did, yes, I don't
21 recall totally.  But it would not surprise
22 me.
23      Q.   Why would it not surprise you?
24      A.   Because as I said, prior to our
25 AFS restrictions, we really all had a fluid

M. WARREN

1
2 organizational model.  And everybody was
3 kind of helping everybody, because we were
4 small and we were figuring it out as we
5 went.  And '19 was really a big part of
6 figuring that structure out.  And it was one
7 for all, all for one.  So we would ask
8 people all the time to come in and give
9 advice, help, et cetera, even if it didn't,
10 quote-unquote, fall within their area of
11 responsibility.
12      Q.   Do you recall what portfolio the
13 FDA was under?
14          MR. WILKINSON:  Objection.
15      Q.   Prior to Ms. Abrey going on leave?
16      A.   I don't, I don't recall.
17      Q.   Do you recall if Joe had any
18 responsibilities associated with the FDA?
19      A.   With the FDA, I don't recall,
20 Alfredo.
21      Q.   Did Ms. Abrey supervise Mr. Wolf
22 prior to going on leave?
23      A.   It is my understanding that David
24 always reported to Kate, from what I
25 remember, yes.

M. WARREN

1
2      Q.   And did David report to Ms. Abrey
3 after maternity leave, Kate's maternity
4 leave?
5      A.   To the best of my recollection,
6 yes.
7      Q.   And did Kate oversee Diane Ashley
8 prior to going on maternity leave?
9      A.   Diane formerly reported to John
10 Harllee.  But she absolutely was coached
11 every day by Kate Abrey.
12      Q.   And did you coach Ms. Ashley at
13 all prior to Ms. Abrey going out on
14 maternity leave?
15      A.   Like I said, pre-restriction, it
16 was very fluid.  I absolutely had some
17 interaction with Ashley.  Was I her
18 day-to-day person?  No, I think she leaned
19 on Kate to do that, knowing that once the
20 restriction were done all of that was going
21 to fall under Kate.
22      Q.   So while Mrs. Abrey was on leave,
23 did you supervise Ms. Ashley in any
24 capacity?
25      A.   Within the restrictions, yes, I

M. WARREN

1
2 coached and mentored and worked with her a
3 lot more frequently than I did before Kate
4 left for her maternity leave.
5      Q.   And Ms. Ashley oversaw DHS; is
6 that correct?
7      A.   Minus CBP.
8      Q.   And prior to Ms. Abrey returning
9 from maternity leave and having her
10 restrictions lifted, could Ms. Abrey engage
11 in any client-facing work with DHS?
12          MR. WILKINSON:  Objection.  You
13 have asked this question like ten times
14 today.  So I am going to object.  This
15 has been asked and answered multiple
16 times.  I don't know if you are trying
17 to get a different answer out of him.
18          MR. PELICCI:  I am not.  We are
19 going through the course of things.  I
20 would appreciate you not to engage in
21 speaking objections.
22          MR. WILKINSON:  I think you made
23 those objections several times when I
24 was deposing Ms. Abrey.  What I am
25 saying is I let you ask this question

Page 234

M. WARREN

1
2    A.  No.
3    Q.  Why didn't you have any doubts
4  about Ms. Abrey being successful in her
5  return to Steampunk?
6    A.  Because Ms. Abrey and I had had a
7  four-year run at Accenture.  And when she
8  was at her best and we were at our best, the
9  performance and the experience was top of
10  class.  And I was convinced that we could do
11  it again.
12    Q.  Did you put a package together for
13  Ms. Abrey that helped get her up to speed
14  when she returned from leave, a package of
15  any type of documents or anything?
16    A.  Yes, I did.
17    Q.  How did you provide that to
18  Ms. Abrey?
19    A.  So we had, like I said, we grew
20  roughly 30 percent in the time that she was
21  gone.  We had some off sites, we had
22  multiple leadership meetings, we made some
23  decisions on different opportunities, our
24  pitch in terms of who we are.  And I wanted
25  to put together a comprehensive list of

Page 235

M. WARREN

1
2  documents, e-mails, PowerPoints, all the
3  things that I did not send her while she was
4  on maternity leave.  And the idea was for
5  her to come back and walk through those
6  documents to get her up to speed on kind of
7  what happened while she was gone and as
8  importantly where we are going.
9    MR. PELICCI:  I am going to ask
10    you to refresh.
11    (Whereupon, a two-page e-mail
12    Bates 70555 to 70556 was marked Warren
13    Exhibit 22 for identification as of
14    this date by the reporter.)
15    Q.  This is going to be Warren
16  Exhibit 22.  You should see it now?
17    A.  Okay, I have it.
18    Q.  In this e-mail there appears to be
19  a link, Here is a quick break out in the
20  contents of that link, the e-mail from
21  Robert Pearson to Kate, and you are cc'd on
22  it, is this the contents what you were just
23  describing what you provided to Ms. Abrey?
24    A.  Yes, this is exactly it.
25    Q.  And this is what is used to help

Page 236

M. WARREN

1
2  get Ms. Abrey reintegrated?
3    A.  Yes, this was sort of what we
4  walked through with Kate once she came back.
5    Q.  What is a bid and booking file?
6    A.  Bid are things that we were going
7  to bid on.  And books are things that we won
8  or booked.  So pipeline versus won.
9    Q.  What is the current wedge and net
10  new slide, what is that?
11    A.  I am not looking at the slide, but
12  one of the things, strategies, one of the
13  things that we agreed at Agilex, we talked
14  about Agilex before, was this wedge model of
15  selling which was a hybrid sort of how
16  software sales, sales tech needs are applied
17  to consulting services, which was all about
18  trying to find net new clients, sell net new
19  deals.  That platform, that strategy that we
20  did at Agilex was then incorporated at
21  Accenture, where the Accenture CEO asked
22  myself and Brad Cole to roll out --
23    Q.  This is one of those times that I
24  am going to politely redirect you to my
25  question.

Page 237

M. WARREN

1
2    A.  I am trying to give you content.
3    Q.  I don't need a full explanation.
4    A.  But didn't you just ask me what
5  that was?
6    Q.  My question was just what would be
7  on the slide?
8    A.  I don't see the slide, so I don't
9  recall.
10    MR. PELICCI:  So I am going to ask
11    to make sure, I did this in an e-mail
12    before, we are going to need the
13    production of these documents, I don't
14    believe I have all of those.
15    THE WITNESS:  I am not sure.
16    Q.  On Number 4, it says folder
17  leadership update e-mails.  Did you send
18  update e-mails to the leadership team
19  regularly?
20    A.  Yes, I overcommunicated all the
21  time.
22    Q.  But were there specific e-mails to
23  the leadership team that were update
24  e-mails?
25    A.  I don't recall you have specific

60 (Pages 234 - 237)

M. WARREN

1
2  e-mails with that heading, but I would think
3  yes, based on the title.
4      Q.  Did you continue to do that after
5  Ms. Abrey returned from leave?
6      A.  I do it until this day.
7      MR. PELICCI:  I will ask for all
8  the e-mails that were given to
9  Ms. Abrey and then continuing after her
10  leave.
11      Q.  Did you decide to make any
12  organizational changes while Ms. Abrey was
13  out on leave?
14      A.  I have to give you some context
15  here, Alfredo, just give me a minute.
16      So there were several things, one
17  is, as I have told you, it was always before
18  our Accenture restrictions and after our
19  Accenture restrictions.  It just happened
20  that Kate went on maternity between those
21  two bookends.  That's how we and I always
22  thought about it.
23      Now that our restrictions were
24  done, including Kate, there was an
25  opportunity based on everything we did to

M. WARREN

1
2  organize the company how we always intended
3  it to be.  This allowed us to formally do
4  away with emerging markets concept and start
5  aligning portfolios.  And those portfolios
6  at the time were DOD, we had -- you know, I
7  can't remember the exact naming conventions
8  back then, but what essentially is CS & D
9  today under Matt.
10      And then Kate had Homeland
11  Security and Justice plus Postal.  I can't
12  remember what the naming convention was of
13  that portfolio.  And the idea was that we
14  were now not constrained by the restrictions
15  that we had from Accenture.  And the intent
16  now was to let us organize in a way that was
17  logical versus as in a pretzel as we
18  described earlier.
19      And that all happened on her first
20  day back which was that Monday, to walk
21  through all that happened and then walk
22  through the organization that we did not
23  announce yet, but we wanted to wait until we
24  had an opportunity to talk to Kate.
25      Q.  So there were organizational

M. WARREN

1
2  structural changes?
3      A.  As was always the plan post
4  Accenture restrictions.
5      Q.  So once those post Accenture
6  restrictions changed, Ms. Abrey now oversaw
7  different clients than before?
8      A.  Yes, she got all of Homeland
9  Security, because she was not restricted out
10  of it anymore.
11      Q.  So of the planning of the
12  organizational structural changes, did that
13  occur while Ms. Abrey was on leave?
14      A.  Some of it, yes.  But it was
15  always the plan to reorganize once
16  restrictions were up, but yes.
17      Q.  Who did you discuss those changes
18  with?
19      A.  Mainly it was John Harllee and I.
20      But I am sure that there were
21  others that we brought in.  I don't recall
22  specifically, but John and I were definitely
23  the architects.
24      Q.  So reasons aside, I understand we
25  have different views potentially on the

M. WARREN

1
2  reasons for why things happened, reasons
3  aside, did Ms. Abrey have the exact same
4  portfolio of business after leave than she
5  did from before leave?
6      MR. WILKINSON:  Objection.
7      A.  You are saying reason aside, that
8  is the reason, it was because she was not
9  allowed to run Homeland Security before the
10  restrictions were --
11      Q.  The reason why I say that, because
12  I don't want to get into the reasons yet,
13  you have already covered some.  I will ask
14  more questions about that.
15      I just want to understand, prior
16  to leave versus after leave, did Ms. Abrey
17  have the same exact portfolio of business or
18  not?
19      MR. WILKINSON:  Objection.
20      A.  No.
21      Q.  She did not have the exact same
22  portfolio of business?
23      A.  She did not.
24      MR. PELICCI:  I am going to ask
25  you to refresh in just one moment.

61 (Pages 238 - 241)

M. WARREN

1
2    Q.  It is going to be one of those
3    times where I redirect you to my actual
4    question.  My actual question is, is it
5    incorrect to say that Ms. Abrey managed the
6    same portfolio of business after leave than
7    she did before leave?
8         MR. WILKINSON:  Objection.  That's
9         actually not what that sentence says.
10        A.  Can you ask that question in a
11   positive?  You are asking it in a negative
12   which is confusing me.
13        Q.  I feel like we have definitely
14   touched on this, but just to be clear, did
15   she manage the same portfolio of business
16   after leave than she did before leave?
17        A.  She managed a different set of
18   business after her restrictions were done.
19        Q.  And so turning back one page, you
20   will see this fourth bullet point?
21        A.  Is it the one that says fourth or
22   is it the actual fourth bullet point?
23        Q.  It is the one that says fourth.
24        A.  All right.
25        Q.  It describes maternity policy here

M. WARREN

1
2    which it says was instituted in July of
3    2020.  And it says it was seven days long.
4    But what I am concerned with is the first
5    sentence, it says, "Fourth, and contrary to
6    the claims asserted in Ms. Abrey's charge,
7    Steampunk offers a generous maternity,
8    paternity and adoption leave benefit to all
9    of its employees," do you see that?
10        A.  Yes.
11        Q.  Do you think seven days is a
12   generous maternity leave policy?
13        MR. WILKINSON:  Objection.
14        A.  That's not my area of expertise.
15   So I have no comment on that to judge.
16        Q.  But you are the CEO of Steampunk,
17   and in your position as CEO, would you
18   consider seven days of maternity leave to be
19   a generous policy?
20        MR. WILKINSON:  Objection.
21        A.  Again, this is not my subject
22   matter expert field, so I have no context.
23        I will tell you, Alfredo, we did
24   make a commitment that we were going to
25   improve the benefits every year.  And we

M. WARREN

1
2    have kept to that promise.  And they
3    continue to get better and better.
4        Q.  At the time, did you oversee HR?
5        A.  No.
6        Q.  Who oversaw HR?
7        A.  Mr. Harllee.
8        Q.  And so in your position as CEO, I
9    am not asking you about changes to the
10   maternity leave policy, I am asking you
11   personally, do you think seven days is a
12   generous maternity leave policy?
13        MR. WILKINSON:  Objection.
14        A.  I have no way to make a comment on
15   that, Alfredo.  I don't know what to compare
16   it to.  So I don't have an opinion.
17        Q.  Prior to Ms. Abrey's return from
18   leave, did you discuss the organizational
19   changes that were to occur after her return
20   from leave with anybody else?
21        A.  I don't recall.
22        Q.  I think earlier you may have said
23   that you discussed some of these changes
24   with Mr. Harllee?
25        A.  No.  What I said is if you asked

M. WARREN

1
2    the question that who discussed the
3    organizational changes that were discussed
4    with Kate when she returned back from her
5    leave, and I said John Harllee and I.
6        Q.  So you had made decisions prior to
7    her return about what those changes would
8    be; is that correct?
9        A.  We wanted to take that day to
10   discuss it with Kate to at least get her
11   feedback and comments.  But essentially we
12   gave her our line of thinking and why based
13   on what transpired and now that the
14   restrictions were over, and we walked her
15   through our logic and we certainly wanted to
16   get her right in before we made the big
17   announcement.
18        Q.  So if that was always the plan, as
19   you testified earlier, why did you need to
20   go through it with Kate to get her feedback?
21        A.  Because I think it is good
22   practice to overcommunicate with all of our
23   executives.
24        Q.  And did you communicate with
25   Mr. Licht about the organizational changes?

63 (Pages 246 - 249)

M. WARREN

1
2      A.  I don't recall.
3      Q.  And did Mr. Licht's area of
4  responsibility change in association with
5  these changes that were made to the
6  organization when Ms. Abrey returned from
7  leave?
8      A.  I don't fully remember.  But no, I
9  think he just continued to build what he was
10  doing.
11      Q.  And what was Mr. Licht doing?
12      A.  He was running what used to be
13  Civilian as we discussed, which mainly
14  consisted of USDA, CBP, EPA.  There is
15  probably a smattering of other accounts, but
16  he was continuing to build out and trying to
17  add talent to his team.
18      Q.  Did you tell Ms. Abrey not to
19  speak to anybody when she first returned
20  from leave?
21      A.  What I asked Kate to do was to
22  meet with John, Scott and I to get her up to
23  speed on everything that has transpired
24  since we had not had a conversation.  And
25  then after we had our talk, she was welcome

M. WARREN

1
2  to talk to anybody she wanted to.
3      Q.  So my question is, did you request
4  that she doesn't speak with anyone at
5  Steampunk prior to that conversation that
6  you had with Mr. LaRose, Mr. Harllee,
7  herself?
8      A.  Yes, I asked her to wait on
9  communicating with other folks until she had
10  a chance to sit down with us.
11      Q.  Why was that necessary, if all
12  that was happening was everything that was
13  always the plan?
14      MR. WILKINSON:  Objection.
15      A.  Because the restrictions ended
16  from Accenture, we grew by almost 30 percent
17  in employee base, we added a ton of people,
18  close to 50, probably somewhere in that
19  number, maybe 40 to 50.  And I thought it
20  was important for her to get up to speed on
21  all the changes that had happened in terms
22  of deals, in terms of organization, in terms
23  of everything that we did, before she jumped
24  inside the business.  It felt like the right
25  thing to do.

M. WARREN

1
2      Q.  Did the organizational changes
3  that you have in mind change while Ms. Abrey
4  was on leave?
5      A.  No, we didn't do anything until we
6  talked to her first.
7      Q.  And was Ms. Abrey aware of the
8  plan before she went on leave?
9      MR. WILKINSON:  Objection.
10      A.  It is probably a question for
11  Kate.  But the plan was always to make sure
12  that Kate ran Homeland Security, which she
13  was unable to do prior to her restrictions
14  being up.
15      Q.  Did you have discussions with
16  Ms. Abrey about that plan prior to her going
17  on leave?
18      A.  We always talked about it, yes.
19      Q.  So why was it necessary for her
20  not to speak to anybody when she returned?
21      A.  Alfredo, I will say it again,
22  restrictions ended, the company grew about
23  by almost 30 percent in FTE account, we
24  added all these new people --
25      Q.  I hear you, Mr. Warren, about what

M. WARREN

1
2  happened.  My question is not what happened.
3  My question was why couldn't she speak to
4  everybody?
5      A.  Because she was not up to speak on
6  everything that we just talked about.
7      Q.  Were you concerned that she would
8  say something wrong?
9      MR. WILKINSON:  Objection.
10      A.  No, I was not concerned of that at
11  all.
12      Q.  So I am trying to get to what your
13  concern was with Kate, why Kate couldn't
14  talk to anybody?
15      MR. WILKINSON:  Objection, asked
16  and answered.
17      MR. PELICCI:  No, that wasn't
18  answered.
19      A.  There was no concern, Alfredo.  We
20  wanted to do the right thing by Kate.  And I
21  took the time and energy with John to put
22  together all the things that happened.  And
23  we wanted to spend a few hours with her to
24  get her acclimated before she started
25  talking to employees.  It seems to be the

64 (Pages 250 - 253)

Page 254

M. WARREN

1
2   right thing to do and a courtesy that my
3   guess is most managers don't do with their
4   employees.  But we decided that we should do
5   it that way.
6        Q.  And did you tell Ms. Abrey that
7   she would have the same title and salary?
8        A.  No, I mean, because that remained
9   the same.  We would remind her of what her
10  salary and title were?  I don't understand
11  your question.
12       Q.  I am asking if in any of those
13  discussions, did you indicate to Ms. Abrey
14  that she would have the same title and
15  salary when she returned?
16       A.  I don't recall.
17       MR. PELICCI:  Could you read the
18  question and answer, not the one where
19  Mr. Harllee doesn't recall, but before
20  that.  Could you read back the last
21  answer before that one, please.
22       (Whereupon, the record was read by
23  the reporter.)
24       Q.  Mr. Warren, does title and salary
25  determine responsibilities within Steampunk?

Page 255

M. WARREN

1
2        A.  Not necessarily.
3        Q.  And so did you have any
4   conversations with Ms. Abrey when she
5   returned about her title not changing?
6        A.  No, not that I recall.
7        Q.  Do you recall sending an e-mail
8   out basically where you said that you were
9   happy to be able to structure Steampunk
10  based off of business deeds?
11       A.  I don't recall exactly.  If you
12  could pull that exhibit up, I would be happy
13  to go through it with you.
14       Q.  I am asking you, if you recall
15  anything along those lines?
16       A.  I remember an e-mail going out
17  about the restructuring of the company,
18  based on post restrictions from Accenture.
19  But the specifics of that e-mail, Alfredo, I
20  can't recall.
21       (Whereupon, a two-page e-mail
22  Bates 32921 to 32922 was marked Warren
23  Exhibit 24 for identification as of
24  this date by the reporter.)
25       Q.  I am going to direct you to

Page 256

M. WARREN

1
2   Exhibit 24, please.  I am first concerned
3   with your first e-mail here on Tuesday
4   May 5, 2020, subject, "What's best
5   Steampunk," it says, "All."
6        First off, before your signature
7   block, the second to last paragraph, it
8   says, "I want to get this group together to
9   talk through this new responsibility for
10  Kate and begin the collaboration
11  specifically with the sector Presidents and
12  ODs," do you see that?
13       A.  I do.
14       Q.  What was Kate's new
15  responsibility?
16       A.  Based on post restrictions she was
17  now able to formally own and run Homeland
18  Security.
19       Q.  So that was a new responsibility
20  for Kate?
21       A.  It was new in the sense that she
22  now had no restrictions and was able to
23  manage people on both delivery, as well as
24  salespeople, and get in front of clients.
25  She could lead from the front and attempt to

Page 257

M. WARREN

1
2   go sell net new.
3        Q.  And you mentioned in this e-mail
4   delivery excellence.  What is delivery
5   excellence?
6        A.  In our business, in the services
7   business, you have to win the deal.  And
8   then you have to deliver on the promises
9   that you made.  And delivery excellence is
10  delivering on time, on budget and making the
11  client happy.
12       Q.  And so part of Ms. Abrey being
13  able to oversee DHS now, was it that she
14  shifted from being able to oversee DOD and
15  Civilian to now overseeing DHS?
16       MR. WILKINSON:  Objection.
17       A.  So first of all, Kate never
18  oversaw DOD.  I am not sure where you got
19  that.  But that never happened.
20       What was the second part after
21  DOD?
22       Q.  My question was, in Kate's shift
23  over to overseeing DHS, did she shift over
24  from overseeing DOD and Civilian?
25       MR. WILKINSON:  Objection.

65 (Pages 254 - 257)

Page 258

M. WARREN

1
2      A.  Alfredo, I am not even following
3  the question.
4      Q.  So at a point Kate now was
5  overseeing DHS; is that correct?
6      A.  DHS, Commerce, she eventually
7  added DOJ to her bucket and Postal, I
8  believe at one point in time.
9      Q.  And prior to this organizational
10  change, who did Nick and Max report to?
11     A.  Nick reported to me, as I had zero
12  restrictions inside of DOD.  Max reported to
13  John Harllee.
14     Q.  And where did Diane report to
15  prior to this?
16     A.  Diane reported to John Harllee as
17  well.
18     Q.  Diane didn't report to Kate?
19     A.  Not before her restrictions, after
20  her restrictions.  But that's my
21  understanding was that she always reported
22  to John, or Kate would have been in
23  violation of her restrictions.
24     Q.  On that last page, the very first
25  paragraph at the bottom, it says, "Yesterday

Page 259

M. WARREN

1
2  morning we spent a lot of time with Kate
3  discussing the business and the
4  organizational changes that we wanted to
5  take as we enter into this next phase of the
6  Steampunk journey.  Also a big thank you to
7  Kate for being open and putting the business
8  needs first."
9      Do you recall that meeting where
10  you spent that time with Kate?
11     A.  Yes, I do recall it.  And that's
12  where we went through the packet that we
13  discussed earlier.
14     Q.  And do you recall Kate telling you
15  that she felt like she was being demoted?
16     A.  She never used the word "demoted"
17  ever.  I never heard that come out of her
18  mouth.  The only question I really remember
19  from Kate was her focus on is this shuffling
20  and organizational change have any impact on
21  her not being the frontrunner to be the CEO.
22  And I told her that she absolutely from a
23  succession perspective is first in line.
24  But it is going to be based on her ability
25  in delivering on her portfolio, of hopefully

Page 260

M. WARREN

1
2  $125 million or more.
3      Also, she summarized that
4  conversation that we had in slack, that she
5  said to me a few hours later, basically
6  breaking out the discussion points that we
7  talked through at that meeting.
8      Q.  When Ms. Abrey returned from
9  leave, it is your testimony that she was
10  still the frontrunner to be CEO?
11     A.  She always was.  She just had to
12  perform and do her job, and that based on
13  merit, it was hers.
14     Q.  I am going to ask you to please
15  turn back to Exhibit 23?
16     A.  Okay.
17     Q.  Let me know when you are there?
18     A.  I am on Exhibit 23.
19     Q.  I am going to ask you to go to
20  page 12, please.
21     A.  I am there.
22     Q.  So on the third paragraph there it
23  starts by saying, "Throughout Ms. Abrey's
24  employment, Ms. Abrey repeatedly failed to
25  perform in accordance with Steampunk's

Page 261

M. WARREN

1
2  expectations," do you see that?
3      A.  I do.
4      Q.  Upon her return from leave, she
5  was still the frontrunner for CEO is what
6  you just testified, is this correct, that
7  even before that point she was failing to
8  meet the expectations of Steampunk?
9      A.  You broke up there, Alfredo.
10     Q.  Is it your testimony that even
11  though when Ms. Abrey returned from leave,
12  and in your testimony that she was still the
13  frontrunner for CEO, that she was failing to
14  perform in a manner that met the company's
15  expectations?
16     A.  Yes, Kate was unable to accurately
17  forecast, even in her restrictive role.  And
18  it was profoundly worse post restrictions.
19  And the life of the company is based on our
20  executive business people to accurately be
21  able to forecast their business.
22     Q.  But Ms. Abrey's performance did
23  not lead you to decide to take her out of
24  the front running to be a CEO when she
25  returned from leave, did it?

66 (Pages 258 - 261)

Page 262

M. WARREN

1
2     A.  No, it did not.  She still had the
3  opportunity.  And we were hopeful that she
4  would make 2020 an incredible year, and we
5  would fulfill all the dreams that we all had
6  for the company and Ms. Abrey.
7     Q.  So you also testified that
8  throughout her employment, you saw her still
9  as a frontrunner to be CEO; is that correct?
10     A.  In terms of succession planning,
11  Kate was always frontrunner.  She didn't
12  accurately forecast net new, grow the
13  business and perform.
14     Q.  Did you engage in any efforts to
15  let employees of Steampunk know who Kate
16  Abrey was while she was out on leave?
17     A.  I don't recall.
18     Q.  So you said you had a lot of new
19  hires; is that correct?
20     A.  Correct.  I think close to 50, but
21  I don't know the exact number.
22     Q.  And did you inform any of these
23  new hires about Ms. Abrey?
24        MR. WILKINSON:  Objection.
25     A.  I don't recall.

Page 263

M. WARREN

1
2     Q.  And did you explain the
3  organizational structure to any of these new
4  hires?
5     A.  I don't recall.
6     Q.  Do you have reason to believe that
7  the new hires wouldn't know who Ms. Abrey
8  is?
9        MR. WILKINSON:  Objection.
10     A.  I don't recall.
11     Q.  Prior to Ms. Abrey's return from
12  leave in that first meeting with her, did
13  you tell her about these organizational
14  changes?
15     A.  Yes, we did.
16     Q.  And how did you tell Ms. Abrey
17  about that?
18     A.  Can you be more specific, Alfredo.
19  We communicated that we finally get to
20  structure the company on what is best for
21  the business and how we could be most
22  successful, because our restrictions were
23  gone.  And we laid out, as planned, Kate
24  would always get Homeland Security.  And it
25  was never our intent to ever, ever have all

Page 264

M. WARREN

1
2  portfolios report up to one person.  It
3  doesn't make any sense.  You want to
4  diversify your portfolios.
5        And at that point we had DOD, we
6  had Max's portfolio and we had Kate's
7  portfolio with the horizontals matrixed in.
8     Q.  Was the pipeline in good shape
9  when Ms. Abrey returned?
10        MR. WILKINSON:  Objection.
11     Q.  The pipeline of business?
12     A.  I don't recall.
13        I am not sure about the pipeline.
14  She is not judged on pipeline.  She is just
15  judged on closing net new deals and
16  accurately forecasting what her business
17  would do quarter over quarter.  Pipeline is
18  fantastic if you could convert it to new
19  business, otherwise it is just a number on
20  the spreadsheet.
21     Q.  And do you recall a time in May or
22  June of 2020, where Kate mentioned to you or
23  Mr. Harllee that she felt like she was
24  demoted?
25     A.  I don't recall ever having a

Page 265

M. WARREN

1
2  conversation with Kate about demotion.  My
3  only conversations I remember is about her
4  standing to potentially be the next CEO.
5     Q.  And then do you recall Ms. Abrey
6  ever saying to you that she felt her role
7  had changed because of her pregnancy?
8     A.  I don't recall ever Kate saying
9  that to me.
10     Q.  Ever, do you recall ever Ms. Abrey
11  ever saying that to you while she was
12  employed at Steampunk?
13        MR. WILKINSON:  Objection.
14     A.  I don't recall her ever saying
15  that to me at Steampunk, from beginning to
16  end.
17     Q.  Do you recall Sean Dillon coming
18  to you regarding any of Ms. Abrey's
19  complaints about her role changing?
20     A.  I don't recall Sean Dillon coming
21  to me about demotion or role changes.
22     Q.  Do you ever recall Ms. Abrey or
23  saying to Ms. Abrey fighting words as
24  something she said or did was fighting
25  words?

67 (Pages 262 - 265)

M. WARREN

1
2       And I know of in one instance to
3  one of the executives, she said why are you
4  only meeting with me 15 minutes, your
5  counterparts spend much more time. Her
6  answer was I don't need to do that, because
7  I have worked for 20 plus years in this
8  industry, and I don't need to spend that
9  much time with you.
10      And she was protective and
11 defensive with David and Diane. And she was
12 sort of non-existent with the other folks,
13 and it created a problem.
14      I never used the word "nurturing"
15 from my recollection.
16      Q.  Did you say Ms. Abrey had
17 nurturing or nurture instincts?
18      MR. WILKINSON:  Note my objection.
19      A.  To the best of my recollection, I
20 have never used the word "nurturing" when
21 speaking about Kate Abrey, period.
22      Q.  Who that be problematic if you
23 did?
24      MR. WILKINSON:  Objection.
25      A.  I have no idea, but I never did.

M. WARREN

1
2       Q.  And do you think that there is
3  some type of connotation with nurturing
4  regarding being a mother?
5       MR. WILKINSON:  Objection.
6       A.  Do I think there is some -- sure,
7  that's probably why I would never use it.
8       MR. PELICCI:  I will ask you to
9  please refresh.
10      (Whereupon, a two-page e-mail
11      Bates 127880 to 127881 was marked
12      Warren Exhibit 26 for identification as
13      of this date by the reporter.)
14      Q.  At the top of this e-mail you are
15 talking about Ms. Abrey?
16      A.  Yes.
17      Q.  "And she will need to learn to
18 manage versus being the jester that sits on
19 top. This is part of her learning
20 experience a/k/a nurturer instincts versus
21 being the person who has to make tough
22 decisions," do you see that?
23      A.  I do see that.
24      Q.  Does this refresh your
25 recollection about using the term

M. WARREN

1
2  "nurturing" or "nurturer"?
3       A.  Your question was did I use
4  nurturing to Kate Abrey. And my answer was
5  no. And I believe this is to Scott LaRose.
6       Q.  And it is about Ms. Abrey?
7       A.  It is describing Kate Abrey,
8  correct.
9       Q.  And you said that that would be a
10 problematic description; isn't that correct?
11      MR. WILKINSON:  Objection. He did
12 not say that. You said that.
13      Q.  Do you think that's problematic,
14 Mr. Warren?
15      MR. WILKINSON:  Objection.
16      A.  Do I think? I think in this
17 context the answer would be no.
18      Q.  Is nurturing the opposite of tough
19 in your eyes?
20      MR. WILKINSON:  Objection.
21      A.  I don't know.
22      Q.  Well, here you say, "Nurturing
23 instincts versus being the person that makes
24 tough decisions".
25      If someone is nurturing, are they

M. WARREN

1
2  unable to make tough decisions?
3       MR. WILKINSON:  Objection.
4       A.  I don't know.
5       Q.  Then why did you say that?
6       A.  This is a reference of Kate being
7  defensive and protective of Diane and David
8  Wolf versus sort of playing in between them
9  and myself. And I thought her instincts
10 were to defend and protect versus coach and
11 push. And I thought it was the wrong
12 decision.
13      Q.  So then you used the term "nurture
14 instincts" to discuss that type of behavior;
15 is that correct?
16      A.  To Scott LaRose, yes.
17      Q.  But about Ms. Abrey?
18      A.  Correct.
19      Q.  And what does it mean to be a
20 jester that sits on top? Is it good to be a
21 jester?
22      MR. WILKINSON:  Objection.
23      A.  I believe what I am saying is
24 rather than, she was trying to broker both
25 sides, she was trying to make me happy and

69 (Pages 270 - 273)

1          M. WARREN
2     she was trying to make them happy and she
3     was just sort of dancing between the two.
4          Q.   So is that essentially calling
5     Ms. Abrey a clown?
6          A.   I didn't say that.
7          Q.   Is this the type of empowering
8     language we discussed when we talked about
9     your leadership style?
10          MR. WILKINSON:  Objection.
11          A.   I can't answer that question.  I
12     don't even know how to answer that question.
13          Q.   Well, you said you had a
14     leadership style of empowerment, so labeling
15     your employees that were high up in your
16     leadership organization as jesters, do you
17     think that's empowering?
18          MR. WILKINSON:  Can you repeat the
19     question.
20          MR. PELICCI:  Sure.
21          Q.   You testified that you had a
22     leadership style where you empowered your
23     employees.  Ms. Abrey was at the top of your
24     organization, here you are calling her a
25     jester to Mr. LaRose, do you think that's a

1          M. WARREN
2     good way to discuss your employees?
3          MR. WILKINSON:  Objection.
4          A.   I think what I am alluding to is
5     the context for how all this was -- I wanted
6     Kate to take responsibility and
7     accountability for the two people that were
8     not performing.  And rather than her taking
9     accountability and responsibility for their
10     non-performance, she sort of played this
11     middle ground.  And it became very, very
12     frustrating.  And that is the context of
13     this e-mail.
14          Q.   And does this refresh your
15     recollection that you would use the term
16     "nurtured" to Ms. Abrey or whether you did?
17          MR. WILKINSON:  We could see go
18     off the record.
19          (Whereupon, an off-the-record
20          discussion was held.)
21          Q.   So my question that was pending
22     before the audio issues is does this refresh
23     your recollection about whether or not you
24     used to Ms. Abrey the term that she was
25     either nurturing or she has a tendency to

1          M. WARREN
2     nurture people?
3          A.   Again, the question I answered
4     that I believe you asked was that I never say
5     that to Ms. Abrey, and my answer remains the
6     same, I never said that to Ms. Abrey.
7          This is in context of me talking
8     to our investor and giving him a heads up
9     that there is an executive that is
10     underperforming and it is getting very
11     serious.
12          Q.   So why did you never say to
13     Ms. Abrey that she has a tendency to nurture
14     people?
15          MR. WILKINSON:  Objection.
16          A.   I don't recall.
17          Q.   You don't recall why you would
18     ever say that to Ms. Abrey?
19          A.   I don't recall.
20          MR. WILKINSON:  Objection.
21          MR. PELICCI:  I am going to ask
22     you to refresh.
23          (Whereupon, a four-page e-mail
24          Bates 128035 to 128038 was marked
25          Warren Exhibit 27 for identification as

1          M. WARREN
2     of this date by the reporter.)
3          MR. PELICCI:  This is going to be
4     Plaintiff's Exhibit 27.
5          Q.   On the last page, excluding this
6     dead horse theory that you include, two
7     paragraphs up from the bottom, so I am on
8     page 2, and then there is the start of this
9     dead horse theory?
10          A.   Yes.
11          Q.   You will see a paragraph that
12     begins with finally, about halfway through
13     the paragraph, you say, "You are a very
14     positive person, try to see things and
15     nurture them back to greatness," do you see
16     that?
17          MR. WILKINSON:  What page are you
18     on?
19          MR. PELICCI:  The second page.
20          A.   Yes, I see it.
21          Q.   Does that refresh your
22     recollection that you did use the term
23     "nurture" to Ms. Abrey?
24          MR. WILKINSON:  Objection.
25          A.   Well, I see that I wrote it, so

70 (Pages 274 - 277)

Page 278

M. WARREN

1
2  yes.
3       Q.   And what is the dead horse theory,
4  what is your understanding -- I should
5  probably ask you why did you include the
6  dead horse theory?
7       A.   Because we were working tirelessly
8  to improve Diane Ashley's performance.  She
9  struggled for the better part of almost two
10  years to win net new business.  And we tried
11  all sorts of different techniques and
12  management styles to make it better.  And
13  essentially what I was saying is that at
14  some point you got to get a new horse.  And
15  getting back to Kate, I want to be clear
16  about this, is that she was unable to in
17  2020 to accurately forecast.  She did no net
18  new, she was unable to land net new herself,
19  she was able to get Diane or David to win
20  net new and she was unable or unwilling to
21  make a change in those people.  And all of
22  that is why we ended up terminating her from
23  performance.  And this is kind of going down
24  towards that path.
25       Q.   So to your eyes, Ms. Ashley was a

Page 279

M. WARREN

1
2  dead horse and Ms. Abrey was a jester?
3       MR. WILKINSON:  Objection.
4       A.   I didn't say that.
5       Q.   You didn't, you didn't call --
6       A.   I don't know how to answer that
7  Alfredo, but those are analogies.  They are
8  not literal.
9       Q.   And in that same paragraph, it
10  says we have five years will fly by, five
11  years for that?
12       A.   I am sorry.  Where is that?
13       Q.   That paragraph where you talked
14  about Ms. Abrey nurturing, you say we have
15  five years will fly by.
16            What does that mean, five years of
17  what?
18       A.   I don't recall.
19       Q.   Is it potentially five years until
20  a potential sale of Steampunk?
21       A.   I don't recall.
22       Q.   And then turning to the first
23  page, at the bottom of the first page, you
24  are discussing Diane Ashley and you say, "I
25  would be open to keeping her on the

Page 280

M. WARREN

1
2  leadership team," do you see that?
3       A.   Where is that?
4       Q.   I am on the very first page, you
5  see 3 A, B and C, you see C, "I would be
6  open to keeping her on the leadership team,
7  (bigger group not the top 13)"?
8       A.   So before the dead horse theory or
9  after?
10       Q.   So going back a page, at the very,
11  very last sentence of the first page, you
12  say, "I would be open to keeping her on the
13  leadership team," do you see that?
14       A.   The very first paragraph of the
15  first page?
16       Q.   No, it is very the last sentence
17  on the whole first page.
18       A.   I know it sounds harsh.
19       Q.   Are you on page 1 of the exhibit,
20  are we looking at a different first page?
21       A.   I appear to be.
22       Q.   Do you see the little exhibit
23  stamp, 27 at the bottom?
24       A.   Let's see 37?
25       Q.   27.

Page 281

M. WARREN

1
2       A.   Oh, Exhibit 27, yes I see that.
3       Q.   You see a little stamp, the
4  Exhibit 27 there on the bottom right corner?
5       A.   Yes, "I would be open to keeping
6  her on the leadership team, bigger group,
7  not the top 13."
8       Q.   That's Diane Ashley?
9       A.   That's referring to Diane Ashley.
10       Q.   And then at the very top of this
11  e-mail, you once again are forwarding this
12  all to Mr. LaRose, did you normally keep
13  Mr. LaRose updated about what was happening
14  at Steampunk?
15       A.   Yes, and I still do to this day.
16       Q.   And you say, "Water works until
17  7:00 last night," do you see that?
18       A.   I do.
19       Q.   What does that mean?
20       A.   I don't recall.
21       Q.   Are you talking about Ms. Abrey
22  crying?
23       A.   Possibly, or myself.
24       Q.   Did Ms. Abrey cry in front of you
25  often?

71 (Pages 278 - 281)

Page 282

M. WARREN
1
2      A.  Define "often."
3      Q.  Did you see Ms. Abrey cry on
4   multiple occasions at Steampunk?
5      A.  I saw her cry at Accenture and at
6   Steampunk.
7      Q.  And are you aware of whether or
8   not Ms. Abrey was crying when you were
9   discussing Ms. Ashley?
10     A.  I don't recall.  But I know she
11  was very protective of her, so it is
12  definitely a possibility.
13        MR. PELICCI:  We can take a break.
14        (Whereupon, a short recess was
15     taken.)
16     Q.  So do you recall terminating
17  Ms. Abrey?
18     A.  I do.
19     Q.  And do you recall on the day
20  before you terminated Ms. Abrey, you met
21  with her on January 13, 2021?
22     A.  Yes, I remember talking to her
23  prior to that, if that was the date.  I
24  don't recall the specific date, but sure.
25     Q.  And during that call with

Page 283

M. WARREN
1
2   Ms. Abrey prior to her termination, did you
3   tell Ms. Abrey that she would be terminated
4   the next day?
5      A.  No.  So, this is going to require
6   context, Alfredo.  So as you could see
7   through some of the e-mails that you have
8   pulled up, we have had disappointment in
9   Kate and her team's performance,
10  specifically --
11     Q.  Just because we are on limited
12  time, I am going to redirect you?
13     A.  If you want me to answer the
14  question, I need to answer the question.
15     Q.  But that's not the question.
16        I am just asking you a simple
17  thing, we will get to it step through step.
18        My question is do you remember
19  having a call with her the day before she
20  was terminated?  We will get to your
21  reasons, why you did what you did, et
22  cetera?
23     A.  And I just told you I did, and you
24  had a follow-up question and said did you
25  tell her that we were going to terminate

Page 284

M. WARREN
1
2   her; correct.
3      Q.  And that's a simple question, did
4   you tell her on the 13th that you were going
5   to terminate her?
6      A.  We did not.
7      Q.  Prior to the 14th when you told
8   her you were going to terminate her, did you
9   officially communicate her termination on
10  the 14th?
11     A.  I am getting my dates confused,
12  but that sounds right.  It was a Thursday in
13  January, I think that was the 14th.
14     Q.  And did you prior to that call on
15  the 14th, January 14, 2021, did you ever
16  communicate to Kate Abrey specifically that
17  you were going to terminate her?
18     A.  No.
19     Q.  And did you communicate to anybody
20  at Steampunk prior to that January 14, 2021
21  call that you were going to terminate
22  Ms. Abrey on the 14th?
23     A.  I got to give you some context.
24  On January 13, we had that conversation,
25  John Harllee and I.  That entire

Page 285

M. WARREN
1
2   conversation, 95 percent of it was around
3   our lack of confidence in her inability to
4   forecast accurately, her inability to sell
5   net new, her inability to have her folks be
6   able to sell net new and her inability to do
7   anything about it.  It was the definition of
8   insanity, you keep doing the same thing over
9   and over again and we expect a different
10  result.
11        And it was a very hard
12  conversation that was oncoming, because she
13  knew that going into Q1 of 2021, based on
14  all of the previous hard conversations that
15  we had, that this was the quarter.  And she
16  forecasted on January 4, and literally
17  changed her forecast, if not that day, the
18  next day.  Then went on PTO for a week.  She
19  came back, gave her a day to get settled in,
20  had the hard talk with her on the 13th.
21  After that hard conversation, I spoke to
22  John Harllee.  I believe, I am not
23  100 percent sure on this one, that we also
24  talked to Scott.  And we as a group made the
25  determination that it was time to let her

72 (Pages 282 - 285)

Page 286

M. WARREN

1
2  go, because the pattern has continued now
3  for at least Q3 of '20, Q4 of '20, and she
4  knew the importance of hitting her forecast
5  for Q1.  And the day she set it, she set the
6  forecast, she changed it literally a day
7  later.  At that point we decided that the
8  next day I was going to have the
9  conversation with Kate to terminate her.
10        Q.  Was that after your call with
11  Abrey on the 13th?
12        A.  That was after, yes.
13        Q.  And was Ms. Abrey on leave for Q2
14  of 2020?
15        A.  Not of Q2, so she was -- what?
16        Q.  She came back May of 2020?
17        A.  That's right.  But Q2 goes through
18  May.  So she came back, I believe, early in
19  May.
20        Q.  Yes.
21        A.  So she was out part of Q2 and she
22  was there part of Q2.
23        Q.  And was she out for Q1 of 2020?
24        A.  She left at the end of January.
25  So she was there for part of Q1 and gone for

Page 287

M. WARREN

1
2  a part of Q1.
3        Q.  So prior to the 13th when you met
4  with Mr. LaRose, and I used met loosely, had
5  a phone call, prior to the conversation you
6  had with Mr. LaRose and Mr. Harllee on the
7  13th, had you ever communicated to anybody
8  at Steampunk that you were terminating
9  Ms. Abrey on the 14th?
10        A.  No, that decision happened that
11  night prior, yes.
12        Q.  So prior to the 13th of January,
13  you did not have any decisions to terminate
14  Ms. Abrey, and I am not talking about
15  performance deficiencies, I am saying prior
16  to the 13th, did you make the actual
17  decision to terminate Ms. Abrey?
18        A.  Prior to the 13th of January, we
19  had many, many conversations with Kate
20  through the course of 2020 about forecast
21  accuracy.  She had a very, very --
22        Q.  I am going to restrict you,
23  because we have a limited amount of time.
24        My actual question, and I actually
25  said besides that, I almost anticipated you

Page 288

M. WARREN

1
2  were going to go that way, my question was
3  prior to January 13, 2021, did you
4  communicate a decision to terminate
5  Ms. Abrey on the 14th to anyone at
6  Steampunk?
7        A.  No.  January 4, to be clear, was
8  the day she missed her forecast, which I was
9  trying to explain to you, January 4 was the
10  first forecast of the year, which is the
11  most important forecast of 2021.
12        She set the forecast, she changed
13  it, she was on PTO -- and I am getting to my
14  answer, this is why it is important, John
15  and I spoke while she was on PTO about here
16  we go again, over and over.  And we both
17  decided that when she got back, we were
18  going to have a very hard conversation with
19  her, which we did.
20        We slept on it and said well, what
21  do we do the next day.  She was very
22  bothered by the tone of that conversation
23  yet again.  And we woke up in the morning
24  and I talked to my colleague, John Harllee,
25  and said, you know, I still think, it is

Page 289

M. WARREN

1
2  time, based on the pattern that has been
3  going on at least Q3 and Q4 of '20, if not
4  before.  And she came out of the gates,
5  missed it again right out of the start, and
6  that's when we finally went through with it.
7        Q.  Just for clarity, that January 4
8  forecast, it was a forecast, it was
9  forecasting what she expected for Q1, the
10  performance of Q1 did not occur yet?
11        A.  Direct, but she dropped her
12  forecast.
13        Q.  So she changed her forecast?
14        A.  Lower, not higher.
15        Q.  But TBD'd still on whether or not
16  she would meet that forecast; correct?
17        A.  Do you understand forecast why it
18  is important?
19        Q.  I do, Mr. Warren, I have had a lot
20  of time to review this case?
21        A.  Give me a second, so Wall
22  Street --
23        Q.  We don't have enough time, and
24  this is irresponsive.
25        A.  If I can't explain --

73 (Pages 286 - 289)

M. WARREN

1
2       MR. WILKINSON:  Objection.
3       A.  I don't recall.
4       Q.  You don't recall if you ever heard
5   Ms. Abrey say whether or not Max reported to
6   her prior to leave?
7       A.  Outside of -- no, I don't recall.
8       Q.  If she did, would you correct her?
9       MR. WILKINSON:  Objection.
10      I don't recall.  I don't know how
11  to answer that, Alfredo.
12      Q.  So on the 13th, you made the
13  decision to terminate Ms. Abrey; is that
14  correct?
15      A.  It was probably final the morning
16  of the 14th.  But we were strongly
17  considering it the evening of the 14th, but
18  we slept on it.
19      Q.  So what changed between the 12th
20  and the 14th?  Did anything change?
21      A.  I just wanted to think about it
22  and absorb.  It was a big decision, and I
23  cared about Kate.
24      Q.  Was there something that happened
25  between the 12th and the morning of the 14th

M. WARREN

1
2   that made you decide during that period to
3   finalize the decision to terminate
4   Ms. Abrey?
5       A.  The one thing that stuck out to
6   us, both John and I -- I will let John speak
7   for himself, but at least for me, her lack
8   of accountability, of taking accountability
9   for either David or Diane's forecast which
10  ultimately rode up to her for her forecast.
11  It was never Kate's fault.  It was either
12  the people that worked for her or some other
13  reason.  And that lack of accountability or
14  responsibility was the pattern that we saw
15  for all that time, which ultimately the
16  missed forecast on the 4th, the lack of
17  accountability, were sort of the straw that
18  broke the camel's back and why she was
19  terminated for performance the next day.
20      Q.  Do you believe that your
21  conversations prior to Ms. Abrey's
22  termination, in your conversation with
23  Abrey, Ms. Abrey behaved dramatically?
24      MR. WILKINSON:  Objection.
25      A.  Can you help me on dramatically,

M. WARREN

1
2   what does dramatically mean?
3       Q.  Based off your understanding of
4   the word "dramatic," do you believe
5   Ms. Abrey behaved in a dramatic fashion?
6       MR. WILKINSON:  Objection.  I
7   don't know.
8       Q.  Do you know, would you describe
9   your conversations with Abrey as being
10  dramatic?
11      MR. WILKINSON:  Objection.
12      A.  I don't know.  I don't recall, no.
13      MR. PELICCI:  I am going to
14  introduce an exhibit here, it is 28.
15  Let me know when it is in front of you.
16      (Whereupon, a transcript of a
17  recorded telephone conversation Bates
18  370910 to 370927 was marked Warren
19  Exhibit 28 for identification as of
20  this date by the reporter.)
21      Q.  Before you is Plaintiff's
22  Exhibit 28 provided by defendants in this
23  litigation.  It is a transcript of the
24  conversation, the telephone conversation on
25  January 14, 2021 being recorded by

M. WARREN

1
2   Mr. Warren.
3       Was this recorded by you,
4   Mr. Warren?
5       A.  Yes, sir.
6       Q.  Why did you record this
7   conversation?
8       A.  Well, you know, Kate and I had a
9   long history together.  And typically in a
10  termination call, you would always have
11  another person in the meeting with you.  I
12  felt that the history that Kate and I had,
13  that I didn't want to subject her to that
14  kind of conversation in front of others.  So
15  we used the recording as a proxy in lieu of
16  having another person there.
17      Q.  Did you tell Ms. Abrey that the
18  call was being recorded?
19      A.  I don't recall.
20      Q.  If I told you in the transcript
21  there is nowhere you telling Ms. Abrey that
22  the call was being recorded, would that make
23  sense to you?
24      A.  Sure.
25      Q.  Do you have any reason why you

75 (Pages 294 - 297)

Page 310

M. WARREN

1
2     A.  I did not have plans, we did
3  communicate termination.  However, the
4  leadership team did a performance exercise
5  in September of 2020.  And everybody did a
6  self-evaluation and talked to the leadership
7  team about it.  I believe you have that
8  data, if not, Nigel will have to get it to
9  you.  In that she wrote that she was very
10 disappointed in the results that her and her
11 team had done to date and she was determined
12 to make it better.
13      That, then the performance review
14 happened, then she said I don't think we
15 deserve a bonus based on our performance.
16 All of those things together, certainly
17 indicated to Ms. Abrey that she knew that
18 she was not performing and we were actively
19 talking about it with her.
20      Q.  And did everyone in terms of
21 portfolios on the front end, did everyone
22 report in to you?
23      A.  And others.  It is a mixed bag.
24      Q.  As a CEO, would you say the buck
25 stopped with you?

Page 311

M. WARREN

1
2     A.  No, not necessarily, that's now
3  how I manage.
4     Q.  Did you contemplate resignation in
5  association with the underperformance of
6  Diane Ashley's organization?
7          MR. WILKINSON:  Objection.
8     A.  Did I contemplate resignation?
9  Explain that to me, I am not understanding.
10    Q.  So you said Ms. Abrey was
11 disappointed with Ms. Ashley and Mr. Wolf's
12 performance; is that correct?
13    A.  That is correct.
14    Q.  And she expressed that
15 disappointment with you; is that correct?
16    A.  She expressed that she was
17 disappointed in both Diane and David.
18    Q.  And were you disappointed with
19 both Diane and David?
20    A.  I was disappointed in the entire
21 chain of command, because it was all the
22 same, starting with Kate to both then Diane
23 and David.
24    Q.  And were you part of that chain of
25 command?

Page 312

M. WARREN

1
2     A.  Was I part of it?  Kate worked for
3  me so, yes.
4     Q.  So were you disappointed with
5  yourself?
6     A.  Absolutely.
7          Yes, my intent was always for
8  everybody to perform and to deliver and
9  build something great.  But you got to do
10 your job.  And you have to separate personal
11 from business.  Kate and then her team's
12 inability to perform, without any changes in
13 either them or accurately forecasting, at
14 some point enough is enough.  And that
15 enough is enough happened on January 4.
16    Q.  January 14, right, you mean?
17    A.  No, January 4 when she changed her
18 forecast.
19    Q.  So for you the changing of
20 forecast was the straw in your eyes?
21    A.  Yes, that was the straw in my
22 eyes.  And then we wanted to have one last
23 conversation with her.  And her lack of
24 taking accountability and responsibility for
25 either David or Diane or herself sort of

Page 313

M. WARREN

1
2  solidified that thinking that happened, you
3  know, on January 4, 5, when she changed the
4  forecast.
5     Q.  Prior to the 13th when you met
6  with Ms. Abrey, did you communicate with her
7  that the change of her forecast made you
8  want to terminate her?
9     A.  I had many conversations prior to
10 January 4 about --
11    Q.  I am sorry, you didn't understand
12 my question.  My question was after
13 January 4 when she changed her forecast, did
14 you communicate prior to the 13th to
15 Ms. Abrey saying that the change in the
16 forecast was problematic?
17    A.  She was on vacation for a week.
18 So that conversation happened once she
19 returned.  Not the day of, but the second
20 day.
21    Q.  And did you say to anyone, we
22 should terminate Kate because she changed
23 her forecast?
24    A.  John Harllee, sure, we talked
25 about.

79 (Pages 310 - 313)

Page 314

M. WARREN

1
2  Q.  But when did that occur?
3  A.  The week of January 4.
4  Q.  Oh, so you had conversations the
5  week of January 4 with Mr. Harllee about
6  terminating Kate?
7  A.  Correct, absolutely.
8  Q.  And you didn't make a decision,
9  though, until after the 13th?
10  A.  Correct.
11  Q.  Do you think it would have been
12  beneficial for Ms. Abrey when you went
13  through this review process, which occurred
14  prior to January 4, to discuss her work
15  habits where you rated her a 5 and an
16  exceptional performer?
17  MR. WILKINSON:  Objection.
18  A.  Well, one thing that I talked to
19  Kate at length about was that activity
20  doesn't equal performance.  So if your work
21  ethic is great, it doesn't always equal
22  performance.  And we are a performance based
23  company based on merit and performance.  And
24  at the end of the day, it is about the
25  numbers.  She was very aware of that.

Page 315

M. WARREN

1
2  Q.  So leading up to January 13, did
3  you continue to praise Kate Abrey's
4  performance at Steampunk?
5  MR. WILKINSON:  Objection.
6  A.  I don't recall.
7  Q.  Do you recall complimenting
8  Ms. Abrey's performance after this
9  performance review?
10  MR. WILKINSON:  Objection.
11  A.  I don't recall, Alfredo.
12  MR. PELICCI:  I am going to ask
13  you to please refresh.
14  (Whereupon, a two-page e-mail
15  Bates 43441 to 43442 was marked Warren
16  Exhibit 30 for identification as of
17  this date by the reporter.)
18  Q.  Before you is Plaintiff's Exhibit
19  30.  It is an e-mail with John Harllee, Dan
20  Parker, yourself, Matt Reeves, it says,
21  "Kate-as promised, wanted to send you your
22  organization's raise, stock and bonus pools
23  for 2020 performance.  As you know, we had
24  an outstanding year from the topline
25  perspective, and that's in no small part to

Page 316

M. WARREN

1
2  the efforts of you and your team."
3  You were cc'd on the e-mail.
4  Do you recall receiving this
5  e-mail?
6  A.  I don't.
7  Do you want me to take some time
8  to read the e-mail.
9  Q.  No, I am just asking you if you
10  recall receiving it?
11  A.  I don't.
12  Q.  Do you recall whether or not you
13  corrected Mr. Harllee's statements in this
14  e-mail?
15  MR. WILKINSON:  Hold on a second,
16  he is going to have to read it, if you
17  want him to comment on what the e-mail
18  says.
19  A.  Do you want to take a minute here
20  so I could read it?
21  Q.  No, my question is do you recall a
22  situation where after this e-mail you ever
23  approached Mr. Harllee or Ms. Abrey to say,
24  Ms. Abrey, the success of the company in
25  2020 was not a result of your team?

Page 317

M. WARREN

1
2  MR. WILKINSON:  Repeat now.  You
3  can't ask him a hypothetical question
4  based on a document.
5  MR. PELICCI:  I am asking him what
6  he did after this e-mail.  Please don't
7  interrupt the deposition anymore.
8  MR. WILKINSON:  Give him an
9  opportunity to read something.
10  MR. PELICCI:  I could ask him what
11  happened after this e-mail without him
12  reading the whole e-mail, thank you.
13  Q.  Mr. Warren, my question to you is
14  after this e-mail on December 1, 2020, did
15  you ever go to Ms. Abrey to say her to her
16  that Mr. Harllee said false statements to
17  you about your performance?
18  MR. WILKINSON:  I object to this
19  question.  Because the question is
20  still about what was said in this
21  e-mail.
22  MR. PELICCI:  That's a speaking
23  objection.  And my question is not
24  about what is said in the e-mail.  We
25  are moving on from the e-mail.  Put the

80 (Pages 314 - 317)

M. WARREN

1
2       MR. PELICCI:  It may be a
3    different iteration of it, but thanks
4    for pointing that out.
5       MR. WILKINSON:  It is the same
6    Bates number.
7       MR. PELICCI:  Thank you.
8       So we will just look at it as
9    Exhibit 31, please.
10      Q.  With number 3, what do you mean
11   that Kate had vision with TSA, what does
12   that mean?
13      A.  To the best of my recollection,
14   TSA was her experience at Accenture.  That's
15   really where she made her mark inside of
16   Accenture.  And we were unable to get TSA
17   going up to this point.  We had one wedge
18   deal in 2019 that was sold.  But we never
19   did anything of volume or substance or of
20   strategic value.  And Kate when she returned
21   and she was allowed to go back into TSA
22   after he restrictions, which I believe was
23   the first call she did, she started putting
24   together her strategy, how to get in there.
25   And we were excited about the potential, I

M. WARREN

1
2    was excited about the potential.
3       Q.  So in July of 2020, you were
4    excited about Ms. Abrey's potential?
5       A.  About the potential of her vision
6    coming true.
7       Q.  And in Q1 following Ms. Abrey's
8    termination, did you close any significant
9    deals or new wedges with any of the clients
10   that Ms. Abrey oversaw?
11      MR. WILKINSON:  Objection.
12      A.  I don't recall specifically,
13   Alfredo.  But it is my recollection that
14   Kate in trying to protect Diane was
15   constantly trying to argue about the
16   definition of what net new and a wedge was.
17   It was very clear to every other person in
18   the organization, which resulted in me, in I
19   believe November or December of that year,
20   finally putting it in writing, because we
21   were literally arguing.
22      The only deal that we ended up
23   giving in, was an expansion deal at ICE that
24   frankly, again, was another episode, where
25   Diane and Kate really hurt their

M. WARREN

1
2    relationship with the team because the
3    delivery folks felt that Kate and Diane were
4    trying to take credit on what they were
5    doing with the client.
6       Q.  Before Kate's termination, did she
7    work on a deal under or assist with a deal
8    for the USPT?
9       MR. WILKINSON:  Objection.
10      A.  I don't recall, I don't recall.
11      Q.  Do you recall a deal for
12   $2 billion that occurred shortly after
13   Kate's termination?
14      A.  Alfredo, if we closed a $2 billion
15   deal, this would be a different
16   conversation, it never happened.
17      Q.  What about $63 million?
18      A.  I don't recall.
19      Q.  Did you close any significant
20   deals after Kate's termination that Kate or
21   Ms. Ashley played a large role in securing?
22      A.  I don't recall.
23      Q.  Do you recall any of the major
24   deals you closed in Q1 after Ms. Abrey's
25   termination?

M. WARREN

1
2       A.  I don't recall, no.
3       Q.  Do you recall an applicant by the
4    name of Jacquelyn Brioux?
5       A.  Vaguely.
6       Q.  Do you remember anything
7    pertaining to Ms. Brioux that relates to
8    maternity leave?
9       MR. WILKINSON:  Objection.
10      A.  The only time that that name was
11   brought up with me, we talked about the hard
12   conversation we had with Kate, I think it
13   was the Wednesday, whatever that date is in
14   January.
15      Q.  The 13th?
16      A.  Yes, thank you, Alfredo.  We had a
17   meeting, 95 percent of that meeting was
18   about her performance or lack thereof.  And
19   at the very end she said can we talk about
20   Jacquelyn.  I did not know who this person
21   was.  I checked out of the meeting.  That
22   meeting ended a few minutes later, and that
23   was the last I ever heard the name Jacquelyn
24   Brioux.  So I had little to no involvement
25   in that at all.

M. WARREN

1
2      Q.  Do you recall what Ms. Abrey said
3   about Ms. Brioux on the 13th?
4      A.  I don't recall what Kate was
5   saying about Jacquelyn in that conversation.
6   It was literally the end of a very difficult
7   conversation, Alfredo.  If the conversation
8   was 30 minutes, maybe it was two minutes
9   long.
10     Q.  So you don't have any recollection
11  of what Ms. Abrey said in those two minutes
12  about Ms. Brioux?
13     A.  I don't, I don't.
14     Q.  Prior to that call, do you
15  remember any discussions about Ms. Brioux?
16     A.  No, that was literally the first
17  time per my recollection that I ever heard
18  that name.
19        MR. PELICCI:  We could take about
20     a five minute break, and then we should
21     be wrapping up pretty soon.
22        (Whereupon, a short recess was
23     taken.)
24     Q.  So after Ms. Abrey was informed
25  that she was being terminated on January 14,

M. WARREN

1
2   did she continue to perform responsibilities
3   at Steampunk?
4      A.  I don't recall.  I know she was on
5   payroll for some time, Alfredo.  I don't
6   recall the exact time.
7        But I believe she made herself
8   available if we needed her.  But that's the
9   best to my recollection.
10     Q.  Do you know if she was directed
11  not to communicate with anybody?
12        MR. WILKINSON:  Objection.
13     A.  I don't recall, Alfredo.
14     Q.  And so who assumed Ms. Abrey's
15  responsibilities?
16        MR. WILKINSON:  Objection.
17     Q.  After her termination?
18     A.  After her termination, we put Matt
19  Reeves in an acting role to take over, who
20  was her deputy number two serving as DOD,
21  based on the great work that he did on
22  delivery with the existing work.  But that
23  was in an acting capacity, not an official
24  capacity.
25     Q.  So prior to Ms. Abrey's

M. WARREN

1
2   termination, you were satisfied with
3   Mr. Reeves' performance?
4      A.  As an OD.
5      Q.  As an OD, can you elaborate, what
6   does that mean?
7      A.  That means the operations director
8   who reports to the portfolio lead is
9   primarily responsible for delivery and
10  getting the renewals and expansion of that
11  work that is on the ground.  And that's what
12  we were talking about the delivery folks
13  were sort of losing faith in Kate, because
14  she would sort of overpromise and
15  under-deliver.  And even despite his boss
16  doing all that, he continued to work hard
17  and do great things on the delivery side.
18     Q.  Did Max Licht oversee Mr. Reeves?
19     A.  Not to my recollection.
20     Q.  At any point did Mr. Reeves begin
21  reporting in to Mr. Licht?
22     A.  Not to my recollection.
23        MR. PELICCI:  I am going to ask
24     you to refresh once again.
25        (Whereupon, a five-page e-mail

M. WARREN

1
2   Bates 132987 to 132991 was marked
3      Warren Exhibit 32 for identification as
4      of this date by the reporter.)
5        This is going to be Exhibit 32.
6      A.  Okay, I pulled it up.
7      Q.  Is a USPTO, was that part of Ms.
8   Abrey's former ambit prior to termination?
9      A.  Are you asking did USPTO report up
10  to Kate?
11     Q.  Correct.
12     A.  Yes, it did.
13     Q.  So this is part of what Mr. Reeves
14  assumed after Ms. Abrey's termination?
15     A.  Yes, that's correct.
16     Q.  Who is Daniel Steinberg?
17     A.  Daniel Steinberg is one of our
18  senior contracts supporting the portfolio,
19  but they don't report into the portfolios.
20     Q.  And so in that role, did he only
21  support Kate or did he support others?
22     A.  At that time, I am not sure how we
23  divied it up, I can't recall.  But we have
24  added people consistently as the business
25  has grown.

83 (Pages 326 - 329)

Page 330

```
1              M. WARREN
2      Q.  And then did Max ever assume, to
3  this date, any responsibility for the
4  clients that were under Ms. Abrey's ambit?
5      MR. WILKINSON:  Objection.
6      A.  To the best of my recollection,
7  no.
8      Q.  So primarily Mr. Reeves was the
9  one who received responsibilities for Ms.
10 Abrey's role?
11     A.  That's right, Matt reported to
12 Kate, Matt led delivery.  When Kate was
13 terminated, we asked Matt to act as the
14 portfolio lead to sort of figure out, you
15 know, what we were going to do next.
16     Q.  And is Matt still the portfolio
17 lead?
18         (Continued on next page.)
19
20
21
22
23
24
25
```

Page 331

```
1              M. WARREN
2      A.  Yes, Matt is still a portfolio
3  lead.
4      MR. PELICCI:  I think that's it
5  for me.
6      MR. WILKINSON:  We do want to
7  review and sign the transcript.  So
8  whenever that is ready, we will get Mr.
9  Warren to review and sign it.
10     (Whereupon, at 6:53 P.M.,  the
11 Examination of this witness was
12 concluded.)
13
14         o    o    o    o
15
16
17
18
19
20
21
22
23
24
25
```

Page 332

```
1              M. WARREN
2
3            I N D E X
4
5  EXAMINATION BY              PAGE
6    MR. PELICCI              4
7
8     INFORMATION AND/OR DOCUMENTS REQUESTED
9  INFORMATION AND/OR DOCUMENTS      PAGE
10 2022 financial statements          57
11 Communications and e-mails about the   97
   acceleration of Ms. Abrey's stock
12 options or the accelerating of any
   vesting schedule related to Ms.
13 Abrey's compensation or stock at
   Steampunk
14
   E-mails that were given to Ms. Abrey  238
15 and then continuing after her leave
            E X H I B I T S
16
17 WARREN EXHIBITS
18
19 EXHIBIT      EXHIBIT
20 LETTER       DESCRIPTION          PAGE
21
22 Exhibit 1      Two-page e-mail Bates  15
                 DA-0006
23
   Exhibit 2      Three-page email Bates  34
24               No. SHI00043101 to 103
25 Exhibit 3      Two-page letter Bates SHI
                 73939 to 73940
```

Page 333

```
1              M. WARREN
2  EXHIBIT      EXHIBIT
3  LETTER       DESCRIPTION        PAGE
4
   Exhibit 4      Washington Exec article 65
5
   Exhibit 5      Two-page e-mails        93
6
   Exhibit 6      Offer letter, beginning 00
7                 with Bates stamp 106230
   Exhibit 7      E-mails - Bates stamped 10
8                 331225 through 331226
9  Exhibit 8      E-mails - Bates stamped 19
                  158054 through 158055
10 Exhibit 9      Two-page e-mail        139
                  Bates No. 76561 to 76562
11
   Exhibit 10     Two-page e-mail        151
12                Bates No. 162588
                  to 162589 E-mails
13
   Exhibit 11     e-mail Bates 318839    155
14
   Exhibit 12     Three-page e-mail Bates 57
15                508888 to 508892
16 Exhibit 13     Two-page e-mails -     162
                  Bates stamped 508895
17                through 508896
   Exhibit 14     Two-page e-mail Bates  171
18                440407 to 440408
19 Exhibit 15     E-mails - Bates stamped 77
                  25741 through 25743
20 Exhibit 16     Two-page e-mail Bates  189
                  63889 t0 63890
21
   Exhibit 17     Two-page e-mails Bates 194
22                39952 to 39953
23
24
25
```

84 (Pages 330 - 333)

Page 334

```
1              M. WARREN
2    EXHIBIT    EXHIBIT
3    LETTER     DESCRIPTION        PAGE
4
5        Exhibit 18    Two-page e-mails Bates 198
             43747 to 43748
6        Exhibit 19    Three-page e-mail 48335 06
             to 48337
7
         Exhibit 20    One-page e-mail Bates 220
8            32911
9        Exhibit 21    Two-page email Bates 230
             74384 to 74385
10
         Exhibit 22    Two-page e-mail Bates 235
11           70555 to 70556
12       Exhibit 23    EEOC submission    242
13       Exhibit 24    Two-page e-mail Bates 255
             32921 to 32922
14
         Exhibit 25    Three-page e-mail Bates 67
15           11386 to 11389
16       Exhibit 26    Two-page e-mail Bates 271
             127880 to 127881
17
         Exhibit 27    Four-page e-mail Bates 277
18           128035 to 128038
19       Exhibit 28    Transcript of a    296
             recorded telephone
20           conversation Bates 370910
             to 370927
21
         Exhibit 29    Two-page e-mail Bates 308
22           133218 to 133219
23       Exhibit 30    Two-page e-mail Bates 315
             43441 to 43442
24
         Exhibit 31    Two-page e-mail Bates 321
25           440407 to 440408
```

Page 335

```
1              M. WARREN
2    EXHIBIT     EXHIBIT
3    LETTER      DESCRIPTION       PAGE
4        Exhibit 32    Five-page e-mail Bates 329
             132987 to 132991
5
6        QUESTIONS MARKED FOR RULING
7        PAGE LINE
8
         228   11
9
         244   6
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 336

```
1              M. WARREN
2         C E R T I F I C A T E
3
4    STATE OF NEW YORK      )
                          : SS.:
5    COUNTY OF QUEENS       )
6
7        I, RIVKA TROP, a Notary Public for and
8    within the State of New York, do hereby
9    certify:
10       That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14       I further certify that I am not related
15   to any of the parties to this action by
16   blood or by marriage and that I am in no way
17   interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto set
19   my hand this 24th day of April, 2023.
20
21
22            Rivka Trop
23            RIVKA TROP
24
25
```

Page 337

```
1    NIGEL WILKINSON, ESQ.
2    Nigel.Wilkinson@jacksonlewis.com
3    May 3, 2023
4    RE:   Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.
5    4/24/2023, Matthew Warren (#5885102)
6        The above-referenced transcript is available for
7    review.
8        Within the applicable timeframe, the witness should
9    read the testimony to verify its accuracy. If there are
10   any changes, the witness should note those with the
11   reason, on the attached Errata Sheet.
12       The witness should sign the Acknowledgment of
13   Deponent and Errata and return to the deposing attorney.
14   Copies should be sent to all counsel, and to Veritext at
15   cs-ny@veritext.com
16
17    Return completed errata within 30 days from
18   receipt of testimony.
19    If the witness fails to do so within the time
20   allotted, the transcript may be used as if signed.
21
22            Yours,
23            Veritext Legal Solutions
24
25
```

85 (Pages 334 - 337)

Page 337

1   NIGEL WILKINSON, ESQ.

2   Nigel.Wilkinson@jacksonlewis.com

3                    May 3, 2023

4   RE:    Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.

5        4/24/2023, Matthew Warren (#5885102)

6        The above-referenced transcript is available for

7   review.

8        Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-ny@veritext.com

16

17   Return completed errata within 30 days from

18  receipt of testimony.

19      If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22                   Yours,

23              Veritext Legal Solutions

24

25

Page 338

1   Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.

2   Matthew Warren (#5885102)

3                    E R R A T A   S H E E T

4   PAGE 201  LINE 6   CHANGE "THAT WORKS WITH A

5   MOTHER COMPANY" TO "THAT WORKS WITH ANOTHER COMPANY"

6   REASON _____

7   PAGE 220  LINE 24  CHANGE STET

8   _____

9   REASON _____

10  PAGE 237  LINE 7   CHANGE "books" to bookings

11  _____

12  REASON Bookings is the terminology

13  PAGE 240  LINE 9   CHANGE "today under MATT"

14  TO TODAY UNDER MAX

15  REASON MAX LICHT AREA OF RESPONSIBILITY

16  PAGE 250  LINE 16  CHANGE "GET HER RIGHT IN"

17  GET HER READ IN

18  REASON TERMINOLOGY USED

19  PAGE 254  LINE 5   CHANGE "BECAUSE SHE WAS

20  NOT UP TO SPEAK" TO B/C SHE WAS NOT UP TO SPEED

21  REASON

22

23  _____   5/16/2023

24  Matthew Warren                    Date

25

Veritext Legal Solutions
www.veritext.com
212-279-9424                           212-490-3430

Page 339

1    Abrey, Kathleen v. Steampunk Holdings, Inc., Et Al.

2    Matthew Warren (#5885102)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Matthew Warren, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____         5-16-2023

12   Matthew Warren                  Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15   16th DAY OF  MAY          , 2023.

16

17

18   _____

19   NOTARY PUBLIC

20

21              DAVID TEICHIRO IZAWA
                   NOTARY PUBLIC
                REGISTRATION # 7802714
22           COMMONWEALTH OF VIRGINIA
              MY COMMISSION EXPIRES
                  AUGUST 31, 2026

23

24

25