DIANE ASHLEY
ABREY V. STEAMPUNK HOLDINGS

April 14, 2023
EXHIBIT 30

**Page 1**

```
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE EASTERN DISTRICT OF VIRGINIA
 3                 (Alexandria Division)
 4
 5   KATHLEEN ABREY,          )
 6          Plaintiff,         )
 7          vs.                ) 1:22-cv-00654-MSN-JFA
 8   STEAMPUNK HOLDINGS, INC., )
 9          Defendant.         )
10        *    *    *    *    *
11
12
13
14
15
16
17        The deposition of DIANE ASHLEY was taken on
18   Friday, April 14, 2023, commencing at 10:00 a.m., at
19   the offices of Jackson Lewis P.C., 10701 Parkridge
20   Boulevard, Suite 300, Reston, Virginia, before Audra
21   A. Gilbert, Court Reporter, Notary Public.
22        *    *    *    *    *
```

**Page 2**

```
 1              A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4        ALFREDO J. PELICCI, ESQUIRE
 5        Wigdor LLP
 6        85 Fifth Avenue
 7        New York, New York 10003
 8        (212) 257-6800
 9        apelicci@wigdorlaw.com
10
11   ON BEHALF OF THE DEFENDANT:
12        NIGEL L. WILKINSON, ESQUIRE
13        Jackson Lewis P.C.
14        10701 Parkridge Boulevard
15        Reston, Virginia 20191
16        (703) 483-8300
17        nigel.wilkinson@jacksonlewis.com
18
19   ALSO PRESENT:
20        PATRICIA DONKOR
21
22
```

**Page 3**

```
 1                    I N D E X
 2              DEPOSITION OF DIANE ASHLEY
 3                   April 14, 2023
 4
 5   EXAMINATION BY:                              PAGE
 6   Mr. Wilkinson                                   5
 7   Mr. Pelicci                                   229
 8   Mr. Wilkinson                                 290
 9
10   ASHLEY DEPOSITION EXHIBITS:           PAGE MARKED
11   Exhibit No. 1                                  13
12   Exhibit No. 2                                  20
13   Exhibit No. 3                                 111
14   Exhibit No. 4                                 126
15   Exhibit No. 5                                 133
16   Exhibit No. 6                                 138
17   Exhibit No. 7                                 142
18   Exhibit No. 8                                 160
19   Exhibit No. 9                                 175
20   Exhibit No. 10                                196
21   Exhibit No. 11                                199
22   (Exhibits continued on the following page.)
```

**Page 4**

```
 1   ASHLEY DEPOSITION EXHIBITS (continued):  PAGE MARKED
 2   Exhibit No. 12                                201
 3   Exhibit No. 13                                212
 4   Exhibit No. 14                                217
 5   Exhibit No. 15                                221
 6   Exhibit No. 16                                223
```



800.211.DEPO (3376)
EsquireSolutions.com

DIANE ASHLEY
ABREY V. STEAMPUNK HOLDINGS

April 14, 2023
17–20

Page 17
1  changes occur?
2      MR. PELICCI:  Objection.
3      THE WITNESS:  So the -- when the new
4  leadership team came in, there was lots of
5  discussion around what roles I would have not being
6  in -- focused on new growth, and so a lot of the
7  discussion from Matt Warren was that my role was on
8  growth only.
9      BY MR. WILKINSON:
10     Q.  So when did the new leadership team come
11  in?
12     A.  That was in May, I believe.
13     Q.  May of what year?
14     A.  May of 2019.
15     Q.  Okay.  And so did Mr. Warren want you to
16  focus on growth?
17     A.  He wanted me to do only growth.
18     Q.  Okay.
19     A.  Which is different than the role that I
20  accepted.
21     Q.  And how so?
22     A.  We had existing work that was ongoing, that

Page 18
1  had ongoing challenges, and overseeing the whole
2  portfolio was important for growth so that we could
3  fix existing work.
4      Q.  Okay.  So, when Mr. Warren came in and
5  wanted you to focus solely on growth, what happened
6  to the rest of it?
7      A.  (No response.)
8      Q.  So you were supervising more than just
9  growth when you accepted the job, right?
10     A.  That's the reason that I accepted the job.
11     Q.  Okay.  And so Mr. Warren comes in in May of
12  2019 and wants you to focus solely on growth, right?
13     A.  I don't know that he said it that straight,
14  but over time that's what the focus was.  And he was
15  clear.
16     Q.  And -- I'm sorry -- he was what?
17     A.  Over time, he was clear that my role was to
18  have growth -- net new growth.
19     Q.  Okay.  And so do you remember when that
20  started?
21     A.  I don't know of a date.  It was in that
22  first year.

Page 19
1      Q.  So, in 2019, he made it clear that you
2  should be focusing solely on growth and net new?
3      A.  Yes.
4      Q.  Okay.  Do you know who your employer was
5  when you left Steampunk, the name of the entity that
6  employed you?
7      A.  Can you ask that again?
8      Q.  Sure.  Do you know the name of the entity
9  that employed you when you left Steampunk?
10     A.  My understanding was the company -- the
11  company who employed me is Steampunk.
12     Q.  So do you know -- have you heard of a
13  company called Steampunk Holdings, Inc.?
14     A.  I have now, because I know that's part of
15  the allegations.
16     Q.  All right.  And so do you know the
17  difference between Steampunk Holdings, Inc., and
18  Steampunk, Inc.?
19     A.  I do now, because of the allegations.  That
20  was just not something that I was attuned to.  My
21  employer was Steampunk.
22     Q.  Okay.  Did you ever take a look at any of

Page 20
1  your paychecks when you were at Steampunk?
2      A.  I'm sure I did.
3          MR. WILKINSON:  We'll mark this Exhibit 2,
4  please.
5          (Ashley Exhibit Number 2 was marked for
6  identification.)
7          BY MR. WILKINSON:
8      Q.  So, if you take a look at the last page of
9  Exhibit 2, do you see what the name of your employer
10  is there?
11     A.  I do.
12     Q.  And what is that?
13     A.  The statement says Steampunk, Inc.
14     Q.  And you'd never recognized that before you
15  read the amended complaint?
16     A.  It's not something that I would have
17  noticed or not noticed.  The word "Steampunk" is
18  there.
19     Q.  Okay.  Were you involved in preparing your
20  personal income taxes?
21     A.  Yes.
22     Q.  Okay.  Did you -- do you remember who you



Page 69

1  BY MR. WILKINSON:
2  Q.  And how do you know that?
3      MR. PELICCI:  Objection.
4      THE WITNESS:  Because I would talk to her.
5      BY MR. WILKINSON:
6  Q.  And this is what she told you?
7  A.  And I saw it.  There was -- I --
8  Q.  Well, but let me -- let me sort of put this
9  in more of a temporal context, right?
10      MR. PELICCI:  Objection to interrupting.
11      BY MR. WILKINSON:
12  Q.  Ms. Abrey goes out on leave at the end of
13  January of 2020, right?  I believe the text message
14  that you're talking about was in February or March
15  of 2020, right, while she was sort of in the middle
16  of her leave?
17  A.  Mm-hmm.
18  Q.  And so I'm asking, then:  How do you know
19  or what happened during that time period that caused
20  her to have -- or what did she tell you that caused
21  her to have that sense?
22      MR. PELICCI:  Objection.

Page 70

1      THE WITNESS:  What did she tell me?
2  Leading up to when she went off on
3  maternity leave, we would talk about mostly all
4  work, client things.  And she voiced her concerns to
5  me about the changing relationship that she had with
6  Matt, primarily, but both Matt and John Harllee.
7  That was happening while she was still employed.
8  And those concerns were what probably built on the
9  spidey sense feeling during leave.
10      BY MR. WILKINSON:
11  Q.  So she didn't tell you specifically why she
12  had that feeling?  She just told you that she had
13  that feeling?
14      MR. PELICCI:  Objection.
15      THE WITNESS:  I don't recall.
16      BY MR. WILKINSON:
17  Q.  So, when you were talking with her before
18  she came back from maternity leave, did you discuss
19  how sort of the organization was sort of changing
20  and sort of evolving?
21  A.  Before she came back, I -- when I would
22  talk with her, we talked -- we talked about her

Page 71

1  child a lot.
2      And, when we talked about work -- I can't
3  recall.  Most of our conversations were what was
4  going on in the industry, how we were -- which
5  clients I was talking with, how the work was going.
6      I don't recall specific conversations on
7  org structure of Steampunk.
8  Q.  Well, how about just general your
9  responsibilities, her responsibilities, things like
10  that?
11      MR. PELICCI:  Objection.
12      THE WITNESS:  While she was on maternity
13  leave, did I talk about my responsibilities?  Sure.
14      BY MR. WILKINSON:
15  Q.  Other than that text message that you gave
16  us, did you have any further discussions with
17  Ms. Abrey, while she was on leave, about what was
18  happening with her responsibilities?
19      MR. PELICCI:  Objection.
20      THE WITNESS:  Other than the text message,
21  did I talk with her about what was happening with
22  her responsibilities?  I don't recall.

Page 72

1      Do you have a specific question of, like,
2  whether she was changing?  I don't recall.
3      BY MR. WILKINSON:
4  Q.  No.  I wanted to know what you discussed
5  with her about that.
6  A.  Yeah.
7  Q.  In terms of your -- in terms of Mr. Warren
8  sort of wanting to get you to focus on growth and
9  net new -- and I think you said that that was sort
10  of what his focus was from the beginning, right?
11  A.  Mm-hmm.
12  Q.  Did that continue after Ms. Abrey returned
13  from maternity leave?
14  A.  Matt Warren is always focused on growth, so
15  I'm sure it did, yes.
16  Q.  What do you know about the company's
17  organizational restructure after Ms. Abrey came back
18  from maternity leave?
19  A.  I recall we -- first off, I heard about
20  changes, direct from Kate, when she was told -- I
21  can't remember if it was the day she came back or
22  the next day.  So she shared with me that



DIANE ASHLEY  
ABREY V. STEAMPUNK HOLDINGS  
April 14, 2023  
85–88

Page 85

1 working those lines of business for at least a year,
2 right?  Probably longer than that, right?
3    A.  That's correct, yeah.
4    Q.  Okay.  And so with Ms. Abrey's, I'll say,
5 expertise in DHS, which is why she had the
6 noncompete agreement, wouldn't it make sense for her
7 to get more involved in trying to build the DHS
8 business, because at that point she could sort of
9 exploit her expertise a little more?
10        MR. PELICCI:  Objection.
11        THE WITNESS:  Ms. Abrey's noncompete was up
12 meant she could do client engagement directly, which
13 she did.  I could now bring her to client meetings,
14 directly.
15        BY MR. WILKINSON:
16    Q.  Okay.  Did that help?
17        MR. PELICCI:  Objection.
18        THE WITNESS:  It was great to have her
19 along, directly, in client meetings.  I took Matt
20 Warren to client meetings, directly, too.
21        BY MR. WILKINSON:
22    Q.  So did Ms. Abrey's involvement in client

Page 86

1 meetings help you grow the DHS business?
2    A.  There were a variety of factors that proved
3 out successful on some of the areas I was focused
4 on.  I can't ascribe it to one or two interactions
5 that Kate Abrey had with me in client meetings.
6 Certainly, it didn't hurt, because she is great in
7 client meetings.
8    Q.  Did Ms. Abrey work with you to set the DHS
9 goals for Q3 and Q4 of 2020?
10    A.  Okay.  So Q3 and Q4 of 2020, did she work
11 with me?  I believe so.
12    Q.  Were you involved in setting any of the
13 goals for the rest of Ms. Abrey's portfolio, sort of
14 outside of DHS?
15        MR. PELICCI:  Objection.
16        THE WITNESS:  Was I involved?
17        BY MR. WILKINSON:
18    Q.  Uh-huh.
19    A.  No, not that I recall.  Outside of my own
20 DHS business that I was running, no.
21    Q.  Did you experience any sort of increased
22 pressure to meet net new in growth or wedge goals

Page 87

1 for the latter part of 2020 --
2        MR. PELICCI:  Objection.
3        MR. WILKINSON:  -- after Ms. Abrey came
4 back to work?
5        MR. PELICCI:  Objection.
6        THE WITNESS:  Every day at Steampunk,
7 working for Matt Warren, was constant pressure.
8 Delineating between when that increased, it was
9 constantly increasing.
10        BY MR. WILKINSON:
11    Q.  So no, necessarily, increase after
12 Ms. Abrey returned?  It was kind of always high
13 pressure, always increasing?
14        MR. PELICCI:  Objection.
15        THE WITNESS:  I recall, in the environment
16 ratcheting up from questions by Matt Warren once she
17 came back, more pointed questions, so perhaps there
18 was an increase in pressure.
19        BY MR. WILKINSON:
20    Q.  Like what?
21    A.  Wanting regular, weekly, almost daily
22 briefings about the pipeline and what we were doing.

Page 88

1    Q.  Do you know whether Matt Warren had -- or
2 exerted the same pressure on other parts of the
3 business?
4        MR. PELICCI:  Objection.
5        THE WITNESS:  I didn't have exposure to the
6 other parts of business.  I was primarily focused --
7 I was focused in DHS.  I did not see those
8 interactions directly.
9        BY MR. WILKINSON:
10    Q.  Did Ms. Abrey ever try to increase the
11 pressure on you to meet the goals that you-all set
12 for Q3 and Q4 of 2020?
13        MR. PELICCI:  Objection.
14        THE WITNESS:  Define what you mean by
15 "pressure."
16        BY MR. WILKINSON:
17    Q.  Well, you said that Mr. Warren was always
18 increasing the pressure on you, and I suppose the
19 rest of the -- of at least Ms. Abrey's portfolio,
20 right?
21    A.  Mm-hmm.
22    Q.  Did Ms. Abrey, in turn, try to increase the



Page 89
1  pressure on you to do the same?
2      MR. PELICCI:  Objection.
3      THE WITNESS:  Did we have to talk more and
4  more about what Matt Warren was conveying to her
5  because he was constantly focused on what was being
6  closed by a daily basis?  Yes.  There was a lot of
7  discussion around how to continue to grow our
8  portfolio.  Did that ramp up?  There was constant
9  discussion on how to grow the portfolio.
10     BY MR. WILKINSON:
11   Q.  Well, was there sort of a trickle down of
12  an increasing pressure?  Because -- well, I don't
13  know.
14     You tell me:  Was Mr. Warren putting
15  pressure on you specifically, as opposed to putting
16  pressure on Ms. Abrey to have it trickle down to
17  you?  How did that work?
18     MR. PELICCI:  Objection.
19     THE WITNESS:  It would be a blend, if I had
20  to put my finger on it, when there were times where
21  we were interact directly, me with Matt Warren.  The
22  focus was always on what new work was being closed,

Page 90
1  and, by association, the discussions that I had with
2  Kate were often on that topic.  It was his focus
3  every single day.
4     BY MR. WILKINSON:
5   Q.  So would those discussions be like between
6  you and Ms. Abrey in terms of what Mr. Warren was
7  sort of -- what the -- the pressure that he was
8  putting onto -- to grow the business?
9   A.  Most of the time, Kate and I talked about
10  ways that we could grow the business, with the
11  understanding that maybe that would take the
12  pressure, but also because we were trying to grow
13  the company.
14     So, with respect to the pressure, we were
15  focused on trying to grow our work and in order to
16  grow the company.
17     So I'm sure what you mean on the specific
18  nature of those conversations?
19   Q.  Well, so Mr. Warren is putting a lot of
20  pressure on, presumably, everybody to grow the
21  entire company, right?  That was sort of everybody's
22  goal in senior leadership, correct?

Page 91
1   A.  Yeah.
2      MR. PELICCI:  Objection.
3      BY MR. WILKINSON:
4   Q.  And so I'm wondering if, because now that
5  Ms. Abrey is solely only responsible for DHS -- and
6  I think Mr. Wolf's line was commerce --
7   A.  Commerce.
8   Q.  -- and that would have included PTO, right?
9   A.  Yeah.
10   Q.  As Ms. Abrey is sort of the in between you
11  and Mr. Wolf and Mr. Warren, whether the pressure
12  that he was putting on her, whether she, in turn,
13  was implementing that same pressure on you and Mr.
14  Wolf, or was it more Mr. Warren is putting all this
15  pressure and Ms. Abrey is just trying to work with
16  you and Mr. Wolf and whoever in order to please
17  Mr. Warren?
18     MR. PELICCI:  Objection.
19     THE WITNESS:  Kate was always professional.
20  I think the way I'll answer that is the best way to
21  answer it:  She was always professional.
22     If there was pressure being put on her,

Page 92
1  lots of pressure, which I know there was, she
2  maintained that professional, engaged, positive
3  energetic attitude.
4     BY MR. WILKINSON:
5   Q.  Did she ever complain about Mr. Warren
6  putting too much pressure on the portfolio?
7   A.  We had lots of challenges with the
8  difficult personality that Matt Warren was.  Were
9  the challenges complained about?  Absolutely.
10   Q.  And what would she complain about?
11   A.  Most of the time we were focused on how we
12  grow the portfolio.
13   Q.  Okay.  Well, you -- okay.  Okay.  So you
14  said, Of course there were complaints, and I'm not
15  faulting you for that, right?  I mean, I think
16  everybody complains about their boss at some point
17  in time.
18     But what I'm interested in is:  What were
19  those complaints?  What was Ms. Abrey complaining
20  about in terms of pressure that Mr. Warren was
21  putting on her?
22     MR. PELICCI:  Objection.



**Page 93**

1    THE WITNESS:  That it was to the exclusion
2    to any other parts of a conversation.  It was almost
3    impossible to talk with Matt unless you were talking
4    about growth.
5         So while we were dealing with a variety of
6    different issues in the land of misfit toys, those
7    didn't matter if it didn't relate to growth.  That's
8    probably the biggest frustration.  We couldn't talk
9    about anything except what he wanted to talk about,
10   which was only growth.
11        BY MR. WILKINSON:
12   Q.   Were you able to meet the net new and wedge
13   goals for Q3 of 2020?
14   A.   Remind me what they were?
15   Q.   I don't know what they were, but
16   I'm just -- and I'm not looking for numbers.
17        I'm just wondering whether you were able to
18   meet the goals that were set for Q3?
19   A.   In 2020?
20   Q.   Mm-hmm.
21   A.   The wedge goals?  I don't remember what the
22   wedge goals were.

**Page 94**

1    Q.   Okay.  Do you remember whether you met them
2    or didn't met them?  Setting aside -- I'm not
3    telling you your goal was 15 and whatever it was.  I
4    don't know what those goals were.
5         But it seems to me that you would know
6    whether the goals were met or not met?
7         MR. PELICCI:  Objection.
8         THE WITNESS:  The goals changed, often.
9    There was a lot of discussion around what the goal
10   was.  It moved from FTEs, to revenue, the wedge --
11   the number of wedges.  There were many things that I
12   didn't, essentially, get credit for because it
13   wasn't on a brand new contract.
14        The work that I helped expand in DHS ICE,
15   because it got added to an existing contract, it
16   didn't count in his mind.  Wedges that I was working
17   on with USCIS didn't always count because the
18   initial relationship wasn't made by me.  Many times
19   it was.
20        So the ways that those things got counted
21   changed, often, so I'm not sure what you're asking,
22   because I'm not sure what the goal was at the time.

**Page 95**

1    BY MR. WILKINSON:
2    Q.   Okay.  So when did Q3 end?
3    A.   I don't know.  What is that September?  Is
4    that September of 2020?
5    Q.   So you don't have a recollection that,
6    after the end of September of 2020, whether there
7    was discussion as to whether the Q3 goals were met
8    or not met?
9         MR. PELICCI:  Objection.
10        THE WITNESS:  I don't remember specific
11   discussions.  Again, growth and new deals, new work,
12   new contracts was discussed all the time.
13        BY MR. WILKINSON:
14   Q.   Okay.  Well, how about for Q4?  Do you have
15   a recollection of whether the growth, net new, wedge
16   deal goals were met in Q4?
17        MR. PELICCI:  Objection.
18        THE WITNESS:  Q4, again, I'll remind -- or
19   I'll restate that the definition of what the
20   quarterly goals were changed.  The definitions were
21   set by Matt Warren.  They were changed.  Despite
22   working towards strong, durable work in services, we

**Page 96**

1    were being measured on singular goals tied to net
2    new wedges.  And the increase of the company
3    overall, focused on long, durable work, happened
4    under my leadership right after I left.
5         BY MR. WILKINSON:
6    Q.   So -- all right.  So if the Q3 goals
7    changed, do you remember when they changed or how
8    often they changed?
9    A.   Do I remember when?
10   Q.   Well, you said that the goals changed all
11   the time, right?
12   A.   Mm-hmm.  And so what I would like to know
13   is:  Can you give me some examples of when goals
14   changed and even how goals changed?
15        MR. PELICCI:  Objection.
16        THE WITNESS:  I don't remember
17   specifically.  I do remember there was a chart or
18   something where wedge deals got a face put on them,
19   who got credit for the wedge deals -- there's
20   probably some documents that you could look at,
21   that, depending on who originated the conversation,
22   that person got credit.



Page 133

1  MR. PELICCI: Objection.
2  THE WITNESS: Inability to talk about
3  anything else besides what he wants to talk about.
4  MR. WILKINSON: Okay. Can you mark that
5  Exhibit 5, please.
6  (Ashley Exhibit Number 5 was marked for
7  identification.)
8  BY MR. WILKINSON:
9  Q. So this is an e-mail that's dated
10  12/10/2020, and it's titled "Wedge 2020 Recap and
11  building up for a killer 2021."
12  The e-mail is sent to the operational
13  leadership team. Were you part of that group, I
14  suppose, admin group e-mail group?
15  MR. PELICCI: Objection.
16  THE WITNESS: I don't -- I don't know.
17  BY MR. WILKINSON:
18  Q. Does this e-mail look at all familiar to
19  you?
20  A. Okay. Hold on. Let me look at it.
21  (Reviewing document.)
22  Okay. I have a sense of this.

Page 134

1  Q. Well, it looks like Mr. Warren is sort of
2  describing what wedge deals are.
3  And does his description here sort of match
4  with what your understanding was, going back to
5  2019?
6  A. Yeah. This sounds like how he usually
7  describes it.
8  Q. And is it also fair that he seems to be --
9  he seems to -- you've got the word -- in the fourth
10  paragraph he says, "Our wedge deals should ALWAYS
11  have a strategic eye towards the future..."  "The
12  wedge model will ALWAYS be part of our sales
13  culture."
14  Does that also seem to match up with what
15  your experience was during your entire tenure with
16  Steampunk?
17  A. Yep.
18  Q. Going down, he's got five -- he's got
19  Numbers 1 through 5 that identify the specific --
20  the numbers specific to new wedges for 2020.
21  He says, "DHS, Commerce, Justice: 1..."
22  What was -- was justice part of Ms. Abrey's

Page 135

1  portfolio as well?
2  MR. PELICCI: Objection.
3  THE WITNESS: I think so.
4  BY MR. WILKINSON:
5  Q. What about -- it says here that commerce is
6  zero; DOD is one.
7  Do you know where DOD fell within the --
8  sort of the -- you said that Ms. Abrey had half of
9  the company and Mr. Licht had the other half.
10  Do you know where DOD fell?
11  A. Well, I said she had the whole company, to
12  start.
13  Q. No, I understand that. But I think after
14  May, right? So this is December of 2020. This is
15  after May of 2020 when you said that she was --
16  A. DOD was Nick Trzcinski. So I don't know if
17  this was before or after he was fired.
18  Q. Okay. Do you know why he got fired?
19  A. I don't know. I was not involved in that.
20  Q. Well, that's two different things, right?
21  So what do you know about his being fired,
22  whether you were involved or not?

Page 136

1  A. I don't remember when it was announced. I
2  know of the firing, certainly. I --
3  Q. You don't know why he was fired?
4  A. I'm sure there was discussion with him
5  directly.
6  Q. I'm sure there was, too, but that, again,
7  wasn't my question.
8  The question is: Did you know why he was
9  fired?
10  A. I have a sense of why Matt believed he was
11  fired, so -- I'm sure it was tied to something like
12  this, but I was not involved.
13  Q. Wait a minute. Hold on a second.
14  Why Matt believed he was fired?
15  A. Yeah.
16  Q. Did Matt -- isn't Matt the one that fired
17  him?
18  A. I believe so -- yeah, of course. He's the
19  CEO.
20  Q. Okay.
21  A. But I don't know the details of whether it
22  was tied to net new or wedges or -- but I suspect it



DIANE ASHLEY                                                                April 14, 2023
ABREY V. STEAMPUNK HOLDINGS                                                    137–140

Page 137
1  was tied to Matt's definition of whether goals were
2  met.
3      Q.  Okay.  So, then, is it your understanding
4  that Matt believed that Mr. Trzcinski didn't meet
5  his goals, and that's why he was fired?
6          MR. PELICCI:  Objection.
7          THE WITNESS:  It is my understanding that
8  Matt believed -- what I'm saying is:  Matt is always
9  focused on -- like, here, it's so clear -- numbers
10 and definitions of commitments and what that means
11 today or tomorrow.  So when he made the decision to
12 fire Nick, I don't know the details of what Nick did
13 or didn't do.  My guess would be that it was tied to
14 performance, in his mind, his definition of
15 performance.
16         BY MR. WILKINSON:
17     Q.  And why do you think that?
18     A.  I don't know the details of the firing.
19     Q.  No, I understand that.  My question is:
20 Why --
21     A.  It was not related to misconduct or
22 anything like that.  That's what I'm saying.

Page 138
1      Q.  Oh, okay.  Okay.  So that's helpful, right?
2  I want to know why you thought it had to do with
3  performance, and that was --
4      A.  Yeah.
5      Q.  Okay.  Thank you.
6      A.  Yeah.
7          MR. WILKINSON:  Okay.  Let's mark this as
8  Exhibit 6, please.
9          (Ashley Exhibit Number 6 was marked for
10 identification.)
11         BY MR. WILKINSON:
12     Q.  All right.  So I know you said that you
13 didn't realize -- you don't know whether you were on
14 the administrative e-mail group for operational
15 leadership team, but this is an e-mail dated
16 12/16/2020.  I think it's titled "Common
17 Definitions," and it has a bucket of business as a
18 PowerPoint presentation.
19         Does this document look familiar to you?
20     A.  Yes, this does.
21     Q.  You have a smile.  I kind of figured it
22 did.

Page 139
1      A.  Yes.  It brings back all kinds of memories.
2      Q.  You can say bad memories.  I'm not going to
3  be offended by that.
4          So what is your -- what is your
5  understanding as to what Mr. Warren was trying to do
6  with this e-mail?
7      A.  Okay.  What is my understanding of what he
8  was trying to do?
9          MR. PELICCI:  Objection.
10         THE WITNESS:  Yeah.  Can I -- you know, my
11 experience with Matt Warren was a singular focus on
12 his definition of success.
13         So can I explain what he was focused on?
14 Well, he wanted to make sure he was clear in
15 describing what his definition of these different
16 buckets were, so that was here.
17         But, you know, what else he was thinking?
18 I mean, he's put -- he's -- again, my experience
19 with Matt is he is singular focused on what he wants
20 to focus on and the definitions of growth that he
21 would have.
22         BY MR. WILKINSON:

Page 140
1      Q.  So does -- does the -- you clearly
2  recognize it, because I saw the look on your face --
3      A.  Of course.  The buckets --
4      Q.  -- right, when I gave it to you, right?
5      A.  -- was infamous.  Yes.
6      Q.  All right.  So was this, like, a completely
7  new concept, or was it just Matt trying to explain a
8  concept that he had been trying to push for a while?
9      A.  Matt --
10         MR. PELICCI:  Objection.
11         THE WITNESS:  -- always talked about --
12 there were endless ways to slice and dice how we
13 talked about growth.  Matt was very talented in
14 slicing and dicing the ways that we talk about
15 growth.  This was another way of depicting how he
16 wanted to talk about growth, how he wanted to define
17 growth.
18         BY MR. WILKINSON:
19     Q.  Right.  Okay.  So these -- but were these
20 definitions that are reflected in this e-mail, was
21 that something you had never heard before?  Was this
22 brand new?

DIANE ASHLEY                                   April 14, 2023
ABREY V. STEAMPUNK HOLDINGS



DIANE ASHLEY                                             April 14, 2023
ABREY V. STEAMPUNK HOLDINGS                                    141–144

Page 141
1    MR. PELICCI:  Objection.
2    THE WITNESS:  Right now, are these things
3  that I -- what are you asking?
4    BY MR. WILKINSON:
5  Q.  I'm asking -- so he is setting out what he
6  wanted everybody to understand were common
7  definitions, right, and he is using buckets as a way
8  to show that?
9  A.  That is what he is showing here.  I agree.
10 Q.  Okay.  So I'm asking you, though:  Is the
11 concept that he is providing, by using these three
12 buckets, was that something that was completely new
13 to you, or is this something that you had been aware
14 of for a while and he is just trying to get
15 everybody to get on the same page?
16   MR. PELICCI:  Objection.
17   THE WITNESS:  The concept of growth being
18 determined by whether it's a brand new contract or
19 an expansion on contract growth, none of those
20 things are new to me.
21   MR. WILKINSON:  Okay.  Are you-all okay at
22 the moment?  Does anybody need to take a break?

Page 142
1    MR. PELICCI:  I'm good.
2    THE WITNESS:  I'm good.  I'm having a great
3  time.
4    MR. PELICCI:  The record can't,
5  unfortunately, capture sarcasm.
6    MR. WILKINSON:  Oh, I think that comes
7  through loud and clear.
8    (Ashley Exhibit Number 7 was marked for
9  identification.)
10   BY MR. WILKINSON:
11 Q.  So this is an e-mail dated 12/28/2020, from
12 Ms. Abrey, and it looks like it's to you.  There are
13 other folks on here:  Samantha Young, David Wolf,
14 Tasha Crawford-Jones, Matt Reeves.
15    These other recipients, they're all
16 still -- they were people who were at the higher
17 levels of Ms. Abrey's portfolio; is that right?
18   MR. PELICCI:  Objection.
19   THE WITNESS:  Yes.  Leaders.  We were all
20 leaders there.
21   BY MR. WILKINSON:
22 Q.  Right.

Page 143
1  A.  VPs -- if you're asking rank, sure, I think
2  they're all at least vice presidents.
3  Q.  No.  What I was trying to establish is that
4  these are all people that Ms. Abrey, sort of at the
5  higher level, had responsibility for?
6  A.  Yeah.  They're vice presidents or senior
7  vice presidents.
8  Q.  Okay.  So can you tell me what the purpose
9  of this e-mail was?
10   MR. PELICCI:  Objection.
11   THE WITNESS:  Okay.  What was the purpose
12 of this e-mail?
13   (Reviewing document.)
14    It looks like she's documenting the
15 discussion around Q1 forecast.
16   BY MR. WILKINSON:
17 Q.  And she has, in bold, "This is all about
18 our COMMITMENT in Q1."  And then the sentence after
19 that she says, "Last year is in the rearview mirror
20 and we aren't going back -- no more missing our
21 numbers..."
22    That seems to imply that, 2020, the numbers

Page 144
1  were not met, right?
2    MR. PELICCI:  Objection.
3    THE WITNESS:  Does it imply that, no more
4  missing our numbers?
5     The word "commitment," again, was tied back
6  to "goal."  That word got asked to be changed by --
7  I think you pointed it out here, the change from
8  "goal" to "commitment" was instituted by Matt
9  Warren, and her statement that we aren't going back,
10 no more missing our numbers.
11    Let's say I dare -- yeah, yeah.
12   BY MR. WILKINSON:
13 Q.  So did Ms. Abrey seem to be, at least in
14 your mind, committed to meeting these goals for Q1?
15   MR. PELICCI:  Objection.
16   THE WITNESS:  She's stating the -- this is
17 all about our commitment, so -- are you asking do I
18 know what she was thinking when she wrote that or --
19   BY MR. WILKINSON:
20 Q.  Well, I mean, do you think that that was
21 her goal, that she was working on expressing to you
22 and others in her group that the goals and what she



DIANE ASHLEY  
ABREY V. STEAMPUNK HOLDINGS  
April 14, 2023  
145–148

Page 145

1 says in the subject matter, the "Q1 Forecast," were
2 a commitment that you-all were going to have to meet
3 in Q1 of 2021?
4     A.   Okay.  So, again, the word "commitment" --
5         MR. PELICCI:  Objection.
6         THE WITNESS:  -- was used interchangeably
7 or replaced "goals."  So that aside, she is talking
8 about our forecast, which is part of our business.
9 So in the Q1 we're trying to do business
10 forecasting, and we're -- well, I guess I'm not sure
11 what you're asking, but it's all right there, so...
12         BY MR. WILKINSON:
13     Q.   Okay.  All right.  Did Ms. Abrey ever
14 express to you how important it was to be accurate
15 with your forecasts?
16         MR. PELICCI:  Objection.
17         THE WITNESS:  Did she ever express that
18 it's important to be accurate with the forecast?
19         BY MR. WILKINSON:
20     Q.   Well, how important it was?
21     A.   Well, we weren't just making up numbers, so
22 did she have to --

Page 146

1     Q.   Well, I mean, was it something like, Do
2 your forecasts.  You know, if -- if it's not so
3 accurate, not a big deal?  Or was it closer to the
4 line of, Do your forecasts.  These need to be
5 absolutely accurate or else?
6         MR. PELICCI:  Objection.
7         MR. WILKINSON:  Where would it sort of fall
8 within that spectrum?
9         MR. PELICCI:  Objection.
10         THE WITNESS:  I think there's -- again,
11 I'll come back to how we were doing the planning,
12 that there's that bottom-up, top-down, so the
13 discussion around being accurate was making sure we
14 had realistic things in the pipeline, that there was
15 a story behind it, big focus on realism with respect
16 to what we were working on.
17         The accuracy piece, if you're talking
18 about, you know, was it, 2.7 or 2.8, I don't recall
19 how much she would emphasize that over realism,
20 understanding the story in the pipeline, again,
21 coming back to durable growth.
22         So if you're asking did she emphasize --

Page 147

1         BY MR. WILKINSON:
2     Q.   Well, what I'm asking is:  Regardless of
3 what the actual numbers are, right, you and your
4 team were to come up with a forecast, which would be
5 a number, right?
6     A.   Yeah.
7     Q.   And it's a forecast, right?  It's something
8 that you're predicting in the future which may or
9 may not happen, right?
10     A.   Sure.
11     Q.   But the idea is to be as accurate with that
12 number as possible, right?
13     A.   Sure.
14     Q.   So what I'm wondering is:  How much of an
15 emphasis did Ms. Abrey put on being as accurate as
16 you could with respect to those forecast numbers?
17         Was it -- right?  That's where I go back to
18 my spectrum, right?  I mean, if you were not so
19 accurate, not that big of a deal; or if you're not
20 so accurate, it's a huge deal, right?
21         MR. PELICCI:  Objection.
22         THE WITNESS:  It was -- we knew the

Page 148

1 importance of the goals, the numbered goals, because
2 of Matt Warren's emphasis on it.
3         I don't recall, specifically, if Kate
4 reemphasized it as strongly.  Matt Warren emphasized
5 it so strongly, it wasn't like Kate had to amplify
6 it.
7         I don't recall.  Maybe.
8         BY MR. WILKINSON:
9     Q.   Okay.  Did Ms. Abrey ever explain to you
10 whether there would be consequences if these
11 commitments, goals, or whatever were not met for
12 2021?
13         MR. PELICCI:  Objection.
14         THE WITNESS:  Did she explain if there
15 would be consequences if they were not met?
16         I knew that my -- let's go back to this,
17 okay?  So Q1 forecast, I knew that I was working, as
18 a business leader, to be as clear and concise as
19 possible with respect to the forecast, to build
20 the -- to have durable work that led to the
21 forecast.  I knew that was my job as the business
22 leader, leading into that forecast.



| DIANE ASHLEY | April 14, 2023 |
|---|---|
| ABREY V. STEAMPUNK HOLDINGS | 265–268 |

Page 265

didn't really have calls to bid on it. And so it took a lot of discussions with customers and meetings and, you know, bring in team members that could do some of this and all that stuff. And it builds over time. Again, it takes a long time to get one of those contracts.

And then the pandemic happened, and so they didn't release the contract on time -- this was a new contract, not work added to an existing, net new that closed right after I left, $75 million net new contract that took the whole two years of working to get to. It was great. I was excited for the team and for all the work. The team that I brought together, the discussions that we had had that helped us prepare for orals, all of that stuff came together right after I left. It was amazing.

Q. In terms of the contracts you witnessed at Steampunk, would you consider that a high-value contract?

A. Very high value, yeah.

MR. WILKINSON: Objection.

THE WITNESS: It was probably the largest

Page 266

one. I can't remember what SAS was, but absolutely, extremely -- and, you know, 1 million here, 2 million there was what was going on at USDA or whatnot. Salesforce deals, right? You get a million here. You get a million there.

I was going for five-year period of performance doing DevSecOps that we hadn't done before, with a ceiling, and we ended up at 75 million. That's a big difference from that to six-month periods of performance doing a million here or there in Salesforce.

BY MR. PELICCI:

Q. And did you inform leadership that that deal was closing or --

A. Yeah. It's interesting: I -- that was, of course, one of the most important deals in my portfolio that I had been shaping and working on, and because of the emphasis on more, more, more, they didn't want to talk about it. In fact, Matt asked me not to talk about this deal, even though it was one of the -- it was the most important deal in my pipeline. He didn't want me to talk about it

Page 267

because I had talked about it too much, in his mind, and we needed to talk about new work.

It was almost as though, That one is already done. Put that to the side. Tell me what the next thing is.

Despite it being extremely complicated, large opportunity, needing to talk about it, he didn't want me to talk about it.

Q. Did anyone ever explain to you why there was changes to how goals were counted at Steampunk in terms of your contracts and new deals, et cetera?

MR. WILKINSON: Objection.

THE WITNESS: Well, I mean the goals changed often, like I've mentioned.

Why it was happening, it's probably because we weren't hitting the numbers that Matt had expected we would hit. He gets things in his head, and he wants to make them true, despite a global pandemic that affects everyone's budget. Anyway, reality has no bearing on where Matt sees.

So that's probably where he became -- self-imposed challenges, like self-inflicted wounds.

Page 268

Like, how -- there were so many positive, great things, growth of existing work, the contract that closed right after I left, all of these things are so positive, and it was like this micromanaging on the numbers and numbers and numbers of these new, net new, net new, wedge, wedge, wedge. But there are so many other positive things that led to that long, durable work, with significant ceiling -- or award value.

So I think it was Matt's overemphasis, like these self-imposed ideas that he had of when we would meet these timelines, and we're going to be the fastest growing company in Northern -- like Virginia and the world. And, you know, we're going to have these headlines. And, in his mind, that was the reality that he was going for. And when it wasn't happening, despite all the reasons why, it didn't matter.

BY MR. PELICCI:

Q. Did the goals or benchmarks appear to be arbitrary to you?

A. Yeah, I don't -- I don't mean -- it wasn't



DIANE ASHLEY  
ABREY V. STEAMPUNK HOLDINGS  

April 14, 2023  
273–276  

Page 273

1 services to be successful, so they were -- they had,
2 essentially, a head start in that market because
3 they already had -- which was great. Like, good job
4 on you. You had some head start. You were able to
5 call back in.
6     Again, I'll go back to I was working to
7 create long, durable work, large periods of
8 performance because services deals on Salesforce is
9 six months here, eight months there, you know 800K,
10 600K, a million, lots of little -- and that's really
11 difficult to operate. When you have these small
12 periods of performance, smaller deals, there's a lot
13 of churn in the organization. It's just not as
14 stable in a company. It's difficult.
15     So, knowing that we were going for that
16 kind of growth trajectory that we could have durable
17 work and impact, honestly, doing the right thing,
18 make an impact, I was going for that. And I didn't
19 come out of a product company that had just sold
20 licenses to and now I could go back and call the
21 same people, so -- I guess, yeah.
22     BY MR. PELICCI:

Page 274

1     Q. Did there seem to be a prioritization of
2 number of contracts versus value of contracts at
3 Steampunk?
4     MR. WILKINSON: Objection.
5     THE WITNESS: Number versus value? Oh, it
6 was almost like -- I mean, you see it in all these
7 letters, like, three net prime and these number of
8 wedges.
9     And, yeah, like, that's why I point out:
10 You can put all kinds of numbers on that, and that's
11 what he cared about. It was almost like Matt just
12 wanted his hit for the day. Like, Oh, what did we
13 close today? 400K? Oh, that's great. I got my hit
14 today, you know? He just loves winning.
15     And I get that and that's great. I love
16 winning, too. And I love building a durable
17 business with a longer period of performance because
18 there's not as much churn in the staffing and we get
19 to do better work that's more interesting.
20     You know, like, I was chasing application
21 development work, which can be pretty interesting.
22 You do work that's right in the mission space

Page 275

1 versus, you know, those smaller periods of
2 performance. And the wedge opportunities are
3 leading into the other things -- so, yeah, it was
4 almost like he wanted a hit every time. Like, what
5 did I win today?
6     BY MR. PELICCI:
7     Q. So turning to what Ms. Abrey discussed with
8 you upon her return from leave, how soon -- do you
9 recall -- how soon do you recall a point where
10 Ms. Abrey expressed concerns that her role was
11 changed?
12     MR. WILKINSON: Objection.
13     THE WITNESS: Yeah. The day she came back
14 and was told about the demotion right away. Like,
15 so probably the day -- that's why I sent that note
16 about, on May 8th or whatever, that feels weird,
17 talked with Kate and Brad -- or talk with Kate about
18 Matt and Harllee. This feels weird.
19     So it was right away.
20     BY MR. PELICCI:
21     Q. And did Ms. Abrey tell you that she felt
22 her pregnancy impacted her standing at the company

Page 276

1 on any other occasions after her leave?
2     MR. WILKINSON: Objection.
3     MR. PELICCI: Maybe I can ask that more
4 clearly. Sorry.
5     BY MR. PELICCI:
6     Q. So you testified that, when she first got
7 back, she saw her role change.
8     A. Yeah.
9     Q. She told you she thought that was happening
10 because of her leave and pregnancy?
11     A. Yeah.
12     Q. Did she ever say that again throughout
13 2020?
14     MR. WILKINSON: Objection.
15     THE WITNESS: Oh, for sure. It was not a
16 one and done. For sure.
17     It was a point of a lot of pain for her, to
18 come back and be -- have the rug pulled out from
19 under her like that, of course. Yeah, she
20 definitely mentioned it more times. Yeah,
21 absolutely. It was difficult.
22     Just like me, we made these decisions to



800.211.DEPO (3376)  
EsquireSolutions.com

DIANE ASHLEY  April 14, 2023
ABREY V. STEAMPUNK HOLDINGS  297–300

Page 297

1  they need Kate out of the picture?  It sounds like
2  like it just happened to be that way?
3      MR. PELICCI:  Objection.
4      THE WITNESS:  Yeah.  You could make -- they
5  could make changes.  Like, they're CEO and COO.
6  They can make changes to the organization whenever
7  they feel fit.
8      The fact that Kate was out and came back to
9  a very different role, a demotion was what happened.
10  Now, did they -- it's up to you guys to decide
11  whether that time, you know -- how they used that
12  time against her.
13      I can just tell you that the erosion of her
14  relationship, her responsibility happened during
15  that time that she was out.  She comes back, and the
16  day she comes back it's different.
17      So it's up to you guys to figure that stuff
18  out.
19      BY MR. WILKINSON:
20  Q.  Okay.  And then I think you said that
21  Ms. Abrey had brought up her various concerns to
22  Mr. Harllee and Mr. Warren, and they didn't do

DIANE ASHLEY
ABREY V. STEAMPUNK HOLDINGS

Page 298

1  anything about it, right?
2  A.  That's --
3      MR. PELICCI:  Objection.
4      THE WITNESS:  They didn't change back.
5  Like, I don't know if you -- what do you mean "they
6  didn't do anything about it"?
7      BY MR. WILKINSON:
8  Q.  Well, you had talked a little bit more
9  vaguely about how Ms. Abrey had brought up various
10  concerns that she had with Mr. Warren, right, and
11  then again with Mr. Harllee --
12  A.  Yep.
13  Q.  -- and I think you had mentioned something
14  that, you know, you couldn't expect Mr. Harllee to
15  make -- to cause Mr. Warren to make any changes,
16  right?
17  A.  Yeah, yeah.
18  Q.  But with respect to what Ms. Abrey talked
19  to about Mr. Harllee and Mr. Warren, were you there
20  for those conversations, or are you just relaying
21  what Ms. Abrey told you?
22  A.  Yeah, I was not there for those

Page 299

1  conversations.
2      MR. WILKINSON:  Okay.  All right.  I'm
3  done.
4      MR. PELICCI:  Cool.
5      (Reading and signature not waived.)
6      (Off the record at 3:19 p.m.)

Page 300

1  COMMONWEALTH OF VIRGINIA, to wit:
2      I, Audra A. Gilbert, before whom the
3  foregoing deposition was taken, do hereby certify
4  that the within-named witness personally appeared
5  before me at the time and place here set out, and
6  after having been duly sworn by me, according to
7  law, was examined by counsel.
8      I further certify that the examination was
9  recorded stenographically by me, and this transcript
10  is a true record of the proceedings.
11      I further certify that I am not of counsel
12  to any party, nor an employee of counsel, nor
13  related to any party, nor in any way interested in
14  the outcome of this action.
15      As witness my hand and notarial seal this
16      day of      , 2023.

19      AUDRA A. GILBERT, Notary Public
20      Notary Registration No-7328582

22  MY COMMISSION EXPIRES:  JUNE 30, 2026



DIANE ASHLEY  
ABREY V. STEAMPUNK HOLDINGS

April 14, 2023  
301–303

Page 301

```
1              DEPOSITION ERRATA SHEET
2    Case Caption: Kathleen Abrey v. Steampunk Holdings
3    Deposition Date: April 14, 2023
4    Witness:  Diane Ashley
5          DECLARATION UNDER PENALTY OF PERJURY
6    I declare under penalty of perjury that I have read
7    the entire transcript of my Deposition taken in the
8    captioned matter or the same has been read to me,
9    and the same is true and accurate, save and except
10   for changes and/or corrections, if any, as indicated
11   by me on the DEPOSITION ERRATA SHEET hereof, with
12   the understanding that I offer these changes as if
13   still under oath.
14   Signed on the _____ day of_____, 20____.
15   _____
16   (Witness)
17   Subscribed to and sworn before me this _____
18   day of_____, 2023, in _____
19   _____
20   Notary Public
21   My commission expires _____,
22   Notary No. _____
```

Page 302

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:
3
4    Reason for change:
5    Page No._____Line No._____Change to:
6
7    Reason for change:
8    Page No._____Line No._____Change to:
9
10   Reason for change:
11   Page No._____Line No._____Change to:
12
13   Reason for change:
14   Page No._____Line No._____Change to:
15
16   Reason for change:
17   Page No._____Line No._____Change to:
18
19   Reason for change:
20   Page No._____Line No._____Change to:
21
22   Reason for change:
```

Page 303

```
1    Page No._____Line No._____Change to:
2
3    Reason for change:
4    Page No._____Line No._____Change to:
5
6    Reason for change:
7    Page No._____Line No._____Change to:
8
9    Reason for change:
10   Page No._____Line No._____Change to:
11
12   Reason for change:
13   Page No._____Line No._____Change to:
14
15   Reason for change:
16   Page No._____Line No._____Change to:
17
18   Reason for change:
19   Page No._____Line No._____Change to:
20
21   Reason for change:
22
```

