DAVID WOLF
ABREY V. STEAMPUNK HOLDINGS

April 14, 2023
EXHIBIT 47

### Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
 2             FOR THE EASTERN DISTRICT OF VIRGINIA
 3                      (Alexandria Division)
 4
 5   KATHLEEN ABREY,            )
 6            Plaintiff,        )
 7            vs.               ) 1:22-cv-00654-MSN-JFA
 8   STEAMPUNK HOLDINGS, INC.,  )
 9            Defendant.        )
10          *       *       *       *       *
11
12
13
14
15
16
17           The deposition of DAVID WOLF was taken on
18   Friday, April 14, 2023, commencing at 3:45 p.m., at
19   the offices of Jackson Lewis P.C., 10701 Parkridge
20   Boulevard, Suite 300, Reston, Virginia, before Audra
21   A. Gilbert, Court Reporter, Notary Public.
22          *       *       *       *       *
```

### Page 2

```
 1               A P P E A R A N C E S
 2
 3   ON BEHALF OF THE PLAINTIFF:
 4         ALFREDO J. PELICCI, ESQUIRE
 5         Wigdor LLP
 6         85 Fifth Avenue
 7         New York, New York 10003
 8         (212) 257-6800
 9         apelicci@wigdorlaw.com
10
11   ON BEHALF OF THE DEFENDANT:
12         NIGEL L. WILKINSON, ESQUIRE
13         Jackson Lewis P.C.
14         10701 Parkridge Boulevard
15         Reston, Virginia 20191
16         (703) 483-8300
17         nigel.wilkinson@jacksonlewis.com
18
19
20
21
22   (Appearances continued on the following page.)
```

### Page 3

```
 1   A P P E A R A N C E S (continued):
 2
 3   ON BEHALF OF DAVID WOLF:
 4         M MOORE, ESQUIRE
 5         BLAIR G. BROWN, ESQUIRE
 6         Zuckerman Spaeder
 7         1800 M Street NW
 8         Suite 1000
 9         Washington, D.C. 20036-5807
10         (202) 778-1800
11         MMoore@zuckerman.com
12
13
14   ALSO PRESENT:
15         PATRICIA DONKOR
16
17
18
19
20
21
22
```

### Page 4

```
 1                    I N D E X
 2              DEPOSITION OF DAVID WOLF
 3                   April 14, 2023
 4
 5   EXAMINATION BY:                          PAGE
 6   Mr. Wilkinson                              6
 7   Mr. Pelicci                               72
 8
 9
10
11   WOLF DEPOSITION EXHIBITS:          PAGE MARKED
12   Exhibit No. 1                            12
13   Exhibit No. 2                            51
14   Exhibit No. 3                            59
15
```



Page 33

1 Q. Okay. And so that curve continued while
2 Ms. Abrey was out on maternity leave?
3 A. Based on my remembrance of the -- we did
4 LinkedIn posts for new employees. We put their
5 pictures up to show that we were growing. I
6 remember, in proposals, stating, you know, despite
7 COVID, we added 200 or some new positions, something
8 like that.
9     So my perspective is the growth curve never
10 changed during or -- you know, it continued on a
11 pretty steady climb.
12 Q. Okay. So you -- before you joined SE
13 Solutions, had you had any work experience with
14 Mr. Warren?
15 A. No.
16 Q. I'm sorry. Did you say that, when
17 Ms. Abrey went out on maternity leave, Mr. Warren
18 became your supervisor?
19 A. Correct.
20 Q. Okay. And so what was it like working
21 under Mr. Warren's supervision?
22 A. I'm not sure I spoke to him the entire

Page 34

1 time. And we might have had two conversations
2 during his tenure as my supervisor.
3 Q. Do you -- do you have a -- did you attend
4 the off-site meeting in Savannah in --
5 A. I did.
6 Q. -- I believe it was October 2019?
7 A. I did.
8 Q. What do you remember from that meeting in
9 terms of what the company was trying to project as
10 what it hoped to do in the upcoming future?
11     MR. PELICCI: Objection.
12     THE WITNESS: I think I'm going to need a
13 better clarification for in terms of what we each
14 had to achieve. Revenue growth would be my answer.
15     If you want further clarification, please
16 ask a different question.
17     BY MR. WILKINSON:
18 Q. Okay. So is it fair to say that the focus
19 of that meeting was to talk about revenue growth?
20 A. Oh, yeah. That's what all those off-sites
21 are about.
22 Q. Okay. Did -- so did Mr. Warren ever talk

Page 35

1 to you about what he wanted you to do in terms of
2 sort of participating in the revenue growth of the
3 company?
4 A. To me directly, no. As part of that
5 meeting to all of us, yes.
6 Q. Okay. What do you remember him talking
7 about?
8 A. Win new work, grow.
9 Q. Okay.
10 A. They were looking for percentages and by
11 when.
12     And how we were going to get there,
13 actually.
14 Q. Okay. So you've heard of the term "net
15 new"?
16 A. Yes.
17 Q. What is your understanding of what that
18 means?
19 A. New work beyond whatever you have today.
20 New customer work that is not a contractural add-on.
21 Q. Okay. How about the term "wedge deal"?
22 A. Yes. I'm very familiar with the term

Page 36

1 "wedge deal."
2 Q. And so what does that mean?
3 A. That's Mr. Warren's favorite term.
4     It is a -- something that you can
5 potentially win that is small, maybe a hundred
6 thousand dollar, $400,000 deal, that hopefully leads
7 to a multimillion-dollar opportunity.
8 Q. Is it fair to say that Mr. Warren focused
9 heavily on net new and wedge deals?
10 A. That's a fair assessment.
11 Q. Okay. To your understanding, was that sort
12 of Mr. Warren's -- that's a bad question. Here we
13 go.
14     Well, net new and wedge deals, that was
15 something Mr. Warren sort of focused on a very
16 regular basis, right?
17     MR. PELICCI: Objection.
18     THE WITNESS: That is a fair assessment.
19     BY MR. WILKINSON:
20 Q. Okay. And do you remember when that
21 started?
22 A. From the day he came.



Page 37

1   Q.  Okay.
2   A.  Or not soon after, at least.
3   Q.  Okay.  And is it fair to say that the focus
4  on net new and wedge deals was sort of -- it
5  continued throughout your entire tenure with the
6  company?
7   A.  I think that's a fair assessment.
8   Q.  Okay.  Did you have any understanding that
9  the company would go through sort of an
10  organizational restructure before Ms. Abrey returned
11  from maternity leave?
12   A.  Ask that again.
13   Q.  Did you have any understanding that the
14  company was going to undergo an organizational
15  restructure before Ms. Abrey returned from maternity
16  leave?
17   A.  I'm still not sure I --
18   Q.  You're still not sure.  Okay.
19   A.  I've seen some court dramas.  Can you lead
20  me?  I'm not sure what you're asking.
21   Q.  So one of the issues in this case is that
22  the company restructured when Ms. Abrey returned

Page 38

1  from maternity leave.
2       Are you aware of that?
3   A.  I believe I read that, yes.
4   Q.  Okay.  So when -- so what is your
5  understanding of how the company restructured once
6  she returned from maternity leave?
7   A.  The -- at least, as I read it, there was no
8  information there would be a restructuring before
9  she left.  There was a restructuring when she
10  returned.
11   Q.  Well, what is your recollection from having
12  lived through that?
13   A.  I don't know that I necessarily can give
14  you an opinion of how that went, because there were
15  so many restructurings, from my perspective, right?
16      From my personal opinion, I got pushed
17  further and further to the right each time one of
18  those restructurings occurred.  I came in to run
19  half the company.  By the time I was done, I had a
20  single account.
21   Q.  Okay.
22   A.  So I don't know that I can give a personal

Page 39

1  account of why those changes occurred or how.  But I
2  had a very large contingent; when I left, I was only
3  doing the patent and trademark office -- or
4  commerce, actually, I guess, would be a better
5  response.
6   Q.  Did any of those restructurings happen
7  while Ms. Abrey was out on maternity leave?
8   A.  Not to my knowledge.  I believe they
9  occurred when she returned, but I can't say for
10  certain.
11   Q.  Okay.  So I think, earlier, you were
12  talking about what the structure looked like once
13  Ms. Abrey returned from maternity leave, and I think
14  you said that -- well, rather than me put words in
15  your mouth, why don't you tell me again what the
16  structure looked like when she came back?
17   A.  When she left, to my recollection, the
18  federal civilian group and Mr. Lickt were under her,
19  as an EVP.  When she came back, that was no longer
20  under her.
21      All she had remaining -- and I may have the
22  name wrong because it may have changed before I

Page 40

1  left, but it was what we called HCJ.  I think it was
2  homeland, justice, and commerce.  So it was
3  homeland, which was Diane; justice, which was a new
4  person that was hired -- and forgive me.  I don't
5  remember her name anymore -- and commerce, which was
6  me.
7      And then under that was also a gentleman by
8  the name of Matt Reeves.  He kind of ran the
9  operational standpoint.
10   Q.  Okay.
11   A.  That was not what it was before she left.
12   Q.  Did Ms. Abrey ever express to you that she
13  believed that the restructuring was because she went
14  out on maternity leave?
15   A.  I don't think -- not to my recollection.
16      We had -- I remember there were
17  conversations amongst the group -- I don't think I
18  had any one-on-ones with her -- to recollect why
19  that might have been occurring.  But there were --
20  we were -- there were restructurings going on, so,
21  as with any company, trying to figure out what the
22  logic was behind that.



DAVID WOLF                                                         April 14, 2023
ABREY V. STEAMPUNK HOLDINGS

Page 45

1  always feasible in the markets you're in.
2   Q.  Okay.  All right.  Did Ms. Abrey ever
3  express to you that she felt that the restructuring
4  that took place when she came back was a demotion
5  for her?
6   A.  I don't remember having any of those
7  conversations.
8      And I can tell you:  From my years working
9  with Kate, I considered her a mentor and a
10 professional.  And coming to an subordinate and
11 saying, I feel frustrated about this, that I'm being
12 marginalized, would not be in Kate's DNA with me.  I
13 wouldn't expect her to do that, and it would
14 probably be inappropriate.
15  Q.  Okay.  Did Ms. Abrey ever tell you that she
16 referred to -- once she came back from maternity
17 leave, that she referred to your line of business
18 and Ms. Ashley's line of business as the island of
19 misfit toys?
20  A.  I saw that in there.  I remember that term
21 coming up, but, to be honest, I don't recollect how
22 and in what circumstance.

Page 46

1     Because, yeah, I recognized it as soon as I
2  saw it, but I -- i do not remember where and when
3  and how it came up.
4   Q.  Do you remember what it was supposed to
5  mean, why, you know -- why coin that term?
6   A.  I can -- again, not to a recollection
7  standpoint, but I've seen the cartoon.  It's a Santa
8  Clause movie from Christmas.  The island of misfit
9  toys are all the toys that no kid wanted and Santa
10 has to find a place for them.
11     So I understand the reference, and I
12 remember that discussion, but not, again, how we
13 talked about it as a group.  I don't remember
14 anymore.
15  Q.  Were you involved in setting the net new
16 and wedge goals for Q3 and Q4 of 2020?
17     MR. PELICCI:  Objection.
18     THE WITNESS:  I would have been involved
19 with Kate directly, for my area, in trying to
20 determine how many wedge deals we think we can
21 potentially close.
22     BY MR. WILKINSON:

Page 47

1   Q.  When would you have started doing that
2  planning?
3   A.  For Q4?
4   Q.  For Q3 and Q4?
5   A.  That would have probably been when we went
6  to Savannah.  Normally, planning happens at the
7  beginning of the year, and you plan out your next
8  four quarters.
9   Q.  Okay.  So did you -- so when Ms. Abrey came
10 back -- and I believe it was the beginning of May of
11 2020, so you're coming up on the end of Q2 -- did
12 you and Ms. Abrey ever work on adjusting what the
13 goals would have been for Q3 and Q4?
14  A.  I don't remember if we adjusted or not.  To
15 answer your first question, right, the planning
16 happened then.  If we adjusted, I don't remember
17 anymore.
18  Q.  Okay.  Were you involved at all in setting
19 the goals for Ms. Abrey's entire portfolio?
20  A.  Only my portions.
21  Q.  Okay.
22  A.  Whatever -- I guess I should say whatever

Page 48

1  my area of responsibility was each time we set
2  goals.  Because, obviously, I was there several
3  years; we set them at the beginning of each year.
4   Q.  But, outside the area of which you were --
5  your line of business, you weren't involved with
6  Ms. Abrey in setting goals for, say, like,
7  Ms. Ashley's line of business?
8   A.  No.  She works with each -- you know, from
9  her direct report standpoint, she worked with each
10 person to determine what their number would be, what
11 they thought they could achieve.  Or if there was --
12 because, in our line of business, there is often a
13 mix.
14     To your point, Mr. Warren may say, I want
15 four.  We try to determine if we could reach four
16 and maybe, if he has set a goal -- and I don't know
17 if he did this with Ms. Abrey or not -- you have to
18 divide that up, right?  If he says, I want four, we
19 might say, one, one, one, one, or it might be, You
20 get four and nobody else has to do one.
21     So she may have had a goal that I'm unaware
22 of, but we worked together to determine how many we



Page 49

1  thought I could do in my group.
2  Q. And when you -- when you came up with those
3  goals, were you able to meet them?
4      And let me be a little bit more specific to
5  that: I just want to kind of focus on Q3 and Q4 of
6  2020, right, because Ms. Abrey was not supervising
7  you for most of Q1 and most of Q2, right?
8  A. I think, during Mr. Warren's time and
9  Ms. Abrey's time, I don't think I met my goals.
10 Q. Okay.
11 A. At least during 2020. It was -- everything
12 I can recollect, what I would call pressure from all
13 from my area -- because, again, everything I had was
14 delayed. Whether it was a wedge or a net new,
15 everything was pushed out.
16 Q. When you said "pressure," who was exerting
17 pressure on you?
18 A. Mr. Warren.
19 Q. Did Ms. Abrey also exert pressure on you
20 to --
21 A. We needed to win, yeah. If you haven't won
22 anything in this job, you need to win. So, yeah, I

Page 50

1  would absolutely say that there was -- I feel that
2  as a person, whether I'm in Ms. Abrey's -- you know,
3  I'm an owner of a company today. I am exerting
4  pressure on myself to win.
5      I know, in this industry, that I needed to
6  win deals, and I was not winning my customers.
7  Because of COVID, we were delaying everything.
8  Because they were -- this was a complete change in
9  how the world worked, and my customers were not
10 prepared to issue a wedge deal, or anything else,
11 for that matter, at least in my environments, and I
12 was struggling to close deals.
13 Q. So did -- did Mr. Warren ever express to
14 you what the consequences would be of not meeting
15 your goals?
16 A. I don't think -- I'm not sure he ever
17 looked at me and said, I'm going to fire you, or I'm
18 going to do anything specific to me for it. But I
19 feared for my job at that time, I did, from him
20 directly.
21 Q. Okay. Did Ms. Abrey ever indicate to you
22 that, Look, you know, you've got to meet these

Page 51

1  goals; otherwise, your job could be in jeopardy?
2  A. She came to me -- and I believe I read it
3  in that section -- that, you know, Mr. Warren has
4  concerns about you and my performance and we need to
5  kick it into gear and win some deals, yes.
6  Q. Okay. Did she ever express to you that she
7  felt that her job was in jeopardy if you didn't meet
8  your goals?
9  A. Not that I recall.
10     (Wolf Exhibit Number 2 was marked for
11 identification.)
12     BY MR. WILKINSON:
13 Q. So this is an e-mail chain, and I want to
14 start with the e-mail at the bottom that's dated
15 December 5th, and it's Ms. Abrey to you, Ms. Ashley.
16 It also looks like it's being sent to Tasha --
17 A. Tasha whose name I couldn't remember.
18 There you go.
19 Q. She's the one that you said came in to
20 do --
21 A. Justice.
22 Q. -- justice?

Page 52

1  A. Yes.
2  Q. Okay. And then Samantha Young?
3  A. Yes.
4  Q. What was Samantha Young's role?
5  A. She did commerce after I left. I'm
6  actually having trouble recollecting what she was
7  doing before I left.
8  Q. Okay.
9  A. She was a salesperson, but what her area of
10 focus was, I don't remember, to be honest.
11 Q. Okay. So the subject matter of this e-mail
12 says, "Revenue Planning for 2021."
13     So you talked about earlier about the
14 planning stage would be sort of a -- you do it for a
15 year started for the entire year?
16 A. Mm-hmm.
17 Q. So is this part of the planning process
18 for -- sort of you-all being involved in the
19 planning process for 2021?
20 A. (Reviewing document.)
21     Okay. Sorry. Ask your question again.
22 Q. So I wanted to know: This seems to be part



DAVID WOLF                                              April 14, 2023
ABREY V. STEAMPUNK HOLDINGS

Page 53

1  of the planning process for 2021, kind of what we
2  talked about earlier when we talked about the plan
3  for 2020 would have happened in 2019; is that right?
4     A.  Yes.
5     Q.  Okay.  So is this the beginning part of the
6  planning for 2021, or had you started planning
7  before December 5th?
8     A.  It is possible -- well, I'll even back up a
9  little further.
10       So when I came into Steampunk -- sorry --
11  SE Solutions, obviously, Mr. Warren, Mr. Harllee,
12  and others had already made the decision to come
13  there but had not resigned yet.  But when -- and I'm
14  not going to remember his name -- the predecessor to
15  those gentleman who came in with Mr. LaRose, the
16  numbers were already set then.
17       When they acquired the company, they pulled
18  out a chart with the Washington Monument on it,
19  showed five years, which I believe is this year, and
20  said, We're going to be at 150 million, and you're
21  going to win this by this year, this by this year.
22  So the numbers were preset five seconds after the

Page 54

1  acquisition.
2       What I read this to be is, depending on
3  where we achieved against that kind of artifical
4  timeline, right?  This is what we expect to be
5  doing, because they wanted to sell five years later,
6  give or take.  Every meeting that Mr. Warren held
7  with the leadership team, This is when we're going
8  to sell.  This is how much money you're going to
9  make.  The whole goal was to just grow this company
10  and sell it.
11       So these were the timelines.  So if you
12  missed a number in 2021, in Mr. Warren's mindset,
13  you needed to make up those numbers the next year,
14  because we have a goal of this number by this date,
15  whether that's reality, achievable, or anything
16  else, right?
17       So that's what I read this to be:  We
18  missed these numbers.  You now have to make up and
19  do more this year.
20     Q.  Well, this is an e-mail from Ms. Abrey,
21  right, and she's -- she says she wants everybody to
22  take a look at, I guess -- well, what is she asking

Page 55

1  you to take a look at?
2     It looks -- so it says, "The week turns
3  over and the revenue forecast for 2021 already is
4  looking/feeling different for me."
5     A.  How much revenue we're going to win in
6  2021, yeah.
7     Q.  Was there -- how would you -- what is it
8  you were supposed to look at?  Is there a chart in
9  place?
10    A.  I'm assuming there was a document attached
11  that showed my area.  Most companies -- and I
12  believe we did this at Steampunk -- usually, you
13  target when you're going to win a deal.  Like, I
14  expect to win my science and technology deal by
15  January 1st.  When that deal awards, this many
16  people will come on board.  That turns into revenue
17  for the company, right?  A body in a chair is
18  revenue or a product or whatever we may sell.
19       So you had to, to the best of your ability,
20  say, My science and technology deal will land on
21  this day; therefore, with that many people, for that
22  long during the year, my growth will be this, right?

Page 56

1  Or, I'm going to win a USDA, or whatever deal you're
2  projecting that you think you can land.  And, many
3  times, you'll -- it's a funnel, right?  There are 50
4  deals at the top.  By the time you get to the
5  bottom, you hope that you've won five of them.  Many
6  fall out during the process, right?
7       So we may have a pipeline of a billion
8  dollars, but what you forecast, as we're talking
9  about here, which ones are the ones I think I'm
10  going to win and by when.  It doesn't happen that
11  way, right?  You might forecast that I'm going to
12  win science and technology; you lose that, but
13  something you didn't forecast came all the way to
14  the bottom, you won it, and it's a hundred million
15  dollars.
16       So this is, Please look at your
17  opportunities.  Make sure the timelines are to the
18  best of your knowledge, based on your customer
19  process, and the values you think they're going to
20  be, for both -- in his case, net new, meaning
21  something we don't have today.  His mindset was
22  to -- I don't want to overemphasize what I think



DAVID WOLF
ABREY V. STEAMPUNK HOLDINGS
April 14, 2023

Page 57

1  he -- what I felt from his conversations, if I had a
2  $10 million contract, but I grew it to a hundred
3  million, he didn't care.  He wanted -- you know, if
4  it's a hundred million, instead of growing ten to a
5  big hundred million contract, he wanted 10 -- you
6  know, 10 more of the $10 million ones.
7       And I don't want to say I disagreed with
8  his philosophy.  I understood what he was trying to
9  do.  When you're selling a company, having new sales
10 makes you more attractive versus having one large
11 hundred million dollar contract.
12      So he wanted net new and wedges, not take
13 something that is worth 10 million and grow the
14 daylights out of it.
15    Q.  Okay.
16    A.  To the point, new.  Don't add work to other
17 contracts.  Don't make this bigger.  Grow new ones.
18    Q.  But that was sort of his philosophy from
19 the very beginning, right?
20    A.  From the very beginning.
21    Q.  Okay.  So --
22    A.  Normally through a wedge deal.

Page 58

1     Q.  I'm sorry?
2     A.  Sorry.  Normally through a wedge deal, if
3  you can do it that way.
4     Q.  Okay.  Okay.  So Ms. Abrey is -- in her
5  e-mail to you and others, she is asking for the
6  revised numbers for net new, and then she says,
7  "Remember this is our COMMITMENT to Steampunk," and
8  she's got "commitment" all in capital letters.
9        Do you know why she --
10    A.  This is what you're signing up for.  This
11 is your number.  You're going to have to own this,
12 deliver on that.  That's where I said, you know, the
13 pressure comes from.
14    Q.  Okay.
15    A.  She was motivating her team.
16    Q.  Okay.  All right.  And, as you go up in the
17 e-mail -- and I realize that the e-mail dated
18 December 8th isn't between -- you're not on that
19 one.  It's just between Mr. Warren and Ms. Abrey.
20    A.  Mm-hmm.
21    Q.  But Mr. Warren is saying to Ms. Abrey, "I
22 would recommend you have a 1 on 1 with each

Page 59

1  person... and explain the importance that forecast
2  accuracy is a commitment."
3        Did Ms. Abrey have that kind of a meeting
4  with you?
5     A.  Yes.
6     Q.  Okay.  Do you remember when?
7     A.  I would imagine it was in this time frame.
8        I remember her -- I remember having the
9  conversation where Ms. Abrey said that, You need to
10 win this, right?  You're -- I don't want to say
11 accountable.  I won't say she said I was going to
12 get fired, but, You're in trouble if you don't win
13 these, right?
14    Q.  Okay.  Was sort of the implication there?
15    A.  Oh, yeah.  Absolutely.
16       And, again, that's standard for our
17 business, right?  I mean, you either win or you go
18 home.
19    Q.  Okay.
20    A.  They did win that deal, too.
21       (Wolf Exhibit Number 3 was marked for
22 identification.)

Page 60

1  BY MR. WILKINSON:
2     Q.  Okay.  So you've been handed what's been
3  marked as Exhibit 3.
4        This is an e-mail from Mr. Warren, dated
5  December 16th, 2020.  And it's to -- it looks like
6  it's an e-mail "ADMINISTRATIVE GROUP," "Operational
7  Leadership Team."
8        Were you part of that e-mail group?  Were
9  you part of the operational leadership team?
10    A.  I don't think I was a part of this, no.
11    Q.  Does this e-mail look familiar to you at
12 all?
13       And it has a PowerPoint attachment to it.
14    A.  (Reviewing document.)
15       I don't specifically remember this e-mail.
16 I don't know if I'm a part of the operational
17 leadership team or not.
18    Q.  Okay.  Do you have a recollection of there
19 being discussions about how business was going into
20 three buckets, which is sort of reflected in the
21 PowerPoint?
22    A.  Well, at least from the e-mail perspective,



DAVID WOLF  
ABREY V. STEAMPUNK HOLDINGS  
April 14, 2023

Page 61

1  right, and to my comments, right, net new versus
2  expansion, right?  That's what I'm talking about.
3  So expansion was my example of growing something to
4  hundred million.  He considered that expansion.
5      Even if it was new services -- you know, if
6  this bucket had -- was doing one thing, but we added
7  a hundred million dollars of something different, he
8  still considered that expansion.  So that part, at
9  least, I'm clarifying.
10     I vaguely remember these buckets, yes.
11  Q.  Do you remember --
12  A.  But I don't remember this e-mail.
13  Q.  Okay.  Well, do you remember this concept
14  of net new, expansion, and renewal being sort of
15  different?
16  A.  This is pretty standard.
17  Q.  Okay.  Well, so was this also sort of what
18  was in place from the beginning?
19  A.  I don't think we had the pictures of the
20  buckets from the beginning, but --
21  Q.  Well, setting aside the pictures, but the
22  concepts?

Page 62

1  A.  Yes.  Again, he was very -- I understand
2  what net new, renewal, and expansions are.  This is
3  when you're recompetes.  This is grow a $10 million
4  contract to a hundred.  And this is go win something
5  new that we didn't have yesterday.
6  Q.  Okay.  When did -- when did you learn
7  that Steampunk had terminated Kate Abrey?
8  A.  The day it happened.
9  Q.  How did you find out about it?
10  A.  She called me.
11  Q.  What did she tell you?
12  A.  I was just fired.
13  Q.  Did she tell you anything other than that?
14  A.  No.  I was terminated.
15     It was mostly consoling her, I'm very
16  sorry.  Shock and awe.  I think it lasted maybe two
17  or three minutes, and then we moved on.  She hung up
18  and did whatever she did next.
19  Q.  Okay.  So you didn't have any discussion
20  with her as to why she was fired?
21  A.  If we did, I don't remember what it
22  detailed.  But I do remember she called me

Page 63

1  immediately -- or I don't know if I was first or
2  tenth in that list, but she called to tell me that
3  Matt Warren had fired her and that she was upset --
4  I won't say visibly, because we were on the phone,
5  but I could sense her being very upset.
6  Q.  Did she ever tell you, while you -- before
7  she was terminated, did she ever tell you that she
8  believed that she was being discriminated against?
9  A.  Not to my recollection.
10  Q.  Did she ever tell you -- never mind.
11     At any point in time, did you ever have a
12  conversation with her where she said that she
13  thought she had been discriminated against while at
14  Steampunk?
15  A.  I think there may have been a conversation
16  at some point after her departure, but I couldn't
17  recollect a time or a place, you know, as to
18  where -- you know, to pin that down to a day.  I
19  believe we had that conversation, yes.
20  Q.  How about the substance?  Do you remember
21  what the substance of that conversation was?
22  A.  I don't remember a long conversation, but

Page 64

1  something along the lines of how it changed from
2  before she left to, you know, how it was when she
3  returned.
4  Q.  Did she explain to you why she thought that
5  was discriminatory?
6  A.  No, not to my recollection.
7  Q.  How about did she ever discuss with you
8  that she believed that she was being retaliated
9  against?
10  A.  I don't know that we used the word
11  "retaliation."
12     Her -- what I would describe are the
13  substance of our conversation is:  Prior to when
14  Mr. Warren had her come in, he -- to the larger
15  audience, right, not only -- I shouldn't say
16  Mr. Warren.  The entire company, who had worked with
17  Kate before, described all of her virtues and how
18  amazing a person she was.  As we approached her
19  departure, that was not the case, right?
20     There was a palpable change in the
21  environments as to -- you know, I could sense
22  pressure, as we discussed, right?  And the



Page 85

1 people?
2    A.  I wouldn't say he had a tendency.
3        There are many different management styles,
4 right?  There are those that mentor.  You know,
5 like, I would consider Kate more of a mentor.  Let
6 me show you how to get there.  Let me help you.
7        She kind of changed my management style,
8 especially with COVID.  She helped me learn to deal
9 better with customers, especially if you're not
10 walking the halls, and it has made me extremely
11 successful in this opportunity, right?  It has
12 worked for me.
13       Matt's more of a pressure down, put fear,
14 right?  And that's not a bad management style.  I'm
15 not making it a negative.  That's just his.
16    Q.  Did you witness him call other people
17 names, like idiot, or anything like that?
18    A.  I don't think it was frequent.  It's the
19 only one that stands out in my mind.
20       I mean, he put immense pressure.  It was a
21 commonly known thing.  I don't want to make it sound
22 like it was just me, right?  I think he and I may

Page 86

1 not have always saw eye to eye.  It might have been
2 personal.  I can't say for certain, right?  Again, I
3 don't know what's in his head.  But I don't remember
4 him doing that on a frequent basis.
5    Q.  Was the environment at Steampunk one in
6 which employees would feel comfortable raising
7 complaints?
8    A.  No.
9        MR. WILKINSON:  Objection.
10       BY MR. PELICCI:
11    Q.  Why is that?
12    A.  It was a high-pressure environment.  I -- I
13 did not feel comfortable -- actually, I will take
14 that answer, but I don't know what other people
15 felt.  I did not feel I had the ability to speak up
16 and speak my mind.
17    Q.  Did anyone ever express to you that they
18 also didn't feel like they could voice concerns?
19       MR. WILKINSON:  Objection.
20       THE WITNESS:  Not to my recollection.
21       BY MR. PELICCI:
22    Q.  Did you regularly interact with

Page 87

1 Mr. Harllee?
2    A.  You've got to define "regularly" for me.
3    Q.  Maybe you can describe your level of
4 interaction with Mr. Harllee.
5    A.  I would say more than Mr. Warren, less than
6 Ms. Abrey.  We would talk on occasion, yes.  Once or
7 twice a month, if that helps, maybe.
8    Q.  Did you witness any type of decline in
9 Ms. Abrey's standing in the company over the course
10 of her employment?
11       MR. WILKINSON:  Objection.
12       THE WITNESS:  Ask a different question, or
13 if you help clarify decline in her standing.
14       BY MR. PELICCI:
15    Q.  Sure.  Did Ms. Abrey appear to be in the
16 inner circle of leadership prior to going out on
17 maternity leave?
18       MR. WILKINSON:  Objection.
19       THE WITNESS:  Yes.
20       BY MR. PELICCI:
21    Q.  And, upon her return from maternity leave,
22 did that change?

Page 88

1    A.  Not that I could tell.
2    Q.  So Ms. Abrey was still -- appeared to still
3 be in the inner circle?
4    A.  From my perspective, she was still a part
5 of the leadership team, yes.
6    Q.  And did Ms. Abrey voice to you any concerns
7 about her role changing at all?
8    A.  As I said, I don't -- I don't believe so.
9 Not to my recollection.
10       Again, I think that would be inappropriate
11 for her to talk to a subordinate, and she's a pretty
12 professional person.
13    Q.  Going to Ms. Abrey's termination, did
14 anybody -- were there discussions about why
15 Ms. Abrey was terminated?
16    A.  I'm sure we did.  I don't have any
17 recollection of those conversations, but I would
18 have to imagine that came up.
19       Again, the only one that I can reference
20 that I know that was a common company discussion was
21 the messaging about she was terminated, but saying
22 that she decided to leave.



Page 97

1 THE WITNESS: I don't -- I can't --
2 BY MR. PELICCI:
3 Q. Did he ever explain to you why?
4 A. No.
5 Q. Okay.
6 A. Well, let me rephrase: If he did, I don't
7 recall, right? I understand the logic of it, right?
8 If you get in and you get one, what they had done at
9 Agilex, the way he explained it previously, is that
10 can grow into something bigger.
11      I don't see the difference, in my
12 perspective, whether you win a hundred -- a
13 hundred-thousand-dollar deal or a million-dollar
14 deal. A deal is a deal to me.
15      If he explained it, right, that's the logic
16 I just gave you, but I don't know that I necessarily
17 saw the difference in between the two.
18      MR. PELICCI: Okay. I think that's it.
19 Thank you.
20      THE WITNESS: Thank you.
21      MR. WILKINSON: Okay. I don't have
22 anything further.

Page 98

1 MR. MOORE: He will read.
2 (Reading and signature not waived.)
3 (Off the record at 5:27 p.m.)

Page 99

1 COMMONWEALTH OF VIRGINIA, to wit:
2      I, Audra A. Gilbert, before whom the
3 foregoing deposition was taken, do hereby certify
4 that the within-named witness personally appeared
5 before me at the time and place here set out, and
6 after having been duly sworn by me, according to
7 law, was examined by counsel.
8      I further certify that the examination was
9 recorded stenographically by me, and this transcript
10 is a true record of the proceedings.
11      I further certify that I am not of counsel
12 to any party, nor an employee of counsel, nor
13 related to any party, nor in any way interested in
14 the outcome of this action.
15      As witness my hand and notarial seal this
16 day of      , 2023.
17
18
19      AUDRA A. GILBERT, Notary Public
20      Notary Registration No-7328582
21
22 MY COMMISSION EXPIRES: JUNE 30, 2026

Page 100

1      DEPOSITION ERRATA SHEET
2 Case Caption: Kathleen Abrey v. Steampunk Holdings
3 Deposition Date: April 14, 2023
4 Witness: David Wolf
5      DECLARATION UNDER PENALTY OF PERJURY
6 I declare under penalty of perjury that I have read
7 the entire transcript of my Deposition taken in the
8 captioned matter or the same has been read to me,
9 and the same is true and accurate, save and except
10 for changes and/or corrections, if any, as indicated
11 by me on the DEPOSITION ERRATA SHEET hereof, with
12 the understanding that I offer these changes as if
13 still under oath.
14 Signed on the _____ day of_____, 20____.
15 _____
16 (Witness)
17 Subscribed to and sworn before me this _____
18 day of_____, 2023, in _____
19 _____
20 Notary Public
21 My commission expires _____,
22 Notary No. _____

