**EXHIBIT 60**



# Office of the Attorney General - Office of Civil Rights
202 North Ninth Street · Richmond, VA 23219 · Office: (804) 225-2292 Fax: (804) 225-3294

**Complaint Questionnaire**

*The information requested on this form will help us to help you. The information submitted will determine whether your complaint will be investigated. Filing with this office does not preclude you from filing with other Federal or State Agencies. Please be specific in your responses and indicate the month, day, and year of the alleged discriminatory actions.*

### 1. Personal Information.

Name: **Kathleen** (First)        **Abrey** (Last)

Street or Mailing Address: [redacted]

City/County: **Arlington**    State: **VA**    Zip Code: **22201**

Home Number: (   )   -        Work Number: (   )   -

Mobile/Cell Number: [redacted]    E-mail Address: [redacted]

Time to be contacted [Day(s) and Time(s)]: You can contact me through my attorney, Ellen Marcus, Monday - Friday during business hours

Date of Birth: [redacted]    Age: **41**    Sex: **Female**

Race/Ethnicity:  ☐ African American/Black   ☐ American Indian   ☐ Asian/Pacific Islander
                 ✔ Caucasian/White           ☐ Hispanic/Latinx    ☐ Other: _____

Person to contact if you cannot be reached: **Please contact me through my attorney Ellen Marcus**

Street or Mailing Address: **Holmes Costin & Marcus 301 N. Fairfax St., Ste. 202, Alexandria, VA 22314**

Telephone(s): (**703**) **991** - **7951** ; (   )   -     Relationship to you: **Attorney**

### 2. I believe that I was discriminated against by a(n): (check any that apply)

■ Employer    ☐ Employment/Staffing Agency    ☐ Union    ☐ Real Estate Agent/Landlord
☐ Educational Institution   ☐ Place of Public Accommodation   ☐ Other: _____

If an Employer, how many employees does the company employ at all of its locations? **300+**

**ATTENTION:** This complaint must be filed with the Office within the time limits imposed by law. Answer all questions completely, and please attach additional pages if needed to complete your response. If you do not know the answer to a question, please answer by stating "not known." If a question is not applicable, write "N/A." When we receive this form, we will review it to determine whether we or another agency has jurisdiction and refer it appropriately.

— FOR OFFICIAL OCR USE ONLY —

EXHIBIT
Abrey
5
4/5/23

**2.a. Organization contact information:** *If the organization is an employer, please provide the address where you actually worked. If you worked from home, check here ☐ and provide the address of the office to which you reported.) If more than one employer is involved, please attach additional sheets.*

Name of Organization: **Steampunk Holdings, Inc.**

Street or Mailing Address: **1753 Pinnacle Drive, Ste 900**

City: **Mclean**    State: **VA**    Zip Code: **22201**

Phone: ( **571** ) **395** - **8000**    Type of Business: **Government Contracting**

Name of Owner/Manager/ Human Resources Director: **Carolyn Muir is the General Counsel**

Job location if different from the above address: _____

3. **What is the reason (basis) for your claim of discrimination?** *(Example: If you feel you were treated worse that someone else because of your race, check the box next to Race. If you feel you were treated worse for several reasons, you should check each box that applies. If you complained about discrimination, participated in someone else's complaint, or filed a complaint or charge of discrimination and a negative action was threatened or taken by your employer, you should check the box next to Retaliation.*

☐ Race    ☐ Color    ☐ National Origin    ☐ Disability    ☐ Veteran Status

☒ Sex    ☐ Sexual Orientation    ☐ Gender Identity    ☐ Religion    ☐ Age

☒ Pregnancy    ☒ Childbirth or related medical condition    ☐ Genetic Information*

☐ Marital Status    ☒ Retaliation

*If you checked Genetic Information, circle the type(s) of genetic information involved:
  i. Genetic testing    ii. Family medical history    iii. Genetic services (counseling, education, or testing).

*How was the genetic information obtained? _____

If you checked Color, National Origin, or Religion, please specify: _____

Other reason (basis) for discrimination (Explain): _____

If your complaint involves employment, please answer the following questions:

What date were you hired? **05** / **15** / **2019**    What was your job title at hire? **Executive Vice President and General Manager**

What was your job title at the time of the alleged discrimination? **Executive Vice President and General Manager**

What was the date you quit or were discharged? **January** / **14** / 20**21**

Name and Title of your immediate supervisor? **Matt Warren, Chief Executive Officer**

4. **What happened to you that you believe was discriminatory?** *(For example in employment, denied promotion, terminated, etc.). Include the date of the alleged discrimination, a description of the actions taken, the name and title of each person who you believe discriminated against you. Please be specific and attach additional pages if needed. (Example: 01/01/2020 – Terminated by John Doe, Production Supervisor)*

I believe that Steampunk discriminated and retaliated against me by demoting and ultimately terminating my employment because of my pregnancy and childbirth, and because I complained of such discrimination against myself and others. Steampunk demoted me the day after I returned from maternity leave, and terminated me a few months later, just one day after I complained about Steampunk's refusal to offer unpaid maternity leave to a highly qualified job candidate.

A fuller description of events, including the date of the alleged discrimination, a description of the actions taken, and the name and title of each person whom I believe discriminated and retaliated against me are set forth in the attached letter from my attorney to your office.

5. **What reason(s) (if any) was given for the action taken against you?**

Upon terminating me, Steampunk claimed that I was a "bad cultural fit" for the office.

In contemporaneous and later correspondence, they also cited "performance issues."

Further details regarding the reason(s) offered by Steampunk are set forth in the attached letter from my attorney.

6. **Describe any person who was in the same or similar situation as you and how they were treated.** For example, who else applied for the same job you did, had the same attendance record, or the same performance. For each person identified, provide their name, race, sex age, national origin religion, or disability if known and it relates to your claim of discrimination. Use additional sheets if necessary.

As set forth in the attached letter, Steampunk also discriminated against a highly qualified job candidate because she requested unpaid maternity leave. The day after I urged Steampunk to offer unpaid maternity leave to the applicant, Steampunk advised that I was not a "good cultural fit" and that my employment was terminated.

**7. If you are claiming discrimination based on disability, please answer the following questions:**

☐ I have a disability    ☐ I do not have a disability now but I did have one    ☐ No disability but I am treated as if I am disabled

What is the disability that you believe is the reason for the adverse action taken against you? Does this disability prevent you from doing anything? (Example: lifting, sleeping, breathing, walking, working, etc.)

_____

_____

Do you use medications, medical equipment or anything else to lessen or eliminate the symptoms of your disability? _____

Did you ask your employer for any changes or assistance to do your job because of your disability? _____

If yes, when did you ask? _____    Did you ask verbally or in writing? _____

Who did you ask (name and job title)? _____

Describe the assistance you requested? _____

How did your employer respond? _____

**8. Have you filed a complaint with any other state and/or federal agency?** ☐ Yes  ■ No

If yes, identify the agency and date of filing: _I have not, but intend to file a similar complaint with the EEOC shortly._

**9. Have you sought help about this situation from an attorney, union, or other source?** ■ Yes   ☐ No

If yes, please provide their name, address, and telephone number: _Ellen Marcus, Homes Costin & Marcus PLLC_
**301 N. Fairfax Street, Suite 202, Alexandria, VA, 22314; 703-991-7951**

I understand that by returning this completed questionnaire to your office, I have filed on official complaint with the Office of Civil Rights. However, this does not mean that the complaint will be accepted for investigation. If accepted for investigation, The Office will notify the person or organization that I have named in my complaint. I declare under penalty of perjury that the information provided herein is true and correct to the best of my knowledge.

_[signature]_                                    6/30/21
Signature                                         Today's Date



**HOLMES COSTIN MARCUS** PLLC

Ellen D. Marcus
(Licensed in Virginia and the District of Columbia)
emarcus@hcmlawva.com
direct: 703.991.7951

June 30, 2021

**BY FEDERAL EXPRESS**

Office of the Attorney General – Office of Civil Rights
202 North Ninth Street
Richmond, Virginia 23219

Re: **Kathleen Abrey's Complaint of Discrimination against Steampunk Holdings, Inc.**

Dear Office of Civil Rights:

We represent Kathleen Abrey in connection with her complaint of discrimination against her former employer, Steampunk Holdings, Inc. This is an attachment to the completed Complaint Questionnaire we are filing on her behalf today, and addresses Question Nos. 4, 5 and 6 of the Questionnaire.

As set forth in detail below:

- Steampunk's termination of Ms. Abrey's employment on January 14, 2021 was discriminatory and retaliatory in violation of Virginia law, including Virginia Code §§ 2.2-3095(B)(1)(a), (B)(2), and (B)(6).

- Steampunk terminated Ms. Abrey's employment due to her pregnancy, childbirth or related medical conditions, and in retaliation for Ms. Abrey having complained about Steampunk's unlawful discrimination against her and others.

- Steampunk demoted Ms. Abrey on the day she returned from maternity leave due to her pregnancy, childbirth or related medical conditions. The demotion materially reduced Ms. Abrey's terms, conditions and privileges of employment, in violation of Virginia law. It is evidence of Steampunk's discriminatory intent.

301 North Fairfax Street | Suite 202 | Alexandria, Virginia 22314



Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 2 of 9

- Ms. Abrey had previously complained that Steampunk's demotion of her was discriminatory, and that its refusal to hire a highly qualified job applicant because she asked for unpaid maternity leave was discriminatory. Steampunk's termination of Ms. Abrey's employment occurred one day after she complained of the discrimination against the job applicant.

\*\*\*

### Steampunk's Aggressive Recruitment of Ms. Abrey To Be A Key Part of Its Foundation

In the beginning, Steampunk recognized Ms. Abrey for the high-performing executive that she is. Her excellence in building and managing complex businesses was on full display for Steampunk's CEO and founder Matt Warren when he and Ms. Abrey worked closely together at Accenture starting in 2015. Mr. Warren saw Ms. Abrey grow Accenture's TSA business to $100 million in annual revenue in three years. At the time, Accenture's TSA business was within the DHS group that Mr. Warren supervised, and Ms. Abrey was a Managing Director. When Mr. Warren was promoted, Ms. Abrey was promoted to Mr. Warren's job heading the DHS group.

Mr. Warren was so impressed by Ms. Abrey's work that he often told her that he wanted to start another company with her. In 2018, when Mr. Warren became more serious about forming the company that eventually became Steampunk, he told Ms. Abrey that he envisioned her being his "number two" and that she would eventually assume his role as CEO. Mr. Warren was so certain of Ms. Abrey's singular skills and talents that he stated that, if she did not agree to join him, he likely would not start the company.

Mr. Warren's sustained campaign for Ms. Abrey to join him in a new venture worked. Once she agreed, he orchestrated their resignations so as not to arouse any suspicion that he had violated his restrictive covenants with Accenture. However, Accenture did not want to lose Ms. Abrey. They countered her January 2019 notice of resignation with an offer that she run the West Coast Region of their Health and Public Service business. This would have been a major promotion for Ms. Abrey. After careful consideration, Ms. Abrey turned the offer down, and walked away from what would have been an annual cash salary of almost $800,000 (up from approximately $500,000).

To join Mr. Warren at Steampunk, Ms. Abrey also had to walk away from unvested stock she had earned at Accenture worth about $500,000. Ms. Abrey made this short-term sacrifice of salary and equity because of the combination of Mr. Warren's promises that she would be his "number two" until assuming his role as CEO, and that she would have a significant equity stake in the new company. The intent was to sell the company within five to seven years, after Ms. Abrey became CEO, at a minimum price of $4 per share.



Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 3 of 9

Because Ms. Abrey and Mr. Warren were friends as well as colleagues, they had both professional and personal discussions. He therefore knew that, during their years working together at Accenture, Ms. Abrey had undergone multiple IVF procedures, all of which failed, culminating in her fertility specialist advising her that she was unlikely ever to carry a pregnancy to term. Ms. Abrey did not realize it at the time, but it is now evident that, on top of her stellar credentials and track record as a business executive, not being able to give birth was a job requirement for Steampunk's founder and CEO.

**Ms. Abrey Served in Steampunk's Top Leadership Trio until She Announced Her Pregnancy**

Ms. Abrey started at Steampunk (then called SE Solutions) on May 15, 2019 as Executive Vice President and General Manager. She was the most senior woman in the company, which has few women in leadership roles. On May 29, 2019, the company issued a press release announcing that Mr. Warren and John Harllee had been appointed to lead the company as "Co-Chief Operating Officers," and "Ms. Abrey has been named as Executive Vice President and General Manager for the Emerging Markets Sector." The three of them were featured together in a photograph accompanying the announcement. Mr. Warren said that he wanted the announcement to signal to the company that Ms. Abrey was in this most senior leadership team of three. To that end, Mr. Warren also arranged that this top leadership trio shared an office together in Tysons Corner.

Steampunk structured Ms. Abrey's job and responsibilities to maximize her impact as EVP and General Manager, while also accounting for her one-year non-compete agreement with Accenture. Initially, she was responsible for the P&L of the Civilian business. After the first year, she would also be responsible for the DHS business. Senior Vice Presidents running those businesses would report to her. When Ms. Abrey arrived, Mr. Warren told her that her first priority was to find the right Senior Vice President to run the Civilian business and report to her.

Ms. Abrey hit the ground running. Within three months, she recruited Max Licht from Salesforce and hired him to be Senior Vice President for the Civilian business. Ms. Abrey also negotiated the hires of other key personnel of the Civilian business, which laid the foundation for the growth in the business that has occurred since. Ms. Abrey also helped set the stage for a successful DHS business by recruiting former DHS Secretary Kevin McAleenan for Steampunk's Board of Directors.

For his part, Mr. Warren recruited Diane Ashley to run the DHS business as a Senior Vice President. He was almost immediately disappointed, and asked Ms. Abrey to work with Ms. Ashley behind the scenes, even while Ms. Abrey had to be mindful of her non-compete obligations. With Ms. Abrey's guidance, Ms. Ashley secured the first new piece of business at TSA for several



Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 4 of 9

million dollars. Ms. Abrey also worked with David Wolf, who headed Steampunk's business at the Department of Commerce. Mr. Warren told Ms. Abrey that he was concerned about Mr. Wolf's performance and asked her to help. Ms. Abrey worked to reshape Mr. Wolf's role and focus at the company. Together, they positioned Steampunk to be awarded a multi-billion-dollar development contract.

**Steampunk Demoted Ms. Abrey the Day She Returned from Maternity Leave and Eventually Terminated Her for Her Pregnancy**

Against odds and without trying to become pregnant, Ms. Abrey realized she was expecting a child shortly after joining Steampunk. She did not announce her pregnancy until August 2019. Her team reacted with shock, as they (like she) did not think she could get pregnant. During the months leading up to delivery, Ms. Abrey met the demands of her job while simultaneously managing a difficult pregnancy. She assured Steampunk that she was committed to the company and would do her best to minimize the impact of her pregnancy on her work. She succeeded in this and did not take any time away from the company during her pregnancy. Nevertheless, offhand comments by Mr. Warren and Mr. Licht caused her to have doubts about how Steampunk management would react to her pregnancy and motherhood. Ms. Abrey approached Mr. Harllee with her misgivings, and he assured her that her job would be waiting for her when she returned from maternity leave.

In October 2019, the senior leadership team met offsite in Savannah, Georgia to discuss goals for the following year. Ms. Abrey was responsible for assisting the Civilian, DHS and Commerce teams prepare their business strategies and financial objectives for presentation at the meeting. She was uniformly praised for this work. At that meeting, the senior leadership team set the company's financial targets for 2020.

Ms. Abrey worked up until the day she gave birth to her son on January 23, 2020. Steampunk does not offer maternity leave—a stunning omission for a company of its size in the twenty-first century—so, following the delivery, Ms. Abrey took six weeks of short-term disability at 60% pay. After that, she took leave without pay until May 1, 2020.

Ms. Abrey was willing to return earlier, but Mr. Warren encouraged her not to return until her non-compete with Accenture had expired. He similarly rejected Ms. Abrey's offer to come back earlier on a part-time basis, and made several comments during this time that she could take off as much time as she wanted provided that she was ready to really "work" upon her return. Mr. Warren went so far as to direct Ms. Abrey not to speak to anyone about company business during her leave. Multiple Steampunk employees were calling her regularly during her leave to check in and for advice. Mr. Warren instructed them not to contact her, claiming it would jeopardize her leave, which makes no sense as she was on leave without pay.



Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 5 of 9

**On the day Ms. Abrey returned from maternity leave, Steampunk demoted her.** Mr. Warren directed her to speak to no one that day until she first met with him, Mr. Harllee and Scott Larose (an investor in Steampunk). At that meeting, they told her that she would no longer be responsible for the profit and loss of the Civilian business and that Mr. Licht (whom she had recruited and had been reporting to her) would be running that part of the company. When Ms. Abrey pointed out that this was a demotion, Mr. Warren insisted that it could not be a demotion because she would have the same title and salary as before. Of course, this is false. Ms. Abrey's authority and responsibilities were substantially reduced when the Civilian business was taken away from her. That *is* a demotion, as the rank and the file of the company readily appreciated. One senior project manager expressed confusion about the revised organization structure, correctly noting that Ms. Abrey had once been overseeing everything except DoD and now suddenly was not.

Steampunk has since claimed that Ms. Abrey was never in charge of the Civilian business. This is false, Steampunk's own records will show.

The demotion was more than a reduced portfolio. Ms. Abrey was ousted from the senior leadership trio upon her return. She was cut out of conversations and decision-making that she was central to before her maternity leave. Mr. Warren all but stopped calling or texting Ms. Abrey informally, as he had in the past. Anticipating a return to the office once the pandemic subsided, Steampunk announced in December 2020 that Ms. Abrey would no longer be sharing an office with Mr. Warren and Mr. Harllee. Ms. Abrey expressed to Mr. Harllee that she feared that her prediction came true that her job would suffer for having been away from the company for maternity leave. He acknowledged that she was right.

Not only did Steampunk demote Ms. Abrey the day she returned from maternity leave, it laid the groundwork for manufacturing a "reason" for her eventual termination. Ms. Abrey was now solely responsible for the part of the company that senior leadership openly referred to as the "Island of Misfit Toys." Taking the Civilian business away from Ms. Abrey mid-year also ensured that she would no longer be recognized for her contributions to the profitable part of the company that she had been charged with *before* her maternity leave, even though she had set it up to thrive. Now, a man she had hired to report to her on that business would get the credit for it.

In July 2020, just two months after the demotion, Mr. Warren, Mr. Harllee and Mr. Larose met with Ms. Abrey. During the meeting they reiterated that her new role was to run only DHS and Commerce. They asked her to describe her plan for achieving the DHS and Commerce numbers for the year. Confused by this, Ms. Abrey pointed out that she had just returned from leave, and had only just been told that she was solely responsible for those businesses. Furthermore, until May, she could not even work to directly expand the DHS business because of her non-compete. As people who work in government contracting know, results are not instant. It usually takes


HOLMES
COSTIN
MARCUS

Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 6 of 9

about nine months to close new work. In fact, this is exactly what wound up happening with the potential deals Ms. Abrey was working on at the time. We understand that, since Steampunk unlawfully terminated Ms. Abrey, it has closed four prime contract deals she had been working on totaling more than $1.1 billion. But Messrs. Warren, Harllee and Larose rebuffed Ms. Abrey's concerns, and Mr. Warren even ticked off a list of reasons (apparently one he had prepared in advance) for her to be thankful that she had a job after returning from maternity leave.

Despite the demotion and impossible demands, Ms. Abrey pressed ahead and worked hard in a short period of time to improve the performance of DHS and Commerce for the second half of 2020. She put together a plan and presented it to the leadership team in August. Except for the net new sales target, Ms. Abrey largely succeeded in executing her plan. Mr. Warren refused to recognize this, even though Mr. Licht had achieved similar results the prior year and was praised for them.

Ms. Abrey did not realize it at the time, but Steampunk did not want to undermine its pretext for her eventual termination. Thus, when Ms. Abrey successfully worked with the DHS Senior Vice President Ms. Ashley to add new work to an existing contract, she was told that the work did not count as net new business. Likewise, when the two captured a new contract at TSA and doubled the pipeline of new work by the end of September, Ms. Abrey was told it did not count. When Ms. Abrey returned to Mr. Harllee for advice on how she might again have a good working relationship with Mr. Warren, he assured her that there was no issue with her performance, which was true.

Meanwhile Steampunk moved the goal posts again. In December 2020, Steampunk adopted a new standard for quarterly forecasts and new definitions for sales. Prior to that, teams were encouraged to develop quarterly "forecasts" for weekly discussions. Mr. Warren had directed Ms. Abrey and other leadership to use the forecast sessions to push their teams to overachieve. In December, however, Mr. Warren advised Ms. Abrey that forecasts were now "commitments" to the company. He also applied the new definitions for sales retroactively, so that the new work Ms. Abrey had brought to the business would not count towards the net new sales forecast. Also in the fourth quarter of 2020, Steampunk renamed Ms. Abrey's post-leave portfolio and added DOJ to it.

During the holidays in December 2020, Ms. Abrey interviewed a woman to join Steampunk's design team. Ms. Abrey thought the candidate would be a great fit for Steampunk, so she advocated hiring her. So did others. Steampunk extended an offer of employment. Ms. Abrey had learned in the course of the interviews that the candidate was trying to get pregnant through IVF treatments. The candidate told Ms. Abrey she wanted written assurance that, if she joined Steampunk, she could take leave without pay—as Ms. Abrey had—when her child was born. Ms. Abrey tried to secure this written assurance for the candidate and was immediately met with



Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 7 of 9

resistance. Steampunk's head of HR and Mr. Harllee said that Steampunk's General Counsel (Carolyn Muir) did not want to set such a precedent.

Ms. Abrey pressed ahead for creative solutions to address the job candidate's concerns. She even offered to work with the head of HR to extend maternity benefits to employees, as that is critical for attracting the best female talent. On the evening of January 12, an *ad hoc* group convened to address the job candidate's concerns about maternity benefits and arrived at a creative solution involving having the candidate initially join Steampunk as an independent contractor. Ms. Abrey added this to the agenda for her weekly meeting with Mr. Warren and Mr. Harllee the next day.

On the afternoon of January 13, Ms. Abrey met with Mr. Warren and Mr. Harllee for their regular weekly meeting. They talked about an e-mail Mr. Warren sent earlier that morning, supposedly addressing Ms. Abrey's performance going into the first quarter of 2021. Mr. Warren claimed that Ms. Abrey's portfolio had underperformed for six quarters. Ms. Abrey pointed out that she had only been charged with that portfolio (DHS and Commerce) for two quarters. Mr. Warren also asked what she had done before maternity leave and she described her achievements. He said he disagreed but did not say why and announced that 2021 Q1 would be Ms. Abrey's last chance to keep her position at Steampunk.

The three then talked about the job candidate and the creative solution for hiring her and extending unpaid leave should she have a baby. Mr. Harllee expressed misgivings about hiring the job candidate as proposed, stating that he did not want to set the precedent for extending unpaid maternity leave, and he worried about client perception if she were to go on leave. When Ms. Abrey asked if he was concerned about maternity leave in particular, Mr. Harllee rolled his eyes and said no. Ms. Abrey observed that Mr. Warren and Mr. Harllee were both texting when he said this.

Ms. Abrey reached out to Mr. Warren early the next morning for a call. He called her at 9 a.m. She said that she understood from him that first quarter performance was important. He cut her off and said it was time to end things. He told Ms. Abrey that she was not "a good cultural fit," and that she was "cold and transactional." Just the day before, he had accused her of being "too nurturing." Steampunk sent Ms. Abrey the severance offer a few days later.

**Steampunk Unlawfully Discriminated and Retaliated against Ms. Abrey**

That Steampunk demoted Ms. Abrey the *day after* she returned from maternity leave is direct evidence of discriminatory intent. The evidence—including performance reviews, e-mails and text messages—would further show:



Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 8 of 9

- Steampunk hired Ms. Abrey to be its next CEO, believing at the time that she could not carry a pregnancy to term. When she did become pregnant and have a baby, Steampunk immediately demoted her, marginalized her and banished her to the "Island of Misfit Toys."

- In demoting her, Steampunk replaced Ms. Abrey as the head of the Civilian business with a man (Max Licht) whom she hired and had previously reported to her.

- As a result of Ms. Abrey's demotion, the most under-performing businesses in the company suddenly became her sole responsibility, and credit for the highest-performing business suddenly was allocated to Max Licht.

- Steampunk's CEO and COO became antagonistic towards Ms. Abrey when she became a mother. Mr. Warren and Mr. Harllee regularly accused her of being "too nurturing," even though they accused her at other times of being "cold and transactional." They openly lamented their perceived loss of her pre-motherhood "sharp elbows."

- During meetings after Ms. Abrey returned from leave, when Steampunk employees had to work from home due to the pandemic, Mr. Warren regularly asked Ms. Abrey to mute her phone when her newborn cried, even when she was in mid-sentence and even though the baby was in another room with a nanny. Mr. Warren also made belittling comments when he detected noise from breast pumps.

- Mr. Warren has said that he never understood why men take paternity leave because all they do during it is watch their wives breastfeed.

- Within 24 hours of saying that Ms. Abrey would have the first quarter of 2021 to demonstrate her performance with the new portfolio, Steampunk fired her. The only thing that happened in the interim was Ms. Abrey's making the suggestion to extend leave *without pay* to a job candidate whom all agreed had the right set of skills for the job, but who also said she was trying to have a baby.

- Steampunk has over 300 employees, earned $40 million in revenues last year and pays its CEO more than $400,000 annually, but refuses to extend maternity benefits to women.

- Steampunk has about 20 leadership roles but has never filled them with more than three women at any given time.

- Ms. Abrey never received a negative performance review before she took maternity leave. On the contrary, her reviews were uniformly positive.



Office of Attorney General
Office of Civil Rights
Richmond, Virginia
June 30, 2021
Page 9 of 9

- Ms. Abrey's pre-maternity leave portfolio, which included the Civilian business, met the 2020 financial targets that senior leadership set at the Savannah meeting. Ms. Abrey made material contributions to that success.

- Despite every obstacle thrown at her by Steampunk leadership, Ms. Abrey brought her post-maternity leave portfolio just shy of meeting the 2020 financial targets set at the Savannah meeting.

- Ms. Abrey had only two quarters to work on her post-maternity leave portfolio, which was notoriously and chronically under-performing. It generally takes nine months to secure a government contract, and Ms. Abrey could not lawfully or ethically work in the DHS space until May 2020. Despite this, in a short time, Ms. Abrey successfully led the businesses in her portfolio to better performance, and lined-up new work for the pipeline.

- Co-workers and clients have said they were shocked and appalled that Steampunk forced Ms. Abrey out. Ms. Ashley, who was the most senior woman at Steampunk after Ms. Abrey, resigned in protest over it.

Very truly yours,

Ellen D. Marcus

301 North Fairfax Street | Suite 202 | Alexandria, Virginia 22314